IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GERMAIN BROWN                       :
                                    :
                                    :
                                    :
                                    :
                                    :
             Plaintiff,             :
                                    :        CIVIL ACTION
v.                                  :        FILE NO.:  1:19-cv-01233-TCB
                                    :
ACE AMERICAN INSURANCE              :
COMPANY, and GALLAGHER              :
BASSETT SERVICES, INC.,             :
                                    :
                                    :
             Defendants.            :

**PLAINTIFFS' EXPERT DESIGNATION AND REPORT DISCLOSURE**

COMES NOW, Plaintiff Germain Brown and hereby makes this expert

witness designation and report disclosure pursuant to Federal Rule of Civil

Procedure 26(a)(2)(B).

The following persons may be used to present evidence at trial under Federal

Rule of Evidence 702, 703 or 705:

1)    Frederick C. Berry, Jr., JD, CPCU, CLU
      Frederick C. Berry, Jr.
      A Professional Corporation
      Suite 200
      1951 West Camelback Road
      Phoenix, Arizona 85015
      602-274-5700

Mr. Berry's report and CV are attached hereto as Exhibit A.

This 17th day of January, 2020.

Respectfully submitted,

_____
DAVID L. BOOHAKER
Georgia Bar No. 159043
MCDONALD LAW FIRM, P.C.
3100 W. 7th Street, Suite 230
Fort Worth, Texas 76107
(817) 717-5081 telephone
(817) 717-5082 facsimile
david@mcdonaldlawfirm.com

_____
Benjamin O. Bengtson
Georgia Bar No. 122973
THE LAW FIRM OF BENJAMIN O.
BENGTSON
1100 Circle 75 Parkway Suite 460
Atlanta, GA 30339
Telephone: (404) 596-5518
Facsimile: (404) 596-5519
ben@boblawfirm.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I certify that this Motion complies with the font and point selections set forth in Local Rule 5.1B.  This Motion has been prepared using Times New Roman font (14 point).

_____
DAVID L. BOOHAKER

_____
BENJAMIN O. BENGTSON

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AFFINITY ROOFING, LLC,<br>a/a/o LARRY FRIEDMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | FILE NO.:  1:19-cv-00155-WMR |
| | : | |
| AMICA MUTUAL INSURANCE | : | |
| COMPANY, a foreign corporation, | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was e-filed and served in accordance with the Georgia Rules of Civil Procedure to all attorneys of record in this cause on this 10th day of September, 2019 as follows:

Kenan G. Loomis
Georgia Bar No. 457865
COZEN O'CONNOR
1230 Peachtree Street, NE, Suite 400
Atlanta, GA 30309
Telephone: 404-572-2028
Email: kloomis@cozen.com

_____
DAVID L. BOOHAKER
Georgia Bar No. 159043
MCDONALD LAW FIRM, P.C.
3100 W. 7th Street, Suite 230
Fort Worth, Texas 76107
(817) 717-5081 telephone
(817) 717-5082 facsimile
david@mcdonaldlawfirm.com

_____
Benjamin O. Bengtson
Georgia Bar No. 122973
THE LAW FIRM OF BENJAMIN O.
BENGTSON
1100 Circle 75 Parkway Suite 460
Atlanta, GA 30339
Telephone: (404) 596-5518
Facsimile: (404) 596-5519
ben@boblawfirm.com

ATTORNEYS FOR PLAINTIFF

# EXHIBIT A

# FREDERICK C. BERRY, JR., J.D., CPCU, CLU

## EXPERIENCE

1978 to Present    Frederick C. Berry, Jr., P.C.        Phoenix, Arizona
*Managing Partner*
- AV Rated Attorney, Martindale Hubbell
- Litigate and manage complex insurance litigation
- Certified Specialist Personal Injury and Wrongful Death Litigation, State Bar of AZ, May 14, 1997-June 30, 2011

July 1, 1976 – September 30, 1978  Arizona Department of Insurance      Phoenix, Arizona
*Deputy Director of Insurance of the State of Arizona and Hearing Officer*
- Hearing Officer for Acquisitions, Mergers, Admissions, Adoptions of Rules
- Hearing Officer for Contested Disciplinary Proceedings
- Draft Insurance Regulations
- Supervised Department Investigations of Producers and Insurers
- Assisted in Drafting Insurance Legislation
- Represented the Department at Legislative Hearings
- Represented Arizona at NAIC Committees Involving Adoption of Uniform State Laws

1973-1976      Evans & Kunz, Ltd.                Phoenix, Arizona
*Associate Attorney*

## EDUCATION

1973   Arizona State University College of Law   Tempe, Arizona
- Juris Doctor, Sandra Day O'Connor College of Law
- Associate Editor, *Arizona State Law Journal* (1972-73)

1969   Arizona State University      Tempe, Arizona
- B.S. in Insurance

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

2010 to Present, Licensed by Arizona Department of Insurance as a Property, Liability, Life, Health and
       Disability Insurance Producer

1981 to Present,   The Society of Chartered Property and Casualty Underwriters
- Chairman, Seattle 2001 Annual Meeting &  Seminars
- Regional Vice President, Western Region (13 Western States)
- Member, National Board of Directors
- Member, National Strategic Planning Committee

- Member, National Nomination Committee
- Member, National Budget & Finance Committee
- Member, National Ethics Committee
- Member, CLEWS Governing Committee (Consultants, Litigators, Expert Witnesses)

1981 to Present,  The Society of Chartered Property and  Casualty Underwriters, Arizona Chapter
- Arizona Chapter President
- Instructor, Insurance Law and Principles [13 years]
- "Light the Way" Award for Outstanding Leadership (1996)
- Arizona Chapter Vice President, Secretary and Treasurer
- Arizona Insurance Day Chairman
- Arizona Insurance Day Program Chairman
- Member, Board of Directors, Arizona Chapter

1983 to Present,  The Society of Chartered Life Underwriters
- Phoenix Chapter Board of Directors
- Chairman, Phoenix Chapter Conferment Day Program
- Chairman, Phoenix Chapter Ethics Awareness Month
- Chairman, Phoenix Chapter By-Laws Committee

1973 to Present,  State Bar of Arizona
- 1996-2002,  Chairman, Insurance Committee
- 1977-2000,  Member, Professional Liability Committee
- 1978-1996,  Member, Insurance Committee

1991 to Present, Hearing Officer, Arizona Supreme Court

June 14, 2011 – October 31, 2014, Arizona Supreme Court Committee on Character and Fitness

1992 to 2009,  Judge Pro Tem, Maricopa County Superior Court

1973 to Present,  Member, Maricopa County Bar Association

1971 to Present,  Phi Delta Phi Legal Fraternity

1973-2001, American Bar Association
- 1979-2001 Member, Torts and Insurance Practice Section
- Standing Committee on Regulation of Insurance

1985 to 2001, Member, International Bar Association

1981-1996,  Member, Defense Research Institute

1988-1996,  Member, Federation of Regulatory Council, Inc.

1991-1996,  Member, Arizona Association of Defense Counsel

1991-1996,  Associate Member, Society of Financial Examiners

1976-1996,  Member, The Honorable Order of Blue Goose International

1985-1992,  Associate Member, Professional Insurance Agents of Arizona and New Mexico

1993-1995,  Member, Lorna E. Lockwood Inn of Court

2007 to Present, Member, American Society of Safety Engineers

1976, Admitted to practice before the United States Supreme Court

1976, Admitted to practice before the United States Court of Appeals for the Ninth Circuit
1976, Admitted to practice before the United States Tax Court
1976, Admitted to practice before the United States Court of Claims
1973, Admitted to practice before the Arizona Supreme Court
1973, Admitted to practice before the United States District Court for the District of Arizona

MILITARY SERVICE

1970-1976,  Arizona Air National Guard, 161st Air Refueling Wing, Honorably Discharged as Sergeant

PUBLICATIONS

- 2018, "Shining a Light on Insurance Marketing Malpractice," (Montana Trial Lawyers Association, July 20, 2018.
- 2017, "Shining a Light on Insurer Misconduct," (American Association for Justice, July 25, 2017);

Reprinted, 53 Trial News 2 (Washington State Association for Justice, Ocotober, 2017) at 6-9; Reprinted, Advocate (Arizona Association for Justice, November/December, 2017) at 1.

- 2012, "Insurance Marketer Malpractice," Advocate (Arizona Association for Justice, May-June, 2012)
- 2006, "Insurance Producer Malpractice," Advocate  (Arizona Trial Lawyers Association, June 2006)
- 2002, "Comparative Bad Faith", CPCU Society News
- 1999, "Getting and Keeping Health Insurance", Arizona Lawyer, March 1999
- 1993, "Funding National Health Insurance With 24 Hour Worker's Compensation",  Federation of Regulatory Counsel, August 1993
- 1979, "Professional Liability Insurance Policies", Arizona State Bar Journal, February 1979
- 1973, "The Variable Interest Note-An Answer to Uncertainty in a Fluctuating Money  Market", 1971 Arizona State University Law Journal 600

CIVIC ACTIVITIES

- 2010 to 2016, University Club of Phoenix, Board of Directors
- 2007 to 2011, Judge of the Ecclesiastical Court, Episcopal Diocese of Arizona
- 2003 to 2007, Arizona Lost Boys Center, Board of Directors
- 2003 to 2010, National Council on Alcoholism and Drug Dependence, Central and Northern Arizona Chapter, Board of Directors
- 1996-2000, Casa de Amigas, Board of Directors  [treatment facility for indigent women]
- 1989-1992, Phoenix Art Museum Men's Art Council, Board of Directors
- 1988-1989, Phoenix Boys Choir, Board of Directors
- 1988,  Arizona Department of Insurance Auto Insurance Rates Task Force, Chairman

1951 WEST CAMELBACK ROAD, SUITE 200,  PHOENIX, ARIZONA 85015 •
PHONE 602-274-5700 • FAX 602-254-0656 • EMAIL
FREDERICK.C.BERRY@GMAIL.COM

FREDERICK C. BERRY, JR.
J.D., CPCU, CLU
Frederick.C.Berry@gmail.com

https://www.frederickcberry.com/

**FREDERICK C. BERRY, JR.**
A Professional Corporation
SUITE 200
1951 WEST CAMELBACK ROAD
PHOENIX, ARIZONA  85015

TELEPHONE (602) 274-5700
FAX (602) 254-0656

January 15, 2020

**VIA FIRST CLASS MAIL AND EMAIL:** david@mcdonaldlawfirm.com,
ben@boblawfirm.com.

David L. Boohaker, Esquire
McDonald Law Firm
3100 West 7th Street, Suite 230
Fort Worth, TX 76107

Benjamin O. Bengtson, Esquire
The Law Office of Benjamin O. Bengtson
1100 Circle 75 Parkway, Suite 460
Atlanta, GA 30339

> **Re:   *Brown v. ACE American Insurance Company and Gallagher Bassett Services, Inc.,* United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:19-cv-01233-TCB**

Dear Mr. Boohaker and Mr. Bengtson:

You have asked me to serve as an expert witness regarding insurance matters in this lawsuit pending in the United States District Court District for the Northern District of Georgia, Atlanta Division.  Specifically, you have asked me to look at insurance industry claim handling standards and the activity of ACE American Insurance Company ("ACE") and Gallagher Bassett Services, Inc. ("GB") as they adjusted the first-party insurance claims submitted by Germain Brown ("Germain") (Sometimes referred to as "Plaintiff" or "Claimant").

I will present my opinion regarding insurance industry standards for handling a first party claim and the sub-standard claim handling of ACE as it adjusted the claim

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 2

arising out of a vehicle crash of March 7, 2016

This letter will examine the provisions contained in the insurance policy bought by and covering Germain, the promises made by ACE in the policy, the legal duty an insurance company such as ACE owes first-party claimants, and insurance industry standards in handling such claims. This letter will also discuss ACE's sub-standard claim service provided to Germain by (1) not conducting a reasonable investigation of his claim that is prompt, thorough and fair giving equal regard to the interests of Germain as ACE gives itself, and (2) not conducting a reasonable evaluation of his claim that is prompt, thorough and fair giving equal consideration to the interests of Germain as ACE gives itself.

## A.    <u>QUALIFICATION TO TESTIFY AS AN EXPERT WITNESS</u>

By way of background, I earned my Bachelor of Science degree in Insurance (1969) and a Juris Doctor degree (1973) from Arizona State University. I served as the Deputy Director of Insurance of the State of Arizona from July 1, 1976 through September 30, 1978 and attained a professional insurance designation of Charted Property and Casualty Underwriter (CPCU) in 1981 and Chartered Life Underwriter (CLU) in 1983. I served as a member of the State Bar Insurance Committee for many years including Chairman of that Committee for six years. I am a licensed insurance producer in the State of Arizona for property, liability, life, health and disability insurance. I also served as a member of the Arizona Supreme Court Committee on Character and Fitness from June 14, 2011 to October 31, 2014. Attached is a copy of my curriculum vitae which lists my publications. [Exhibit A]  My publications may be accessed from my web page, www.FrederickCBerry.com. I have testified as an expert witness concerning insurance matters in state and federal court on many occasions. I charge $500.00 per hour for deposition and trial testimony and $350.00 for all other work. A list of cases I have worked on is attached. [Exhibit B]

From my own personal experience working in my family's insurance agency from the early 1960s through the time I received my Bachelor of Science Degree in Insurance from Arizona State University in 1969, I have actual knowledge of the fact that most insurance companies had long maintained standards and procedures for good faith claim handling in the form of claim manuals. I learned that claim manuals from one insurance company to the next insurance company were similar if not virtual identical. Insurance companies shared their experience with claim handling informally

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 3

as well as in industry trade organizations. In this regard, competing insurance companies had a common interest in maintaining good public visibility of the insurance industry supporting the theme that when American consumers bought an insurance policy they could rest assured that the insurance company would treat them fairly and in good faith, provide helpful claim service and indemnify the insured for covered claim. My experience in this regard was reinforced when I was the Deputy Director of Insurance of the State of Arizona where I also served as an administrative hearing officer. When employed at the Arizona Insurance Department, I was the administrative law judge concerning contested hearings involving examinations of insurance companies and insurance company practices. I also served as administrative law judge in connection with discipline hearings against both insurance producers as well as insurance companies. In addition, I served in the role as an investigative, quasi-judicial administrative law judge in connection with violations of the Arizona Insurance Code by licensees of the Arizona Insurance Department as well as activities of unauthorized insurers and unauthorized marketers of insurance. I also served the function as a legal advisor to the Arizona Director of Insurance concerning all aspects of the Director's official duties as the insurance regulator in the State of Arizona. While working at the Arizona Insurance Department, I regularly attended at least bi-annual meetings of the National Association of Insurance Commissioners ("NAIC") and represented Arizona on committees and sub-committees of the NAIC looking into insurance company and insurance producer practices as well as of NAIC model state laws and regulations.

B.     **MATERIALS REVIEWED**

**Pleadings**

a.  Complaint (filed 2/18/19);
b.  Defendants' Answer to Plaintiff's Complaint (filed 3/25/19);

**Defendant's Disclosure Statements**

c.  Defendants' Initial Disclosure dated April 23, 2019;

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 4

### Plaintiffs Disclosure Statements

    d.  Plaintiff's Initial Disclosure dated April 19, 2019;

### Defendant's Responses and Supplemental Responses to Plaintiffs Discovery Requests

    e.  Defendants' Response to Plaintiff's Request for Admissions (dated 3/25/19);

    f.  Defendants' Response to Plaintiff's Request for Production (dated August 1, 2019);

    g.  Defendants' Supplemental Response to Plaintiff's Request for Production (dated August 12, 2019);

- DEFS 0001-0340 (claim correspondence)
- DEFS 0341-0433 (claim log)
- DEFS 0434-0442 (list of claim payments)
- DEFS 0443-0484 (certified copy of policy)
- DEFS 0485-0488 (log of checks paid)
- DEFS 0489-0613 (copies of checks)
- DEFS 0614-0620 (Meridian Investigations Group Report dated July 15, 2016)

    h.  Defendants' Supplemental Response to Plaintiff's Request for Production (dated August 12, 2019);

    i.  Defendants' Second Supplemental Response to Plaintiff's Requests for Production (dated August 28, 2019);

    j.  Defendants' Responses to Plaintiff's First Set of Written Interrogatories (dated August 1, 2019);

### Deposition Transcripts

    k.  Deposition Transcript of McCreary conducted on 8/29/2019; and

    l.  Deposition Transcript of Cullinan conducted on 9/12/2019.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 5

## C.    FACTUAL BASIS and LEGAL THEORIES[1]

### Summary of Underlying Facts

1.     The relevant insurance policy was effective June 1, 2007 with a Policy Anniversary Date of January 1, 2008 and renewed each January 1 thereafter. This policy designated as No. TOC N01303533 was issued to Swift Transportation Co., Inc. ["Swift"] for delivery and delivered in Arizona.   [Control page DEFS 0445, hereinafter, "0445"] [This document is formatted as what the American insurance industry calls a Master Policy from which "Certificates of Insurance" may be issued.] ACE or Swift issued Germain a Certificate of Insurance also designated as No. TOC N01303533. Germain Brown, while not the named on the policy as the policy holder, purchased the policy with his own money and for his own benefit. The insurance policy was not delivered to Germain until after the March 7, 2016 crash and then he only received a fragment of the policy. After this lawsuit was commenced, Germain finally received a Certified Copy of the complete policy [0443-0484].

2.     On or about March 7, 2016, the Germain was the co-driver of a commercial vehicle with Mr. Marc Samuel. Germain was sleeping in the sleeper cab of the vehicle when Mr. Samuel lost control of the vehicle and traveled into oncoming traffic. Germain experienced injuries to his lower back as a result of the accident. Subsequently, Germain started treatment for his injuries and was diagnosed with lumbar radiculopathy. On September 20, 2016 Plaintiff's doctor recommended he receive spinal decompression and fusion surgery with hardware.  Germain continued conservative treatments for the remainder of 2016.  On January 24, 2017 Germain returned to his doctor's office to proceed with the surgery. However, by March 14, 2017, Defendant still had not approved the surgery and instead sent him for an "independent medical examination." The doctor selected by ACE recommended surgical treatment for Germain's injuries. Pursuant to the terms and conditions of the subject policy, Germain timely reported the injuries to ACE, which designated Germain's loss as Claim No. 2778-2084-NS-01 (the "Subject Claim"), encompassing damage Germain sustained from the car accident. Germain has performed all other conditions precedent to bringing this lawsuit and maintaining all the claims alleged below. Subsequent to conducting its investigation of claim, ACE and GB have denied

---

[1]     The facts presented here are taken primarily from the Complaint dated February 18, 2019 and Plaintiff's Initial Disclosures dated April 19, 2019.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 6

Germain's claim for back fusion surgery at L4-L5 outright and by not authorizing his doctors to perform the surgery. As required by Georgia law, a formal 60-day demand letter was sent by Plaintiff to Defendants under O.C.G.A. §33-4-6 on or about December 15, 2017.

