# EXHIBIT G

# In The Matter Of:

*GERMAIN BROWN v.*

*ACE AMERICAN INSURANCE COMPANY, et al.*

---

*DAVID McCREARY*

*August 29, 2019*

AHFI = Accredited Healthcare Fraud Investigator 6:18. = must (1) be employed by member organization (2) 3 years experience (3) 75 hours in preceding four years in anti-fraud (4) GED, AHFI (5) passing score on examination.

---




404.351.4577 | 1600 Northside Drive
(fax) 404.351.3464 | Suite 250
www.WheelerReporting.com | Atlanta, GA 30318

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GERMAIN BROWN
Plaintiff,

v.

ACE AMERICAN INSURANCE COMPANY and GALLAGHER BASSETT SERVICES INC.
Defendants.

CIVIL ACTION FILE
NO. 1:19-CV-01233-TCB

Deposition of
DAVID McCREARY

10:05 a.m.
August 29, 2019
Atlanta, Georgia
before Carol Lipinsky, CCR

WHEELER REPORTING COMPANY, INC.
1600 Northside Drive, N.W.
Suite 250
Atlanta, Georgia 30318
(404)351-4577



INDEX TO EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| #1 | Certified Copy of Insurance Policy | 35 |
| #2 | Payment Register from Gallagher Bassett | 52 |


P.V. Claims for Chubb North America 26 years "special risk accident and health business"



APPEARANCES OF COUNSEL:
For the Plaintiff:
DAVID BOOHAKER, Esquire
McDonald Law Firm
800 Johnson Ferry Road, NE
Suite B
Atlanta, Georgia 30342
david@mcdonaldlawfirm.com
- and -
BENJAMIN O. BENGTSON, Esquire
The Law Firm of Benjamin O. Bengtson
1000 Parkwood Circle
Suite 350
Atlanta, Georgia 30339
ben@boblawfirm.com
For the Defendant:
KENAN G. LOOMIS, Esquire
Cozen O'Connor
1230 Peachtree Street NE
Suite 400
Atlanta, Georgia 30309
kloomis@cozen.com



(Signature reserved.)
DAVID McCREARY,
having been first duly sworn by the notary public, was examined and testified as follows:
EXAMINATION
BY MR. BOOHAKER:
Q. Mr. McCreary, can you identify yourself for the record for us?
A. David McCreary.
Q. Have you ever given a deposition before?
A. I have.
Q. Okay. Is it okay, then, if I cut out with all of the usual intros about depos and what goes on?
A. Yes.
Q. Okay. Let's start off, can you tell me a little bit, what's your background, your work background?
A. Okay. I am the vice president of Chubb North America Claims Accident and Health. I am responsible for overseeing the claims for that and my staff that works underneath me. I have been doing insurance since March of 1985. I have been doing special risk accident and health business for the last 26 years.
Q. Okay. How many prior depositions have you given?
A. Five to ten probably.

Page 5

Q. All right. Have those all been as the corporate representative for Chubb?
A. No.
Q. What have you given those depositions as?
A. I have given them as a corporate representative and also as a claim handler.
Q. Of the five to ten that you have given, how many have been as a corporate representative and how many as a claim handler?
A. Probably 50/50.
Q. So you said you have been in insurance since March of 1985. Has all that time been with Chubb or its predecessor entities?
A. Other companies.
Q. How long have you worked for Chubb?
A. I worked for Chubb 16 years.
Q. So it's been since 2003?
A. Yes.
Q. Who did you work for before that?
A. AIG for the prior 10 years. Then I worked for a temporary agency for a number of years. I started out with Blue Cross Blue Shield DC.
Q. Okay. So one of the defendants in this action is ACE American Insurance Company. What's the relationship between Chubb and ACE?

Page 6

A. ACE American Insurance Company is an underwriting paper that Chubb uses.
Q. But you work for Chubb, you do not work for ACE; is that correct?
A. They are one in the same.
Q. Okay. Perfect. As we go along today, if I am asking you a question like that that's confusing, it's just because I don't work at Chubb, and I don't know.
A. Sure.
Q. If there's some sort of explanation, feel free to give it to me.
A. Okay.
Q. Okay. So I want to talk to you a little bit more about your background. What sort of insurance -- I guess for lack of a better term -- credentialing do you have? Sometimes insurance professionals may have CPCU. What do you have particularly?
A. I have AHFI, which is an accredited healthcare fraud investigator. I have a producer license for property, casualty, and A&H in Pennsylvania and Delaware. And I have all-lines adjustor licenses in Delaware, Pennsylvania, Texas, North Carolina, and I believe Connecticut.
Q. All right. Now, in your capacity as vice president at Chubb, what is your relationship or what is

Page 7

your role with regards to occupational accident policies like the one at issue here?
A. Well, they are one of the programs that myself and my team oversee.
Q. Okay. Briefly what other programs do you oversee?
A. We oversee any programs that's written through accident and health. It could be business travel accident, it could be enhanced banking, it could be cell phones, it could be Texas non-subscriber, it could be an AD&D policy, out of country medical. Whatever the business unit writes, we handle those type of claims, oversee those.
Q. How much of your time would you say you devote to the occupational -- what do you guys call the unit that handles occupational accident policies?
A. We don't. So within my unit, I don't have a separate unit that handles occupational accident. I have a staff of people that are qualified that understand all of the programs and work with our various TPA's when questions arise.
Q. All right. How many staff do you have that work on occupational accident policies?
A. Five right now.
Q. Okay. And they interface with TPA like --

Page 8

(Telephone interruption.)
BY MR. BOOHAKER:
Q. Those five interface with your third-party administrators like Gallagher Bassett; is that correct?
A. That's correct.
Q. What other TPA's do they interface with in the occupational accident scenario or context?
A. That's the only one.
Q. That's the only one. Okay. How much of your time would you say is devoted to the occupational accident side as opposed to any of the other parts of your business?
A. I don't know.
Q. If you had to ballpark it, half your day, 20 percent of your day, can you do that?
A. You know, it would vary depending on the day.
Q. All right.
A. Some days I may spend 20 percent of my time, some days only 10 percent. It depends on the issues and what underwriters have and what's going on.
Q. You understand today that you are here as the corporate representative for ACE/Chubb; is that right?
A. Yes.
Q. Should I refer to it as ACE or Chubb or does it make a difference?

A. It doesn't matter.
Q. As the corporate representative for ACE, do you understand your answers are binding on the corporation; is that right?
A. Yes.
Q. So unless you tell me so, today I am going to presume the answers that you give me are on behalf of ACE, okay?
A. Yes.
MR. LOOMIS: Let me interject. His answers are binding on the corporation that fall within the notice. If you start asking him stuff outside the notice, the rule is not -- I am not going to tell him not to answer. But the answers would not be binding on the company.
MR. BOOHAKER: Do you want to -- I guess we haven't talked about objections. Do you want to reserve except to form and responsiveness?
MR. LOOMIS: Yes, that's fine. I didn't want there to be any suggestion we would be waiving our right to assert -- those answers are not binding to the extent that you had stuff that is off the three issues you noticed him on.
BY MR. BOOHAKER:
Q. All right. So Mr. McCreary, let me ask you in a



general sense, in a claims handling sense, when ACE is handling occupational accident policies, when they are adjusting occupational accident policies, specifically we are talking about the occupational accident policy that Mr. Brown had -- you understand you are here for Mr. Germain Brown's case, correct?
A. Yes.
Q. Does ACE owe Mr. Brown a duty of good faith and fair dealing when adjusting his claim?
A. Yes.
Q. Is ACE required to give as much consideration to Mr. Brown's interests as ACE's interests when adjusting his claim?
MR. LOOMIS: That calls for a legal conclusion. I will object to form. You can answer the question.
A. Yes.
BY MR. BOOHAKER:
Q. Okay. Is Gallagher Bassett the third-party administrator for ACE with regards to his occupational accident policies?
A. Yes.
Q. Is Gallagher Bassett ACE's agent when it comes to handling the occupational accident policies that ACE underwrites?