## Legal Theories

3.   Germain's complaint alleges two legal theories. Count one alleges breach of contract. Specifically, Germain alleges that ACE materially breached policy number TOC N01303533 by failing and refusing to fully and properly indemnify Germain for the injuries sustained by him. As a direct and proximate result of Defendants' material breach of the insurance contract as alleged, Germain alleged he has sustained damages, all for which Defendants are obligated and liable to Germain. Germain alleged he has complied with all conditions precedent under the policy to maintain the right of recovery of insurance proceeds and to fully indemnify Germain for his losses, including, but not limited to, timely payment of all premiums due, the timely reporting of the claims to Defendants, full cooperation with Defendants' investigation of this claim, and generally, full compliance with all other conditions of the policy requested by Defendants, except as to those conditions, if any, that were either not invoked, waived or excused by Defendants, as may hereafter be ascertained.

4.   In count two, Germain alleges that ACE's failure and refusal to fully indemnify Germain for his damages was frivolous and unfounded and in bad faith under Georgia law. In this regard, a formal 60 day demand letter was sent by Plaintiff to Defendants under O.C.G.A. §33-4-6[2] on or about December 15, 2017. Defendants

---

[2]   O.C.G.A. § 33-4-6. Liability of insurer for damages and attorney's fees; notice to Commissioner of Insurance and consumers' insurance advocate.

(a) In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer. The action for bad faith shall not be abated by payment after the 60 day period nor shall the testimony or opinion of an expert witness be the sole basis for a summary judgment or directed verdict on the issue of bad faith. The amount of any reasonable attorney's fees shall be determined by the trial jury and shall be included in any judgment which

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 7

have failed to pay Germain for the loss and suffering sustained by him within sixty (60) days of their receipt of said demand letter, thereby triggering Germain's right to recovery of the policy proceeds sufficient to fully indemnify Germain for the damage, plus attorney's fees and damages as provided for in O.C.G.A. § 33-4-6, and for all other special, compensatory, incidental, consequential and all other permissible damages, costs and expenses to which Germain is entitled, which will be proven at the time of trial and determined by the enlightened conscience of the jury.

5.      Germain requests that he be awarded compensatory damages in an amount according to proof as well as certain monies allowed pursuant to Georgia law as the result of ACE's bad-faith, prejudgment interest, costs that are taxed under applicable law that the jury resolve all factual disputes and for such other relief as to the court deems just and proper.

## D.      THE POLICY

6.      Before the insurance policy was disclosed by ACE and GB in their initial disclosures dated April 23, 2019, ACE and GB had only provided a fragment of the policy that was attached to the complaint as Exhibit A. With their initial disclosures served on April 23, 2019, ACE and GB disclosed an expanded policy that included the pages 1-17 of what is attached as Exhibit A to the complaint, plus additional general provisions, endorsements, riders and amendments all being assigned with control pages DEFS0443-0484.

---

is rendered in the action; provided, however, that the attorney's fees shall be fixed on the basis of competent expert evidence as to the reasonable value of the services based on the time spent and legal and factual issues involved in accordance with prevailing fees in the locality where the action is pending; provided, further, that the trial court shall have the discretion, if it finds the jury verdict fixing attorney's fees to be greatly excessive or inadequate, to review and amend the portion of the verdict fixing attorney's fees without the necessity of disapproving the entire verdict. The limitations contained in this Code section in reference to the amount of attorney's fees are not controlling as to the fees which may be agreed upon by the plaintiff and the plaintiff's attorney for the services of the attorney in the action against the insurer.

(b) In any action brought pursuant to subsection (a) of this Code section, and within 20 days of bringing such action, the plaintiff shall, in addition to service of process in accordance with Code Section 9-11-4, mail to the Commissioner of Insurance a copy of the demand and complaint by first-class mail. Failure to comply with this subsection may be cured by delivering same.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 8

## E.    INVESTIGATION BY FREDERICK C. BERRY, JR.

### Review of ACE American Insurance Company and Chubb, Ltd.

7.    I reviewed the official annual report issued by the Director of Insurance of the State of Arizona; a document required by law to be compiled and published. *Ariz. Rev. Stat.* § 20-154. The most recent annual report available online concerns the calendar year ending December 31, 2017. This report compiles data from the sworn annual statement of ACE American Insurance Company required by law to be filed each year (by March 31 of the next calendar year)[3] with the Director of Insurance of the State of Arizona. This shows ACE American Insurance Company is a Pennsylvania domestic insurer with December 31, 2017 assets of $13,605,973,000, a net worth in the form of capital and surplus of $2,531,806,000 and direct Arizona premium income for the 2017 calendar year of $67,485,000. [Exhibit C]

8.    ACE American Insurance Company is a part of Chubb, Ltd. This insurance group is the seventh largest American Property and Casualty Insurance Group by 2017 Combined Lines Direst Premiums Written. The Annual Report on the Insurance Industry 2017 (Federal Insurance Office, U.S. Department of the Treasury, September 30, 2018 at 69)[4] shows that Chubb, Ltd.'s 2017 direct written premiums were $21,208,576,000 giving it a 3.31% market share of all United States P&C Combined Lines Direct Premiums Written. The publication of this annual report is required by the Federal Insurance Office Act of 2010. 31 USC §313(n).

### Review of Claim Log [Exhibit E]

9.    In going through the claim log found within control pages DEFS0341-0433, I do not see any redactions. This is as it should be. There is an old saying that is often repeated when claim adjusters are given training that, "If it ain't in the claim file, it didn't happen." This statement is presented using poor grammar to emphasize the fact that American insurance industry claim handling standards as well as the National Association of Insurance Commissioners ["NAIC"] Model Unfair Claim Practices Act

---

[3]    *Ariz. Rev. Stat.* § 20-223.

[4]    https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/2018_FIO_Annual_Report.pdf. The cited data from page 69 of this report is included in Exhibit D.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 9

require that all claim activity be recorded in the claim log located within the claim file. More specifically, any basis upon which an insurance company relies to either delay an investigation of a claim, fail to thoroughly investigate a claim, unfairly investigate, delay the evaluation of a claim, fail to thoroughly evaluate a claim, or fail to fairly evaluate a claim must be documented in the claim log and promptly communicated, in writing, to the insured. Such writing should be found in the claim file and noted in the claim log. If documentation does not exist in the claim log or claim file, it simply did not happen. These concepts that are a part of American insurance industry claim handling standards and the NAIC Model Unfair Claim Practices Act and Regulation are reinforced by the common law doctrines of waiver, estoppel and election of remedies which are discussed in below.

10.    In my experience, it is very common for insurance company claim adjusters as well as vendors such as GB who provide third-party administration or claim handling services employ the use of claim handling software that digitally records all telephone calls and incoming documents. Although I would not expect defendant's attorneys to know about this automatic recording system, I would expect that all data captured by such a system including telephone conversations will be produced.

11.    As I went through the claim log as well as other paper documents and depositions provided to me for review, I made margin notes. In some instances, these margin notes simply summarize my understanding of the information provided. In other cases, my margin notes include my expert opinion or identify any additional material I would like to see. In those instances where my margin notes disclose expert opinion or identify additional material. I would like to see, I have endeavored to include the note within brackets ("[****]").

12.    In reviewing the claim log note of June 8, 2016 at control page 0358 that "RE-ADVISED THAT OCC/ACC POLICY DOES NOT REQUIRE ANY PRE AUTH BUT IS BASED OFF OF MEDICAL NECESSITY FOR DOL . . ." Although the note says that the claim adjuster re-advised Germain regarding no preauthorization required, I do not see where that Germain was actually so advised prior to this log entry. [I would also like to know if that the provider gave Germain epidural injections without a preauthorization. It seems that it did.] [It seems to me that the frequent use of the word to the effect that ACE has re-advised that the insurance policy does not require preauthorization is liberally salted throughout the claim log. I also note that

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 10

when Germain or his attorneys or providers are continuously told that the subject policy is not workers' compensation insurance and that the policy does not require preauthorization but is based off of medical necessity regarding the subject occupational accident, Germain, his attorneys and providers are not told at the same time that the policy benefits are otherwise limited in several particulars not the least of which is that the medical procedure must be performed and the medical expense must be incurred before expiration of the 104 weeks. Failure to disclose the entirety of the coverage limitation makes the partial disclosure of a limitation deceptive. This is (1) deception, (2) cheating and (3) insurance fraud by omission. Such reprehensible practices are unethical and below American insurance industry claim handling standards.

13.    The log entry of June 20, 2016 at control page 0359 shows that Germain was "dropped" by one of his providers because ACE wouldn't preauthorize treatment. [In forcing a provider to drop Germain, is ACE being helpful? Why is ACE giving Germain the hassle with his claim? In my judgment, the failure of ACE to completely inform Germain, his lawyers and providers of the full impact of not providing preauthorization for covered medical procedures is being done because ACE knows that its' client/insureds will more often not be able to use the available $1 million of indemnity before the expiration of the 104 week coverage limitation that is unexpected and obviously unknown.]

14.    I note the log entry of July 18, 2016 at control page 0364 regarding surveillance. I have also reviewed the report from Meridian Investigative Group found on control pages 0614-0620. [What was disclosed seems to only be a fragment of what Meridian's work. It seems to me that the entirety of the work done by Meridian Investigative Group should be disclosed. It would perhaps be discovered most completely if Germain's lawyers sent Meridian a subpoena for documents and data.]

15.    I note entries on control page 0365 with reference to DIVERSIMED scheduling an insurance medical examination. [It is not unusual for insurance adjusters to use outside firms to set up insurance medical exams as well as independent medical exams. I note that the peer review of medical records, as well as the examinations of Germain, were done this way. I note that independent medical exams were not undertaken by ACE because ACE selected the vendor who selected the physician to perform the medical examination. Real independent medical examinations are done pursuant to court rule that requires the physician to be truly independent as well as

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 11

qualified. *See, e.g. Fed R. Civ. P. 35.*]

16.    I note several log entries on July 25, 2016 at control page 0366. ACE memorializes that if Germain does not return to work in the next few weeks, it will order an insurance medical examination. One of Germain's providers at Premier Orthopedics was also advised that the ACE policy is not workers' compensation and ACE is "in process of scheduling insured for an IME to determine further treatment . . ." Advising an orthopedic provider that ACE will not preauthorized treatment and it is in the process of scheduling Germain for an IME (which was not true because it is not noted in the claim file) was intended by ACE to scare away the orthopedic provider. That is apparently what happened as is shown at control page 0367. Although Germain reported that the second orthopedic physician said that the "insurance was okay", he also advised that the doctor did not want to do the work because Germain's injuries were too severe and referred him elsewhere. I also note that ACE faxed the occupation accident coverage to Tallahassee Orthopedics of Southern Georgia. [I presume this was the policy fragment attached to the Complaint filed in Superior Court of DeKalb County.] There seems to be a locator code of exactly what was sent to Tallahassee Orthopedics. I have some further questions about Germain being required to give up the apparent fourth orthopedic physician at Southern Active Orthopedics in Moultrie, Georgia if ACE uses it for an insurance medical examination. [The cause and origin of this dilemma is unclear from the claim log. It seems to be another claim hassle designed by ACE to delay Germain as he tried to get his claim paid.]

17.    [Not surprisingly,] ACE noted at control page 0368 that Germain switched orthopedic treating physicians in the log entry dated August 10, 2016.

18.    On control page 0369, the log entry of August 15, 2016 notes that Germain's orthopedic provider was told that no preauthorization would be allowed and the insurance policy is not workers' compensation. [Again, the orthopedic physician was not advised regarding the unusual way that ACE interprets its' policy as requiring that medical expense indemnity will only be paid by ACE if medical procedure is performed during the 104 week benefit period and that the medical expense is incurred by Germain during this same limited period.]

19.    At control pages 0371 relating to a log entry of September 15, 2016, I see an entry that was put into the inbox of the adjuster that, "Warning – this is the next to last payment." I cannot tell if ACE told Germain that this disability income check was

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 12

his "next to last" but it does not appear from the log that this communication was sent to Germain. [It appears that ACE preauthorized disability income payments and some lower cost medical procedures but refused to preauthorize much more expensive medical procedures. I am referring, of course, to the proposed spinal fusion surgery at L4-L5 that was ordered by Germain's physician. I understand the cost of this procedure was estimated to be about $200,000.]

20.    I see a log entry on September 21, 2016 at control page 0371 that the insurance medical examination report was not supposed to be given to Germain. [In my judgment, all IME reports should be given to the insured, the insured's attorneys and the insured's physicians. I do not understand why an IME report would not be given to an insured. Why was it secret? In my experience, IME reports are always given to the insured, the insured's lawyers and the insured's physicians. Such is an American insurance industry claim handling standard because it is helpful to the insured obtaining covered insurance benefits.]

21.    On September 22, 2016, the artificial intelligence claim adjusting system ["AI"] generated a note that Germain received his final income disability payment. [I believe that these warnings were only provided to the adjuster and not to Germain. I see this note many times throughout the claim log.]

22.    A claim log entry of the September 28, 2016, on control page 0372 summarizes an IME report. [This appears to be the first IME report showing Germain needs six more weeks of physical therapy and then he should be able to return to work. I do not understand the reason why the IME physician and the adjuster noted that Germain has "some pre-existing conditions relating to lumbar." Is there any evidence that Germain's injury requiring him to have a fusion at L4-L5 is pre-existing? I don't think so and do not understand why ACE would say otherwise. In my opinion, it signals the adjuster that benefits are coming to an end when the client-insured returns to work. It seems to be a caution for the adjuster to not commit a waiver, estoppel or election of remedies that would prevent a prompt termination of policy benefits.]

23.    On control page 0374, I note a disconnect between what Germain thought ACE would pay and what ACE expects to pay for prescribed spinal fusion surgery at L4-L5. Germain clearly indicated to the ACE adjuster on October 17, 2016 that he thought he would get follow-up injection and then possibly surgery. On October 21, 2016, a log entry notes that ACE received a "corrected IME report" and that Germain

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 13

only needs six weeks of physical therapy and then should be able to return to work. [Why was there a disconnect between Germain's expectations of what he understood the treatment plan would be and ACE's understanding of the same thing? Another log entry of October 24, 2016, also on control page 0374 indicates that the provider will contact ACE regarding the IME, but I do not understand why this contact is necessary. Is ACE trying to micromanage Germain's treatment or the insurance medical examination? If so, the micromanagement is inconsistent with ACE's litigation position that its claim management is hands off.]

24.     I note a log entry of November 7, 2016, that a provider's nurse reported that Germain's care needed to be "transferred to Dr. Lee or someone who believes his injury as he will not have his treatment directed to him . . ." [I do not understand what this means. It seems that ACE is trying to salt the claim log with false information that Germain's is submitting a fraudulent claim and is having a hard time getting a doctor to play along with his fraud.]

25.     A log entry of November 8, 2016, states that GB "will need to know once his appointment has been scheduled . . ." [I do not know why ACE has a need to know when Germain's appointment is scheduled. It sounds like ACE is micromanaging Germain's medical treatment.]

26.     A log entry of November 11, 2016, on control page 0377, states that ACE "needed comments regarding IME results whether Dr. agreed that insured needed further additional treatment or not." [Why does ACE need comments from the treating provider regarding an insurance medical examination? This is evidence of more micromanagement by ACE. It looks like ACE wants treating physician to agree with insurance medical examination.]

27.     A log entry of December 14, 2016, at control page 0378, discloses that ACE wanted Germain to call the adjuster regarding his physical therapy scheduling. [Why does ACE micromanage Germain's physical therapy scheduling? This micromanagement by ACE is inconsistent with its statements throughout the claim log to the effect that ACE does not preauthorized treatment because the insurance policy is not workers' compensation. It is inconsistent with ACE's litigation position that Germain is free to choose any medical procedure and medical provider he wants.]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 14

28.    [Another example of ACE's micromanagement of Germain's physical therapy treatment is found in the log entry dated January 20, 2017, at the top of control page 0380.]

29.    I note a log entry dated January 20, 2017, that Dr. Bernard "wanted to verify coverage prior to scheduling insured." [Of course, Germain's medical providers want to know if they will get paid. They would not expect Germain to have the financial resources to pay out of pocket for his medical expense. ACE has knowledge that Germain in financially stressed because of his injuries sustained in the crash because Germain said so and such is almost always the case. Financial responsibility is always of concern of medical providers who are about to embark on very expensive surgery. All physicians, hospitals and other medical providers of scheduled surgery want to know if they are going to get paid. Nobody can blame them for this concern.]

30.    The log entry of January 25, 2017, discloses an updated claim form for Germain's total temporary disability benefit and a current treatment plan for "surgery, if approved." [If surgery is not approved on the one hand, ACE is preventing the surgery from taking place and preventing Germain from getting needed and covered medical expense. On the other hand, if surgery is not approved, ACE and Swift will be able to redirect what should be a $200,000 claim reserve into their operating profit.]

31.    The claim log entry of January 30, 2017, at control page 0381, shows Germain's medical provider's current plan is that Germain needs lumbar surgery. This log entry also notes that ACE is "sending the claim file to follow up a peer review post IME and completed physical therapy to determine if requested surgery is medically necessary and related to original date of loss." [In my opinion, this log entry evidence that ACE is actually investigating the orthopedic surgeon's request for preauthorization notwithstanding its prior statements to the effect that it does not provide pre-authorizations. It does not appear, however, from my examination of the entire claim file that ACE ever noted the result of its claim investigation in this regard concerning the request for preauthorization of the surgery. American insurance industry claim handling standards require that all insurance companies note the result of every aspect of its claim investigation and claim evaluation and communicate in an effective manner to the insured all reasons supporting a claim denial. Claim delay is a claim denial.]

32.    On March 7, 2017, two weeks after ACE received the peer review results stating that lumbar spinal fusion and LESI injections are not medically necessary, ACE

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 15

sent Germain a letter "Re: Surgery status/medical necessity." This was a claim denial letter and explained to Mr. Germain that a review of his claim was completed and the surgery that was requested [for preauthorization] was deemed not medically necessary or and directly related to your 3/7/2016 date of loss." [This claim denial letter has significance to me in several particulars. First, it is evidence that ACE did, indeed, undertake an investigation and evaluation requested by Germain and his physicians for a determination that spinal fusion surgery was a procedure that would be covered under his policy. Prior to March 7, 2017, the claim file reflects 17 occasions when Germain, his lawyers or providers were advised that the ACE insurance policy is not workers' compensation insurance but, instead, an occupation/accident insurance policy and, therefore, no preauthorization for any future surgery would be provided by ACE. After March 7, 2017, the claim file reflects 20 more times when Germain, his lawyers or providers were told the same thing. Nevertheless, the peer review and the claim denial letter of March 7, 2017, shows that ACE did, indeed, undertake the effort to support a claim denial decision based on the peer review to the effect that the spinal fusion surgery is not covered because it would not be "medically necessary or and directly related to your 3/7/2016 date of loss." American insurance industry claim handling standards require an insurance company to explain all reasons why a particular claim is denied. Thereafter, ACE proceeded to obtain a second Insurance Medical Examination that supported that the prescribed spinal fusion surgery at L4-L5 met all conditions for coverage under Germain's policy. There was never a claim denial letter from ACE to Germain after March 7, 2017. Because of it ignoring the second IME report, ACE is prevented from denying the claim for other reasons based on the common law of waiver, estoppel and election of remedies. Second, the claim denial letter of March 7, 2017 marks the beginning of time when Germain may file a lawsuit seeking damages arising out of ACE's breach of contract. The law of Georgia imposes extra requirements on Germain before he could sue ACE for a violation of its tort duty of good faith and fair dealing. Georgia law requires that ACE get notice and extra time to cure its violation of its implied duty of good faith and fair dealing.]