MR. LOOMIS: Object to form. That's a legal issue as well. You can answer the question, though.
A. What do you mean by agent?
BY MR. BOOHAKER:
Q. Do they act on behalf of ACE and in ACE's stead?
A. They act on our behalf as the claims pair under a TPA model.
Q. Okay. And what do you mean by a TPA model?
A. Third-party administrator, someone who we have contracted with to handle certain types of claims.
Q. Okay. I want to talk about that at a later point. Does Gallagher Bassett also owe Mr. Brown a duty of good faith and fair dealing when adjusting the claim?
MR. LOOMIS: Same objection.
A. Yes.
MR. LOOMIS: Form.
BY MR. BOOHAKER:
Q. Your answer was yes?
A. Yes.
Q. Does ACE and Gallagher Bassett have a duty to investigate and evaluate Mr. Brown's claim promptly thoroughly and fairly?
MR. LOOMIS: Calls for a legal conclusion as well. Objection. You can answer the question.



A. Yes.
BY MR. BOOHAKER:
Q. Are ACE and should ACE and Gallagher Bassett adopt and implement procedures for the prompt investigation and settlement of claims arising under occupational accident policies like Mr. Brown?
A. Yes.
Q. Okay. I will talk about -- I will go in detail about that a little bit later. But does ACE or Gallagher Bassett have any claims, adjusting manuals, or written standards that they use in order to investigate any unsettled claims?
A. I can only speak for ACE Chubb. We do not have a written manual to follow.
Q. All right. So ACE has no written manual or guidelines or procedures or policies that outline how to adjust or handle occupational accident claims?
A. No.
Q. Who does?
A. I would say Gallagher Bassett has them since they handle the claims.
Q. Is there an agreement between ACE and Gallagher Bassett that says that Gallagher Bassett will be the one to develop those written procedures and policies?
A. Yes.

Page 13

Q. Okay. What is that agreement called?
A. Our third-party administrative agreement.
Q. Have you seen this third-party administrative agreement?
A. I have.
Q. Okay. To your knowledge, has it been edited recently?
A. Not that I am aware of.
Q. How long has it been in place with Gallagher Bassett?
A. As long as I have been there. So at least 16 years.
Q. Okay. Is it ever updated or revised or changed -- has it ever been updated, revised, or changed since you have been there in the last 16 years?
A. I am sure it has.
Q. Okay. Do you know how many versions it's gone through?
A. I do not.
Q. Okay. If I wanted to ask for that document specifically, what would I ask for, the third-party administrative agreement with Gallagher Bassett?
A. Yes.
Q. That's its formal name? If I came and asked you for that document, you know which document I am referring

Page 14

to and where to go get it?
A. Yes.
Q. Okay. I just want to digress there for a minute. I will come back to that. Let me stay with some more of the general themes that I want to talk to you about. Should ACE and Gallagher Bassett assist the policyholder with the presentation of his claim?
MR. LOOMIS: That's a legal conclusion. Legal issue too. I object. You can answer the question.
A. Yes.
BY MR. BOOHAKER:
Q. Okay. Should ACE and/or Gallagher Bassett attend in good faith to effectuate prompt, fair, and equitable settlement of claims submitted in which liability has become reasonably clear?
MR. LOOMIS: Same objection. You can answer the question. Form of the question.
A. Yes.
BY MR. BOOHAKER:
Q. Now, ACE and Gallagher Bassett, they should not mischaracterize or misrepresent the policy terms to the benefit of the insurer, correct?
A. Correct.
Q. Okay. And they should not mischaracterize or

Page 15

misrepresent the facts of a particular case to the benefit of the insurer, correct?
A. Correct.
Q. They must disclose all benefits, coverages, and time limits that may apply, correct?
MR. LOOMIS: Objection. That's a legal question too. You can answer the question, though.
A. Yes.
BY MR. BOOHAKER:
Q. Okay. They must timely advise insureds like Mr. Brown of all policy limitations, conditions, or exclusions that may apply, correct?
MR. LOOMIS: Same objection.
A. Yes.
BY MR. BOOHAKER:
Q. They must look for ways to apply coverage and not just ways to deny a claim, correct?
A. Correct.
Q. Claims handling certainly in an occupational accident scenario or context is not an adversarial process, correct?
A. Correct.
Q. And ACE/Gallagher Bassett's job in that scenario, claims handling scenario, is to find reasons to

Page 16

pay the claim both as presented and as how it should have been presented, correct?
MR. LOOMIS: That's a legal issue too. Objection. You can answer the question.
A. Can you clarify what you mean presented or as --
BY MR. BOOHAKER:
Q. Sure. Let me break it up. There were two. Let me ask you this: ACE/Gallagher Basset's job is to find reasons to pay the claim as presented, correct?
A. So their job is when a claim is submitted in to them, they are to look at that claim, apply the policy parameters. And if it's covered, issue a timely payment.
Q. Correct. Okay. In the scenario where a claim is presented and there may have been another way to present it where coverage would be applicable, what would ACE and Gallagher Basset do then; is it to notify the insured and tell them what needs to be presented to have coverage or to be silent?
A. No. It would be to advise the claimant on what needs to be filed to have the services reviewed for consideration under the policy.
Q. Okay. Should ACE and Gallagher Bassett's focus be on how to pay the claim?
A. No.
Q. Why not?



provider wants further assurances regarding specific charges, Δs should negotiate price. The point is that Δs should help π receive benefit of policy; not hinder, delay, deflect + deny.

Page 17

A. I think our focus is, has Gallagher Bassett evaluated it and applied the provisions of the policy correctly, whether that's a payment and/or denial.

Q. So if there are -- so it's your contention that ACE and Gallagher Bassett shouldn't be focusing on how to make sure to pay; just as presented it's handled correctly?

A. Correct.

[handwritten: No. Violates American Insurance Industry Claim Handling Standards.]

Q. So does ACE or Gallagher Bassett have a duty to let the insured know that there's a different way to present a claim that might find coverage?

MR. LOOMIS: Objection to form. Calls for a legal conclusion. You can answer the question.

A. If a claim is remitted and the policy does not provide coverage, Gallagher Bassett has an obligation to send a letter to the claimant advising him of the reasons why it wasn't covered. And if the claimant wants to appeal it with additional information, they can. [handwritten: No. See bottom of P. 16.]

BY MR. BOOHAKER:

Q. What if there are facts out there that could change no coverage to coverage, does ACE or Gallagher Bassett have a duty to notify the insured about that?

MR. LOOMIS: Objection to form. It's a hypothetical question.

A. I don't know how Gallagher Bassett would know

Page 18

there's other information out there if it wasn't presented to them.

BY MR. BOOHAKER:

Q. Well, Gallagher Bassett has their own duty to do a fair and investigation, correct?

A. Yes.

Q. If there's information that Gallagher Bassett has that perhaps the claimant is not presenting correctly, does Gallagher Bassett have a duty to notify the claimant on how to present it correctly to find coverage?

MR. LOOMIS: Objection to form. Calls for a legal conclusion. You can answer.

A. Gallagher Bassett should advise them what is missing and what is needed.

[handwritten: ΔS should tell π what is missing & what is needed.]

BY MR. BOOHAKER:

Q. All right. Does ACE/Gallagher Bassett, do they have an obligation to find facts that support coverage and to give those facts an objective and fair evaluation?

MR. LOOMIS: Same objection.

A. ACE and Gallagher Bassett have an obligation to review the facts as presented, compare it to the parameters of the policy, and apply coverage appropriately. If there isn't coverage under the policy, they have an obligation to advise the claimant why it wasn't covered.

[handwritten: ΔS have obligation to review facts as presented and apply coverage or tell π why there isn't coverage.]