33.   The claim log entry dated March 17, 2017, notes that Germain contacted ACE asking how to proceed with other treatment that would be related to the date of loss. It appears that he was told that if a medical provider does not agree that the requested surgery is not directly related/medically necessary for the date of loss, the provider can submit medical documentation "for further review." There is no indication here or anywhere else in the claim file that Germain was told that ACE is all along planning to deny a claim for medical procedure and medical expense unless they

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 16

were both performed and incurred before the expiration of the period of time marked by the passage of 104 weeks from March 14, 2016.

34. A claim log entry of March 21, 2017 notes that Germain's lawyer contacted ACE and requested a copy of the policy. [I have not seen evidence that a copy of the policy was provided to Germain, his attorneys or providers prior to this point. American insurance industry claim handling standards require that the insurance policy be delivered to an insured at or near the point of sale and that any amendments be promptly provided to each insured as well. To the extent that Germain, his lawyers or providers did get some sort of evidence of insurance, that evidence of insurance must include all terms required by A.R.S. § 20-1113.]

35. Another claim entry log on March 21, 2017, demonstrates that Germain doesn't have much wiggle room in his current financial state for large gaps in benefits. [I doubt if hardly any Swift driver with limited medical payments insurance and limited income disability insurance fronted by ACE would be able to weather benefit gaps without catastrophic financial disaster. ACE and Swift both know this.]

36. Another March 21, 2017, log entry indicates that a copy of the "Swift OccAcc policy" was mailed to the insured. [In my judgment, a copy of the policy should have been sent to Germain at or near the point of sale, so he would have an opportunity to review the terms of the policy and compare it with other insurance policies on the market. In my experience, the American insurance industry is very competitive in almost all lines of insurance. Competition is keen with the three types of insurance found in the Swift OccAcc policy. That is, (1) short-term income disability insurance, (2) limited health insurance, and (3) accidental death and dismemberment insurance. All three types of insurance are considered disability insurance. A.R.S. § 20-1342. As a matter of substantive Arizona law, an application for disability insurance that is not given to the insured is not admissible into evidence by the insurance company. *Ariz. Rev. Stat.* §20-1108; *Sciranko v. Fidelity & Guar. Life Ins. Co.*, 503 F. Supp. 2d 1293 (D. Ariz. 2007); *Arellano v. Primerica Life Ins. Co.*, Co., 332 P. 3d 597 (Ariz. App, 2014.]

37. [Another claim log entry of March 21, 2017, at control page 0388 is confusing. It states that, "surgical procedure pending approval." This is confusing because ACE has stated on numerous occasions that it does not preapproved medical expenses and also because the surgical intervention was "deemed not medically

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 17

necessary or/and directly related to your 3/07/2016 date of loss." As pointed out in the claim denial email dated March 7, 2017 found in the claim log beginning at control page 0384.]

38.    A log entry dated March 26, 2017, toward the bottom of control page 0388 states that the denial of the proposed spinal fusion as not being medically necessary or appropriate is "pending possible appeal . . ." There seems to be no foundation in the claim log suggesting that there is pending a possible appeal. [This may be an effort by ACE to memorialize something that did not happen, because it may serve ACE's objective in creating an illusion that the proposed spinal fusion may one day be approved so that Germain, his attorneys, and providers may be less likely to file a lawsuit against ACE before the unexpected 104 week claim window slams shut.]

39.    A claim log entry dated March 29, 2017, toward the top of the control page 0390 expresses Germain's plan to discuss with one of his physicians getting an epidural injection, "and any remaining non-surgical treatments available." This tells me that Germain is aware that ACE has evaluated his request that ACE evaluate whether or not spinal fusion surgery is covered under his policy. Notwithstanding ACE's refusal to preapprove the back fusion surgery at L4-L5, it went ahead and ordered a "peer review" evaluation from an ACE selected vendor which resulted in ACE determining that it would not pay for the spinal fusion surgery under the terms of the policy.

40.    A claim log entry dated April 6, 2017, indicates that ACE learned from a medical note that Germain now has an attorney and is filing lawsuit.

41.    A claim log entry dated April 19, 2017, memorializes that ACE learned from a provider that Germain has decided not to proceed with the surgery but, instead, is scheduling pain injections. [It appears that giving Germain a hard claim denial regarding the spinal fusion surgery (even though ACE claims that it does not pre-approve medical procedures) has resulted in Germain abandoning his plan to get the prescribed spinal fusion surgery. It seems to me that this claim log note demonstrates that the ACE alligator claim handling strategy so far is working.]

42.    The claim log entry dated May 15, 2017, found at the bottom of control page 0394 includes an email from Germain concerning what he described as "constant delay in weekly benefits." Germain is a referring to his total temporary disability

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 18

checks that he has been getting from ACE. [Germain's email shows that he is very frustrated. There really is no reasonable basis for ACE to have injected claim delay in providing total temporary disability benefits under the policy. This leads me to opine that ACE is intentionally inflicting upset, humiliation, and inconvenience on Germain so Germain will adopt an attitude of hopelessness and despair to encourage him to abandon his insurance claims.]

43.    A claim log entry of May 15, 2017, toward the top of control page 0396 shows contact from a medical provider where the provider was told that Germain's policy is an occupation accident policy and not workers' compensation. In response to the providers question regarding preapproval, ACE told the provider that the procedure was not preapproved and the policy does not require preauthorization. ACE reaffirmed that information had been provided to the provider and the insured in various ways on multiple occasions. [I note that ACE did not tell the provider that ACE had, indeed, investigated and evaluated preauthorization for spinal fusion surgery and obtained a "peer review" report that indicated the surgery was not covered under the policy. In other words, the request for preauthorization of the spinal fusion surgery was, in fact, investigated and evaluated by ACE notwithstanding its constant statements in the claim log and to Germain, his attorneys and providers to the contrary. I also note that the inquiring provider was not told by ACE that Germain's claim for indemnity for the prescribed spinal fusion surgery was denied prior to it being performed and prior to Germain incurring any expense for spinal fusion surgery.]

44.    [I note a claim log entry of June 5, 2017, with the same thing as the claim note of May 15, 2017 occurred with Northwest Plaza.]

45.    The claim log entry of June 8, 2017, shows a contact with Regional Health who apparently was complaining about bills getting paid. Regional Health was told that all bills for 2017 are pending attendance [presumptively by Germain] of another insurance medical examination to determine what "treatment/surgery/etc. was medically necessary and related to the DOL." A log entry at the bottom of control page 0397 again indicates that "pending surgery approval." [The language, "pending surgery approval" is inconsistent with the sometimes pretended position of ACE that it will not give preauthorization for any medical procedure.]

46.    The claim log entry of the June 12, 2017, at control page 0398 indicates that temporary total disability has been preauthorized. Moreover, a provider was told

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 19

that the preauthorization not required but ACE is moving ahead with an insurance medical examination so ACE can pre-authorize prescribed injections. This claim log entry continued to the top of control page 0399, indicating that medical costs are being reserved and probably paid at the Preferred Provider Organization (PPO) rate [even though Germain does not appear to be a member of any PPO and there is no evidence that any of the medical providers agreed to accept the discounted PPO rate for medical expenses that have already been incurred and those which are expected to be incurred in the future. Perhaps the medical provider and ACE entered into a negotiated rate schedule for payment of incurred and non-incurred expenses. Of course, there is no prohibition for ACE and medical providers entering into a similar negotiation regarding prescribed spinal fusion surgery at L4-L5. In the absence of such an agreement, I question why ACE appears to impose PPO rates on Germain's providers and would be interested in seeing any communications with the providers regarding their ability to balance bill Germain for the difference between the retail cost of medical expenses and a discounted PPO rate. Making misrepresentations to medical providers in this regard is a relatively new unfair claim handling practice that is engaged in by many automobile medical payments insurers.]

47.    I see log entries dated June 14 and 15, 2017, on control page 0399 concerning ACE's contact with the Index Bureau. [The Index Bureau is a vendor that looks for other insurance claims submitted by Germain. ACE is apparently investigating Germain to see if he has a pre-existing condition or whether he is more susceptible to injury or illness than an ordinary healthy person. ACE would undertake this investigation to enable it to not pay for medical expenses that preexisted the subject crash or are attributable to some sickness or injury that was not caused in the subject crash.] The Index Bureau got two hits in its investigation. The first one related to a July 29, 2014 motor vehicle accident. The other hit relates to the subject collision.

48.    In the claim log entry of July 17, 2017, at control page 0401, there is an indication that Peter Loeb, M.D. will perform an insurance medical examination on July 19, 2017. [I believe this is sometimes called the "first IME."

49.    There is a claim log entry dated July 18, 2017, that Germain's lawyer was told that Germain must attend a second insurance medical exam because ACE has the right under the policy to investigate whether the requested surgery is medically necessary and related to the crash. [It appears the only reasons for ACE to order another insurance medical examination is so it can preauthorize the prescribed back

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 20

fusion surgery at L4-L5 or deny the preauthorization on the grounds that it is not covered by the insurance policy. In other words, ACE is a moving forward with a pre-authorization investigation that apparently made up all or part of the $8,983.75 direct claim expense accounted for in the "LIST CLAIM PAYMENTS – SUMMARY" at control page 0014, notwithstanding the fact that it has declared on numerous occasions that it does not preauthorize medical expenses. Even though "pre-authorization" is not a condition, limitation, exclusion or other provision of the insurance policy, ACE has self-declared that pre-authorization is not done. Any statement along this line is clearly untrue. It is unethical and contrary to American insurance industry claim handling standards to lie to Germain, his attorneys or providers.]

50.    The claim log entry of July 20, 2017, at the bottom of control page 0402 shows that Germain requested that ACE send him the first insurance medical examination report located in the ACE file but ACE told Germain that ACE would not send it to Germain. Instead, Germain was told that he should get to the report from Germain's treating physician at the time. [It is substandard claim handling for ACE to refuse to give Germain pertinent portions of the claim file at any time during the claim process. In my judgment ACE is simply giving Germain the hassle and creating unnecessary barriers as it intentionally inflicts delay and damage on its client-insured.]

51.    The second insurance medical examination was undertaken on July 19, 2017, and a log entry dated August 17, 2017 is noted beginning on control page 0404. The note of the IME report indicates that Germain's treatments "have been appropriate within guidelines." [I do not know what guidelines the doctor is referring to but suspect that they relate to workers' compensation guidelines. Significantly,] paragraph 8 indicates that the second insurance medical examination doctor states, "I think it has been noted in the chart that it is felt that at this time with failure of continuing to be able to improve his symptoms and he continued L5 to have essentially L4- nerve root compression, I think it is reasonable to consider potential surgical treatment. It needs to be just at that level [L4-L5] and not addressing the other congenital issues." [In my judgment, the second insurance medical examination physician clearly indicated that the prescribed L4-L5 spinal fusion surgery reasonable. After having obtained an indication from its selected insurance medical examiner that the proposed spinal fusion of L4-L5 is made necessary because of the subject accidental injury covered by the policy, American insurance industry claim standards require that it advise Germain so he can move forward with the prescribed surgery. Instead, ACE delayed, deflected and denied the claim]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 21

52.     I note that a claim log entry of September 8, 2017, indicates that ACE has not placed a reserve for the proposed spine fusion surgery at L4-L5. [Not placing such a reserve in accordance with the NAIC statutory reserve requirements tells me that ACE has made a claim decision to deny Germain's claim for this prescribed surgery. American insurance industry claim handling standards require that an insurance company promptly advise the insured of a claim denial and promptly provide to the insured all the reasons why it denied the claim. Here, I see no evidence that ACE sent out a new claim denial letter after it received the results of the second insurance medical examination. If ACE had accepted the claim for this proposes surgery, it would be required by the NAIC field examiners handbook[5] to maintain the loss reserve for the prescribed L4-L5 fusion surgery. Not maintaining proper claim reserves is contrary to American insurance industry finance and accounting standards. {Exhibit K}. My opinion in this regard is reinforced by the claim log entry of September 27, 2017, referencing the need for Germain "to be seen for L4-L5 level but not addressing his congenital issues, per IME results that were faxed on 8/17/17." There is no indication that Dorothy with Musculoskeletal Associates was advised that the 104 week claim window was closing on the second anniversary of Germain seeking treatment for his industrial injury. This tells me that ACE was continuing to pursue its alligator claim handling strategy.]

53.     The claim log entry of November 8, 2017, discloses a "coverage question from Swift." [The ACE insurance policy is configured so that Swift is the assuming reinsurer. This means that Swift has all or most of the risk to make profit or incur a loss in selling the policy. I note that this reinsurance treaty or other contractual relationship has not been disclosed. At the end of the day, it is Swift or its senior management that must pay for Germain's surgery. If the Germain's claim for back fusion surgery is denied, Swift pays no more money. If Germain wins his lawsuit requiring Swift to pay for the surgery, the amount of money that Swift will have to pay from the $1 million combined single benefit found in the policy would increase from $92,678.17 to $349,387.17. The claim log entry quotes from the policy that purports to give ACE and Swift the power, in its discretion, to either pay a claim or not pay a claim "based on and consistent with standards approved by our medical personnel." An insurance company cannot be given the power to have the discretion to pay a claim or not pay a claim. Claims must be paid on the basis of the promises contained in the insurance policy. In this specific case, however, we know that ACE has no standards

---

[5]     https://www.naic.org/documents/prod_serv_marketreg_mes_hb.pdf

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 22

developed with the approval of its medical personnel or in any other way. The entire provision of the insurance policy pretending to give Swift the discretion to pay or not pay a claim is foolish. Of course, it violates American insurance industry claim handling standards. These standards do not give any deference whatsoever to any insurer or reinsurer to pay or not pay any claim. American insurance industry claim handling standards require that a claim investigation and a claim evaluation must be prompt, thorough and fair. Fair means giving at least equal consideration to the interests of the client-insured as the insurer or assuming reinsurer gives itself. Here, ACE and Swift did not adjust Germain's claim within the American insurance industry claim handling standards.]

54.    The same correspondence from Swift found in the claim log by entry date November 8, 2017, continues at control page 0411 with a copy of an email from Jenny Bishop at Swift Trans asking several questions, "Is there a time limit for payment of accident-related medical or will they [Swift] likely be on the hook for the back surgery regardless of when it occurs now that their IME doctor agrees that it is necessary and related." [This question confirms my opinion that Swift is the ultimate to risk bearer by virtue of it being the assuming reinsurance carrier. Swift had absolutely no problem concluding it was "on the hook for the back surgery."]

55.    The claim entry log dated November 27, 2017, notes that the fault for the crash is on Swift because its student driver was negligent. For this reason, the log entry concludes that Swift in its capacity as the risk bearer on the policy purchased by Germain does not want to pursue any reimbursement against Swift Transportation. This concept is reinforced in a log entry dated November 29, 2017, after a review by MWC, who appears to be an attorney for Swift. MWC, as reviewer concludes that there the investigating New Mexico State Police found no evidence of equipment failure. Notwithstanding this fact found in the police report, ACE and Swift almost from the very beginning of this claim, salted a falsehood to the contrary in its numerous claim log entries. (*e.g.,* there is possibly an equipment failure that could support a subrogation claim.) Putting false information in a claim log is unethical and contrary to American insurance industry claim handling standards. It evidences the fact that ACE has no compunction at all about filling its' claim log with falsehoods.]

56.    [The claim log entry of December 7, 2017, is very revealing. It creates a "supervisory" diary review because of the upcoming 104 week claim window is about to close. Even though this log entry was made approximately three months before the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 23

claim window was actually going to close, ACE did nothing to notify its' insured of this fact. Instead, it simply continued to wait silently and thereafter reduce its claim reserve to zero. I also note that ACE is preparing itself to go after Germain's social security disability income award when Germain is eventually is paid. It is quite common in private income disability insurance for the private insurance company to seek recoupment from Social Security disability income benefits. Knowing that these Social Security benefits are usually not awarded until several years after an application is submitted. The plan to go after Germain's Social Security benefit is manifested in the note that ACE will "protect any potential lien." The same claim log entry continues on control page 0414 where the claim reserves are reviewed. I note that there is no claim reserve to cover the prescribed back fusion surgery at L4-L5 which, of course, tells me that the claim has been denied. Although ACE wrote a claim denial letter to Germain after the "peer review," it did not write a claim denial letter to him after the second insurance medical examination found that the proposed back fusion surgery at L4-L5 was covered under the policy. As stated above, American insurance industry claim handling standards require all insurance companies to promptly notify an insured of a claim denial and to inform the insured at that time of all reasons that form the basis of the claim denial. Here, it appears that ACE sat silently probably not wanting to alert Germain that ACE's alligator claim handling tactics would be brought to fruition before Germain could get his prescribed back fusion surgery at L4-L5.]

57.    I note a claim log entry of December 29, 2017 at control page 0415, that ACE received a "legal demand" and given the name "GERMAIN BROWN CHUBB REFERRAL- SWIFT.DOC."

58.    I note a claim log entry of January 8, 2018, where ACE faxed a legal response to demand letter with a copy of the policy. [Again, I presume that the copy of the policy provided was that fragment of the policy attached as an exhibit to the complaint filed in the Superior Court of DeKalb County.]

59.    [The claim log entry of January 28, 2018, again repeats the fallacy that the crash was cause because of equipment failure. The log entry continues on to control page 0418 where ACE again makes no reserve for back fusion surgery. Notwithstanding the fact that the insurance medical examiner found that the surgery was necessary and covered under the policy and ACE acknowledged internally that it was medically necessary and covered by the policy, ACE did not tell Germain or his lawyers that it had denied the claim and was simply waiting to shortly close the claim

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 24

without further payment because of the closure of the claim payment window. Of course, American insurance industry claim handling standards require ACE to promptly tell Jermaine and his lawyers that it has decided to deny the claim and provide all reasons why the claim is being denied. Here, ACE kept secret its' claim denial post second independent medical examination.]