Page 19

[handwritten: ΔS not obligated to research to find coverage. No. Fair & thorough investigation requires ΔS to look for ways to pay indemnity]

I don't believe that ACE and/or Gallagher Bassett has an obligation to go out and seek additional research on their own to find coverage for the claimant. It's all based on what's presented on the claim.

BY MR. BOOHAKER:

Q. Okay. Can ACE/Gallagher Bassett -- I am referring to both of the entities together in this instance -- train claims adjustors or outside vendors in methods that are oriented towards reaching financial goals as opposed to finding coverage?

A. I'm sorry.

THE WITNESS: Can you read the question back?

(Question read.)

MR. LOOMIS: You can answer, if you understand it.

A. I am not sure I understand the question.

BY MR. BOOHAKER:

Q. Sure. Can they train their adjustors or their vendors to minimize costs on a claim solely at the expense of proper adjustment?

A. No. We train our adjustors and our TPA's train their adjustors to take the information, evaluate it against the policy, and provide the proper benefits. There's no -- it doesn't matter the amount of the claim.

Page 20

If it's payable, it's payable. If it's deniable, it's deniable.

Q. Let's talk real briefly about some basic terms. Can you tell me what the difference is between a workers' comp policy and an occupational accident policy, specifically this occupational accident policy?

A. Before I respond, I want to qualify that. I am not a workers' comp expert at all. I am not comfortable with speaking about workers' comp. I can speak about the occ/acc portion.

Q. What I am trying to figure out is how in your mind or knowledge is the occupational accident policy different than a workers' compensation scenario. What are the differences between your policy and workers' compensation?

A. Our policy is sold to nonemployees. We sell our policy to an entity that's available for nonemployees of certain classes that will provide coverage to them while they are in the employment of that person.

So in this case, under load or dispatch for Swift, it has a benefit maximum that pays certain benefits for a certain time period and then the coverage would cease.

Q. So in your mind, is the payment maximum and the time period the main distinctions between your

occupational accident policy and the worker's compensation scenario?
A. Well, also -- again, I don't know workers comp. I think there are state laws that workers' comp claims follow which ours don't. I don't know how long a workers' comp pays or doesn't pay or what workers' comp claims do to claimants or don't. I don't have that background, so I can't talk to it.
Q. So you used a term, letter dispatch to Swift. What is a letter dispatch to Swift?
A. They are covered while they are under load or dispatched.
Q. Load or dispatched?
A. Load or dispatched. I'm sorry.
Q. I will get to that in a minute. Under an occupational accident policy like Mr. Brown, how does one make a claim? First, what is a claim under that policy?
A. So a claim would be if the policy -- if Mr. Brown met the eligibility under the policy, and he was working at the time of an accident -- it's an accident only policy, it does not provide any sickness coverage -- Mr. Brown is to notify, I believe he notifies Swift and then Gallagher Bassett, fill out a claim. He would provide the treatment records, the treatment -- proof of services rendered with a charge.



Gallagher Bassett then investigates the claim, verifies he was under what I call load or dispatch, so he was working at the time that the accident occurred. They would cover the -- they would process the claim according to the policy terms.
Q. All right. So he first reports -- you gave us a lot in there. He first reports the claim to Swift, correct?
A. Yes.
Q. That's all he needs to do, and Swift gets the process started with Gallagher Bassett, to get the process started?
A. I believe Swift tells Gallagher Bassett. I am not on that front end handling.
Q. And then Gallagher Bassett subsequently communicates back with Mr. Brown and says, we have some forms for you to fill out, correct?
A. Correct.
Q. Are some of those initial forms what's called a proof of loss?
A. Yes.
Q. All right. What is contained in that proof of loss?
A. So it would be name, where he was driving at, nature of the injury, things of that nature.



Q. Okay. So after Mr. Brown fills out that proof of loss and submits it to Gallagher Bassett, what else does he -- let's presuppose that it's an accident during the course of his employment, load and dispatch, like you said. What else does he need to do to show to Gallagher Bassett that he is entitled to coverage?
A. He completes the claim form.
Q. What I am trying to figure out here is, how does he let his doctors know that his carrier is going to pay for the treatment that they are going to provide to him; what's the next step he needs to do after that proof of loss is filled out?
A. He can go seek treatment at any doctor. He can have -- then the doctor can bill Gallagher Bassett directly. And if it is a covered loss and a covered service under the policy, Gallagher Bassett can pay back the doctor directly. If Mr. Brown has paid out of pocket, Gallagher Bassett would do the same adjudication of the claim and reimburse Mr. Brown accordingly.
Q. Okay.
MR. BOOHAKER: So would you read that back?
(Answer read.)
BY MR. BOOHAKER:
Q. What makes it a covered loss?
A. It would be a service that was provided and



charged against Mr. Brown that's directly related to the injury that he sustained during the accident.
Q. So who made the determination that the injury, the treatment is directly related to the injury sustained?
A. That would be Gallagher Bassett.
Q. Okay. And when did they make that determination?
A. When the claim is -- when the claim and the itemized bill for services rendered is submitted into them.
Q. There's basically a burden shifting, if you will. Does the burden shift on to the doctor or Mr. Brown to prove that the treatment was directly related to the injury sustained?
MR. LOOMIS: Objection to form. That's a legal question. You can answer the question.
A. I don't think the burden shifts to the doctor or Mr. Brown. If it's related to an accident and they send the claim in and it's validated under the policy, benefits will be paid.
BY MR. BOOHAKER:
Q. Right. But the doctor or Mr. Brown are not the ones who make the determination if it's directly related to the injury sustained; is that correct?
A. That would be based on -- Gallagher Bassett

Page 25

based on the policy.
Q. The doctor and Mr. Brown don't make the determination that the treatment was directly related to the injuries sustained?
A. Okay. I guess.
Q. That's correct?
A. Yes.
Q. That determination is made by Gallagher Bassett?
A. Yes.
Q. That determination under the way you understand the policy works is only made after treatment is rendered?
A. Correct.
Q. Never made before treatment is rendered?
A. Correct.
Q. So the burden shifts, then, to the doctor and Mr. Brown to prove that their treatment is directly related to the injury sustained?
MR. LOOMIS: Object to form. You can answer the question.
A. Yes.
BY MR. BOOHAKER:
Q. So along those lines, is ACE or Gallagher Bassett obligated to pay for all medically necessary procedures for injuries resulting from a workplace accident?

Page 26

A. Yes.
Q. Okay. Now, I want to talk about a little bit now -- I think we will cover it a little bit later as well. There's mention many times that this policy does not require preauthorization. Am I correct in that?
A. Yes.
Q. What in your mind is preauthorization?
A. In my mind, preauthorization is authorizing a service to be rendered prior to it being rendered and a charge being applied.
Q. Okay. Why is the occupational accident policy not required for preauthorization?
A. Just the way that the occupational accident policy is written. There's no preauthorization required. We allow an injured person to treat with whoever it wants to for the condition and submit the bills in for consideration.
Q. So that injured person essentially has to get his treatment on spec, if you will, hoping that the payment will come after the fact?
A. If it's related to the accident, the payment will come.
Q. But that relation to the accident is determined by Gallagher Bassett after services have been rendered and after either the policyholders come out of pocket or the

Page 27

doctor has conducted the procedure?
A. Yes.
Q. All right. As the representative for ACE/Chubb, you have no idea why preauthorization is not required in the occupational accident policy?
A. It's just not part of the offering on behalf of Chubb to preauthorize services.
Q. So I have seen a -- I reviewed the claim notes. We will talk about that in a little bit. There's come up quite a few times in the -- by the way, have you reviewed the claim notes in the case?
A. I reviewed a few but not -- I reviewed for what you said you were going to depose me on.
Q. At certain points through those claim notes, the representative of Gallagher Bassett in response to various inquiries from different providers would say this is not a workers' comp policy, no preauthorization is required. Did you see that appear in a claim note at some point?
A. Sure I did, yes.
Q. Okay. That's mentioned repeatedly to various different providers by Gallagher Bassett in the claim notes. Did you see that?
A. Yes.
Q. At some point if Gallagher Bassett or ACE realizes that providers don't understand that policy