60.    The claim log entry of March 14, 2014, is a few days after the closure of the 104 claim window. [The entry repeats the fallacy that the crash was caused because of an equipment failure, and also repeats the fact that no reserves were maintained for back fusion surgery. There is, however, a plan to send a letter to the insured "at special diary." I am not sure what the phrase, "special diary" means as that term is found on control page 0420. I do not understand why ACE did not send a letter to Germain and his lawyers long before the expiration of the 104 week benefit window. This is particularly true since it is clear from the claim log that ACE decided it would not provide promised benefits months before. There is lots of evidence in the claim file that ACE gave itself "warning" concerning the expiration of total temporary disability benefits as part of an artificial intelligence feature of its claim handling software. Why didn't ACE instill a warning system that would generate a communication to its insured and his lawyer regarding the practical effect of the 104 week window closing? As I've said above and below, ACE should have sent a claim denial letter after its' second insurance medical examination when it set its claim reserve for back surgery at zero. Since ACE went to the trouble and expense of having Germain examined by an insurance medical examiner, it should have preauthorized the prescribed surgery. Alternatively, ACE should have explained, in an understandable and straightforward way, that it will assert an extra-contractual loss conditions, limitations or exclusions by failing to help Germain get needed surgery. (*E.g.,* requiring Germain to "incur" a medical expense before it will commence a claim investigation and that ACE will not preauthorize medical covered medical procedures.) ACE should have sent Germain a "warning."

61.    It appears from the log entry of April 3, 2018, at control page 0421, that the long planned policy expiration letter to Germain and his attorneys was finally sent out. [The timing and sequence of this letter was, of course, extraordinarily prejudicial to Germain. ACE intended for the withholding of covered benefits so that Swift could fulfill its financial goal of not paying Germain for covered benefits.]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 25

62.    The claim log entry of April 27, 2018, formally orders the lowering of the medical and expense reserves [because, of course, it appeared to ACE that it was successful in executing its substandard alligator claim handling tactics to cheat Germain out of promised insurance benefits.]

63.    [With reference to the claim log entry of April 27, 2018, at the bottom of control pages 0422, I would like to know more about the alert sent to Greg Williams. The alert itself was created by a person whose code is LNQ00.]

64.    I see that the claim log entry dated June 24, 2018 on control page 0424 formally removes the claim reserve and formally closes the claim file.

65.    Although the claim entry log of August 13, 2018 shows that Germain's lawyer wants a copy of the claim file, another claim log entry dated August 14, 2018 at control page 0427 asks if Patricia Boucek should "just advise that GB is unable to release a copy without a subpoena . . ." The same claim log entry but at the top of control page 0429 advised that the attorney should be told "that supporting medical documentation is required in order to review the medical necessity for surgical treatment." [This looks like ACE is requesting the attorney to furnish a HIPAA compliant medical authorization before it will provide the attorney with the second insurance medical examination that resulted in the insurance medical examination physician finding medical necessity and the presence that all conditions for coverage were met for the recommended L4-L5 surgery.]

66.    I see a claim log entry of August 14, 2018, at control page 0430 that "per carrier [ACE, Swift, or Swift's rented assuming reinsurer?] unable to release copy of claim file without official documentation." [The term, "official documentation" is mumbo jumbo.]

67.    A claim log entry of August 16, 2018, at control page 0432 shows a letter from Germain's attorney, Benjamin O. Bengtson that, "Your policy says a proof of loss asked to be submitted. I guess that means we need to formally submit a proof of loss for the surgery." [For reasons explained below, there is no such thing as comparative fault for claim handling that is accomplished in violation of the tort duty of good faith and fair dealing. American insurance industry claim standards fall on the insurer not the insured. Any failure on the part of Germain or his attorneys not to recognize the trick that ACE had set up to trap Germain in a 104 week claim window is not relevant

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 26

to the issues framed in this litigation.]

68.     The claim log entry of August 16, 2018, on control page 0433 memorializes a contact with Germain's attorney, Ben Bengtson where ACE "explained in detail again the letters/correspondence regarding insured's 104 week coverage RE surgery, benefits etc. and that no additional POL claim form is needed as the insured has already completed for his 104 week claim. The attorney then asked if he could submit a POL claim form for him to have the surgery. I explained again that there was no preauthorization for treatment but based off the medical necessity to DOL and I read in detail the letter that was sent to him on 1/8/2018 and 3/2/2018 regarding the insured's coverage, surgery, expiration, etc. What I'm hearing you say is that "you'll cover the surgery, if it's medically necessary for the insured." I stated, no, [because] his 104 week policy expired on 3/13/2018 for his medical benefits." [The letters of 1/8/2018 and 3/2/2018 are not in the Claim Correspondence, control pages 0001-0340 and accordingly did not happen.]

69.     The final claim log entry is February 21, 2019, when ACE notes that the lawsuit from Germain was received.

## Review of Claim Correspondence. [Exhibit F, Excerpts]

70.     The disclosed claim correspondence is included within control pages 0001-0340. Much, but not all, of this claim correspondence is noted in the claim log. In presenting some of my observations and expert opinions concerning matters in the claim correspondence, I note that the claim correspondence is maintained in reverse chronological order.

71.     I note that the supplementary attending physician's statement signed by the attending physician on March 16, 2017 at control page 0339 indicates that the nature of the surgical procedure is "pending approval."

72.     I see from control page 0328 that Germain was required to sign a "Temporary Total Disability Benefit Affidavit," dated June 17, 2017 in order to get to his weekly disability income benefit. In this affidavit, he attests to the fact that ACE's obligation to pay income disability benefits "will cease the date I am released to return to work and/or no longer considered a temporary totally disabled, as defined by the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 27

policy."

73.    I note a letter from GB dated March 9, 2016 to Germain Brown at control page 0215. This letter encloses "claim forms that must be completed by you and your attending physician." This letter also advises Germain in the fifth paragraph that "if you are applying for temporary total disability (TTD) benefits you are treating doctor must disable you within 90 days from the date of a covered occupational accident. You and your treating physician will need to complete the disability claim form and return it to us. We will also need a copy of your 1040 schedule from your last income tax return or 13 consecutive settlement statements immediately prior to the date of total disability beginning or the period worked. If your treating physician does not disable you for more than seven consecutive days completion of the disability claim form is not required. Medical and TTD benefits are in effect for a maximum of 104 weeks." This is the first time I have noticed any communication to Germain or his lawyers regarding a 104 week limitation regarding his medical benefits. Here, the 104 week medical benefit limitation is found within a paragraph applying to a situation "if you are applying for temporary total disability . . ." [In my opinion, the 104 week limitation regarding medical benefits is separated from other important loss conditions concerning medical benefits and hidden in a paragraph dealing with TTD benefits. This is deceptive. ACE should have investigated and evaluated its practice of failing to provide the insurance policy at or near the point of sale and thereafter deceptively disclosing the important limitation in a paragraph dealing with income disability benefits. American insurance claim handling standards require an insurance company to undertake a meaningful investigation and evaluation regarding its failure to failure to disclose the 104 week claim. These failures are substandard, unreasonable and unethical]

74.    GB wrote to one of Germain's attorneys on May 20, 2016. The attorney requested by letter dated April 8, 2016 to Swift Transportation for a copy of the applicable incident report and the name and policy number of the applicable insurance policy. The response from GB represented that Germain was not an employee of Mohave/Swift Transportation but, instead, is an "independent contractor." This letter further advises that "this is not a policy of statutory workers' compensation. Benefits are payable for certain losses resulting directly and independently of all other causes from an occupational accident or accidental bodily injuries that occur while the policy is in force and his coverage is in effect. Benefits are subject to all the provisions, conditions, exclusions and limitations of the policy." The letter further advises that it is

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 28

attaching a copy of the occupational accident policy "for your review." I do not see what copy of the ACE policy was sent to Germain's attorney and question if one was sent at all. Certainly, this letter does not advise the attorney of any provisions, conditions, exclusions and limitations of the policy and does not explain why Germain is not an employee of Swift Transportation while working full-time for Swift Transportation. [In my judgment, Germain was at all material times a bona fide employee of Swift Transportation and the paperwork concocted by Swift Transportation to give it a colorable claim that Germain is an independent contractor is fake.]

75. I note that a fragment of the ACE insurance policy is found at control pages 0065-0082. It is styled as an "Occupational Accident Policy" effective June 1, 2007 with a policy anniversary date of January 1, 2008, with a received a stamp of October 10, 2007 and a notation on the cover page that the "state of delivery" is Arizona. I note that at control page 0069 the maximum payment is 104 weeks from the date the first treatment is received. I also note that at control page 0074, the insuring clause for medical benefits requires that the limited medical expenses scheduled "must be charged" to Germain resulting "directly and from no other cause from an occupational accident." Also at control page 0074, covered expenses are defined as (1) the actual costs to Germain of the (2) reasonable charges for the limited services and supplies scheduled below and that the service or supply must be (3) ordered by a physician for the diagnosis or treatment of an occupational accident, and (4) medically necessary. Although the term Medically Necessary is defined in the certified copy of the insurance policy at control pages 0469 and 0470, the fragment of the certificate of insurance that appears in the correspondence file at 0074 states that "a service or supply may not be Medically Necessary if a less intensive or more appropriate diagnostic or treatment alternative could have been used. We, at our discretion, may consider the cost of that alternative to be covered expenses. In this case, covered expenses are limited to the reasonable charges for that diagnostic or treatment alternative." [In my judgment, it is substandard claim handling for an insurance company to pretend to have the discretion to not agree to pay the actual cost of a reasonable charge for medically necessary medical expense ordered by a physician when such is either not communicated to the insured or communicated in such a way that delays the insured receiving medically necessary care because of the expiration of the a 104 week claim window. There is no indication in the claim log or claim correspondence that ACE conducted any investigate or evaluate of its claim deception and claim delay that resulted in Germain not receiving covered medical care from the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 29

ACE policy that promises to provide indemnity for covered medical expenses. These failures are unreasonable, unethical and substandard.]

76.     I note a letter dated January 8, 2018, beginning at control page 0020. This letter was directed to one of Germain's attorneys and purports to respond to Mr. Bengston's letter of December 15, 2017, threatening a lawsuit for damages arising out of breach of contract and bad faith insurance claim handling. I note that the letter signed by Tricia Boucek again represented that Germain was an independent contractor with Mohave/Swift Transportation. As justification for denying the claim, GB states, "please note that there was no denial or preauthorization for treatment or surgery was given." In my judgment, a claim delay is a claim denial and although the proposed lumbar fusion surgery at L4-L5 met all the criteria for being covered under the ACE policy and the second insurance medical examination was obtained for the purpose of either denying the claim or pre-authorizing the proposed spinal fusion surgery at L4-L5. American insurance industry claim handling standards require that all reasons for denying a claim be included in a claim denial letter that is sent to the insured on a timely basis. Ms. Boucek's letter of January 8, 2018 is such a claim denial letter. I note that Ms. Boucek's letter on control page 0020 states that in order to be covered, "the surgery would need to address the occupational accident injury specifically, and not address any underlying pre-existing condition." [It appears clear to me that the insurance medical examination report submitted to ACE and GB clearly demonstrated that the spine fusion surgery limited to L4-L5 and was indeed specifically addressed. That the prescribed surgery at L4-L5 was specifically addressed was not only ignored by ACE and GB, the fact that it is present in the claim file and claim log is denied. This denial of what in fact actually occurred was never investigated or evaluated by ACE. This failure of ACE to investigate and evaluate its denial of a fact is unreasonable, unethical and substandard. Finally, I note at control page 0021 that Ms. Boucek with great emphasis with *italics* and underlining stated that medical and temporary total disability benefits are effective for the first 104 continuous weeks and that Germain's "first covered medical expense was incurred 3/14/2016." As noted elsewhere in this report, ACE imposes the extra contractual limitation, exclusion or condition that medical expenses must be "incurred" before ACE is obligated to pay indemnity. Unlike other medical and health insurance policies, ACE does not use the word "incur" or "incurred" as a loss condition, limitation or exclusion.]

77.     I see another claim denial letter dated April 3, 2016, at control pages 0018-19. This letter directed to Germain personally tells him that his "104 week policy

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 30

benefits have expired" and quoting from the policy, "[U]nder the, Schedule of Benefits it states: Accident Medical Expense Benefit, Maximum Payment Period- 104 weeks from the date the first treatment is received".

78.     I note a letter to one of Germain's lawyers dated August 14, 2018, wherein GB states that the ACE policy is not one for statutory workers' compensation but not explaining that the medical benefits are subject to a 104 week claim window. The letter also advises Germain's attorney that GB has requested that an additional copy of the policy but GB "is unable to release a copy of the claim file at this time without official documentation." [It appears that the reference to "official documentation" is simply mumbo-jumbo intending to further delay the claim.]

79.     I note a "List Claim Payments - Summary" at control page 0014 showing a "Net PTD of $103,389.62 made up of $72,800 of "total wage/loss payments", $19,678.17 of "total medical payments" and that $10,911.45 of "total expense payments." [The expense payments made by ACE are for Incurred Direct Claims Expense and not the payment of indemnity. American insurance industry claim handling standards and Statutory Accounting Principles[6] which all insurance companies are obliged to follow require that insurance companies undertake a prompt, thorough and fair investigation and a prompt, thorough and fair evaluation of each insurance claim at their own expense. The investigation and evaluation expense may not erode indemnity promised in the insurance contract. In this particular case, the insurance policy promises a total of $1 million of indemnity for each accident. In the subject accident, ACE only paid $92,478.17 of indemnity leaving $907,521.93 of unpaid indemnity benefit.

## Review of Deposition of David McCreary dated August 29, 2019 [Exhibit G]

80.     Mr. McCreary is the VP of Chubb North America Claims Accident and Health and is responsible for overseeing the claims and the staff that works underneath him. He has been doing insurance since March 1985 and has been doing special risk accident and health insurance business for the last 26 years. (4:15-22) Mr. McCreary described the relationship between ACE American Insurance Company and Chubb as

---

[6]     Elliott, "Finance and Accounting for Insurance Professionals" (American Institute for Chartered Property Casualty Underwriters (3d ed., 2018). [Exhibit K]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 31

one in the same because ACE American Insurance Company is "an underwriting paper that Chubb uses." (5:23-6:5) Mr. McCreary is an accredited healthcare fraud investigator (AHFI), has an insurance producers license for property, casualty, accident and health in Pennsylvania and Delaware and an all lines adjusters license in Delaware, Pennsylvania, Texas, North Carolina and he believes Connecticut. (6:13-23) Mr. McCreary's job is to work with third-party administrators (TPAs) like Gallagher Bassett. (7:14-8:5)

81.    Mr. McCreary agreed that ACE owes Germain a duty of good faith and fair dealing when adjusting his claim. (10:8-10) Mr. McCreary also agreed that ACE is required to give as much consideration to Germain's interests as ACE gives to its own interests when adjusting Germain's claim. (10:11-17)

82.    When asked to describe Gallagher Bassett's role as a third-party administrator for ACE, Mr. McCreary testified that GB acts "on our behalf as the claim pair under a TPA model." (10:23-11:8) Mr. McCreary described the third-party administrator model as someone who ACE has contracted with to handle certain types of claims. (11:9-11) With respect to GB, Mr. McCreary agreed that it also owes Germain a duty of good faith and fair dealing when adjusting the claim. (11:12-16) Mr. McCreary also agreed that ACE and GB have a duty to investigate and evaluate Germain's claim promptly, thoroughly and fairly. (11:21-12:1) In addition, Mr. McCreary testified that ACE and GB should adopt and implement procedures for the prompt investigation and settlement of claims arising under occupational accident policies like Germain has. (12:3-7) When asked about the existence of claims manuals, adjusting manuals or written standards that are used to investigate any unsettled claims, Mr. McCreary testified that "I can only speak of ACE Chubb. We do not have a written manual to follow." [This statement is not true. All insurance companies always have claim manuals.] But Mr. McCreary testified that he would say that GB has such manuals and standards since they handle the claims. (12:8-21) There is an agreement between ACE and GB that says that GB will be the one to develop those written procedures and policies. (12:22-25)

83.    Mr. McCreary agreed that ACE and GB should assist the policyholder with the presentation of his claim. (14:3-11) He also agreed that ACE and GB should attempt in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear. (14:13-19) In addition, Mr. McCreary agreed that neither ACE nor GB should mischaracterize or misrepresent the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 32

facts of a particular case, to the benefit of the insurer. (14:21-15:3) Moreover, ACE and GB must disclose all benefits, coverages, and time limits that may apply. (15:4-9) By the same token, Mr. McCreary agrees that ACE and GB must timely advise insureds like Germain of all policy limitations, conditions, or exclusions that may apply. (15:11-15) Significantly, Mr. McCreary agreed that ACE and GB must look for ways to apply coverage and not just look for ways to deny a claim. (15:17-19) McCreary also agreed that claim handling certainly in an occupational accident scenario or context is not an adversarial process. (15:20-23)

84.     In response to a question about the job of ACE and GB to find reasons to pay the claim both as presented and as how it should have been presented, Mr. McCreary responded that ACE and GB are to look at that claim, apply the policy parameters and if it's covered, issue a timely payment. (15:24-16:12)

85.     When asked if ACE and GB should either (1) notify the insured and tell them what needs to be presented to have coverage or, (2) be silent, McCreary testified that ACE and GB would advise the claimant on what needs to be filed to have these services reviewed for consideration under the policy and that ACE and GB's focus should not be on how to pay the claim. (16:13-24) [In my opinion, Germain should have been advised by ACE and GB that an insurance company cannot insert an extra contractual term, limitation, exclusion or loss condition that is not found in the insurance policy. For example, the insurance policy issued by ACE promises to pay Germain for losses resulting from an accident that occurred while the policy and coverage was in effect. This is found in the insuring clause on page 1 of the "certificate of insurance" that was provided to Germain and his medical providers prior to this lawsuit being filed as attached to the Complaint. The certificate of insurance is an occurrence form insurance policy. ACE and GB's claim handling practices, however, employ unfair practices which turn this occurrence policy into a claims made policy. The insuring clause for this occurrence policy is restated on page 9, requiring four things obligating ACE to pay accidental medical benefits for covered expenses under four conditions. These include (1) that the covered expense be ordered by a physician, (2) that the covered expense be medically necessary, (3) that the covered expense be medically necessary for injuries, and (4) that the covered expense be caused by an accident. The covered expenses themselves are limited to those expenses listed on pages 9-11. By inserting an extra contractual condition, limitation or exclusion to the effect that ACE will not preauthorize covered expenses that are medically necessary for injuries caused by an accident and ordered by a physician and requiring that the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 33

medical expense be "incurred" before the expiration of 104 weeks, ACE knows that an insured is less likely to undergo more expensive medical procedures such as back surgery during the 104 week coverage period. This is because providers of the expensive medical services are more aware of the risk of not being paid by an insurance company. Inserting such extra contractual terms, ACE delays the claim process, hinders its client/insured from receiving benefits, deflects bona fide inquiries from providers and ultimately denies claims on account of the 104 week claim window having expired.]

86.     Mr. McCreary testified that the job of ACE and GB is to not focus on how to make sure the claim gets paid but, instead, just focus on the process of handling the claim. (16:25-17:8) [In my judgment, not providing useful and helpful claim information is below American insurance industry claim handling standards. It is widely known that medical providers including hospitals and surgeons are more than happy to charge patients the cost of medical expense before they are undertaken. Whether ACE pays this charge before the medical procedure is actually performed or not does not relieve ACE's obligation to pay for the procedure under the terms of its insurance policy. Inserting an extra-contractual claim condition that a medical expense be "incurred" is an unreasonable claim practice that is unethical and contrary to American insurance industry claim handling standards. All the medical provider wants to know is that it will be paid a particular sum of money or at a particular rate (*i.e.* PPO, Medicare, etc.) if the subject medical procedure is performed in the future. Thereafter, surgical scheduling can take place. Doctors and hospitals are in the business of providing healthcare. They are not in the lawsuit business and do not want to be drawn into a litigation trap by an insurance company that engages in unethical, unreasonable and substandard claim handling practices.]