Page 28

language, does Gallagher Bassett or ACE have a duty to point that out to those providers?
MR. LOOMIS: Object to the form. It's asking for a legal conclusion.
BY MR. BOOHAKER:
Q. In other words, if the Gallagher Bassett claims adjustor realizes there's a misunderstanding between the provider that they are talking to and the way that the ACE policy functions, does Gallagher Bassett have a duty to point out that discrepancy to the provider?
MR. LOOMIS: Same objection.
A. I think when Gallagher Bassett tells them this isn't a workers' comp policy, a preauthorization isn't required, that they have done their duty.
BY MR. BOOHAKER:
Q. You don't think there's anything else they have to tell a provider?
A. No.
Q. Explain to me how the IME process works in the context of an occupational accident policy like this one.
A. So when a person has a claim under the occ/acc policy, and a claim is submitted, and the TPA in this case, Gallagher Bassett, is not sure if the services are or aren't related to an injury, they are not medical doctors, they will send it out, the medical records out

for review by a doctor of similar credentialing as the treating physician, and ask them to opine on it, because we don't want to make our TPAs or anyone who is not in that -- a doctor to make those type of decisions.
Q. There's a lot to unpack in there.
MR. BOOHAKER: Can you read that answer back?
(Answer read.)
BY MR. BOOHAKER:
Q. Okay. So in this scenario, there is a treating physician who says, Hey, we need to -- we want to submit this claim for payment. We maintain it's related to the injury. And then Gallagher Bassett hires an IME to determine if that's correct. Is that right?
A. Depending on the service, yes.
Q. That's one of my next questions. Where is the line between Gallagher Bassett's discretion to be able to approve it out of hand and having to refer it out to an IME?
A. I think that comes down to the experience of the adjustor, just to make sure that the services are directly related to an accident. Again, because they are not medical doctors, they need to seek opinions of medical doctors from time to time to make sure that we are paying claims appropriately in accordance to the policy.



Q. So if a claims adjustor is brand new and never handled occ/acc policy before and has no medical background, is he seeking an IME for every claim submitted?
A. I doubt that he would. I mean, I think he would go to his supervisor manager for assistance first. Then if you need an IME, you would go externally.
Q. So there is no written policies or procedures that say, Hey, when you are presented with a claim, that that requires an IME, but this claim does not require an IME?
A. No, no written procedure.
Q. And there's no claims handling guidelines to help decide when to submit to an IME and when not to?
A. No.
Q. That's simply left up to the discretion of the non-medically trained claims adjustor and/or his supervisors?
A. Yes.
Q. All right. What kind of deference is given to a treating physician's determination that the claim submitted is related to an injury?
A. In regards to what?
Q. Well, if my doctor, Dr. Smith in this example, submits a claim to Gallagher Bassett and says this

In my judgment, there are written policies or procedures required as unfair by Unfair Claim Practice Act in AZ + GA



treatment I have provided is medically necessary and related to the accident in question, what kind of deference is given to the doctor in that case as opposed to seeking an independent medical opinion?
MR. LOOMIS: Can you read that question back one more time?
(Question read.)
MR. LOOMIS: I am going to let him answer the question, of course. You are getting pretty far outside the three issues he is here to talk about today. Go ahead and answer, as best you can.
A. So the records, the information provided by the treating physician would be reviewed by the examiner and/or their supervisor. They would give it all the consideration. But if they're unsure, then they would seek an outside opinion.
BY MR. BOOHAKER:
Q. What would make a non-medically trained adjustor be unsure about what was the opinion of a medically-trained doctor who had been treating a claimant?
A. It could be words that are used in the medical records, it could be areas of treatment, it could be a lot of different things that are contained within a medical documentation that would prompt them to seek an



independent review.
Q. What kind of words would make them seek an independent review?
A. Degenerative, pre-existing, words like that.
Q. Okay. What kind of treatments would make them seek an independent review?
A. It could be all treatments.
Q. You said there's certain words that could make them seek an IME, there are certain treatments that could make them seek an IME. What kind of treatments would make them automatically seek an IME?
A. It could be injections, it could be MRI's, it could be EKG's, it could be any service that a provider is providing. If they are unsure, they would seek an IME on that to validate it.
Q. Right. But why would an injection make an adjustor be unsure as to whether or not it was medically unnecessary?
A. If the injection were treating another condition that wasn't related to the accident.
Q. So in this case where a doctor says, I believe this claim submitted is medically necessary and related to the accident, the adjustor is making his own determination that the injection is not actually treating something that was medically necessary and related to the accident.

Page 33

A. No. I think the adjustor is seeking the advice of another qualified physician to determine if it was or wasn't.
Q. Right. But that adjustor has to make an initial determination it might not be related, and that's why they need to seek additional advice?
A. Yes.
Q. All right. Are there any written policies, procedures, manuals, guidelines, anything of the sort that help adjustors determine what words or procedures require an IME as opposed to do not require an IME?
A. No. [not true]
Q. None of the claims manuals or handling guidelines approach this issue at all?
A. No. [not true]
Q. It's all strictly related to on-the-job training and in-house knowledge that's completely verbal among the staff?
A. Yes. [not true]
Q. Okay. How in your mind is obtaining a determination of medically necessary not preapproval?
MR. LOOMIS: I'm sorry. Please read it back.
(Question read.)
A. So when a claim is submitted in to Gallagher

[Here, suggested factors don't fit. In my judgment, the expense of the needed treatment was only factor that drove DS to IME looking for reason to avoid paying big indemnity money.]

Page 34

Bassett, there has been a service provided with a charge. That's being sent into them for consideration under the policy.
At that point, that claim that they were sending out for an IME, there's already been a charge incurred to determine whether it's medically necessary or the condition to be paid.
A predetermination, if I understand what you are asking, is you would want Gallagher Bassett to advise a provider that a service will or will not be covered before the service and/or charge -- or before the service is rendered and a charge is applied. That's the difference.
BY MR. BOOHAKER:
Q. All right.
MR. BOOHAKER: Kenan, Ben and I were talking about this. We would like to label them sequentially so we can refer to them not just this dep but maybe future ones. Are you opposed to that?
MR. LOOMIS: Sure. Do you want to do it not plaintiff's and defendants' but just 1 through -- all the way through?
MR. BENGSTON: It's that fine with you.
MR. LOOMIS: As long as we keep up with it.

Page 35

BY MR. BOOHAKER:
Q. Okay. Mr. McCreary, I am handing what's been marked Defendants' 1. For the record this is Bates labeled 443 through 484, which has been represented to us by Chubb is a certified copy of the insurance policy. Take a look at that please.
(Exhibit 1 marked for identification.) [Ex 1 = policy]
A. Okay.
BY MR. BOOHAKER:
Q. Is what I handed you the certified copy of the policy at issue in this case?
A. Yes.
Q. Okay. Just some minor housekeeping things. Can you turn to Defendants' -- are you aware of what a Bates label is?
A. A base label?
Q. Bates label. This little number, that's called a Bates label, how we keep track of pages.
A. Okay.
Q. I want you to turn for me to Defendants' 445, if you would please.
A. Okay.
Q. Now, my question for you is: Who's the policyholder listed there?
A. Swift Transportation Company.