87.     Mr. McCreary did testify, however, that GB should advise an insured what is missing and what is needed in connection with the presentation of a claim. [In my judgment, GB and ACE should do more. That is, GB and ACE should provide their client/insureds with useful claim information that will allow necessary medical care to be received. ACE and GB should not act like alligators with their mouths open waiting for their client-insureds to walk-in after 104 weeks so that their client-insureds will be trapped in an unwanted claim denial.] By the same token, Mr. McCreary was not willing to admit that ACE and GB have an obligation to find facts that support coverage and to give those facts an objective and fair statement. Instead, Mr. McCreary testified that ACE and GB have an obligation to review facts as presented and to

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 34

compare those presented facts to the parameters of the policy and apply coverage appropriately. Mr. McCreary went on to testify that ACE and GB do not have "an obligation to go out and seek additional research on their own to find coverage for the claimant. It's all based on what's presented on the claim." (18:16-19:4)

88.    When asked how the ACE occupational accident policy differs from a workers' compensation policy, Mr. McCreary testified, "Our policy is sold to non-employees. We sell our policy to an entity that's available for nonemployees of certain classes that will provide coverage to them while they are in the employment of that person." (20:11-19) [This answer should be read in light of Mr. McCreary's testimony found on pages 68-70 of his deposition in connection with Swift being both the employer and the assuming reinsurance company for this ACE policy and Swift ending up with all of the underwriting profit or loss from the sale of the ACE policy to Germain.]

89.    Mr. McCreary was asked some questions about when a determination under the policy is only made after treatment is rendered and never made before treatment is rendered. (25:2-14) With that the explanation of how the ACE policy works, Mr. McCreary agreed that the burden shifts to the doctor and Germain to prove that their treatment is directly related to the injuries sustained. [Creating a loss condition during the course of claim administration that is found nowhere in an insurance policy is contrary to Arizona law. *Ariz. Rev. Stat.* § 20-1113(B) (7). I note that the ACE policy does not state anywhere that preauthorization cannot be given by ACE. In fact, insurance companies will universally tell medical providers that a plan procedure is covered by a particular insurance policy. This is not only done with workers' compensation insurance but is done with all forms of major medical type health insurance, automobile medical payments coverage, limited medical expense coverage, Medicare, Medicare Advantage plans and all other forms of disability insurance where medical expenses are covered.]

90.    Mr. McCreary testified that GB responds to various inquiries from different providers to the effect that the subject policy is not a workers' compensation policy and no preauthorization is required. (27:14-23) [By making the statement, ACE and GB are silent as to whether or not preauthorization under the ACE policy is prohibited or that the insurance contract does not allow ACE to affirm coverages in place for a particular claim, or even to enter into negotiation with a provider regarding terms of payment under the policy. An insurance company not being helpful during the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 35

claim process is contrary to American insurance industry claim handling standards. I also note that the representation often recorded in the Claim Log that "no preauthorization is required" is not in the policy. I also note the statement is not true in practice as ACE often provides preauthorization and, in fact, did so with respect to the back fusion surgery at L4-L5 prescribed for Germain.]

91.     Mr. McCreary testified that ACE has no written policies or procedures for selecting and engaging an insurance medical examiner. (30:8-12) [In my judgment, this testimony is not correct. Having written procedures for the fair adjustment of claims is required by statute in all 50 states[7].]

92.     Mr. McCreary testified that an adjuster has to make an initial determination that a particular medical procedure might not be related to a covered accident before sending an insured for an insurance medical examination. (33:4-7) Nevertheless, Mr. McCreary testified that there are no procedures, manuals, guidelines for doing so and such is strictly related to on-the-job training and in-house knowledge that's completely verbal among the staff. (33:9-19) [In my judgment, the six-figure expense associated with Germain obtaining spinal fusion surgery at L4-L5 was most likely the only factor that was taken into account by ACE as it was continuing to delay and deflect the claim and quietly waiting for the 104 week coverage period to expire. When the second IME report came in, it was supportive of back surgery. Yet ACE and GB continued to delay, deflect and deny the claim as they quietly waited for the 104 week claim window to shut.]

93.     The ACE policy purchased by Germain is the only choice if you are a Swift driver to have occupational accident insurance. (36:24-37:2) Mr. McCreary testified that he does not believe that an actual copy of the policy with all of its terms and conditions is provided to the insured. (37:21-38:5) [The insurance policy was marketed by Swift on behalf of ACE. Here, the policy is called a "Certificate of Insurance" but is nevertheless a policy and should have been delivered to Germain at or near the point of sale.]

94.     When handed a copy of the insurance policy asking for Mr. McCreary to point to the concept where preapproval is discussed, Mr. McCreary testified that there isn't a definition or anything in the policy about preapproval but there is a lot in the

[7]      https://www.naic.org/store/free/MDL-900.pdf

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 36

claim file. (38:6-21) Mr. McCreary testified that by preapproval, ACE can restrict the claimant's ability to seek treatment, which Mr. McCreary explained, was an advantage to the ACE insureds because the insured could go to any doctor to seek service as long as the services related to the loss and there could be coverage under the policy. (38:22-39:7) [I do not believe Mr. McCreary is sincere in this testimony. Mr. McCreary's answer is double talk. The concept of preapproval appears nowhere in the insurance contract but is imposed by ACE on insureds in a manner that is an unreasonable extra-contractual loss condition that discourages claimants from getting treatment that is unquestionably covered under the ACE policy. In my education, training and experience, I know that very few Americans have the financial ability to pay for expensive medical treatment and subsequently seek reimbursement from health insurance.]

95.     Mr. McCreary testified that the no preapproval claim handling arises from the insuring clause that appears at the top of control page 0457 regarding expenses ordered by a physician as medically necessary or that these expenses must be charged while covered. (39:17-40:14) Mr. McCreary finished his answer by testifying, "There has to be a service rendered and a charge provided in order for us to consider coverage. A predetermination does not have either of those two. So they wouldn't qualify underneath the policy terms." (40:15-18) [Mr. McCreary's testimony requires both the existence of a service rendered and a medical expense incurred before ACE has an obligation to consider coverage. However, neither having a service rendered nor a medical expense incurred are terms found the insurance policy. Concocting nonexistent loss conditions is simply the unreasonable way ACE manages their claims resulting in Germain not receiving contract benefits for his needed back surgery.

96.     In addition, Mr. McCreary freely admitted that the words "charged" and "ordered" are not defined anywhere in the insurance policy. (41:7-18) Again in his testimony, Mr. McCreary inserts an extra contractual limitation or loss condition and adds that "I think the *sequence* is expenses must be charged." [Emphasis added] (42:6-24) [Mr. McCreary's testimony was he interpreted the word "charged" in a way that would allow Swift to avoid having to pay six figure indemnity to Germain[8]. Such an

---

[8]     The word "charge" has various meanings. Some of the most pertinent are given here. The Random House Dictionary of the English Language (Unabridged, 1966) at 248 ("12. to hold liable for payment; enter a debt against. 13. To list or record as a debt or obligation; enter as a debt. 14. To impose or ask as a price: *That store charges $12 for gloves.* 15. (of a purchaser) to

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 37

interpretation is unreasonable, unethical, unfair and does not give equal consideration to the interests of Germain as ACE gives to itself. By the same token, the imposition of a special presentation "sequence" is an unreasonable, unethical and substandard extra-contractual loss condition.]

97.    Mr. McCreary again confirmed that precertification is not required or discussed at all in any written guidelines but the medical care must be medically necessary as that is defined at control page 0469. This definition includes a determination consistent with standards approved by ACE's medical personnel but Mr. McCreary does not know where these standards can be found. They cannot be found in the insurance policy. (46:4-15)

98.    ACE does claim audits on GB by randomly selecting claim files to review and audit. (57:6-18) The audit tool called Atheneum is an industry tool available for purchase and uses written guidelines called "best practices" resulting in a score during the claim audit. (57:19-60:2) [It seems to me that Mr. McCreary's testimony in this regard discloses the existence of a claim manual, which is consistent with my understanding of market conduct examinations performed approximately every five years by state insurance regulators[9]. Under NAIC guidelines, third-party administrators are held to the same claim standards as is ACE and noncompliance with the Unfair Claim Practices Act can result in administrative penalties being imposed on ACE[10]. The procedures undertaken by ACE and GB are discussed at (64:20-66:22), resulting in written audit reports that would likely be available. I would like to see these written audit reports for the past 5 calendar years to review if any state insurance department has challenged ACE as it handled any claim arising out of the "Master Contract" that make up any part of control pages 0443-0484.]

---

defer payment for (a purchase) until a bill is rendered by the creditor: *The store permitted her to charge the dress.*" The same dictionary defines the word, "charged" quite differently. "1. Pertaining to a particle, body, or system possessing a net amount of electricity. 2. Intense; impassioned... 3. Fraught with emotion... 4. Capable of producing violent emotion, arousing controversy, etc. ..."

The Merriam-Webster Online Dictionary presents the word "charged" as an adjective. https://www.merriam-webster.com/dictionary/charged.

[9]    https://www.naic.org/documents/prod_serv_marketreg_mes_hb.pdf.

[10]    Note 5, *supra.*

FREDERICK C. BERRY, JR., P.C.
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 38

99.    I find it interesting that Mr. McCreary testified that the ACE insurance contract is reinsured through a captive agreement with a Swift company. (67:17-69:10) [This tells me that Swift is the ultimate risk holder and stands to gain or lose underwriting profit depending upon a positive or negative combined ratio for the book of insurance business ceded to the Swift reinsurance company. I would like to see the agreements including the reinsurance treaty concerning the marketing of the subject ACE policy for Swift in force at the time Germain's policy was in force. I would also like to see the annual reports of the Swift reinsurance company for the last three years.]

### Review of Deposition of Brenda Cullinan [Exhibit H]

100.   Ms. Cullinan admitted that GB acting on behalf of ACE has the duty of good faith and fair dealing when handling claims, is required to evaluate and investigate Germain's claim promptly, thoroughly and fairly and assist Germain in presenting his claim. (7:6-8:23) She testified that she does not know if ACE should settle but ACE should process claims once a claim is determined it to be covered under the words of the policy. (9:5-22) [Ms. Cullinan's opinion in this regard does not leave room for ACE to comply with the implied duty of good faith and fair dealing and is, accordingly, substandard.]

101.   Ms. Cullinan did recognize that ACE should not mischaracterize or misrepresent facts or benefits and ACE should disclose time limit requirements under the policy and provide timely assistance as it looks for coverage and not just look for ways to deny coverage. (10:9-11:15) Ms. Cullinan testified that ACE would have a duty to advise Germain exactly what ACE needed and to advise Germain's physicians or to have Germain advise his physicians what ACE needed. Indeed, Ms. the Cullinan agreed that ACE should focus on how to pay a claim. (12:23-25) [Here, ACE knew the proposed L4-L5 surgery was covered by the policy. ACE would have been helpful if it told Germain and his providers that ACE would pay for the surgery at a reasonable rate such as Medicare rates, an agreed PPO rate or at a sum certain. Indeed, throughout adjusting Germain's claim, ACE would frequently utilize PPO rates as it determined a reasonable amount of indemnity to pay Germain's medical providers. The important thing, of course, was that Germain would get the needed medical care that was covered under his ACE insurance policy. Instead, ACE's claim handling omitted telling Germain and his providers about an important loss condition concerning charges for

FREDERICK C. BERRY, JR., P.C.
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 39

medical expenses and by unreasonably insisting that medical expenses be "incurred" before ACE was obligated to provide indemnity even though the word "incurred" appears nowhere in the insurance policy. It is, of course, illegal and unreasonable for ACE to deny or not pay a claim on the basis of an exclusion, limitation or condition (i.e., that an expense be "incurred") that appears nowhere in the insurance policy.]

102.    When asked if ACE is obligated to search for and seek out facts that support coverage and to give those facts an objective and fair evaluation, Ms. Cullinan testified that ACE's duty would be to advise the insured what ACE needed as far as obtaining facts and that ACE's duty is to investigate the claim regarding the police report and the circumstances surrounding the accident. (13:1-20) Ms. Cullinan did admit, however, that ACE can't just focus on facts that support claim denial. (14:3-9) Ms. Cullinan also agreed that ACE does not and should not train its adjusters and methods that help achieve financial goals of ACE. (14:17-20) She agreed that ACE must pay medically necessary procedures from workplace accidents under terms and conditions of the policy. (14:21-15:2) [ACE may not be obligated to prepay the cost of the prescribed L4-L5 surgery cost, but after the second insurance medical examination, ACE should have preapproved payment at a reasonable rate such as a Medicare rate or PPO rate after medical records and bills had been reviewed. Failure to do so is unreasonable, unethical and substandard claim handling. Indeed, under the facts of this case, this substandard claim handling was unfairly deprived Germain from getting necessary back surgery.]

103.    Ms. Cullinan was asked if she realizes that a provider doesn't understand the policy and if ACE should have a duty to point out important features of the policy to medical providers, she responded that ACE should do that because if ACE knows such a procedure is covered or not covered; that should be communicated. She added, however, that usually ACE does not know until the procedure is done if it's covered. [Ms. Collins testimony in this regard does not seem sincere under the facts of this case where several insurance medical examinations were obtained by ACE and the last one clearly and unambiguously advising that the proposed L4-L5 spinal fusion surgery was reasonable. Here, ACE had actual knowledge of the fact that the proposed surgery was covered. [American insurance industry claim handling standards mandate that ACE tell Germain and his providers in a manner that is known to gain their attention and understanding that ACE will pay for the surgery at reasonable reimbursement rates. This kind of reasonable and fair claim handling is done by other insurance companies that provide indemnity for medical expense whether the indemnity is promised in a

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 40

major medical type insurance policy, a limited medical expense policy, an automobile medical payments coverage or workers' compensation coverage. Claim delay its claim denial. ACE had no excuse for delaying the adjustment of Germain's claim until after it could issue its closed claim letter after the expiration of 104 weeks of slow walking the adjustment of the L4-L5 back fusion surgery claim.]

104.    Ms. Cullinan testified that ACE would send any insurance medical examination opinion to Germain's providers so they could see what the opinion was. She added, however, that ACE does not have a duty to tell Germain's providers anything beyond sending them copy of the IME report. (16:3-15) [Ms. Cullinan's response is unreasonable because it does not meet American insurance industry claim handling standards that require ACE to be helpful to Germain in doing everything that needs to be done to get an indemnity claim paid. Here, ACE through Ms. Cullinan were silent and their silence predictably was highly prejudicial to Germain.]

105.    Ms. Cullinan testified that if a treating physician's opinion conflicts with an insurance medical examiner's opinion, ACE will send the case out for a second insurance medical examination. (17:3-16; 18:25-19:3)

106.    [Although Ms. Cullinan testified on numerous occasions during her deposition that ACE does not preapproved anything, the evidence in the claim log as well as Ms. Cullinan's own testimony show that ACE does, indeed, preapproved temporary total disability benefits and preapproves some medical expense benefits such as injections for treatment of pain. Here, ACE undertook a second insurance medical examination and knew that the proposed spinal fusion surgery at L4-L5 was covered under the ACE policy. Not saying it would be paid at a reasonable PPO or Medicare rate was extremely harmful to Germain and, of course, was significantly and unreasonably below American insurance industry claim handling standards.]

107.    Ms. Cullinan testified that usually a physician will call and want preauthorization for a procedure. The physician is told that ACE does not do that. (21:4-9) [Telling a physician that ACE will not do preapproval for procedures is not helpful to the client-insured. This unfair claim handling practice creates a hindrance to getting promised indemnity. Played out as it was in Germain's case, it results in covered claims never getting paid which results in increased profits for ACE and Swift. Not preauthorizing covered procedures when ACE knows it is covered is not a loss condition found in the insurance policy. Indeed, the insuring clause of the ACE policy

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 41

promises to pay claims on an occurrence basis. There is no exclusion, limitation or condition in the ACE policy that requires any reasonable and necessary medical expense caused in a covered accident from having to be "incurred" before ACE is obligated to pay indemnity.]

108.   When asked if ACE would investigate if something should be covered for payment, Ms. Cullinan testified that would not necessarily be done but, instead, would be based on the records. (23:2-6) [But here, ACE knew surgery was not done, therefore insurance medical examination was ordered to see if ACE would be obligated to pay the spinal fusion surgery or if ACE could be relieved of any obligation to pay for the proposed spinal fusion surgery. The insurance medical examination was not ordered to see if the medical expense for this surgery was "incurred" or not "incurred."]

109.   Ms. Cullinan testified that ACE has no claim manual or claim handling guidelines or any such documents regarding whether or not to send a claim out for an insurance medical examination. (23:21-25) [This statement is not true. ACE does have a claim manual regarding insurance medical examinations and was discussed in Mr. McCreary's deposition at 58:3-60:9.] When asked if ACE has claim handling guidelines or procedures or documents, she answered that it has "best practices" and identified them as being about 20 pages in length. (24:1-25). [This is the claim manual that Germain has been asking about during the course of this litigation, and is set still been secreted for no good reason. Not promptly disclosing a claim manual in a claim handling lawsuit is unreasonable and below American insurance industry claim handling standards.]

110.   Ms. Cullinan agreed, of course, that the word "charged" is not defined in the policy. (28:17-25) [As I note below, insurance companies have the power to define words in their insurance policy so long as they do not violate state insurance codes. What words and phrases an insurance company chooses not to define in a policy says a lot about the insurance company's ethics and claim handling practices. By using ambiguous words or applying unusual application to ordinary words in an effort to put the interests of the insurance company ahead of the interests of its client-insured is unreasonable, unethical and below American insurance industry claim handling standards.

111.   Ms. Cullinan was asked questions about the definition of the phrase, "medical necessity" and references beginning at control page 0469. (29:8-35:6) Ms.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 42

Cullinan confirmed that ACE has no standards referenced in the definition of medically necessary which is consistent with Mr. McCreary's deposition testimony at 46:8. Ms. Cullinan minimized the absence of these standards on the basis that "each claim is different." (35:6) [In my opinion, this response is foolish. ACE has not disclosed its standards not because they don't exist, but because these standards do not to help ACE sustain its claim delay resulting in claim denial. An adverse inference should be taken against ACE on account of its failure to comply with its own policy by maintaining standards relevant to health care that is medically necessary. Stated differently, the failure on the part of ACE to disclose its standards in this regard, results in all medical procedures relating to a covered accident being deemed to be medically necessary.]