Page 36

Q. Is this policy some sort of a master policy that all the contractors for Swift subscribed to at a different time? In other words, is this the policy that Mr. Brown himself took out in January 1st of 2008, or does he become a beneficiary under this policy by paying into the fund, I guess?
A. So this policy is sold to Swift Transportation. So when they bring on an independent owner-operator, non-employee, that non-employee has the option of providing their own accident insurance.
If they don't have it, this policy is there to provide coverage for them. It's provided by Swift. And every driver pays the same rate based on the age. And it covers them while they are driving for Swift if an accident should occur.
Q. Okay. So in this case, Mr. Brown didn't have the option of choosing any additional coverages under this policy; is that correct?
A. Not under this policy, no.
Q. This policy and all the coverages and all the conditions, it was basically presented to him as, this is it, and this is your only choice; is that right?
A. No. [DS' policy only choice for П.]
Q. Well, this is your only choice if you want to have the ACE occupational accident policy provided by

Page 37

Swift?
A. Correct.
Q. And that's what I was trying to figure out. So this is not a policy that was issued to him specifically; this is one that's common to all the drivers for Swift?
A. That's correct.
Q. Okay. Does he get a chance to review this policy -- if he said, I want to purchase the ACE occupational accident policy as provided by Swift, does he get a chance to review the terms and conditions of that policy before purchasing it?
A. I believe he does, but I am not 100 percent certain. I am not involved in that aspect of it.
Q. Who would be involved in that aspect?
A. That would be between Mr. Brown and Swift.
Q. Why do you believe he has access to it?
A. I just believe that as part of the enrollment process or signing to drive with Swift, they would present him with something that says, this is what I have, or you have to bring your own insurance.
Q. Right. But they don't -- as far as you know, they don't provide them an actual copy of the policy with all the terms and conditions that he will be bound by if he purchases it?
A. I don't believe they do.

Page 38

Q. Okay. They just say, this is our policy, and they may give him a summary sheet of benefits?
A. Yes.
Q. He doesn't see the actual terms and conditions?
A. No.
Q. Okay. Can you point to me -- I handed you this policy because we were talking about the preapproval process. Can you point to me where in the policy, the terms, "This is not a preapproval policy appear" or whatever that concept is, the preapproval concept; where does that appear in this policy?
A. There isn't a definition or doesn't say that this policy, that -- there isn't a definition in the policy for preapproval. It's not in here.
Q. Okay. Does the term -- I saw it appear in a lot in the claims log where the Gallagher Bassett representative said, this is not a workers' compensation policy, we don't require preapproval. Where is that phrase or concept, we don't require preapproval, where is it in this policy?
A. It's not.
Q. Where does that concept come from in this policy?
A. By preapproval, the concept of preapproving, you can restrict the claimant's ability to seek treatment.

Page 39

Under our policy, we allow you to go to any doctor and have any services and submit them in. And as long as they are related to the loss, there could be coverage underneath the policy.
So by preapproving, you are actually restricting the ability of a claimant to seek care from multiple or a doctor of their choosing.
Q. I understand that's what you are telling me is the procedure. But I want to know where in the policy the authority for that procedure comes from. My basic understanding of -- very mean understanding of insurance concepts are that the relationship between the parties are governed by the policy. I want to know where in the policy that comes from.
MR. LOOMIS: Where in the policy it says, "We don't preapprove"?
MR. BOOHAKER: No. I am not looking even for that particular term. I want to know where this concept is: Go to whoever you want and submit the bills, and we will make the determination later, where that comes from. I want to figure out where that process comes from in the policy.
MR. LOOMIS: Take your time and go through it.

Page 40

MR. BOOHAKER: I genuinely would like to know. That's why I am asking you.
MR. LOOMIS: I can tell you.
MR. BOOHAKER: Okay. Let's see if he can answer the question.
MR. LOOMIS: Sure.
A. So if you look under the medical -- accident medical dental expense benefit on Defendants' 0457, the first paragraph there, it clearly says: An accident medical benefit provides payment for the covered expenses shown below. These expenses must be charged to you while covered. These expenses must be ordered by a physician as medically necessary for injuries that result directly and from no other causes than occupational accident.
There has to be a service rendered and a charge provided in order for us to consider coverage. A predetermination does not have either of those two. So they wouldn't qualify underneath the policy terms.
BY MR. BOOHAKER:
Q. Say that again for me.
MR. LOOMIS: I have to tell you now.
BY MR. BOOHAKER:
Q. Say that again for me.
MR. BOOHAKER: Maybe she can read the answer.

Page 41

(Answer read.)
BY MR. BOOHAKER:
Q. Where is the term -- you read out that policy. I am still at 457. You see, it says: These expenses must be charged to you while covered?
A. Yes.
Q. Where is the term "charged" defined in the policy?
A. "Charged" isn't a defined term.
Q. Okay. Now, look at that second sentence. These expenses must be ordered by a physician as medically necessary for injuries that result directly and from no other cause than from an occupational accident. Do you see that?
A. Yes.
Q. Where is the term "ordered" defined in the policy?
A. It's not.
Q. Okay. The reason why you say neither of those terms charged or ordered is defined is because they are not in quotes, correct?
A. Not in caps.
Q. Typically, in a policy when terms are defined, they are either capitalized or bold or put in quotes or something that lets you know that word has a specific

Page 42

meaning in the policy, correct?
A. Correct.
Q. Here the term "charged" and the term "ordered" are not defined in the policy, correct?
A. Correct.
Q. All right. So from that language, what makes you determine that the services must be rendered first and then coverage determined later as opposed to the other way around? Where is the sequence in time laid out in that policy provision for Gallagher Bassett's and ACE's interpretation of how the sequence must be done?
A. I think the sequence is expenses must be charged. I think that's the key. Services are rendered, a charge is provided, a claim is submitted, an evaluation is done, and a payment is rendered. In a predetermination, none of that occurs.
Q. Okay. So in your mind, speaking on behalf of ACE, that term "charged" includes everything that you laid out just a minute ago; that service must be rendered, it must be charged by the doctor, and then submitted to Gallagher Bassett?
A. Yes.
Q. That's all encompassed in the term "charged"?
A. That's how I interpret it, yes.
Q. Okay. So could it be possible -- well, what

Page 43

about an interpretation where a doctor determines that it's medically necessary to be done, but he hadn't yet carried out a procedure; you don't consider that to be a charge?
A. No.
Q. Okay. Now, the same question as to the term "ordered." Do you believe that the term ordered also encompasses the same concept, to wit, the doctor makes a determination, he performs the procedure, and then he charges Gallagher Bassett all before obtaining permission or approval?
A. Yes.
Q. All right. But that concept is not elsewhere outlined in this policy except for that first paragraph on Defendants' 457?
A. Yes.
Q. And that statement was correct?
A. Correct.
Q. Okay. I am trying to make sure my record is clear. So again, these expenses must ordered by a physician. In your mind, speaking on behalf of ACE, that does not encompass a scenario where a doctor says, Hey, this procedure should be done, that it hadn't been ordered at that point in time?
A. That is correct.

Page 44

Q. All right. What would you call that scenario -- what would ACE call that scenario?
MR. LOOMIS: I don't understand. What's --
BY MR. BOOHAKER:
Q. I am trying to figure out -- I saw the narrative in the claim log, no preauthorizations required. The term doesn't actually appear in the policy. This is the provision where the concept, "no preauthorization is required," comes from. I am just trying to figure out how we got from these terms to that.
Is it just simply based on what, there's some sort of internal procedure or policy or claims manual that addresses how this sequence will go down, or is it just understood by ACE that this is how it's going to happen? I am trying to figure out what sort of written guidelines there are to interpret this policy in this manner.
A. So there's no written guidelines. I think the policy is clear that you have to have an expense, you have to have a service rendered, it has to be charged and submitted. I think when you get into Gallagher Bassett's notes, that what they're trying to do is explain to the service providers that this is not a workers' comp policy where precertification is required. That you can treat anywhere, send us in the bills, and we will consider.