112.    I note that ACE does not audit insurance medical examination referral firms. (37:13-16) I also note that the insurance medical examination doctor is sent some of the policy wording but Ms. Cullinan does not know if for the independent medical examination physicians or reviewers were sent to policy wording in Germain's case, recognizing that it is possible that these insurance medical examiners did not get the policy wording. (40:3-41:6) In the absence of standards for medical necessity, Ms. Cullinan testified that she does not know other considerations for medical necessity. (41:8-17) [Not having claim standards for medical necessity results in an *ad hoc* claim handling practice. Such a practice is substandard, unethical and below American insurance industry claim handling standards.]

113.    Ms. Cullinan was taken through a series of questions about the three criteria set forth in the definition of medical necessity beginning at control page 0469. Her testimony regarding Germain's proposed back fusion surgery at L4-L5 met criteria number two because it was reasonably safe and effective according to accepted clinical evidence reported by generally recognized medical professionals or publications. She denied, however, that the proposed back fusion surgery at L4-L5 met criteria number one or criteria number two because, in her judgment, the surgery was not appropriate and required for the diagnosis or treatment of the occupational accidental injury and because the there is a less intrusive or more appropriate diagnostic or treatment alternative that could have been used in lieu of the surgery. [Because all three criteria must be present before ACE is obligated to pay indemnity under the definition of medical necessity, Ms. Cullinan's opinion regarding the proposed spinal fusion surgery at L4-L5 was a claim denial. American insurance industry claim handling standards require an insurance company write a letter or other effective written communication to a client-insured informing the client-insured that the claim has been denied and

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 43

providing all reasons why the claim is denied. Here, ACE did not send a letter to Germain or his lawyers before the expiration of the 104 week claim window that his claim for the specific back fusion surgery at L4-L5 was denied. This delay in communicating a claim denial to Germain is unreasonable, unethical and below American insurance industry claim handling standards. These failures resulted in Germain being highly prejudiced by virtue of him not obtaining necessary surgery before the closure of the 104 week claim window.]

114.    Reviewing the certified copy of the insurance contract at control pages a 0443-0484, Ms. Cullinan acknowledge that the policyholder was Knight-Swift Transportation Holdings, Inc., as identified on an amendment found at control page 0484. The insurance policy itself was delivered to Swift Transportation Co., Inc. effective June 1, 2007 in Arizona. (Control page 0445) Although Ms. Cullinan identified Aon as the insurance broker or producer, (45:9-19) I do not see Aon's name on the insurance policy.

115.    Ms. Cullinan testified that there is a contractual relationship between Gallagher Bassett and ACE or Chubb that is probably called a third-party administration agreement. (47:17-48:15) The only instruction that GB gets from ACE are referral amounts. (48:21-23) When claim authority is requested beyond what GB is allowed to pay, the claim file is sent to ACE. (50:7-13) The claim file would include all claim notes including emails. Germain Brown's case was referred to ACE. (51:15-52:13) Ms. Cullinan testified that GB is not paid on a percentage of premium but is paid a dollar amount per claim. (53:20-54:8) She also testified that claim audits are undertaken by ACE at least once a year and reports are probably issued to Swift. The ACE auditor is Michelle Eaddy and she imagines that the auditor looks at bills, CPT codes and makes sure that covered claims are paid, that GB did not pay duplicates or pay something that should not have been paid. (54:5-55:20)

116.    Ms. Cullinan testified that ACE only pays reasonable and customary part of a claim through either at the amount prescribed by the UCR system or the preferred provider organization system they have a contract with. GB uses Global Excel for PPO repricing. (57:1-58:15) Ms. Cullinan testified that "management action" comes out of a claim audit. (59:7-14) [I have not seen any claim audits or management action documents resulting from a claim audit. In my judgment, these documents should be disclosed by the defendants. The same is true for audit reports and scores that were identified in Ms. Cullinan's deposition at 60:13-25] Ms. Cullinan testified that GB tries

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 44

to close claim files and remembers that GB's score in a close claim file audit was 100 for financials. (62:1-11) GB's authority review at ACE is $150,000. (65:1-8)

117.  Germain's claim file was referred to ACE because of a "legal notice." (66:19-67:1) In addition to adjusting claims for ACE's Swift occupational accident policy, GB adjusts other claims for Swift Transportation. (68:21-69:1) Ms. Cullinan testified that Swift is in a captive where different motor-carriers pool risk. (69:2-71:6) She testified that she knows that Swift has involvement with the accident claim as a bodily injury liability exposure because it is in the claim notes in the Germain file. (71:7-9)

118.  Ms. Cullinan confirmed that ACE paid no indemnity after February, 2019. (74:22-75:1) She also testified that Mohave Transportation is a captive that Swift rents as identified on control page 0441. (75:2-22) [I would like to know more about Mohave Transportation and its controlling parties. Ultimately, I would like to see its Holding Company Statement (Form A), financial examination reports and market conduct examination reports regarding any insurer directly or indirectly owned by Swift. I also question that the name of Swift's captive reinsurer is "Mohave." I expect that that information will be disclosed without intervention by the judge.]

119.  A wage loss claim is identified in the claim log under code 903. (76:9-25)

120.  In getting into more detail about the claim, Ms. Cullinan testified that a proof of loss is not required for each bill. (83:1-14) [This would be a waiver of any proof of loss requirement found in the policy. A waiver such as this is very commonly done in insurance claim handling. Once a waiver is done by an insurer, the waiver may not be undone.]

121.  Ms. Cullinan testified that medical services have to be completed in order for the bill to be paid; that medical services must be performed before a bill can be paid and that ACE never pays for a service that hasn't already been done. (83:15-84:15) [Ms. Callahan's testimony in this regard show several examples of where ACE imposes extra-contractual conditions, limitations or exclusions justifying claim delay and claim denial. ACE could have used words and phrases in its insuring clause, as well as words and phrases in its loss conditions that would allow it to insist that a medical expense be *incurred* and a medical procedure *performed* before an insured was entitled to receive indemnity. ACE did not do this. It is, of course, unreasonable for ACE to insert words

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 45

not found in an insurance policy to justify claim delay or claim denial. Such is also unethical and contrary to American insurance industry claim handling standards. ACE, of course, knows that it may not delay or deny a claim if the medical expense is not incurred unless it uses the "incurred" in that part of the policy that references exclusions, limitations or conditions.]

122.   When asked how an insured would let ACE know that the insured was not interested in having a prescribed medical procedure performed in a particular way or that he or she wanted the procedure done in a different place, Ms. Cullinan responded that such is usually discovered where the physician actually writes a prescription. (102:2-10) [What usually is done or what is sometimes done does not establish an American insurance industry claim handling standard. Failing to require preauthorization for some procedures and not others is inconsistent and is a waiver of any extra-contractual exclusion, limitation or condition that a particular procedure must be *performed* and the expense *incurred* before ACE will process the expense for indemnity.]

123.   When Ms. Cullinan was asked if ACE sets up a medical procedure through its vendor, One Call Medical it "probably [is] going to be covered." (105:18-21) [This is an example of medical expense that was scheduled through one of ACE's vendors was preauthorized for payment. It is another example of the fact that ACE does, indeed, conduct preauthorization for some claim expenses and other indemnity such as total temporary disability. By not moving forward with preauthorization of other proposed procedures such as a very expensive but medically necessary and covered back fusion surgery at L4-L5, ACE is depriving its client-insured of the very peace of mind and indemnity that is promised in the insurance contract.]

124.   Ms. Cullinan agreed that ACE has claim manuals called operating procedures and best practices [after previously denying that such documents exist]. (111:11-19)

125.   I note that Ms. Cullinan testified that even though the expense for an MRI scheduled through One Call was preauthorized, she testified that ACE declines to pay MRI bills quite a bit on the basis of a lack of medical necessity. (113:15-114:1) [Ms. Cullinan's testimony in this regard seems to lack foundation except if there is a policy limitation for a specific number of procedures such as physical therapy. It seems to me that if the insurance medical examination confirms that back fusion surgery at L4-L5 is

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 46

covered but the doctor does more than fuse at L4-L5, the additional surgery beyond the scope of fusion at L4-L5 is simply not going to get paid. This is what other insurers do and is easy to administer. In this case, ACE did not tell Germain or his doctor about to this undisclosed secret "best practices" method by which ACE does allow preauthorization of covered medical expense. The failure to make this disclosure and to apply this "best practice" with Germain is unreasonable, unethical and below American insurance industry claim handling standards.]

126.    When Ms. Cullinan was asked about the numerous instances in the claim file where ACE states that the policy does not require preauthorization and that coverage is based on medical necessity, Ms. Cullinan explained that this means that ACE does not preauthorized any service. (116:19-117:1) [It seems to me that ACE should not tell its insured-clients that it will not preauthorized any service when, in fact, it will. This telling client-insureds a lie and is unreasonable, unethical and below American insurance industry claim handling standards. In addition, whenever ACE presents a hindrance or obstacle to a client-insured under this policy, it should also remind the client-insured that the ACE will not pay for any medical procedure unless that procedure is performed and the expense incurred before the expiration of the 104 week claim window. Delaying a claim without the providing this key information is unreasonable, unethical and below American insurance industry claim handling standards. In other words, ACE has absolutely no difficulty whatsoever by redundantly explaining to a client-insured, his attorneys and providers that the policy does not require preauthorization and is based on medical necessity knowing such is not true. As redundantly presented, the language, "the policy does not require preauthorization and is based on medical necessity" is mumbo-jumbo and essentially meaningless unless ACE redundantly explains to the client-insured, his attorneys and providers that no indemnity will be paid under the ACE policy beyond the 104 week claim window unless the proposed medical procedure is performed and the expense thereof is incurred before the expiration of the 104 week claim window. Of course, ACE would also have to amend its insurance policy by clearly stating a loss condition to the effect that the claim expense must be performed and the medical expense incurred within the claim window.]

127.    Ms. Cullinan testified that ACE's claim handling practice is to require service first and then a charge for that service. (117:8-11) There is nothing in the insurance contract that requires that a medical service be first performed before ACE will commit to pay reasonable expenses insured. Of course, ACE decided to not define

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 47

the word "charged" in the insurance contract as is noted in the text at footnote X.]

128.    Ms. Cullinan agreed that when adjusting claims under the ACE policy. ACE also reiterates over and over that the policy is not a workers' compensation policy and preauthorization is not required. (118:9-16) Indeed, Ms. Cullinan guesses that in workers' compensation, everything is preauthorized. (118:17-20) [Medical providers, of course, are not use to hearing that statement because they are accustom to working within the workers' compensation system and Germain's claim has all the appearance of being covered by workers compensation (as it should be). In my opinion, the representation that the ACE occupational accident policy "is not workers' compensation and preauthorization is not required and is based on medical necessity" is not understood by medical providers because it is mumbo-jumbo. Why doesn't ACE give these providers a straight answer regarding preauthorization? That is, preauthorization is generally not given, but can be given under special circumstances but that no medical expense will be paid by ACE unless the medical service is provided and the expense incurred before the 104 week claim window is shut. In my opinion, ACE does not give a straight explanation because it wants to create confusion among its client-insured, his lawyers and medical providers in order to create confusion, delay, deflection and denial of claims. ACE shifts the risk to the client-insured and his providers for not obtaining completion of the prescribed medical procedure and incurring the medical expense before the 104 week claim window closes without providing useful information. The statement that no preauthorization is required is not supported by the policy or evidence presented in this case. Lying to an insured, his attorneys or providers is unreasonable, unethical and below American insurance industry claim handling standards.]

129.    In a moment of candor, Ms. Cullinan admitted that she "can understand the provider doesn't want to do something and not get paid for it." (119:11-12) [This is exactly correct. Shifting risk by creating uncertainty and confusion results in claim delay. Claim delay is always below American insurance industry claim handling standards and is unethical and unreasonable. If Germain, his attorneys and the medical providers had actual knowledge of the fact that ACE was creating claim delay and claim confusion so it could trap its client-insured in a policy so it could trick Germain and his providers out of promised insurance benefits increases underwriting profits for Swift and, perhaps, ACE.]

130.    Ms. Cullinan testified that the claim practice at ACE requires the insured

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 48

to follow a "sequence." (108:22-24; 120:3-8) [Requiring an insured or his providers to follow a particular "sequence" or any program claim submission process is not in the insurance policy. It is an unfair claim practice that was concocted by ACE to create obstacles and snares so that its client-insureds would not get promised indemnity or simply become frustrated and confused, resulting in claim abandonment. In connection with an expensive medical procedure such as the proposed back fusion surgery at L4-L5, hospitals, doctors and other medical providers will simply likely not perform the procedures unless they receive some kind of assurance that that they will eventually be paid a reasonable fee from the available insurance. By withholding this assurance in an unreasonable and extra-contractual way, ACE engaged in claim handling practices that are unreasonable, unethical and not in conformity with American insurance industry claim handling practices. In this case, ACE's unfair claim practice resulted in Germain getting cheated and Swift and, perhaps ACE increasing their profits. For example, Thomasville Orthopedics dropped Germain because it was told that no pre-authorizations would be allowed. (121:11-19) Even after the second insurance medical examination indicated that the proposed fusion at L4-L5 was covered under the policy, ACE continued to ignore the request that preauthorization be allowed. At the end of the day, ACE and Swift didn't pay and the surgery wasn't done.]

131. Ms. Cullinan testified that the claim adjuster gets trained to write a current plan of action because it is a Gallagher Bassett standard that they have to follow this standard. Ms. Cullinan admitted, however, that the standards are not written down. (122:21-123:7) [Not writing down standards for claim handling is unreasonable, unethical and well below American insurance industry claim handling standards. Of course, ACE has policies and procedures for the prompt adjustment of claims. If it did not, I would expect that a deficiency would be noted in a market conduct examination[11] performed by a state insurance department. Indeed, ACE may very well be fined for not having written policies and procedures for claim handling. If ACE persisted in not having written policies and procedures for claim handling, I would expect that its certificate of authority to transact insurance business in the states of Georgia and Arizona would be suspended or revoked.]

132. I note that Ms. Cullinan testified that it looks like the insurance medical examination was performed to determine what further treatment, if any, is medically necessary. (123:16-24) [The insurance medical exam was not to determine the

---

[11]      https://www.naic.org/documents/prod_serv_marketreg_mes_hb.pdf.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 49

treatment, services and charges that have already been provided but to determine what future treatment, services and charges are medically necessary and covered by the ACE policy. (124:1-8) This is a major admission on the part of ACE.]

133.   [I note some additional claim delay found at control page 0371 where claims were delayed "pending the receipt of an IME report." (125:15-22) Again, the second insurance medical examination was to determine what future medical services, treatment and charges are medically necessary. (126:6-11) Ms. Cullinan also admitted that an insurance medical exam was undertaken in connection with physical therapy so the physical therapy would be done. This shows that this physical therapy was preauthorized. (127:21-128:20)]

134.   Ms. Cullinan testified that if charges and records are received, ACE determines if it's medically necessary. If it's determined that the charges are not medically necessary, ACE sends out a claim denial letter saying that the charges are not medically necessary. (130:18-131:4) [In my opinion, if ACE goes through this procedure concerning a claim denial letter if "charges" are not medically necessary, it is only fair and reasonable that ACE send out a preauthorization letter if a proposed procedure is determined by ACE through its insurance medical examination or otherwise, that a proposed procedure is, indeed, medically necessary and will be paid at reasonable rate (i.e.: relevant PPO rate, Medicare rate or some negotiated rate.]

135.   Ms. Cullinan confirmed that ACE is required to keep all claim denial letters. (132:12-19)

136.   When asked if it is ACE's position that it can't just read an insurance medical examination report and know that ACE is going to abide by the medical examination report, Ms. Cullinan testified, "you are not going to know that it's – – we are going to consider it as medically necessary until charges are incurred and we get the report." (135:3-10) [I note that "incurred" is a word that is often used in the insurance industry as a claim condition found in the insurance policy. In the ACE insurance policy, however, the word "incurred" is not used in that context. In other words, ACE has inserted the word "incurred" as a loss condition after its policy was issued and delivered. I have reviewed all of the amendments to the certified insurance policy issued by ACE {control pages 0443-0484} and do not find where the loss conditions were amended. The law requires that the all conditions pertaining to the insurance be included in the insurance policy. A.R.S. § 20-1113(B) (7).]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 50

137.    I note that that Ms. Cullinan again testified that ACE gave preauthorization for injections not yet performed. (137:4-138:2)

138.    Ms. Cullinan also testified about the "peer review" medical review stating that the proposed spine fusion surgery at L4-L5 was not necessary. This resulted in the claim for the surgery being denied. (138:7-24) The claim denial letter found on control page 0384 dated March 7, 2007 went to Germain but not his providers. (138:16-139:4)

139.    Ms. Cullinan testified at 142:3-143-13 that a bunch of doctors wrote Blue Cross and Blue Shield that Germain may require a surgical procedure, was not communicated to Germain. At control page 0384 does not say that such a procedure may be necessary in the future. Of course, the future may be after the 104 week claim window closes, which is extraordinarily important information for both the physicians as well as Germain to have in mind when evaluating what to do next. Georgia and Arizona law require that claim denial communications be in writing and contain all the reasons why the claim is being denied. [Not providing the insured with a comprehensive claim denial letter is unreasonable, unethical and below American insurance industry claim handling standards. The failure of ACE to follow this law and these claim handling standards is strong evidence supporting the fact that ACE all along actually intended to delay the claim until after the close of the 104 day claim window so that ACE and Swift could transfer approximately $256,709.00[12] in what should be claim reserve to its underwriting surplus or operating profit.] Ms. Cullinan testified that ACE never told Germain's medical providers that ACE believed that the proposed surgery was medically necessary. (144:5-12) [This failure on the part of ACE is unreasonable, unethical and well below American insurance industry claim handling standards.

140.    [I note Ms. Cullinan's continuous and inappropriate use of the phrase "independent medical examination." The medical examinations and reviews undertaken by ACE were not at all independent. They were, instead, undertaken selected by ACE and should be called "insurance medical examinations."]

141.    Ms. Cullinan testified that Germain's medical providers were not told about ACE's claim handling practices. (149:2-4) [By keeping claim handling practices

---

[12]    Report from Dr. Erik T. Bendiks at control page 0064.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 51

secret, ACE is injecting uncertainty in the claim process and creating a hurdle for its client-insured to get benefits promised in the insurance contract. This is unreasonable, unethical and below American insurance industry claim handling standards.]

142.     [I note that Ms. Cullinan again use the word "incurred" as an extra contractual claim condition as justification for delaying Germain's claim and not being helpful to Germain so he could receive all of the benefits promised in the ACE insurance contract. (150:10)]

143.   Ms. Cullinan testified that the second insurance medical examination doctor opined that his need for fusion surgery at L4-L5 was related to his back problem or the accident or that she believed the proposed fusion was for his entire back and not just the L4-L5 area. (151:15-16; 154:9; 154:24-155:1) [Ms. Cullinan is mistake in this regard. The second insurance medical examination physician stated in his report, quite clearly that the fusion of the L4-L5 was covered under the ACE policy because it was medically necessary and caused in the covered accident.]