That's why you see the term, "no preauthorization is required."
Q. Okay. Well, let's talk about -- while we are on the policy, I want you to jump ahead for me to Defendants' 469, if you would please. Are you there?
A. Yes.
Q. Do you see at the bottom "medically necessary"?
A. Yes.
Q. We determined in our discretion if a service or supply is medically necessary for the diagnosis and treatment of an occupational accident injury. A determination is based on and consistent with standards approved by our medical personnel. So my question -- did I read that correctly?
MR. LOOMIS: No. You said occupational accident injury. It's accidental injury. Small difference.
MR. BOOHAKER: Occupational accidental injury.
MR. BENGSTON: He is right. He got you.
BY MR. BOOHAKER:
Q. We determined in our discretion if a service or supply is medically necessary for the diagnosis and treatment of an occupational accidental injury. This determination is based on and consistent with standards



approved by our medical personnel. Did I read that correctly?
A. Yes.
Q. Where are these standards referenced in that second sentence? See, it says standards approved by our medical personnel. Where are those standards, where can I find them?
A. You won't find them in the policy. I don't know.
Q. I agree, I won't find them in the policy. Are there any sort of claims manuals, procedures, memos, any sort of written documentation showing what the standards approved are that either ACE or Gallagher Bassett has, to your knowledge?
A. Not to my knowledge.
Q. All right. Who are the medical personnel?
A. Those would be the independent doctors that the records are sent out to. There are doctors of the same treating physicians, orthopaedic surgeon -- sent out to an orthopedic surgeon. They would look at it based on their medical background, and they would render an opinion if the services were consistent with approved standards for the services being provided.
Q. Okay. So there's no -- as far as you know, ACE has no sort of in-house personnel that kind of oversees or

Mr. McCreary doesn't know where these standards can be found, they are not in policy.



manage these standards?
A. No.
Q. When it refers to our medical personnel, you are referring strictly to independent outside medical persons?
A. From my perspective, yes. I don't know whether Gallagher Bassett has internal medical department or not.
Q. Okay. And that's all I want to find out. Turn, will you please, to Defendants' 471. Do you see pre-existing condition on there?
A. Yes, sir.
Q. All right. Can I read this to you again? I know Kenan will keep a close tab on me if I get it wrong. A condition for which you have sought or received medical advice or treatment during the 12-month period immediately prior to your effective date of coverage. Until you have been continuously covered under this policy for 12 consecutive months. However, you will be covered for a new occupational accident for which you received treatment within the six-month period prior to your effective date of coverage. Did I read that correctly?
A. Yes.
Q. All right. Can you tell me that phrase, until you have been continuously covered under this policy for 12 consecutive months, what does that mean to ACE?
A. That means if you had a prior condition that you



are still seeking treatment for for a prior loss, accident, and you had treatment in the 12 months prior to starting under this policy, that we are not going to pay benefits directly related to that service until you are covered under the policy for a year.
Q. Okay. To ACE's understanding, this pre-existing condition clause applies to pre-existing injuries related from covered accidents?
A. Correct.
Q. Does this cover, say, congenital defects?
A. Under pre-existing, congenital defects wouldn't be covered. But congenital defects aren't accident related. It's a medical condition, and the illness -- the illnesses aren't excluded under the terms of the policy.
Q. Okay. I just want to clarify that. I don't see that this term encompasses a condition related to an occupational accident. But ACE's understanding is that this does include only conditions that were treated for that were related to a previous occupational accident?
A. Yes.
Q. I think that is everything that I want to cover with you right now as far as the policy is concerned.
(Recess held.)
BY MR. BOOHAKER:
Q. Mr. McCreary, I want to ask you a quick set of

follow-ups based on some things we had discussed earlier. So ACE has no claims handling, written claims handling documents concerning occupational accident policies; is that correct?
A. Correct.
Q. ACE has no written documentation concerning what constitutes medically necessary; is that correct?
A. Correct.
Q. ACE has no in-house medical personnel; is that correct?
A. Not in my area, no.
Q. Well, in the occupational accident context?
A. No.
Q. So my statement is correct?
A. Correct.
Q. All right. Any of that written documentation would be promulgated by Gallagher Bassett?
A. Correct.
Q. ACE provides no guidance or -- no guidance to Gallagher Bassett on how to draft those claims documents, claims manuals, anything like that?
A. No.
Q. And Gallagher Bassett is the one that solely comes up with all of that written material about how to adjust, pay, and handle claims?



A. Yes.
Q. All right. Does ACE train any adjustors to work on occupational accident policies either for Gallagher Bassett or for their own?
A. We don't train Gallagher Bassett employees. For our own employees, we do on-the-job training.
Q. Okay. Those are the five staff that you referenced for me earlier that you oversee?
A. Yes.
Q. Do you provide any sort of written claim handling guidelines to those five staff?
A. No.
Q. So everything that they use to do their job is on-the-job training that's provided verbally?
A. Yes.
Q. Okay. Can you tell me what those five individuals names are?
A. Briana, Michelle, Jenna -- Briana, Michelle, Jenna, Nikki, and Terri.
Q. Okay. Those five ladies, I believe you told me earlier, their job is to interface with Gallagher Bassett, correct?
A. They interface with all of our third-party administrators. So they interface with Gallagher Bassett and anyone who is doing claims on behalf of ACE/Chubb.



G & B limit is $100,000 [Probably PA self-retention in its layer of risk in this "program."]

Q. In the occupational accident scenario, they only interface with Gallagher Bassett?
A. Correct.
Q. What do they interface with Gallagher Bassett about?
A. So it could be a authority review. Gallagher Bassett has a set dollar amount they can pay a claim up to. After that, they send the file in to us. They ask us to approve the payment because it's over their amount. We will review the file and approve it.
They may ask us if we agree with their position on a case. Whenever there's a lawsuit filed, they will send it to us for immediate oversight. If a department or insurance complaint was filed, they would send it to us so we could work with them to formulate a response back to the Department of Insurance.
Q. What is the authority review threshold?
A. I want to say it's $100,000.
Q. All right, 100,000. So if a claim has paid out for any reason more than $100,000, that meets the authority threshold that Gallagher Bassett then forwards the claim on to you?
A. Correct.
Q. To your ladies. Do you know if Mr. Brown's case met the authority review threshold?



A. I do not know if it was referred or not. I don't know what the total amount was paid.
Q. Let's see if I got the documentation on that.
(Exhibit 2 marked for identification.) Ex 2
BY MR. BOOHAKER:
Q. Let me hand you what's been marked as Exhibit 2. For the record, it's Defendants' Bates label 0014. What are we looking at there?
A. This looks like a payment register from Gallagher Bassett on this case that has the wages paid, medical paid, and expenses paid.
Q. All right. What's that total amount up at the top there?
A. $72,800.
Q. No, above that.
A. Oh, 103,389.62.
Q. Would Mr. Brown's case have met the threshold for the authority review in this instance?
A. In this instance, yes.
Q. All right. Do you know if Mr. Brown's case came in to your ladies in the office for authority review?
A. I don't know if it did or not. I am willing to make the assumption that it did.
Q. Okay.
A. But I can't say that with 100 percent certainty.