144.   After all of her claim handling, Ms. Cullinan testified that even after the second insurance medical examination report was circulated to Germain's providers, ACE is still not going to pre-authorize the spinal fusion surgery at L4-L5 but the service has to be performed. (155:24-156:7) [ACE all along wanted Germain's providers to know that the providers bore the risk of not getting paid by ACE for the proposed medicals that were estimated to cost around $256,709.00. By shifting all risk to Germain and his providers, ACE knew that further delay would be injected in the claim as the 104 week claim window was closing. For the reasons disclosed above, ACE's position is unreasonable, unethical and below American insurance industry claim handling standards.]

145.   On direct examination from ACE's attorney, Ms. Cullinan agreed that sending the insurance medical examiner a copy of the ACE policy provided the examiner with standards for the examiner's review. (164:6-17) [The insurance policy at control pages 0443-0484 requires standards to take into account in determining whether a claim is "necessary." In this case, we know from the testimony of Ms. Cullinan as well as Mr. McCreary that ACE has no standards referenced in the definition of the phrase, "medical necessity." It would have been quite appropriate for ACE to advise its insurance medical examiners that claim handling standards require each insurer to have written procedures for (1) prompt, thorough and fair claim

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 52

investigation, and (2) prompt, thorough and fair claim evaluation. In this context, the word "fair" should be given the meaning that the insurer must give at least as much consideration to the interests of its client-insured as it gives itself.]

## Review of the Defendants' Disclosure and Discovery Responses.

146.   I reviewed the Defendants' Initial Disclosures dated April 23, 2019 and their various discovery responses dated March 25, 2019, August 1, 2019, August 12, 2019, and August 28, 2019 identified above in the section of the material I have reviewed.

147.   [As discussed below, the tort duty of good faith and fair dealing in insurance claim handling is a continuing one and may be perpetrated by an insurer using vendors, agents, employees or attorneys. In Defendants' Response to Plaintiff's Request for Production dated August 1, 2019, ACE and GB frequently object and justify nonproduction because the "information protected by the attorney-client privilege, the work product doctrine, or which was prepared in anticipation of litigation." Responses to 8, 10, 11, 18, 19. American insurance industry claim handling standards and the Federal Rules of Civil Procedure require that ACE and GB provide a proper privilege lot of each document not produced with enough detail that Germain can test if nonproduction is bona fide. Here there is nothing presented which justifies non production. Not producing a proper privilege log will delay the administration of this claim and prejudice Germain. I find it hard to believe that the lawyers for ACE and GB don't know what to do in this regard. After all, they are admitted to practice law in federal court.]

148.   [I also note that in Defendants' Response to Plaintiff's Request for Production dated August 1, 2019, ACE and GB refuse to disclose their underwriting file in item 12 because "it is irrelevant and not reasonable calculated to lead to the discovery of admissible evidence." This object is never proper and violates American insurance industry claim handling standards. Similarly, ACE and GB objected to item 20 requiring production of their claim manuals or procedures. The reason was that they are "irrelevant and not reasonable calculated to lead to the discovery of admissible evidence" and that they contain "confidential and proprietary information." I understand that Germain through his lawyers has indicated that he will not stipulate to the entry of a secrecy order and will resist any effort by ACE and GB for the entry of

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 53

such an order. The reasons why such matters are not "confidential" or "proprietary" are discussed below.]

149.    [Finally, I note that ACE and GB in their Response to Plaintiff's Request for Production dated August 1, 2019 did not disclose all of the photographs or surveillance video which was taken on their behalf by a vendor. 0614-0620 is just a report with some screen shots. All documents of information gathered by their vendor should be produced with further delay. Because the Defendants will likely continue to delay, I recommend Germain serve a documents subpoena on the vendor to get what should have been produced by ACE and GB.]

## E.    THE BUSINESS OF INSURANCE

150.    The financial services provided by insurance companies require insurance buyers to place great trust and confidence in the insurance company and the marketers selected by an insurer to sell policies.  After all, the insurance company sells nothing but a collection of papers containing promises that an insurance company will undertake certain actions upon the happening of future events including (1) the payment of money and, (2) claim service.  All an insurance company has to market is peace of mind, freedom from worry and transfer of risks from the insurance buyer to the insurance company.  For his, her or its part, the insurance consumer promises to (1) pay money to the insurance company and, (2) comply with the cooperation clause of the policy.

151.    The insurance transaction is, in itself, very complex and not easily understood by most consumers.  This lack of understanding is based, in part, upon the failure of almost all insurance consumers to actually read the insurance contract and the fact that insurance contracts themselves are difficult to understand even if the consumer takes the time to read the document.[13]

152.    The law recognizes the trust and confidence that insurance buyers place with their insurance companies and unequal bargaining power between them.  This

---

[13]    Markham, The Claim Environment (Insurance Institute of America, 1993) at 12. [Exhibit I]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 54

Common Law has evolved to the point where this special relationship carries with it the implied covenant arising out of the Common Law of torts that all insurance companies treat their client/insureds in good faith and that all insurance companies engage in fair dealing in all aspects of the insurance transaction including claim handling. As is explained below, the implied tort duty of good faith as developed by the Common Law is different from the contract duty of good faith as codified in the Uniform Commercial Code[14] and enacted by the legislature.

## F.    A BRIEF HISTORY OF THE REGULATION OF INSURANCE

153.    In approximately the 17th Century, some European merchants began to divide their cargo among ships owned by other merchants, so that if one ship and not others was lost at sea or captured by pirates, it was hoped that other ships and cargo would reach their destination. Later, certain financiers that frequented Lloyd's Coffee House in London developed a contract whereby they would agree to indemnify merchants and ship owners for a specified loss upon the payment of a premium.

154.    Insurance regulation can trace its beginning to The Bubble Act, (6 Geo. I, c 18, May 31, 1720), requiring royal charters for marine insurance. This included a statute that is essentially the same as *Ariz. Rev. Stat.* §20-1109 (requiring that statements by an applicant for insurance must be considered representations and not guarantees or warranties). Other regulation followed.

155.    The British model of insurance regulation carried over to the United States after independence and states began to regulate insurance not only for the protection of consumers concerning unfair terms but also to encourage financial solvency of insurers. Modern American insurance regulation started in the post-Civil War era with the United States Supreme Court decision in *Paul v. Virginia*, 75 U.S. 168 (1869). There, it was declared that insurance was not engaged in interstate commerce and, accordingly, should be exclusively regulated by the states. Much later in *United States v. South-Eastern Underwriters Association*, 322 U.S. 533 (1944), the United States Supreme Court held that the business of insurance is engaged in

---

[14]    *See, i.e., Ariz. Rev. Stat.* §§ 47-1305, ("Every contract or duty within this title [The Uniform Commercial Code] imposes an obligation of good faith in its performance and enforcement.") and 47-1201(A) (20) ("'Good faith' means honesty in fact in the conduct or transaction concerned.")

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 55

interstate commerce and that the federal antitrust laws apply to a rating organization that fixed the price of insurance in a manner that significantly lessened competition. Soon thereafter, the Congress of the United States adopted the McCarran–Ferguson Act of 1945, 15 U.S.C. §1011-1015, which declared that the federal government would not regulate the business of insurance so long as the several states did so effectively. The McCarran–Ferguson Act also provided that insurance companies were required to comply with the federal securities laws (regarding issuance of insurance securities) but were exempt from the federal antitrust laws. Almost immediately thereafter, all states adopted comprehensive reform of their insurance codes primarily through uniform state laws adopted by the National Association of Insurance Commissioners (NAIC).

156. Today, the business of insurance is still primarily regulated by the several states with a few notable exceptions where the private insurance industry would not provide a viable market for insurance demanded by Americans. For example, insurers did not want to sell health insurance to most senior citizens so Medicare was established. Insurers did not want to sell flood insurance so a socialized flood insurance program was adopted. Most recently, the Affordable Care Act was adopted primarily because insurers would not give up their insistence that individual health insurance be underwritten to exclude or limit coverage for pre-existing conditions.

157. The business of insurance continues to be highly regulated. *Ariz. Rev. Stat.* § 20-142 gives the Arizona Insurance Director broad powers and authority to regulate both the business of insurance as well as people operating in the insurance business. The insurance director in Arizona is given the power to examine insurers and is required to conduct a financial examination of each insurer as often as the director deems advisable but must do so at least once every 5 years. *Ariz. Rev. Stat.* § 20-156(A). The Insurance Director is also given broad powers to examine and investigate insurers' "claim files." *Ariz. Rev. Stat.* § 20-157.01. Examination of claim practices is referred to in state insurance departments and in the insurance industry as a "Market Conduct Examination." ACE is an "authorized insurer." [Exhibit C]

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 56

158.    In light of the post-Great Recession shrinkage of state government and *laissez-faire* governance in most states[15], juries are the true regulators of insurer conduct.

## G.    REGULATION OF CLAIM HANDLING

159.    In 1981, Arizona adopted the NAIC Model Unfair Claim Settlement Practices Act, *Ariz. Rev. Stat.* § 20-461 [Laws 1981, Ch. 198, §2.] Georgia adopted substantially the same model statute. GA. CODE ANN. §§ 33-6-30 to 33-6-37 (1992). This is a model state law and the NAIC Unfair Claim Settlement Practices Rule is a uniform regulation meant to support the Unfair Claim Settlement Practices Act. The Unfair Claim Settlement Practices Rule was adopted in Arizona and codified in *Ariz. Adm. Code* §20-6-801 effective January 12, 1982. Georgia did the same. GA. COMP. R. & REGS. 120-2-52 (1993). Leading up to the NAIC and state actions were Congressional hearings conducted by Congressman John Dingell. Congressman Dingell was looking into whether the Federal Trade Commission should take over regulation of insurer claim handling because of the failure of states to adopt uniform state laws and regulations establishing uniform claim handling standards.

160.    Before the adoption of the NAIC uniform statute and regulation governing unfair claim settlement practices, the many insurance companies had long developed standards for good faith claim handling. These were incorporated into claim manuals that set forth procedures, rules, guidelines and other criteria for claim handling.

161.    At the time the NAIC Uniform Unfair Claim Settlement Practices Act and Regulation were adopted, the NAIC conducted extensive public hearings and received input from insurance regulators, insurance industry representatives and some groups representing the interests of insurance consumers. The NAIC Uniform Unfair Claim Settlement Practices Act and Regulation reflected insurance industry standards for prompt, thorough and fair claim handling for both first party as well as third party claim. Since then, the statute and rule have been changed to reflect evolving standards

---

[15]    *See generally*, 2017/2018 Annual Report & Five-year Strategic Plan of the Arizona Department of Insurance [Exhibit C] at 12-15.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 57

for good faith claim handling practices in the insurance industry as well as respond in some cases to constituent requests.

## H.    THE COMMON LAW OF DUTY OF GOOD FAITH AND FAIR DEALING

162.    Although it is not my role as an insurance expert witness to provide an opinion concerning the law or the legal duty of an insurer, it is important for me to be aware of the legal duty governing insurance company practice when adjusting insurance claim. This legal duty was established by the Supreme Court of Arizona. Knowledge of this legal duty is a foundation to my opinions regarding the insurance industry standards of care when adjusting insurance claim. It was and is the role of the Arizona Supreme Court to establish the Common Law legal duty of an insurance company.

163.    Implied in every contract is a duty for all parties to the contract to engage in good faith and fair dealing. Because of the enormous disparity of the bargaining power between insurance companies and insurance consumers as well as the very nature of the insurance contract transaction [reposing great trust and confidence in an insurance company to provide peace of mind through the use of an insurance contract that transfers the risk of loss from an insured to an insurer], tort law has evolved to impose an expanded obligation of good faith and fair dealing on an insurance company, the breach of which will give rise to tort damages rather than only contract damages.

164.    The common law of Georgia regarding insurance "bad faith" is summarized in *Squires v. State Farm Fire & Cas. Co.*, NO. 1:17-CV-2613-RWS, N.D. Ga., February 28, 2019 at 12:

> Under Georgia law, "bad faith . . . means any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy." Progressive Casualty Ins. Co. v. Avery, 302 S.E.2d 605, 606 (Ga. Ct. App. 1983). Standing alone, "the mere fact of non-payment is not evidence of bad faith, nor is any burden thereby cast on the insurer to prove good faith." Florida Int'l Indem. Co.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 58

v. Osgood, 503 S.E.2d 371, 374 (Ga. Ct. App. 1998) (citation omitted). If an insurer can show reasonable and probable cause for making a defense, the good faith of the company is vindicated as effectually as would a complete defense to the action. Rice v. State Farm Fire and Cas. Co., 430 S.E.2d 75, 78 (Ga. Ct. App. 1993) (citation omitted). If there Page 12are genuine factual issues about whether an insurer has reasonable grounds to contest a claim, there can be no bad faith as a matter of law. Allstate Ins. Co. v. Smith, 597 S.E.2d 500, 503 (Ga. Ct. App. 2004). Squires v. State Farm Fire & Cas. Co. (N.D. Ga. 2019).

165. The legal duty as established by the Supreme Court of Arizona is conveniently set forth in the Revised Arizona Jury Instructions Civil (5th) Bad Faith. [Exhibit L]  I note that the Superior Court of Georgia publishes Pattern Jury Instructions which are available for use in trial courts including Federal District Court (as this matter was removed to federal court by the defendants because of federal diversity jurisdiction. The federal courts are obliged to follow applicable state law. There is no applicable federal insurance law regarding insurance claim handling.) An insured may recover bad faith damages if he proves, by the greater of weight of the evidence, that the insurer breached its implied duty of good faith and fair dealing in either one of two different ways: first, that the insurer intentionally failed to pay the claim or delayed payment of the claim without a reasonable basis for such action and knew that it acted without a reasonable basis; or second, that the insurer intentionally failed to pay the claim or delayed payment of the claim without a reasonable basis and failed to perform an investigation or evaluation adequate to determine whether its action was supported by a reasonable basis.  [RAJI Civil (5th) Bad Faith 1], [Exhibit L]

166. In all aspects of investigating or evaluating a claim, the insurance company must give as much consideration to its insured's interests as it gives its own interests.  [RAJI Civil (5th) Bad Faith 2, Exhibit L]

167. To prove that the insurer acted intentionally on the bad faith claim, the insured must prove that the insurer intended its conduct, but the insured does not need to prove that the insurer intended to cause injury. The insurer's conduct is not intentional if it is inadvertent or due to a good faith mistake such as loss of papers,

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 59

misfiling of documents and like mischance.  [RAJI Civil (5th) Bad Faith 3, Exhibit L]

168.    If the jury finds that the insurer violated its duty of good faith and fair dealing, it must decide the full amount of money that will reasonably and fairly compensate the insured for the unpaid benefits of the policy, monetary loss or damage to credit reputation experienced and reasonably probable to be experienced in the future and emotional distress, humiliation, inconvenience, and anxiety experienced, and reasonably probable to be experienced in the future.  [RAJI (5th) Bad Faith 7], [Exhibit L]

I.    **EXPERT OPINION REGARDING INSURANCE INDUSTRY STANDARDS FOR INSURERS ADJUSTING A FIRST-PARTY CLAIM**

169.    There are, in my opinion, national standards for any insurance company when adjusting a first-party insurance claim. These standards of reasonable prudence apply in Georgia and Arizona. That is, the insurance company must investigate and evaluate all such claim promptly, thoroughly and fairly.  "Fair" in this regard means that in investigating or evaluating a claim, an insurance company is required to give as much consideration to the interests of its insured/client as it does to its own interests. This concept of fairness is sometimes referred to as "equal consideration."

170.    The insurance industry standards to reasonably investigate and reasonably evaluate claim in a prompt, thorough and fair manner may be further explained by consideration of more specific insurance industry standards that are universally understood and adhered to by ethical insurers:

A.    The insurance company must treat its insured/client's interests with at least equal regard as it does its own interests;

B.    The insurance company should assist at its own expense the insured/client with the presentation of the claim.

C.    The insurance company should not mischaracterize the evidence to the benefit of the insurer.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 60

D. An insurer should not select and/or use biased consultants or experts.

E. An insurer should be open and honest in all of its dealings with its insured/client.

F. The insurance company must disclose to its insured/client all benefits, coverages and time limits that may apply to the claim.

G. The insurance company should not consider factors in its evaluation for which there is no evidence.

H. The insurance company must conduct a full, fair and prompt investigation of the claim at its own expense.

I. The insurance company should objectively evaluate all claim based on all available evidence and not just evidence which the insurance company believes supports its position.

J. The insurance company should examine and question reports from its consultants to assure they contain all opinions necessary to evaluate properly the claim and are based on all relevant and available evidence.

K. The insurance company must fully, fairly and promptly evaluate and adjust the claim.

L. The insurance company must pay timely all amounts not in dispute.

M. If there is a full or partial claim denial, the insurance company must give a written explanation, pointing to the facts and policy provisions supporting the denial.