MR. BOOHAKER: Kenan, do you have any documentation that shows that? We would like to see that, if it made the authority review threshold.
MR. BENGSTON: We can take it up.
MR. LOOMIS: Give me a request for production. You got what I got so.
MR. BOOHAKER: I think it would be responsive. We can take it up later, but I think it would be responsive to what we have already given to you.
MR. LOOMIS: That makes me think it doesn't exist in that arena.
(Off the record.)
A. On the record, even though the total payment was 103,000 and change, I am going to say I don't believe it was sent to them, because we require them to send it on disability and medical payments. Expenses are outside the threshold. So based on the 72 and the 19, it's right around $90,000. I will say they probably did not send it in.
BY MR. BOOHAKER:
Q. All right. I just want to check. Let me go back to what you were discussing with regards to the other functions of your in-house ladies. You mentioned there's



an authority review which they will undertake if the wage loss payments and medical exceed 100,000, correct?
A. Correct.
Q. They also review and approve claims sent from Gallagher Bassett on occasion; is that correct?
A. Usually those would be through the authority review.
Q. Through the authority review?
A. Yes.
Q. You also said that the ladies would deal with requests from Gallagher Bassett to determine if your ladies agreed with the position taken from Gallagher Bassett; is that right?
A. Correct.
Q. Would that also be under the authority review or separate?
A. That could either be under it or separate.
Q. All right. What is the guideline -- if it's outside the authority review, what is the guideline whereby Gallagher Bassett sends something to your ladies for an agreement with their position?
A. They may send something for a policy interpretation. They may send something for a clarification on policy wording. They may send something when they are writing out a denial letter to make sure



that we have reviewed it, that it contains all the pertinent information. And we would say yes, go ahead and send it off.
Q. Okay. So whether it comes to an authority review or whether it comes to a request from Gallagher Bassett for policy interpretation, policy wording, or denial letters, is there any sort of written documentation which helps your ladies determine and decide what decision and course of action to take; does ACE have anything like that?
A. Just the policy.
Q. So there's no written documentation of any kind -- are any of those ladies lawyers?
A. No.
Q. You are not a lawyer, right?
A. No.
Q. There's no sort of written documentation to help those ladies interpret or understand the policy language other than the policy itself?
A. Well, we have in-house counsel. So if they have something that they are not sure of, we have the ability to use Chubb in-house counsel or we have the ability to use Chubb-approved counsel externally to help us make those determinations. Could use Chubb in-house counsel
Q. But aside from in-house counsel, there's no



written documentation or guidelines to help your ladies with policy wording or interpretation?
A. Correct.
Q. There's no written documentation or guidelines to help them with the authority review to determine what decision to make?
A. Correct.
Q. Aside from authority reviews and policy wording and interpretation/denial letters, lawsuits, and department of insurance complaints, is there anything else that your ladies handle from Gallagher Bassett?
A. Not that I can think of.
Q. How does ACE -- you told me. The ladies in your office are trained on the job, correct?
A. Yes.
Q. You train them to appropriately evaluate the claims that come to them from Gallagher Bassett, correct?
A. Correct.
Q. All right. But you don't train Gallagher Bassett's adjustors, correct; ACE does not train Gallagher Bassett's adjustors?
A. Correct.
Q. ACE has no control over how Gallagher Bassett trains their adjustors or do they?
A. No, I have no control over how they train their

Page 57

adjustors.
Q. Okay. But ACE does want Gallagher Bassett to train their adjustors to appropriately adjust and evaluate claims?
A. Correct.
Q. All right. How does ACE evaluate the job that Gallagher Bassett is doing in adjusting claims?
A. We perform audits on their claim files.
Q. What do those audits consist of?
A. So we will do a random selection of claims that they have either paid or denied or pending over a course of a period of time. We will go to their office. We will look at the entire claim. We will read their notes. We will look at what they pay, what they didn't pay. We have developed an audit tool. We have had designated best practices in those audit tools. And we will review each claim independently against that. Then we provide them with an overall score.
Q. What is the audit tool; what is it called?
A. Atheneum.
Q. Atheneum. Is that a software program?
A. It is.
Q. Is that something that was developed in-house by ACE or purchased from someone?
A. It's a purchase.

Page 58

Q. It's an industry tool?
A. Yes.
Q. All right. How about those best practices, are those something promulgated by Atheneum or by ACE?
A. ACE.
Q. What are those called?
A. Best practices.
Q. Those are written guidelines?
A. They are what we adjudicate the claims against, which we look at.
Q. But are they written down?
A. Yes.
Q. All right. So those best practices are used to evaluate how Gallagher Bassett handles and adjusts claims?
A. They are used as a tool to evaluate them.
Q. What other tools are part of it?
A. The policy.
Q. What else?
A. The best practices and the policy is what we review when we audit a file to make sure they paid the claims properly or deny them properly in accordance with the terms of the policy.
Q. How do you score the work that was done; that's an Atheneum tool as well?
A. Yes.

Page 59

Q. That's not something ACE developed on its own?
A. So each section of the best practices has certain questions asked to it. When you review the file, you answer those questions either yes, no, or NA. And then based on what we put in there, the Atheneum will kick out a percentage to us on their accuracy.
Q. So you input the data -- did you do this, yes, no, NA -- and then Atheneum gives you a score?
A. Correct.
Q. Who calibrated Atheneum for ACE? In other words, did ACE purchase Atheneum and calibrate it so that -- for criteria that was important to ACE in the occupational accident policy scenario?
A. So our best practices, what we do for the audit tool that we use, we use for all of our TPA's. It's not occ/acc specific; it's a generalized audit tool. ACE developed the best practices to put into the tool. We have a department that works with Atheneum to put in there. We have access to use the tool.
Q. What department?
A. That's our -- for lack of better word, internal audit within claims.
Q. This is not specific to occ/acc; it's across the board for ACE?
A. Correct.

Page 60

Q. Those best practices are written down, correct?
A. Yes.
Q. All right. So if I ask ACE for their best practices, you know what I meant?
A. Uh-huh, yes.
Q. You would be able to identify and produce those documents to us?
A. Yes.
Q. All right.
MR. LOOMIS: Subject to objection on my behalf.
MR. BOOHAKER: Of course. I just want to make sure when I say the term "best practices," we all know what we are talking about.
MR. LOOMIS: Sure.
BY MR. BOOHAKER:
Q. So aside from the claims that Gallagher Bassett sends to ACE, either the authority review or the policy interpretations, ACE does not adjust any other claims or make any decisions?
A. Correct.
Q. That discretion is left with Gallagher Bassett subject to the periodic audit review?
A. Correct.
Q. Which in turn is subject to the best practices?

A. Correct.
Q. Excuse my ignorance. The question has occurred to me, if Gallagher Bassett is adjusting and handling the vast majority of the claims, what is ACE's role in the process? Are they simply the marketing arm, are they -- what is the expertise or utility that ACE brings to the table?
A. From the claims side of it?
Q. Well, in the relationship as a whole. I have encountered carriers where they had their own inside adjustors and handled IAs or TPAs when they had too many claims. It's just unusual where a TPA handles all of the work for the carrier, and the carrier does nothing. That's been my experience. I am not saying I am some sort of insurance savant.
Is it simply the way the business was set up by ACE, and that it's handled by TPA completely; is there some benefit that Gallagher Bassett derives from this arrangement or ACE? I am trying to figure it out.
A. So the model of outsourcing claims to TPAs was the model that was established by ACE and Chubb.
Q. Okay. So this is a business practice particular to ACE/Chubb?
A. Right.
Q. All right. That makes sense. Okay. How then



does Gallagher Bassett get paid for the claims it handles for ACE/Chubb?
A. So they get compensated a percentage of premium on the overall program, and that's all.
Q. So they don't get any portion of underwriting dollars?
A. No.
Q. They don't get any portion of claims not paid?
A. No.
Q. All right. They don't get any portion of dollars saved?
A. No.
Q. Is a part of the best practices audit that we discussed earlier, is there any sort of compensation tied up in that audit review?
A. No.
Q. Is a part of the best practices developed by ACE, does it look at dollars saved?
A. It looks to see if claims are handled properly. We don't track dollars saved as part of the audit process.
Q. Does it look at dollars paid?
A. Yes.
Q. Does the best practices try to ensure that similar claims are handled similarly across the occupational accident portfolio?