N. The insurance company may not misrepresent facts or policy provisions.

O. The insurance company must timely advise its insured/client of all policy limitations or exclusions which may apply to a claim.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 61

P. An insurance company must not assert coverage positions which it knows are without merit.

Q. An insurance company must look for coverage and not just ways to deny a claim.

R. An insurance company must interpret its policies reasonably, pursuant to the well-recognized insurance industry rules for insurance policy construction, which include the following:

   a. exclusions and limitations are to be interpreted narrowly;

   b. insuring agreements are to be interpreted broadly;

   c. the insurance company must resolve doubts concerning coverage in favor of the insured/client;

   d. policy language should be given plain, ordinary and popular meaning;

   e. ambiguous policy provisions should be interpreted against the insurer and in favor of coverage;

   f. the insurance company has the burden of proving the application of an exclusion, limitation or condition that takes away coverage promised in the insuring clause;

S. The claim process should not be an adversarial process. An insurer's claim handlers including its attorneys are trained or should be trained to try and not be adversarial and to give the insured/client's interests at least as much consideration as they give to the insurer's interests;

T. It is the job of an insurance company to find reasons to pay the insurance claim both as presented as well as how it should have been presented. If neither the insured/client nor her/his lawyers recognize that the insured/client is entitled to something that he may be entitled to in the insurance contract, it is the insurer's obligation to point it out. Certainly, an insurer cannot deny or

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 62

delay payment of a claim without first conducting a prompt, thorough and fair investigation and evaluation of the claim. The focus of this investigation and evaluation should not be how the insurer can hold on to the proper claim reserve; the focus should be on how to pay the claim;

U.    When conducting a claim investigation or evaluation, an insurance company is not privileged to focus on facts that would support a claim denial. Insured/clients are promised that they will be given good claim service and the law requires insurers to give insureds equal consideration. All insurers are obligated to go out and look for facts and law that support coverage and to give those facts and law an objective and fair evaluation. This is what claim handlers should be trained to do;

V.    Because insurance is vested with the public interest, it is highly regulated by the several states generally and by the federal government as allowed by specific federal statutes, such as the Affordable Care Act. Adjusters are often called on to interpret statutes and regulations. Such is part of an adjuster's job. When interpreting such a law, the adjuster must do so promptly, thoroughly and fairly giving equal consideration to the interests of its insured/clients as it gives to itself. Adjusters must consider the entire statute or rule and not just that part that may favor non-payment of all or part of an insured/client's claim;

W.    Claim handlers should not base their claim evaluation on suspicion, hunches or speculation. If claim handlers including their lawyers have had experience with claim exaggeration or claim fraud, it is not appropriate to be biased in favor of claim delay or denial because some claim in their experience have included an element of fraud or exaggeration. Claim handlers should overcome insurance industry fear, prejudice and unfounded suspicion that many claim are fraudulent. Such prejudice has no evidentiary support;

X.    It is the job of all insurers to conduct a prompt, thorough and fair investigation and evaluation. There is no corresponding duty on

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 63

the part of the insured/client. The insured/client's obligation is to comply with the cooperation clause of the insurance contract, which contains an integration of most duties the insured/client owes to the insurance company;

Y.   If the insurer wants or needs something for its claim investigation or claim evaluation, it should get it. Each insurer knows what it needs and it is the insurer's obligation to affirmatively go out and get what it needs. It also has an obligation to disclose to its insured/client information it gathers in its investigation and what it does in its evaluation of the claim. This standard holds true whether the information supports the insurer/client's interests or the insured/client's interests. Withholding information from an insured/client that supports claim payment can even support a jury instruction for punitive damages arising out of the insurer's claim handling. An insurer may reasonably request its insured/client to comply with the cooperation clause in an insurance policy. It is sub-standard for an insurer to delay or deny payment of a covered claim because the insured/client has not complied with a task not required by the cooperation clause or that is impossible (i.e.: obtaining non-existent cash receipts). An insured/client may not defend a claim delay or denial based on an insured/client's alleged failure to follow the cooperation clause unless the insurer carries the burden of proving that it was significantly prejudiced by the insured/client's failure to meet the cooperation clause;

Z.   The insurer should promptly disclose to its insured/client any information it learns that is favorable to the payment of a claim. An insurer may not wait for the insured/client or the insured/client's lawyers to "ask the right question." First party claim litigation is unlike any other form of civil litigation. This is the substantive law and the insurance industry standard for good faith claim handling. An insurer's obligation in this regard is much broader than any discovery or disclosure requirement in civil litigation. The insurer's obligation to disclose exists before, during and after the commencement of arbitration or litigation;

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 64

AA.   An insurer has the duty to assist its insured/client with a first party claim.  If there is a benefit in the insurance contract that the insured/client may not know about or if there is something that needs to be done to strengthen the insured/client's entitlement to insurance contract benefits, the insurer has an obligation to assist its insured/client in obtaining that benefit.  This standard of care is existent even where the insured/client is assisted by a lawyer, advocate or public adjuster; and

BB.   An insurance company cannot misrepresent facts or insurance policy provisions to its insured/clients.  An insurance company cannot lie.  All insurers have an obligation to interpret the insurance contract fairly and to handle the claim in relation to the actual insurance policy and not in relation to extraneous things.

171.   I doubt if any witness at trial called by the insurer will disagree with any of the above standards because they are accepted standards throughout the insurance industry. Indeed, I would expect these standards to be stated (perhaps using different words) in every insurer's claim manual and in the materials used to teach its employees, agents, vendors and attorneys. All insurers always have a claim manual. Such is required in NAIC uniform state law adopted in each state. *See, i.e.: Ariz. Rev. Stat. §20-461(A) (3); O.C.G.A. §33-6-34 (3)*.  I have seen insurers not produce their claim manual because (a) it is called something besides "claim manual," (b) the insurer pretends it is propriety and confidential, or (c) the insured's lawyer "did not ask the right question" in a discovery request. In all first-party insurance claim litigation, the claim manual should be promptly produced.

172.   Insurance companies during the claim process possess Great Powers over the insurance consumer who presents a claim.  These Great Powers have been identified generally in insurance industry claim treatises as (1) the power of money, (2) the power of time, (3) the power of superior knowledge over low-information consumers, and (4) the power of litigation tolerance.[16]  In other words, insurance companies have large financial resources and perpetual existence that give them a significant advantage over the insurance consumer.  Insurance companies also have a

---

[16]     Markham, The Claim Environment (Insurance Institute of America, 1993) at 192-195, 228-229 [Exhibit I].

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 65

far superior knowledge of the insurance contracts they sell, insurance industry standards for good faith and fair dealing as well as the claim process. Insurance consumers, on the other hand, rely on their insurance company to treat them fairly and in good faith as well as the expertise of the insurance marketers selected by the insurance company to represent the insurance company with the insurance consumer. The fact is that consumers hardly ever read their policies and when they do, they hardly ever understand the interplay between the insuring clause, exclusions, limitations, conditions and specially defined words and phrases scattered throughout the policy and various amendments or "riders."[17] All this renders insurance policies almost unintelligible to virtually all consumers. Consumers increasingly rely on branding defined by advertising as insurers portray the insurance contract as a commodity.

173.   The greatest of the four Great Powers is exercised when an insurance company is willing to litigate a claim to the highest court reasonably available even when the cost to do so is far greater than the pecuniary benefit the insurer could possibly realize. Few insured/clients can match this tolerance of litigation.

174.   An insurance company may not use its claim department and, by extension, its outside vendors including its litigation attorneys as a profit center. It may not misuse its great powers of (1) money, (2) perpetual existence, (3) superior knowledge of insurance and its litigation strategy or (4) its tolerance for litigation to the disadvantage of its insured/clients. The fact that an insurer may be losing money administering a book of insurance business should not have any impact at all on its administration of any claim. Sometimes when an insurance product is designed, it is profitable and sometimes it is not. If an insurance product is not profitable, the insurer must, nevertheless, pay claim. An insurance company should not use its claim adjusters or outside lawyers to put pressure on the insured/client to accept less than what was promised in the insurance contract.

175.   It is improper to train claim adjusters and outside venders or to teach them techniques or methods that would assist the insurer to meet its financial objectives. Financial objectives have nothing to do with fair claim handling. The claim department and its attorney are required to look at the insurance policy at issue, interpret the policy fairly and reasonably and give everything the policy promises without regard to the costs to the company or if the payment of the claim will result in

---

[17]     *Id.* at 12.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 66

a drain on the insurer's surplus. The claim department including its outside attorneys is not supposed to try to figure out ways to not pay everything that is due to the insured/client.

176.   Sometimes an insurer defends a bad faith lawsuit by arguing that it was just doing to its insured/client what other insurers do to their insureds. The argument continues that such claim handling practices, therefore, conform to insurance industry "customs" and/or "practices" and, therefore, the insurer cannot be found to be in bad faith. If these "customs" and/or "practices" are contrary to either (1) the promise found in the insurance policy, (2) the legal duty for good faith claim handling [articulated in the jury instructions], (3) the standards [(A) through (BB)] set forth above or, (4) the insured's reasonable expectation, such acts or omissions [stated as "customs" and/or "practices"] nevertheless support a bad faith claim. As was pointed out in *Atchison, T. & S.F. Ry. Co. v. Parr*, 96 Ariz. 13, 17-18, 391 P.2d 575, 578-79 (1964), such testimony cannot relieve a party from liability. The Arizona Supreme Court observed that Justice Holmes once rejected a similar contention in *Texas & Pacific R. Co. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903):

> What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.

*See also*, 2 Wigmore, Evidence (3rd Ed.) § 461 and Prosser on Torts (2nd Ed.), 135. Similarly, it is error to instruct a jury that compliance with custom or practice in a particular industry is conclusive evidence of due care. *Buccafusco v. Public Service Elec. & Gas Co.*, 27 N.J. 74, 140 A.2d 79 (1958).

177.   Sometimes an insurer will argue that it may deviate (sometimes in significant ways) from the law and insurance industry claim handling standards if it has "questions" arising out of the reasonableness of its interpretation or belief as to the law or insurance industry claim handling standards. This statement is contrary to insurance industry claim standards. All insurance companies are charged with knowing all applicable law as well as insurance industry claim handling standards[18]. Relevant

---

[18]   As stated above, these insurance industry claim handling standards are always found in the

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 67

portions of the law will be read by the judge to the jury at the close of this case. ACE may not defend this lawsuit by having its lawyers or an insurance expert argue in testimony that ACE is not guilty of sub-standard claim handling or breaking the law because it did not know all applicable insurance industry claim standards or law or that it perceived the standards or law to be something other than what they are.

178.    It is, of course, up to the jury to determine the facts guided by the jury instructions. ACE's interpretation of insurance industry claim standards or its "questions" about the law or claim handling standards does not alter the law or claim handling standards. Simply stated, ACE's "interpretations" or "questions" about the law or insurance industry claim handling standards is simply the "ACE way" of doing business.  The fact that ACE conducts its affairs including its claim handling in accordance with the "ACE way" does not make the "ACE way" the law or an insurance industry claim standard. Indeed, the "ACE way" as applied to the claim of Germain being litigated reveals that the "ACE way" provided sub-standard claim handling service to Germain.

179.    Litigation is very expensive, time consuming and emotional.  An insurer's great power of litigation tolerance was explained above.  Insurance companies know that they possess this litigation power and some unethical insurance companies abuse this power as they utilize the Law of Large Numbers.

180.    Let me explain the Law of Large Numbers[19].  Insurance companies know that out of the universe of claim only a few will actually go to trial.  Very few insurance claimants have the ability to locate a lawyer to represent them through trial. Insurance companies know that most claim can be resolved for far less money than the insurance company is obligated to pay and they are fully aware of the fact that many claimants will simply give up a claim either out of disgust, fear or the inability to locate counsel to represent their interests.  The net effect of the unethical misuse of the

---

claim manual that all insurance companies are required to maintain whether or not the insurance company discloses its claim manual. [Exhibit J, note 20.] Here, ACE sometimes says it has no claim manual. This statement is not true. It is substandard, unreasonable and unethical for ACE to lie to its client-insured.

[19]    Berry, "Shining a Light on Insurer Misconduct" Presented at the American Association for Justice annual meeting in Boston, Mass. On July 25, 2017 and reprinted in "Advocate" (Arizona Association for Justice, Nov.-Dec., 2017) at text and note 15 [Exhibit J].

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 68

litigation power is that insurance companies know with certainty that few of the claimants that are denied benefits will actually withstand the gauntlet of litigation. Few claimants actually obtain a day in court where their case can be presented to a fair minded jury and judge.

181.    The distinction between tort damages and contract damages is confusing. Perhaps it can be explained by comparing the two. With contract damages, the injured party can recover the "benefit of the bargain" plus certain consequential damages. This is generally the difference between what was promised in a contract what was actually received in the contractual undertaking. With tort damages in bad faith, however, the injured insured can recover not only the unpaid benefit of the insurance policy but also monetary loss or damage to credit reputation experienced and reasonably probable to be experienced in the future as well as money damages for emotional distress, humiliation, inconvenience and anxiety experienced, and reasonably probable to be experienced in the future as determined by a jury. [RAJI Bad Faith No. 7 jury instruction, Exhibit L] It has been my experience that only insurance consumers are allowed to recover bad faith damages in tort. There is no such thing as comparative fault when dealing with the tort of bad faith. *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 97 Cal. Rptr.2d 151, 2 P.3d 1 (2000).

182.    The tort law of insurance bad faith recognizes the disparity of bargaining power between almost all insured/clients and any insurance company. Bad faith law is existent mainly because of the very nature of the insurance contract being a contract of adhesion. This means that the insurance company dictates the terms of the policy and the insurance consumer simply "adheres" to those terms. In the real world, the insurance consumer takes the policy presented by the marketer and insurance company with all of its terms, conditions and exclusions as they are. Rarely does an insurance consumer have the power to dicker with the insurance company and negotiate changes in the policy form offered by the insurance company. Although an insurance consumer has the power to shop around for insurance policies offered by different insurance companies, once a purchasing decision occurs, the consumer is stuck with the policy language found in the purchased policy. This creates an imbalance of negotiating power.

183.    The common law regarding election of remedies, estoppel and waiver are an important part of the business of insurance generally and the insurance claim

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 69

process specifically. They are very much included in the curriculum that is taught to claim adjusters by all insurance companies. As a general rule, an insurer may assert a good faith justification to deny a claim. But once a claim denial justification is given, the law of election, waiver and estoppel work to prevent an insurer from flip flopping to another reason or if the insurer is found to have knowingly and voluntarily waived other claim denial justifications. Whether an insurer committed a waiver can be an issue in dispute requiring resolution by the trier of fact but once a waiver or election is made or an estoppel committed, the insurer is not privileged to un-waive a waiver or "mend the hold." *Services Holding Co., Inc. v. Transamerica Occidental Life Insurance. Co.,* 180 Ariz. 198, 883 P.2d 435 (1994). In other words, an "insurer is not privileged 'to run with the hare and hold with the hounds' until such time as it should become plain on which side its advantage lay." *McCollum v. Continental Cas. Co.,* 151 Ariz. 492, 495, 728 P.2d 1242, 1245 (App. 1986), quoiting *Glens Falls Indem. Co. v. D.A. Swanstrom Co.,* 203 Minn. 68 at 73, 279 N.W. 845 at 847 (1938); *Hydro Systems, Inc. v. Continental Insurance Company,* 929 F.2d 472, 476 (9th Cir. 1991). "Mend the hold" is derived from nineteenth century wrestling terminology and means "to get a better grip (hold) on your opponent." *Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 362 (7th Cir. 1990).

184.    As a precondition to ACE asserting that any error or omission on the part of an insured/client (or an insured/client's agent or attorney) is a proper excuse for ACE having failed to promptly, thoroughly and fairly investigate or evaluate a first party insurance claim, ACE must first plead and prove that it was substantially prejudiced by the alleged act or omission by its insured/client, agent or attorney. There is no such thing as comparative bad faith in tort.

185.    It is, in my judgment, sub-standard claim handling for an insurance company to inject irrelevant and non-admissible evidence into the claim decision process[20]. This would include reading the mind of Plaintiff's lawyers.

---

[20]    ACE may not in its claim evaluation consider matters that are not admissible into evidence at the trial of this matter. Claim adjusters are trained, or should be trained, to understand the basics of what is admissible evidence and, of course, have access to claim lawyers who can confirm finer points of admissible evidence. Continuing to interject inadmissible matters is substandard claim handling on the part of ACE. Insurance industry claim handling standards require ACE to help Germain present his claim (whether or not he is represented by a lawyer). In this regard, first-party insurers may not erect needless litigation obstacles and hurdles that create needless claim delay and expense. ACE may not unfairly hinder and delay resolution of plaintiff's claim. Such practices by an

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 70

186. Insurance companies frequently use words and phrases that are susceptible to more than one meaning. In some cases, however, insurance companies provide special and very specific definitions for words to eliminate some or all of the ambiguity. In other cases, insurance companies purposely do not define ambiguous words and phrases. Since insurers have the power to include or eliminate ambiguity, fair consideration demands that any such ambiguity be construed in favor of the insured and against the insurer.

## J.   BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

187. In my judgment, ACE has misused its power of money, time, superior knowledge and litigation tolerance as it provided sub-standard claim service to Germain. In its claim investigation and later in its claim evaluation, ACE was not prompt and thorough and did not give equal consideration to the interests of Germain as it gave its own interests. The factual basis for this opinion is set forth above within the text of this letter defined by brackets ("[****]")

## K.   ADDITIONAL MATERIAL REQUESTED

188. I would like to have additional information from ACE in connection with this litigation. These materials are:

A.   ACE's claim manuals (by whatever name called) available for use by anyone at ACE in adjustment of Germain's claims.

B.   ACE's training material (by whatever name called) available for use to train ACE's adjusters, vendors and attorneys in the adjustment of Germain's claims.

C.   ACE's producer manual (by whatever name called) available to ACE's producer in the marketing, field underwriting, solicitation, negotiation,

---

insurer are unethical use of the insurer's Power of Litigation Tolerance and substandard claim handling practices.

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 71

procurement and effectuation of any ACE policy under which Germain is covered for the subject collision.

D.    ACE's underwriting manual (by whatever name called) available to ACE employees, agents, vendors and attorneys in the risk selection and pricing of the policy under which Germain is covered for the subject collision.

E.    Reinsurance Treaties, insurance production agreements (by whatever name called) in force between or among Swift, ACE, GB, Aon and the producer or marketer (or any other insurance producer or marketer in the marketing chain between ACE and Germain) at the time the subject policy under which Germain is covered for the subject collision.

F.    Swift, GB and ACE's incentive and compensation plans (by whatever name called [*i.e.:* "contest"]) in force for Swift, GB or ACE employees (including senior management), agents, producers, vendors or attorneys at the time Germain's claims were adjusted.

G.    ACE's Enterprise Risk Management plan (by whatever name called) in force for ACE to weigh the risk of getting caught cheating insured-clients and third-party claimants against the expected gain by engaging in providing sub-standard claim handling service. This information should be included in ACE's Corporate Governance Annual Disclosure ("CGAD") filed as required by state law. (*See*, "Shining a Light on Insurer Misconduct" which expresses the opinions of the undersigned on this subject. [Exhibit J])

H.    That information and documents that should have been disclosed because of disclosure requirements or responses to discovery requests but have not been disclosed. *See,* ¶¶147-149, *supra.*

189.   None of this material listed in the preceding paragraph should reasonably be considered confidential. Most insurers have such documents and all insurers have manuals that say virtually the same thing regarding claim standards. Insurers often claim in bad faith that such material and manuals are "proprietary" and seek to keep them secret. With rare exception no aspect of an insurer's manuals are unique or "proprietary." Claims of secrecy by an insurer or producer instead are used to (1) delay claim handling, (2) increase litigation complexity and expense, (3) create traps for

**FREDERICK C. BERRY, JR., P.C.**
David L. Boohaker, Esquire
Benjamin O. Bengtson, Esquire
Page 72

claimants and their lawyers, and (4) prevent other insureds or clients from having easy access to information that would be useful to promptly, thoroughly and fairly get a claim adjusted.

## K.    CONCLUSION

190.    Thank you for giving me an opportunity to express my opinions concerning ACE's handling of Germain's claims against ACE, the express and implied promises made by ACE in its insurance undertaking and the damages caused by ACE's unreasonable, unethical and sub-standard claim handling practices.

191.    I affirm that my opinions are derived from a review of the records provided and based on multiple factors including my experience in addition to my knowledge and familiarity with the insurance industry. The opinions and conclusions presented above are based on the records reviewed, and may or may not be supplemented or changed upon presentation of additional materials not presently available for review. The opinions above were derived only after reviewing the records and pleadings submitted. No assumptions of validity or invalidity were made prior to an actual review of the materials provided. Unless noted otherwise, all presented opinions are rendered to a more likely than not basis. The derived opinions expressed herein are the author's alone and have not been modified or skewed on the basis of any prejudice, financial consideration, or secondary influence other than an analysis of the available records, including provided communications, pleadings, etc. The opinions stated above would remain the same based upon the evidence provided regardless of the parties involved or the agent or agency requesting this review and/or examination.

Yours very truly,

*Frederick C. Berry, Jr.*

Frederick C. Berry, Jr.

FCB:tf