A. Because every claim that we look at may be tied to a different policy, we try to make sure that the claims meet the criteria of that policy. Now, if we do notice some thing across multiple policies, we will bring it to Gallagher Bassett's attention.
Q. Does Gallagher Bassett -- okay. That's a good point. For example, this Swift occupational accident policy is just one policy?
A. Correct.
Q. But Gallagher Bassett handles more than this Swift policy?
A. Correct.
Q. All right. So if you are seeing a trend done by Gallagher Bassett pop up across multiple policies, that is something you will bring up with them?
A. Yes.
Q. All right. That trend is identified by the best practices criteria set up in Atheneum?
A. Correct.
Q. Roughly, what is the -- you said you track to see that a claim was handled appropriately. What is encompassed, what is involved in that, what is a part of that?
A. So if we are talking audit specific, we would look at when was the notification received, was a letter



sent out timely, was the claim form provided timely. When the medical -- when the itemized bill was received, was it reviewed properly. If additional information was needed, was a request sent out timely. If it came in and there was no need for additional review, IME, peer review, was the claim processed and adjudicated in accordance to the terms and conditions of the policy.
If a payment was issued, was the payment issued properly. Was it sent to the right person, sent to the right provider. If a claim was denied, was the proper denial wording done, was there an explanation on why it was denied, was there -- in certain states, was the appeal wording within your letter.
Q. Is there any consideration given to dollars paid, amount paid, anything like that?
A. We track the total dollars paid. If we find a payment error, either they overpaid a claim or underpaid a claim, we do that as a financial assessment. But we don't look at -- outside of that, we don't look to say they paid $20,000 on this claim. We look at total altogether, both disability and medical. We don't track for anything other than a financial accuracy score.
Q. How do you know if something was overpaid or underpaid, though?
A. If they missed something in the policy, if they

missed the claim in the policy, if a claim submitted wasn't paid, that would be an underpayment. It should have been paid. If they miscode or transpose a number, that could be an underpayment or overpayment.
Q. There's no analysis, though, of miscode or policy provision -- what about analyses for specific medical procedures, whether or not the payments for certain medical procedures wasn't in line with other trends?
A. We would look at what was in the file to determine whether it was paid properly or not. We will get into -- we wouldn't look to say, oh, this is a trend, this service is paid for every single claim. That's not something we adjudicate -- sorry, not something we audited.
Q. I am interested more specifically in, are there expectations on an audit for a particular claim. If there are deviations from what was paid in that claim, do you look to see why that was the case?
A. In an audit we expect every claim to be paid within the limits of the policy. If there is a deviation, we would inquire as to why.
Q. Okay. Under the terms of the policy, though?
A. Correct.
Q. Not with regards to the course of medical



treatment?
A. Correct.
Q. All right. How does ACE communicate with Gallagher Bassett concerning its satisfaction or dissatisfaction with Gallagher Bassett's claim handling aside from the audit, any other way?
A. No.
Q. All right. If you are -- at the end of that process, if you are satisfied or unsatisfied with the way Gallagher Bassett has handled the claims that you audited, what's the next step; do you have some sort of after action meeting or conference or email with them?
A. After we complete the audit, we provide them with a written audit report, which would address operational reviews and the various areas within the Atheneum tool we audited. If there were concerns, issues -- we call them MAPS, management action plans, where we would address the issue we sent to Gallagher Bassett. They come back with a plan they have it corrected by. Then we will follow up to make sure those management action plans are implemented and adhered to and look at those at the next audit.
Q. There's an audit report, correct?
A. Yes.
Q. Is it called anything other than audit report?



A. No.
Q. Atheneum audit report?
A. Gallagher Bassett TPA audit report.
Q. There's an audit report. And out of that audit report comes an management action plan?
A. There could be.
Q. There could be. Then you check to make sure you follow up on the action plan?
A. Correct.
Q. Do you know if Mr. Brown's case was ever subject to an audit, an audit report, or management action plan?
A. I do not know.
Q. Is there a goal in Atheneum or the audits or audit reports or the management action plan to keep claim dollars paid beneath a certain amount?
A. No.
Q. Does ACE reinsure the occ/acc policies with anyone else?
A. Yes.
Q. Who?
A. Through a captive arrangement.
Q. With?
A. Swift.
Q. With Swift. Okay. How does that work?
A. I really -- I don't know how the reinsurance



contract is set up with Swift. But I know that because it's a policy written on ACE paper, that ACE has full authority over it.
So Gallagher Bassett reports it to us when it comes to claims. As they make payments, we reimburse Gallagher Bassett. Then through a reinsurance process, the payments are recovered from a captive arrangement from Swift back to ACE.
Q. What is that captive arrangement called?
A. Captive arrangement. That's all I know it as.
Q. Is there some sort of documentation memorializing this captive arrangement?
A. I am sure there is, but it's not part of what we get involved with. It has no bearing on the claim adjudication.
Q. Who does get involved?
A. Our reinsurance services department.
Q. So it's called the reinsurance services department Of ACE?
A. Yes.
Q. Is there someone there that you report to that would know about reinsurance arrangement with Swift?
A. Yes. There's people that would know about it, but I don't report to any of them.
Q. Do you know if ACE makes any reporting to Swift

Page 69

about its reinsurance arrangements?
A. I do not know.
Q. So Swift ultimately is underwriting -- I don't know if that's the right word -- reinsuring all the risk for the occ/acc policy that is its own policy?
A. Through their own captive, yes.
Q. This reinsurance arrangement with Swift is limited only to their policy, not the other occ/acc policies that Gallagher Bassett has?
A. Yes.
Q. Okay. Aside from the reinsurance arrangement, are there any other sort of contractual relationships between ACE and Swift concerning the occ/acc policy?
A. Not that I am aware of.
Q. So Swift doesn't provide any -- there's no contract between Swift and ACE that you are aware of to handle the occ/acc policy?
A. No.
Q. And swift doesn't provide any sort of guidelines or procedures or manuals to ACE for Gallagher Bassett on how to handle those claims?
A. No.
Q. Do you know if Swift shares in any underwriting profits or claim profits or anything like that in part of the policy?

[Handwritten notes: Swift owns captive insurance company. It essentially controls the insurance business covering drivers. [Reinsurance contract program some form contract]]

Page 70

A. I have no idea.
Q. Do you know who would know?
A. No.
Q. Okay.
MR. BOOHAKER: If we can take a break a second, I think we may be done.
(Recess held.)
MR. BOOHAKER: We are done.
THE REPORTER: Would you like to order a copy?
MR. LOOMIS: Rough would be fine. Can I get it by next Thursday? TextMap.
THE REPORTER: Yes.
MR. LOOMIS: I don't have any questions.
(Deposition concluded 12:00 p.m.)

[Handwritten note: [Swift gets all underwriting profit]]

Page 71

E R R A T A S H E E T

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or Official Code of Georgia Annotated 9-11-30(e), any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

I, the undersigned, DAVID MCCREARY, do hereby certify that I have read the foregoing deposition and that to the best of my knowledge said deposition is true and accurate (with the exception of the following corrections listed below.)

Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________

Page 72

Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________
Page____Line____should read:__________________
Reason for change:_________________________

________________________
DAVID MCCREARY

Sworn to and subscribed before me this_____day of________________, 2019.

______________________________
Notary Public
My commission expires:____________

DISCLOSURE

STATE OF GEORGIA DEPONENT:
COUNTY OF FULTON DAVID MCCREARY

Pursuant to Article 10.B of the Rules and O.C.G.A. Sec. 9-11-28 (c) of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as an independent contractor for Wheeler Reporting Company, Inc.

Wheeler Reporting Company, Inc. was contacted by the offices of The Law Firm of Benjamin O. Bengtson to provide court reporting services for this deposition. Wheeler Reporting Company, Inc. will not be taking this deposition under any contract that is prohibited by O.C.G.A 15-14-37 (a) and (b).

Wheeler Reporting Company, Inc. has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Wheeler Reporting Company, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Carol Lipinsky

Carol Lipinsky, CCR B-2144
September 6, 2019



CERTIFICATE

STATE OF GEORGIA
COUNTY OF FULTON

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions, and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of Wheeler Reporting Company, Inc., Certified Court Reporters, and the signature and original seal is attached thereto.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of the action.

This, the 6th day of September, 2019.

Carol Lipinsky

CAROL LIPINSKY, CCR-B-2144