# EXHIBIT H

# In The Matter Of:

*GERMAIN BROWN v.*

*ACE AMERICAN INSURANCE COMPANY, et al.*

*BRENDA CULLINAN*

*September 12, 2019*

at TPA, Gallagher & Bassett, corp rep. of GB



**WHEELER**
R E P O R T I N G
**COURT REPORTING & VIDEO**

404.351.4577 | 1600 Northside Drive
(fax) 404.351.3464 | Suite 250
www.WheelerReporting.com | Atlanta, GA 30318

Min-U-Script® with Word Index

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

---

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

GERMAIN BROWN,                          :

   Plaintiff,              : CIVIL ACTION FILE

vs.                          : NO.: 1:19-CV-01233-TCB

ACE AMERICAN INSURANCE        :

COMPANY and GALLAGHER         :

BARRETT SERVICES, INC.,       :

   Defendants.              :

The deposition of BRENDA CULLINAN, taken pursuant to the stipulations contained herein; the reading and signing of the deposition reserved; before Nile L. Jones, Certified Court Reporter in and for the State of Georgia; commencing at 9:55 a.m., September 12, 2019 at Promenade, 1230 Peachtree Street, N.E., Suite B, Atlanta, Georgia 30309.

WHEELER REPORTING COMPANY

1600 NORTHSIDE DRIVE

SUITE 250

ATLANTA, GEORGIA 30318

(404) 351-4577

---

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

   THE LAW OFFICE OF BENJAMIN O. BENGTSON

   BY:   BENJAMIN O. BENGTSON, ESQ.

   1100 Circle 75 Parkway

   Suite 460

   Atlanta, Georgia 30339

   TEL:   404 596-5518

   FAX:   404 596-5519

ON BEHALF OF THE DEFENDANT GALLAGHER BARRETT SERVICES:

   McDONALD LAW FIRM

   BY:   DAVID L. BOOHAKER, ESQ.   no, David

   800 Johnson Ferry Road, N.E.

   Suite B   Boohaker for TT.

   Atlanta, Georgia 30342

   TEL:   817 717-5081

ON BEHALF OF THE DEFENDANT ACE AMERICAN INSURANCE:

   COZEN O'CONNOR

   BY:   KENAN G. LOOMIS, ESQ.

   Promenade

   1230 Peachtree Street, N.E.

   Suite 400

   Atlanta, Georgia 30309

   TEL:   404 572-2000

   FAX:   866 591-9127

---

Page 3

I N D E X

                                 Page

CROSS-EXAMINATION

   By Mr. Boohaker......................... 4

   By Mr. Bengtson......................... 72

DIRECT EXAMINATION

   By Mr. Loomis. for ACE............. 157

E X H I B I T S

DEFENDANT'S

EXHIBIT NO.:        DESCRIPTION        MARKED/IDENTIFIED

   1        Policy Terms & Conditions     27/27

   2        Claim Payment Summary         65/65

   3        Claim Documents               79/79

   4        Payment History               74/74

---

Page 4

PROCEEDINGS   TT

9:55 a.m.   for

MR. BOOHAKER: Swear the witness, please.

Whereupon,

BRENDA CULLINAN,

having been first duly sworn, was examined and testified as follows:

MR. LOOMIS: She's going to reserve signature. Put that on the record and just send the transcript to me, I guess.

CROSS-EXAMINATION   for TT

BY MR. BOOHAKER:

Q.  Ma'am, can you give us your full name for the record, please?

A.  Brenda Jean Cullinan.

Q.  C-u-l-l-e-n?

A.  C-u-l-l-i-n-a-n -- i-n-a-n.

Q.  So it's Cullinan?

A.  Uh-huh (affirmative).

Q.  Ms. Cullinan, have you ever been deposed before?

A.  Yes.

Q.  So I'm going to dispense with all of the introductory background stuff. The only point that I'd make for you at this point is that our reporter is

---

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 5

trying to take everything down. If I ask a question, if you can wait until I'm finished to make your answer and I will try to do the same for you when you're answering my questions so that we can get a clean record. Does that work for you?

A. I will try.

Q. If you don't understand my questions just let me know, otherwise I'm going to get started.
So how many times have you been deposed previously?

A. Approximately eighteen to twenty.

Q. And tell us a little bit about -- well, first, who is your employer?

A. Gallagher Bassett.

Q. Is that their legal name? Is it Gallagher Bassett - do they have another name that they use legally?

A. Gallagher Bassett Services, Inc.

Q. How long have you worked for Gallagher Bassett?

A. I worked for an agency previously that Gallagher Bassett purchased, so my start date would officially be June 1, '87.

Q. When did Gallagher Bassett purchase that previous agency?

Page 6

A. I want to say back in 1995.

Q. So you've been an employee of Gallagher Bassett since '95?

A. Yes.

Q. What sort of insurance industry experience or credentialing do you have? And I'll say that this way: Some people in the industry have a bunch of different letters after their name, CPCU or other sorts of certifications. Do you have anything like that in the insurance industry?

A. No.

Q. Do you understand that you're here today as the corporate representative for Gallagher Bassett?

A. Yes.

Q. And you understand that your answers today are binding on Gallagher Bassett?

MR. LOOMIS: I will make a statement there. Binding to the extent that they are within the issues that are in the notice.

BY MR. BOOHAKER:

Q. Subject to the objection do you understand that?

A. Yes.

Q. Unless you tell me so, I'm going to go ahead and presume that you're answering on behalf of

Page 7

Gallagher Bassett as opposed to your individual capacity, okay? So if you're answering on behalf of yourself individually as opposed to Gallagher Bassett, please let me know, all right?

A. Okay.

Q. I want to ask you some general questions about claims handling procedures and things of that nature. Does Gallagher Bassett -- and in this case the gentleman we're talking about is Mr. Germain Brown, correct?

A. Correct.

Q. Does Gallagher Bassett owe Mr. Brown a duty of good faith and fair dealing?

MR. LOOMIS: Objection to form. Calls for a legal conclusion.

BY MR. BOOHAKER:

Q. You can answer subject to his objections.

A. Yes.

Q. And that's yes, they do owe him a duty of good faith and fair dealing?

MR. LOOMIS: Same objection.

THE DEPONENT: Yes.

BY MR. BOOHAKER:

Q. Does Gallagher Bassett have a duty to give as much consideration to Mr. Brown's interest as to

Page 8

Gallagher Bassett's own interests when adjusting his claim?

MR. LOOMIS: Objection, calls for a legal conclusion. You can answer.

THE DEPONENT: Yes.

BY MR. BOOHAKER:

Q. Does Gallagher Bassett have a duty to investigate and evaluate Mr. Brown's claim promptly, thoroughly and fairly?

MR. LOOMIS: Same objection.

THE DEPONENT: Yes.

BY MR. BOOHAKER:

Q. Does Gallagher Bassett owe a duty to adopt and implement procedures for the prompt investigation and settlement of claims arising under its policies of occupational accident insurance?

MR. LOOMIS: Objection, calls for a legal conclusion.

THE DEPONENT: Yes.

BY MR. BOOHAKER:

Q. Should Gallagher Bassett assist policy holders like Mr. Brown with the presentation of their claims?

A. I'm not sure I'm understanding the question.

Q. Sure. What do you not understand, the term presentation of the claim?

A. The assisting Mr. Brown on presentation. I'm not sure what that encompasses.

Q. All right. Should, for example, should Gallagher Bassett provide him with documents and information in order to help him present his claim to Gallagher Bassett, give him proofs of loss, for example, or other supplementary documentation that they need for him to fill out, follow up with him to find out that it's been filled out, things of that nature?

A. Yes.

Q. Should Gallagher Bassett attempt in good faith to have a prompt, fair and equitable settlement of claims like Mr. -- well, of claims in which liability has become reasonably clear?

MR. LOOMIS: Let me object. That calls for a legal conclusion as well.

BY MR. BOOHAKER:

Q. Sure.

A. I don't know if the word settle is correct but to process the benefits, yes.

Q. So Gallagher Bassett owes a duty to promptly, fairly and equitably -- instead of settle what was the word that you used?

A. Process the benefits.

Q. Process. -- process his claim once liability has become reasonably clear?

MR. LOOMIS: Objection, calls for a legal conclusion.

THE DEPONENT: Once it's been determined it's covered under the policy wording, yes.

BY MR. BOOHAKER:

Q. And Gallagher Bassett should not mischaracterize or misrepresent the policy terms to insured for the benefit of the insurer, correct?

A. Yes.

Q. Along those same lines, Gallagher Bassett should not misrepresent or mischaracterize the facts to the benefit of the insurer?

A. Correct.

Q. Gallagher Bassett has a duty to disclose all benefits, coverages and time limits that may apply?

MR. LOOMIS: Objection, calls for a legal conclusion.

THE DEPONENT: According to the policy provisions, yes.

BY MR. BOOHAKER:

Q. And Gallagher Bassett must timely advise insureds of all policy limitations, conditions or

exclusions which may apply?

A. Yes.

Q. Does Gallagher Bassett owe a duty to look for coverage and not just a way to deny a claim?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: Yes.

BY MR. BOOHAKER:

Q. In Gallagher Bassett's view claims handling is not an adversarial process, correct?

A. Correct.

Q. And Gallagher Bassett's job is to find reasons to pay the claim as presented, correct?

A. Gallagher Bassett's job is to pay the claim under the terms and conditions of the policy, yes.

Q. Does Gallagher Bassett have a duty to pay a claim as it should have been presented if it knows facts and circumstances that the policy holder is not a party to it?

MR. LOOMIS: Objection to form, calls for a legal conclusion, hypothetical.

THE DEPONENT: Okay, could you repeat that?

BY MR. BOOHAKER:

Q. Sure. Does Gallagher Bassett have a duty to pay a claim as it should have been presented by the

policy holder?

MR. LOOMIS: Same objection.

THE DEPONENT: As it should have been presented?

BY MR. BOOHAKER:

Q. As it should have been presented, that's right.

A. I don't know for sure what you mean as -

Q. Sure. So let's suppose in this scenario that Gallagher Bassett knew or had at its disposal facts that would help find the claim had coverage but the insured wasn't presenting them in the manner in which they needed to be presented; would Gallagher Bassett have a duty to assist the policy holder to present those facts in a way to find coverage?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: Gallagher Bassett would have a duty to advise the insured exactly what we needed and to advise his physician or have him advise his physician what we needed.

BY MR. BOOHAKER:

Q. Does Gallagher Bassett focus on how to pay a claim?

A. Yes.

[Only correct answer "in "Yes."]

Page 13

Q.  Is Gallagher Bassett obligated to search for and seek out facts that support coverage and to give those facts an objective and fair evaluation?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: Could you give me an example of facts?

BY MR. BOOHAKER:

Q.  Well, when a claim is presented by a policy holder does Gallagher Bassett have a duty to go out and find not only facts that would not support coverage but also facts that would support coverage?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: Gallagher Bassett's duty would be to advise the insured what we need as far as obtaining facts. It's our duty to investigate it regarding the police report, the circumstances surrounding the accident and so forth.

BY MR. BOOHAKER:

Q.  So Gallagher Bassett doesn't have a duty to go out and find facts that would support coverage?

MR. LOOMIS: Objection to form.

THE DEPONENT: I'm not sure what you mean

[Standards require much more than fact investigation]

Page 14

by find facts.

BY MR. BOOHAKER:

Q.  Well, if there are things in the police report or any of the other documents that you mentioned that Gallagher Bassett obtains that would indicate one way or the other that there may be coverage if there was a little more investigating to be done, would Gallagher Bassett do it?

A.  Yes.

Q.  And Gallagher Bassett has a duty not to just focus on the facts that would support denial, correct?

MR. LOOMIS: Objection to form, legal conclusion.

THE DEPONENT: Yes.

BY MR. BOOHAKER:

Q.  Does Gallagher Bassett train adjusters in methods that would help Gallagher Bassett reach financial goals?

A.  No.

Q.  No? Okay. Is Gallagher Bassett obligated to pay for all medically necessary procedures for injuries resulting from a workplace accident?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

[ACE can't just focus on facts that support or support claim denial]

[ACE does not train adjusters that methods that help financial goals.]

[ACE must medical pay necessary procedures from workplace accident under conditions of policy. ACE not obligated to pre-pay cost of L4-L5 surgery but after second IME should have pre-approved payment at medicare or PPO rate]

Page 15

THE DEPONENT: Under the terms and conditions of the policy, yes.

BY MR. BOOHAKER:

Q.  In the case of an occupational accident policy, if Gallagher Bassett realizes that a provider doesn't understand that the policy -- doesn't understand the policy language but Gallagher Bassett knows that a procedure is covered otherwise, does Gallagher Bassett have a duty to point that out to the provider?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: Could you repeat that?

BY MR. BOOHAKER:

Q.  Yeah. If Gallagher Bassett realizes that providers don't understand the policy language of the occupational accident policy, okay, but it also realizes that a procedure may be covered, does Gallagher Bassett have a duty to point that out to the provider?

MR. LOOMIS: Objection to form.

THE DEPONENT: That it may be covered?

BY MR. BOOHAKER:

Q.  Correct.

A.  Well, if we know, because if we know a

Q: 

A:

Page 16

procedure is covered or is not covered, but usually we don't know until the procedure is done if it's covered.

Q.  If you know that the procedure is covered, does Gallagher Bassett have a duty to point that out to the provider?

MR. LOOMIS: Objection to form.

THE DEPONENT: Well, we would not say -- we would probably have made the determination based on a medical opinion and we would send that medical opinion to the provider so they could see what the opinion was.

BY MR. BOOHAKER:

Q.  So you don't have a duty to tell them other than sending them the opinion?

A.  Right. [Silly b/c does not meet standard to be helpful to Germain]

Q.  You don't have an independent duty to tell them whether or not a procedure is covered or not?

MR. LOOMIS: Objection to form.

THE DEPONENT: Correct. [Same]

BY MR. BOOHAKER:

Q.  What deference does Gallagher Bassett give to a treating physician's opinion regarding whether something is medically necessary or not?

A.  Well, the treating physician's opinion is going to be taken into place but also we are going to

[ACE would send IME to provider. But ACE need not tell provider that procedure is covered.]

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

**BRENDA CULLINAN**
September 12, 2019

*[Handwritten margin notes: "If treating prior I+ME ACE will send out for second IME." "Physicians opinion conflict ACE will send out for second" "once premium payment + insured fill out documents, ACE pays + wag verification"]*

Page 17

send it out probably for a medical opinion to see if it was medically necessary under the policy.

Q. So if you have a treating physician who says one thing and a medical opinion that says the other, who gets greater deference?

A. It's probably going to be sent to a third one.

Q. It's going to be sent to a third one?

A. Or it's going to be referred to the carrier for their opinion, yes.

Q. And what happens in that instance? In other words, let's suppose it gets referred to the carrier, what happens then?

A. Then it's going to be a determination made by them whether they want a third opinion or whether they want to make the decision.

Q. And if the third opinion comes in supporting -- let's say supporting the treating doctor, what happens then?

A. Then probably that opinion is going to be sent to the carrier for their decision and it will be their determination.

Q. So even if the third opinion and the treating doctor concur, you still send it on to the carrier for their opinion?

Page 18

A. The original treating doctor and the opinion -

Q. The original treating and the third opinion, if they both concur you're still going to send that on to the carrier for their determination?

A. Yes, because it's been referred to them previously, yes.

Q. And we'll talk about that in a little bit. but when a new claim comes in what is required to start the payment of benefits?

A. When a new claim comes in we send claim forms to the injured party and we require the claim forms to be completed by the insured and by the doctor. We verify that the premium was paid and that they were under dispatch at the time.

Q. If the doctor and the insured both complete the claim form is that enough to start payment of benefits?

A. If they're completed in full. A lot of times the physician doesn't complete the disability dates but we still have to have to have premium verification and dispatch verification to verify they were working.

Q. So once premium dispatch and the docs are

Page 19

*[Handwritten margin note: "POL not enough."]*

filled out in full, that's enough to start paying benefits? + wag verification

A. Yes.

Q. You don't need an IME at that point?

A. Not if -- depends on what the accident is. I mean, you can't say that for every claim because different claims are reported that we have to try and figure out if it's related to an accident or over time something happens. So specifically motor vehicle accident, we have all the information, premium dispatch -- oh, I forgot the wage verification for lost time and the claim forms, yes.

Q. Is a proof of loss enough, proof of loss alone enough to determine whether something is medically necessary or not?

A. No.

Q. Can you tell me what, in your mind, the difference is between an occupational accident policy and a Workers' Compensation policy?

A. The benefits are significantly different.

Q. How so?

A. Pardon?

Q. How so?

A. Well, I think under Work Comp there's a permanent partial disability benefit. This policy pays

Page 20

only temporary or permanent total. Phonetical differs somewhat. I believe certain things -- and I'm not a Work Comp expert by any means, but I believe some things that happen in the work place are covered more than what they are under the accident plan because -- yeah, I believe the benefits are a lot different for what's covered.

Q. And do you believe the occupational accident policy provides more or less benefits than the Workers' Comp policy?

A. I think some of the benefits may be higher in some states. As far as the temporary total disability I believe in some states they're probably lower.

Q. How about in Georgia, do you know?

A. I don't know what your TTD rate is here.

Q. Is obtaining a peer review or independent medical exam prior to treatment, is that considered pre-approval?

A. No.

Q. Why not?

A. Because we don't pre-approve anything.

Q. So obtaining an opinion from a medical expert to determine if treatment is necessary, that's not, in your mind, pre-approval?

*[Handwritten margin notes: "But here, ACE undertook second IME + prev L4-L5 was covered. Not saying it would be paid at PPO rate was extremely harmful to its client-insured." "but does preapprove TTD benefits."]*

*Handwritten annotation across top:* usually physician calls + wants pre aut — which ACE doesn't do — That is not helpful for claim condition in policy. It seems clear to be done to cheat client — insured and it is not increase profit for Swift + ACE. to cheat client — insured and it is not

*Handwritten left margin (Page 21):* [not pre-approved covered procedure when ACE knows it is not covered is a loss of fact, unaware claim provision claim to pay denial]

**Page 21**

A. Not that we're going to pre-approve it with the physician. We know in our mind whether or not the procedure is probably going to be covered.

Q. So what's the distinction between knowing procedure is covered and pre-approving it with the physician?

A. Well, usually the physician will call and want pre-approval or pre-authorization, which we do not do. Now, if we do know a procedure is going to be covered or not covered we may send that report from the referring -- or the physician we referred it out to and have -- and so they will know what that opinion was.

Q. But you don't provide them any sort of -- you just send them the IME or the peer evaluation, right?

A. Right. = [Sub standard]

Q. You don't tell them one way or the other -

A. Right.

Q. -- what's happening or what they should do or what you'll pay for?

A. Right.

Q. How do you decide when you need a peer review or an IME?

A. Kind of depends on the case. Lot of claims -- I mean every claim is different so an IME is used a

**Page 22**

lot for return to work more than a peer review is. Lot of time the desk review we'll use for -- to determine if the certain procedure is going to be related to the accident or an underlying physical condition. We usually try to use IME's more than we use desk reviews, especially if we're determining whether or not someone's disabled due to the accident or an underlying cause.

Q. Did you just tell me that you use IME's mostly to determine whether or not somebody can return to work?

A. We use them a lot for that, not all.

Q. Not all?

A. Yeah.

Q. What other purposes do you use IME's for?

A. We sometimes use them for -- after, say, we get -- someone has a procedure and then we get in their records and the charges. We will send them to an IME doctor to review those and to determine any further treatment that may be necessary.

Q. Would you use an IME after a procedure is performed to essentially double check the work of the procedure that was done to make sure that it was a covered procedure?

A. I'm not understan--- double check like

*Handwritten left margin (Page 22):* use IME to determin whether further treatment may be necessary. [Done here]

**Page 23**

Q. physically see if the surgery was done?

A. Not only to see if it was done but to see if it would -- if it would subsequently be something that should be covered for payment?

A. Not necessarily, no. But that would be based on the records.

Q. The peer review you mentioned to me you used a lot for determining if a particular injury is related to the accident; is that correct?

A. We use some, yes.

Q. What else would you use a peer review for?

A. Once in a while if we get in, for example in some states you might get in eight months worth of charges for physical therapy that seem excessive. We may send those off for a peer review to a physical therapist for medical necessity.

Q. Is there any sort of documentation that you rely on to determine whether or not to engage an IME or a peer review?

A. No, just the medical records.

Q. So there's no claims handling guidelines or outlines or documents of any sort that you would refer to to determine whether or not to send something out for an IME?

A. No.

*Handwritten annotations (Page 23):* But here, ACE knew surgery was not done — IME ordered to see if ACE would say it needed surgery. wouldn't pay. | no claim manual for IME. [I don't believe that statement. See McCreary 58:13 - 60:9]

**Page 24**

Q. Do you have any claims handling guidelines or procedures or documents of any form in any substance whatsoever?

A. In house, Gallagher Bassett?

Q. Yes.

A. Yes, we have a best practices.

Q. And if I was asking for that would I ask for the Gallagher best practices manual or how would I call it?

A. That would be fine.

Q. What does the best practices manual cover?

A. It covers timelines that we try to -- when the claim is reported for example, we try to get the claim set up within two to five business days, that type of thing. When the claim forms go out guidelines or thoughts on supplemental claim forms, you know, the ones that we send, the supplemental proof of loss, it recovers some reserving guidelines. It's very standard and it's not specifically towards this policy so it's a general office guideline.

Q. If I ask for the best practices documentation is it one document, is it one book, is it a set of documents? What is it?

A. It's probably about twenty pages long.

Q. Twenty pages, okay.

*Handwritten annotation (Page 24):* claim manual 20 pages

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

**Page 25**

A. That's a guess.

Q. But it contains no directions as far as whether or not to retain an IME or a peer review on a particular case?

A. I don't believe it distinguishes between the two. They're addressed in there but I don't think it tells you in this case send it to an IME or this case in peer review.

Q. So what does best practices have to say about outside medical opinions? Let's just call it that.

A. You know, I really can't tell you without the document in front of me.

Q. All right, okay. Well, so do you have any medical training?

A. No.

Q. And you're not a doctor, right?

A. No.

Q. You're not a nurse?

A. No.

Q. So you just simply make a judgment call based on your experience whether or not to obtain outside medical opinions?

A. That's done within Gallagher Bassett between the adjuster, the supervisor and sometimes I do

**Page 26**

look at a file but it's mostly between the adjuster and the supervisor and that's why we send them out most of the time, is because we're not medical personnel.

Q. So you send out most of the claims that come in for an outside medical opinion?

A. I can't give you the percentage. We send out quite a few.

Q. Because none of the adjusters, as far as you know, at Gallagher Bassett are medical personnel?

A. Correct.

Q. But floor supervisors?

A. Correct.

Q. But as far as -- there's no guidelines that say send it out for outside medical evaluations every time or in these criteria or these conditions, anything like that?

A. No.

Q. If an adjuster doesn't know whether or not to send out a claim for an outside medical opinion does he or she talk to their supervisor first before doing it?

A. Most of the time, yes.

Q. And then who makes the final determination, the supervisor?

A. Usually the supervisor.

**Page 27**

Q. And the supervisors, they have no criteria for deciding whether or not they should, written criteria I should say?

A. That is correct.

Q. They simply go on their training and experience and their judgment?

A. Correct.

Q. Let me show you what we previously have marked as Exhibit 1.

(Whereupon, Defendants' Exhibit No. 1 was marked for identification.)

BY MR. BOOHAKER:

Q. Have you had a chance to look at that?

A. Oh, you want me to look at the whole thing?

Q. Well, I just want to make sure that you're familiar with what that document is.

A. Oh, I've seen this document.

Q. And what is that document?

A. It's the terms and conditions of the policy.

Q. Is it also the policy itself?

A. Yes.

Q. I want to ask you some questions about the policy, about certain terms in the policy. As defined by the policy, which is a part of this deposition as

*[handwritten: EX 1, Policy]*

**Page 28**

Exhibit 1, Mr. Germain Brown is an owner-operator; is that correct?

A. Yes.

Q. And as far as the claim, the accident that is at the heart of his case, he was not on a personal deviation; is that correct?

A. That is correct.

Q. I want you to turn for me to -- let's see if I've got it here -- well, first of all, are you familiar with what a Bates label is?

A. Yes.

Q. Can you turn to Bates Label DEFS0457, that page? Are you there?

A. Uh-huh (affirmative). Yes.

Q. You see that first paragraph up at the top?

A. Yes.

Q. That second sentence -- well, actually, let me read the first two. The accident medical benefit provides payment for the covered expenses shown below. These expenses must be charged to you while covered. Did I read that correctly?

A. Yes.

Q. Can you tell me where the word charged is defined in this policy?

A. It is not.

*[handwritten: "charged" not defined]*

Page 29

Q. It is not defined in the policy?
A. No.
Q. And I'm correct, it's not defined anywhere in this policy?
A. Charged is not.
Q. Not defined, correct?
A. Correct.
Q. Sorry, trying to clear up my record.
The second sentence or the next sentence says these expenses must be ordered by a physician as medically necessary for injuries that result directly and from no other cause from an occupational accident. Did I read that correctly?
A. Yes.
Q. Is the term ordered defined in the policy?
A. No.
Q. Do you know if in this case Mr. Brown had a spinal fusion ordered by a physician?
A. Yes.
Q. He did have one ordered; is that correct?
A. He had -- yes.
Q. Yes, okay. Was the spinal fusion that was ordered for the treatment of an occupational accident?
A. I don't believe so solely, no.

Page 30

Q. Was it partially for treatment of an occupational accident?
A. I believe part of his injury was possibly related to an accident but the procedure was for entire back and I don't believe the accident caused the entire back injury, no.
Q. And what do you rely on to say that you don't believe that the injury caused the entire back procedure?
A. Based on the medical records from the doctors.
Q. Which medical records?
A. Actually, I believe all of them.
Q. Well, I think Mr. Bengtson is going to cover that a little bit later.
A. Okay.
Q. But I want to talk to you a little bit more about some of the terms here in this policy. What is your understanding of what a preexisting condition is?
A. A condition they treated for twelve months prior to this policy being in effect, I believe.
Q. Let's just see if we can find the definition here in the policy. You want to turn to Defendants' 0471, you may find it defined.
A. Okay.

Page 31

Q. Can you read that for us?
A. Sure. A condition for which you have sought or received medical advice or treatment during the twelve-month period immediately prior to your effective date of coverage until you have been continuously covered under this policy for twelve consecutive months. However, you will be covered for a new occupational accident for which you receive treatment within the six-month period prior to your effective date of coverage.
Q. Do you know when Mr. Germain Brown had been continuously covered under this policy for twelve consecutive months?
A. I don't.
Q. Do you know if at the time of his accident he had been continuously covered under this policy for twelve consecutive months?
A. I don't know how long his coverage had been in effect.
Q. Do you know if Mr. Germain Brown -- or let me back up. Is it your belief that Mr. Brown had any preexisting conditions that prevented payment under this policy?
A. I believe that he had a congenital defect but I don't know if he treated any time before this

Page 32

policy was in effect.
Q. So to your understanding, if Mr. Brown had not been treated at any point in time for these congenital defects prior to the policy going into effect, would that qualify as a preexisting condition?
A. If he had not treated within the first twelve months, no, or the twelve months prior to his coverage being in effect.
Q. What if after he had been in -- he had been continuously covered under this policy for twelve consecutive months, would it matter if he had been treated for that congenital defect at that point?
A. No.
Q. So if Mr. Brown had either had continuous coverage under the policy for twelve consecutive months or had never been treated for this congenital defect, he would not have a preexisting condition; is that correct?
A. May not have a preexisting condition but -- yes.
Q. Let me -
MR. LOOMIS: David, before we leave that can we just for the record clarify that was Exhibit 1 that we were reading from?
MR. BOOHAKER: That's correct. I was

*[But adjusting process is the same]* (handwritten)

*(handwritten margin notes: "medically necessary"; "[no standard]" "Mc Creary 46:8"; "Send out for IME or peer review."; "ACE has no standards to send to IME physician. It just sends questions maybe definition out of policy")*

**Page 33**

Q. reading from Defendants' Exhibit 1, Bates Page labeled DEFS0471.

MR. LOOMIS: All right.

BY MR. BOOHAKER:

Q. Ma'am, if you'll turn back a couple of pages to Page 69. Down at the bottom you can see the term medically necessary as defined. Do you see that?

A. Yes.

Q. We determine in our discretion if a service or supply is medically necessary for the diagnosis and treatment of an occupational accidental injury. Did I read that right?

A. Yes.

Q. This determination is based on and consistent with standards approved by our medical personnel. Did I read that right?

A. Yes.

Q. What standards are those that are referenced in that definition?

A. You mean -

Q. Do you have any written documentation at Gallagher Bassett outlining what the standards are that are approved by your medical personnel?

A. We do not have medical personnel. We refer those out to either peer reviews or IME.

**Page 34**

Q. And that was my next question. So our medical personnel doesn't actually refer to anyone employed or retained on a permanent basis by Gallagher Bassett?

A. That's correct.

Q. It only refers to physicians who you may refer out for IME or a peer review or something similar; is that right?

A. Correct.

Q. And you don't in-house have any standards for what those personnel use when they make their analysis, any written documentation or standards for what those personnel use?

A. We send -- are you talking about the people we refer out to?

Q. I'm talking about what -- anything in-house that you provide to those people that you refer out to to help them make their decision.

A. We usually send them all the medical records.

Q. But you don't have any sort of guidelines or documentation, aside from the medical records, that you send to them to help them make their determination?

A. Other than the questions that we are asking them and we may send them a definition out of the

**Page 35**

A. policy.

Q. So there's no documentation in-house at Gallagher Bassett that says these are our standards that we use and adhere to when we're -- when we have our medical personnel evaluate a claim?

A. No, because each claim is different.

Q. Do the physicians that you refer these claims out to, do they have any sort of written documentation where they evaluate the claims that are sent to them? *[no. Questions and definition from policy]* (handwritten)

A. I'm not aware of that.

Q. And this is -- I want to touch on this real briefly to see where it takes us, but do you -- first of all, how do you find out or how do you determine who the personnel are, the medical personnel are that you send these claims out to?

A. We use different independent companies that they refer them out. *[Med to uses HHC & send IME doc]* (handwritten)

Q. What companies do you use?

A. We use HHC, we use DiversiMed. I believe there's another one that we started using recently, but the records are sent to them and they find the physician for us that best fits the type of -- like an ortho, gen-ortho chiropractic review to a chiropractor, that type of thing.

**Page 36**

Q. And who's the -- you said HHC and DiversiMed. Who's the third one?

A. Can't think of the name of them. I can provide it to Kenan if you want.

Q. All right. Those companies, how do you get in touch with them? Do they solicit you or seek your business?

A. Not really.

Q. How did you get in touch with them? How did Gallagher Bassett get in touch with them?

A. Well, HHC, I believe, is a third provider for ACE American. DiversiMed we've used probably for twenty years and I can't recall how we started using them.

Q. Do those companies, is part of their job to help minimize cost for Gallagher Bassett?

A. No.

Q. Does Gallagher Bassett provide them with any criteria on how to select physicians?

A. We tell them we want closed -- like we tell them what kind of physician we think we need, like if it's an orthopedic surgeon. Other than that, no.

Q. Do you tell them that in writing?

A. Probably in the form we fill out to send to them.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 37

*(handwritten margin note: ACE does not audit IME referral firms)*

Q. In the marketing that these companies -- well, first of all, do these companies, HHC and DiversiMed, do they do any active marketing to Gallagher Bassett to promote them over, say, the other ones?

A. Not that I'm aware of, no.

Q. Not that you're aware of, okay. Do you know if they have any of their own written documentation or criteria for evaluating claims that they receive from Gallagher Bassett?

A. I do not.

Q. How do you audit or review or check on the work of HHC or DiversiMed or the third provider that we were talking about?

A. We don't audit them.

Q. You don't? Okay. How are they compensated?

A. Well, they have a fee for facilitating, sending it out to the doctor, noti--- if it's an IME, notifying the insured when and where the appointment is and there is a flat fee for them to set up the appointment.

Q. So they both have flat fees?

A. Yes.

Page 38

*(handwritten margin note: random selection of referral firms)*

Q. Do you compare the results or the opinions provided by the doctors from HHC versus the doctors from DiversiMed?

A. No.

Q. You don't look at how the doctors from one vendor to the next come out in their opinions as to whether or not coverage should be applied?

A. Not really.

Q. Well, you say not really. What does that mean?

A. Well, I mean we don't -- we don't look at how many of DiversiMed's, say, don't pay the claim and how many of HHC's that don't pay the claim. We just randomly choose which one. We don't do a survey or an audit of how many coverages or denials, no.

Q. So do you have some sort of system to pick one or the other or do you just on a rotation or is it they have individual relationships with adjusters? I mean how do you pick who?

A. The adjusters usually pick.

Q. Do any of these vendors market to individual adjusters to pick -- to get them picked more than the other?

A. No.

Q. Well, I'm just trying to figure out how,

Page 39

you know, how the adjuster decides which one to go with.

A. They just randomly pick.

Q. Are they told by Gallagher Bassett to just randomly pick between the three?

A. Yes.

Q. Is that written in some sort of document somewhere?

A. No.

Q. Let's look at the -- let's look at the end of that definition of medically necessary because these standards are developed in part with consideration to whether the service or supply meets the following. Okay, do you see that? Did I read that right?

A. Yes.

Q. Is this -- now, we just talked about that Gallagher Bassett doesn't have any standards. Are these three criteria sent out to HHC or DiversiMed for evaluating whether something is medically necessary or not?

A. I don't know if that particular language is quoted so I can't answer that.

Q. Well, this is the language that governs the policy to decide whether or not coverage should be applied and determine if something is medically

Page 40

necessary, right?

A. Correct.

Q. How are these standards conveyed to the providers that are determining -- making an IME or a peer review? *(handwritten margin note: IME doc sent some of the policy wording)*

A. Well, they are sent some of the policy wording, yes.

Q. So are they sent the medically necessary definition in the policy?

A. I can't answer if it is on every one, no.

Q. Do you know if that happened here in Mr. Brown's case? *(handwritten margin note: Does not know if IME docs sent policy wording in Germain's case)*

A. I do not know.

Q. So is it possible, then, that in Mr. Brown's case the IME's or peer reviews that were engaged did not know about these three standards for determining whether or not something is medically necessary? *(handwritten margin note: Possible IME docs not sent)*

A. I don't know without looking at the referral itself.

Q. But is it possible?

MR. LOOMIS: Objection, calls for speculation.

BY MR. BOOHAKER:

Q. And we're going to talk about the referral

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

*[Handwritten margin notes: "Possible that If standards for IME or peer review, peer wouldn't doc wouldn't know standards know IME for IME"; "does not know other consideration for medical necessity."; "[ad hock claim handling - substandard"; "Medically necessary (1)"]*

Page 41

later, but is it possible that if the standards weren't sent to the IME or the peer review that they would not have known what those standards were when performing their IME or peer review?

MR. LOOMIS: Same objection.

THE DEPONENT: I guess it's possible.

BY MR. BOOHAKER:

Q. Let me talk about, then, the three -- the three -- it also says, I should mention, these standards are developed in part with consideration to whether the service or supply meets the following three criteria that are outlined. What is the other part? Do you know what the other -- it says in part, so what are the other considerations that are made by Gallagher Bassett in determining something is medically necessary?

A. I don't know.

Q. Well, I'm just trying -- I'm just trying to figure out what the policy would define as medically necessary so if it says these standards are developed in part with consideration of those three outlined elements -- I'm trying to figure out what the other part is. And you're the representative for Gallagher Bassett today so you don't know what that other part is?

Page 42

A. I'm saying each case is different. I can't tell you generically in part what's -- but each claim may have something different with it and so this may apply, there may be other things that would apply. I can't tell you.

Q. And again, Mr. Bengtson is going to get into the details but sitting here right now from a general global level you can't think of any other criteria specific to Mr. Brown's case that would be applicable to determining medically necessary aside from these three bullet points?

A. I can't right now without looking at the record.

Q. So then let's -- let me read these three criteria.

MR. LOOMIS: Can you remind us which page we're on?

MR. BOOHAKER: Yeah, we're on Defendant 0469.

BY MR. BOOHAKER:

Q. Criteria No. 1. It is appropriate and required for the diagnosis or treatment of the occupational accidental injury. Did I read that right?

A. Yes.

Q. No. 2, it is safe and effective according

Page 43

to accepted clinical evidence reported by generally recognized medical professionals or publications. Did I read that right?

A. Yes.

Q. No. 3, there is not a less intensive or more appropriate diagnostic or treatment alternative that could have been used in lieu of the service or supply given. Did I read that right?

A. Yes.

Q. I want to ask you about criteria -- I'm going to go backwards. I want to ask you about Criteria No. 3. In Mr. Brown's case do you know if there is a less intensive or more appropriate diagnostic or treatment alternative that could have been used in lieu of the fusion surgery requested by his physician?

A. I believe there was a report in there that talked about trying to treat with pain management and possibly doing a discogram prior to doing the whole fusion.

Q. How about No. 2? In Mr. Brown's case the recommended surgery by his physician, do you know if it was safe and effective according to accepted clinical evidence reported by generally recognized medical professionals or publications?

Page 44

A. I don't know about the safe. There's no surgery safe. I know there were some other treatment options but as far as I know back fusions are performed all the time.

Q. So would you say that back fusion at least met Criteria No. 2?

A. Yes.

Q. And I guess I should ask, do you believe that the back fusion met Criteria No. 3?

A. No.

Q. How about No. 1? It is appropriate and required for the diagnosis or treatment of the occupational accidental injury. In Mr. Brown's case did the spinal fusion meet that criteria?

A. I don't believe so.

Q. Why not?

A. I think there were some other methods to try the chronic pain management and the discogram.

Q. I just wanted to cover that generally. I think Mr. Bengtson is going to touch on that as well in more detail when he gets down to the claim filed. Couple of other housekeeping things that I wanted to talk to you about. If you could turn to -- this is Defendants' 0484. And let me know when you're there.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 45

MR. LOOMIS: I'm sorry, what's the page number?

MR. BOOHAKER: 0484.

THE DEPONENT: I'm here.

BY MR. BOOHAKER:

Q. You see up there it says at the top policy holder Knight-Swift Transportation Holdings, Inc.?

A. Correct.

Q. Is that the current corporate name for Swift Transportation, the policy holder in this case?

A. I believe so.

Q. How do you know -- how does Gallagher Basset know that Germain Brown is an owner-operator entitled to benefits?

A. We verify through Aon, which is the broker, that the premium is paid and then we receive settlement sheets from either Mr. Brown or from the trucking company which shows his settlement statements which also shows the premiums invested.

Q. Do you know if either the settlement statements or the verification through Aon were parts of the documents produced in this case?

A. I don't know.

Q. And I think we touched -- we mentioned this earlier, but let me ask. You don't know when he first

Page 46

started participating in this policy?

A. I don't. I personally don't know.

Q. I think I'm done with Exhibit 1 there for the moment. Let me ask you about the relationship between Ace and Gallagher Basset under this particular occupational accident policy. Does Ace adjust any claims itself?

A. I don't believe so.

Q. But they do approve certain decisions; is that right?

A. Regarding claims?

Q. Yes.

A. Yes.

Q. And I might touch on that later but I think there's an escalation that Gallagher Bassett can either make based on the dollar amount or a particular policy question that they had; is that right?

A. Yes.

Q. Are you -- or is Gallagher Bassett the agent of Ace/Chubb -

MR. LOOMIS: Objection to form.

MR. BOOHAKER: Ace slash Chubb?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: We're their first-party

Page 47

administrator. I don't know if that qualifies as an agent.

BY MR. BOOHAKER:

Q. Do your decisions on an individual claim like Mr. Brown's bind Ace?

MR. LOOMIS: Objection to form, calls for a legal conclusion.

THE DEPONENT: We make decisions on behalf of Ace.

BY MR. BOOHAKER:

Q. If you make a decision and you pay a claim is Ace subsequently able or entitled to come in and overturn that decision and call back those claim statements?

A. I don't believe that's ever happened. I don't think so.

Q. You don't think so? Okay.

I guess what's the -- there's a contractual relationship between Gallagher Basset and Ace slash Chubb and when I say Ace I mean Chubb.

A. Yes.

Q. There's a contractual relationship between them for Gallagher Bassett to act as the TPA on these occupational accident policies, right?

Page 48

A. Yes.

Q. What is the name of that policy, do you know -- I'm sorry, that contract?

A. I don't know.

Q. Do you know where it is?

A. It would be in our home office.

Q. And where is your home office?

A. Rolling Meadows, Illinois.

Q. If I wanted to find it, how would I refer to it to ask for it? I mean is it a TPA service agreement, is it a contract between Ace and GB, Gallagher Bassett? I'm just trying to figure out how you'd call it.

A. I don't know exactly what it's called but it's probably TPA agreement.

Q. TPA, okay. Does that agreement set out the respective roles of Ace or Gallagher Bassett in the claims handling process?

A. It does not have claims handling instructions in it, no.

Q. Does Gallagher Bassett have any claims handling instructions from Ace?

A. Only referral amounts, I believe.

Q. Referral amounts.

A. Like when we should refer a claim to Ace.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 49

I believe it probably addresses the referrals as far as like death, dismemberment, a certain dollar amount, Department of Insurance complaints, that type of thing.

Q. How about lawsuits?

A. Yes, we send them lawsuits.

Q. So this agreement between you and Ace outlines procedures for referring claims when it reaches a certain amount, right?

A. Yes.

Q. And when it involves death or dismemberment or is that just when it reaches a certain amount?

A. Well, there's different criteria, death, dismemberment, multiple fractures, certain kinds of third-degree burns when it reaches our claims authority. But basically that's all the claims handling instructions we have.

Q. So I'm just trying to -- I'm trying to nail them down. So there's -- the agreement provides that if you reach a certain amount you refer it to Ace, correct?

A. Correct.

Q. It provides that if there is a death, dismemberment, a multi-fracture, third-degree burns you refer it out to Ace?

A. Correct.

Page 50

Q. There's a Department of Insurance complaint referred to Ace?

A. Correct.

Q. If you get notice of a lawsuit, referred to Ace?

A. Yes.

Q. If there is a claims authority -- what does that mean?

A. Well, we have a claims authority level where if it reaches a certain level of payment that we need to refer the file to Ace, so we send them to -- we send the entire file to Ace to request further authority to continue the benefits.

Q. Other than claims authority and the ones I just mentioned any other claims adjusting guidelines or handling provided by Ace?

A. There may -- if there is I think it's all referral procedures. And there may be some other situations where we would refer but as far as day-to-day handling, no.

Q. So what's the difference between a referral amount and a claims authority level?

A. I guess there really isn't.

Q. So on a day-to-day handling type basis Gallagher Bassett has pretty much open authority to do

Page 51

as it wants on a particular claim?

A. Correct.

Q. And that's subject to the criteria we just talked about, if it reaches a certain amount, if it involves certain claims, lawsuits, part of an insurance then you refer it to Ace, right?

A. Correct.

Q. Are you obligated to refer it to Ace or is it just we prefer that you do?

A. We're obligated to send to Ace under certain criteria. We will refer other claims if we're not sure of the determination to be made, so we probably refer others that don't fit within that criteria.

Q. Do you know if Mr. Brown's case was referred to Ace?

A. Yes.

Q. And why was that?

A. I believe it might have been legal correspondence, maybe a demand letter.

Q. So before that demand letter was Mr. Brown's case referred to Ace?

A. I don't believe so.

Q. All right.

A. It may have been, but I don't think so.

Page 52

Q. Do you know where would the notation of the referral to Ace be located in the documentation of Mr. Brown's claim?

A. It would be in the claims notes.

Q. But Ben touched on this but if it doesn't appear in the claims notes what happened? Where else would it be? Where else would you document the referral upstairs, I guess?

A. It may have been an email sent to Ace Referrals.

Q. And would those emails be captured in the claims notes?

A. Most of them would be, maybe not all.

Q. So there may be some emails that aren't captured in the claims notes that refer to Mr. Brown's file?

A. Possibly.

Q. What is Ace's role, aside from the oversight role does Ace have any other role in the occupational accident policy, not just in the adjustment but do they have any other role? Is their job simply to act as the insurance company? I'm trying to figure out what they do in this process if you've got to do all the adjusting.

A. Well, we refer claims to them in most

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 53

situations for them to review if there's a claim that we want them to look at that we do not want to make a determination on without the carrier review, we will refer it. They come in and audit it but that's pretty much what they do.

Q. How is Gallagher Bassett paid?

A. I think per claim.

Q. Is it a set dollar amount per claim?

A. I think so.

Q. It doesn't increase or decrease based on how much is paid out on the claim?

A. No.

Q. And Gallagher Bassett pays their adjusters out of that per-claim basis?

A. No. The adjusters are on a salary.

Q. But Gallagher Bassett ultimately -- well, I guess Gallagher Bassett handles more than just this one occupational accident policy; is that right?

A. Correct.

Q. But as far as the relationship with Chubb regarding this policy, all of it, Gallagher Bassett is paid on a per-claim basis that doesn't fluctuate based on the complexity of the case, the amount paid, the length of time it takes, anything of that nature?

A. Correct.

Page 54

Q. Is it paid on underwriting in any capacity?

A. You mean like on premium?

Q. Right, correct.

A. No.

Q. Does Gallagher Bassett have any goals or metrics to keep claim dollars beneath a certain amount?

A. No.

Q. Do you know if Ace has any re-insurers?

A. I'm sure they do. I don't know.

Q. So I guess this would probably be a no but I'm going to ask anyway. Does Gallagher Bassett make any reporting to any re-insurers that Ace may have?

A. No.

Q. You touched on a little bit about auditing. Tell us about that audit process from Ace.

A. Well, once a year they bring -- send in an auditor and they look at procedures, financial reporting, timely reporting, payments, verifying claim was investigated appropriately -- they randomly test files or a computer picks them and then they come in and audit the files.

Q. One time a year, is that one person or is it multiple people.

A. It's usually one.

Page 55

Q. Is it the same person or is it different?

A. It varies.

Q. Who was the last one?

A. Michelle Eaddy.

Q. She works for Chubb?

A. Yes.

Q. Is that E-a-d-y?

A. E-a-d-d-y.

Q. So what is the financial reporting that you mentioned? What is that that they look at?

A. It's making sure the claims are paid correctly.

Q. Is there any aspect -- well, when you say they're paid correctly, how do you determine whether or not they're paid correctly?

A. They look at the bills, look at the CPT codes to verify that it's related to the accident, that we didn't pay duplicates, that we didn't pay something we shouldn't have but that we didn't deny something we should have paid, that type of thing.

Q. How do they determine whether or not you paid something that you should have paid or didn't pay something that you shouldn't have paid?

A. They look at the file, the records. If there's a payment they write -- because we write on the

Page 56

payment or the bill itself what we've paid. If they look at it and say well, that's not related to the accident, so they charge you with an overpayment. If we -- there's a letter denying something to a provider saying it wasn't covered and they say well, but you should have paid that, then that's an underpayment. So they look at all the documents in the file.

Q. But those are on the individual files?

A. Correct.

Q. The financial reporting that I'm talking about, do they do some sort of financial reporting on your claims as a whole -

A. No.

Q. -- to look at, you know, the claims as a whole, how much was paid out versus how much should have been paid out?

A. No.

Q. They don't look at the -- do you have any budgeting or forecast about claims that -- looking forward and when you have the audit that you prepare what you pay versus what you were budgeted?

A. Not that I'm aware of.

Q. The computer program, is that Athenium?

A. I don't know what it's called. It's Ace's program.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

**Page 57**

Q. Let's talk about the two individual audits that you just gave us a second ago, the two criteria. Let's suppose you have a claim that's covered and the doctor says it's going to be -- it's going -- and he invoices $1,000 -

A. Right.

Q. -- and Gallagher Bassett agrees that it's a covered, medically necessary -- covered under the policy, okay? Do they pay $1,000?

A. We pay the reasonable and customary amount or -

Q. What, so even if you determine the procedure is covered, medically necessary, covered under the policy, you still have another hurdle for the provider where you determine if it was medically necessary or not?

A. No. That's not -- I said reasonable and customary. We have a UCR system that goes by geographical area, zip code, procedure code and what eighty percent of physicians charge for that same procedure, or we may send it to -- through a PPO that may -- that they may have a contract with.

Q. What is a UCR system?

A. The usual and customary system that is updated quarterly. It's through Fair Health that most

**Page 58**

of the -- I'm sure most of the health insurance carriers use. As you know, when you go to a physician and your charge is $180, the insurance company allows so much. We use the UCR system, yes.

Q. And it's provided through Fair Health?

A. Yes.

Q. And what about the PPO you mentioned?

A. We have a network of PPO's that we can send the bills through to be repriced.

Q. What's the name of that network?

A. We sent them through Global Excel which has multiple networks underneath it or we may send through a local company and they have contracts with multiple PPO's. They don't always honor them because they've already been treated.

Q. So going back to my overly simplistic example, doctor sends in a bill, it's been determined that coverage is medically necessary, you then move to the UCR system to determine how much to pay on that $1,000?

A. And it may be the full thousand.

Q. Or it may -- depending on what the criteria are for that zip code and that procedure it may not be?

A. It may be $998.24.

Q. Are there any best practices that govern

**Page 59**

the audit system that Ace or Chubb executes every year that you know of?

A. Not that I'm aware of.

Q. Is the term management action plan familiar to you?

A. I don't know with those exact words, no.

Q. As a result of the audit report or review are you given any sort of things to work on, bullet points to deal with after the audit?

A. Yes.

Q. And what is that called?

A. That may be the management action.

Q. And you get those every year?

A. Yes.

Q. Does Ace maintain those or do you maintain them? Do you get a copy of them?

A. Yes, because they're sent to me for us to respond to.

Q. Do you recall for the previous year what your -- well, what did you call them when they're sent to you? How do you refer to them?

A. An audit report.

Q. What did your latest audit report cover?

A. Covered our percentages, financial procedural coverage and management action plan. I'm

**Page 60**

sure that that's probably what it's called.

Q. So what is the percentages?

A. What were the percentages?

Q. Well, what if -- you said -

MR. BOOHAKER: Can you read that, the answer back for me, please? I'm just trying to write this down as best I can.

THE DEPONENT: I think I know what you were asking.

MR. BOOHAKER: Let's see if we can get him back on line first.

BY MR. BOOHAKER:

Q. Let me ask it again. The audit report that you just mentioned, what is covered or encompassed in that?

A. It's our scores. It's a percentage for the financial procedural and I believe accuracy. There's three categories. I know one of them is financial. Maybe it's just financial and procedure and then at the end of the report they have recommendations and the management action plan that they would like me to review and respond to.

Q. So when you say it's your percentages, they grade you, I guess, on a scale of a hundred?

A. One to a hundred percent, yes.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 61

Q. One to a hundred. And they grade you on your financials, right?

A. Correct.

Q. Which is whether or not you were paying what you should have been and not paying what you shouldn't have been?

A. On each claim, yes, there's a score.

Q. On each claim that they audit?

A. Correct.

Q. And how many did they pick for an audit?

A. It varies. I want to say somewhere probably between fifteen and twenty.

Q. And tell me what is -- they grade you on your procedure. What does that mean exactly?

A. Procedure would be response time to sending out the claim forms, setting up the claim, responding to correspondence, processing or denying or appending the medical bills within fifteen days of receipt. If the claim was referred to Ace previously, did we refer it timely, if it met one of the criteria, that type of thing. There are probably some others but -

Q. Sure. Do you recall what the recommendations and management action plan were for you this past year?

A. Yes.

Page 62

Q. What was it?

A. To go through some of the claims that had been pending for several years and see if we can either resolve them, they were being paid continuous totals, look at buying annuities or trying to settle out the claims because they were not ever going back to work, looking at the fatalities, about buying annuities, trying to resolve some old subrogation terms.

Q. Do you remember what your percent score was for your financials?

A. I do, it's one hundred.

Q. And that means what, that every payment that they looked at you had done correctly according to criteria?

A. Correct.

Q. Of the fifteen to twenty that they audited for the past year?

A. Yes.

Q. Explain to me a little bit, you were talking -- we were discussing that earlier but if you look at -- if you're auditing a file how do you determine if it was paid correctly or not?

A. Well, I believe -- well, I'm not the auditor but I think they look at -- I believe they look at every document in the file. There's a bill, there's

Page 63

a record, whether or not it's related to the accident. They look to see if we repriced it through the UCR system or send it out to a PPO but that's really a question for the auditors. I believe that's what they look at.

MR. LOOMIS: Now, this is way outside the scope of the Notice but I can't tell her not to answer. Go ahead.

BY MR. BOOHAKER:

Q. Okay. So the auditor makes the decision whether or not a particular payment was medically necessary related to the occupational accidental injury?

A. Well, they look at it based on the file, on the file that we've already paid, yes.

Q. Right, but in that file like we talked about earlier, you don't make any recommendations or tell the providers whether or not something would be paid, right?

A. I'm not understanding that one.

Q. Well, I guess if in your claims file you don't make any judgment calls on whether or not to pay something?

A. Throughout the life of a claim?

Q. Well -- all right, let me back up.

Page 64

We were talking earlier about IME's and peer reviews and things of that nature. You said we just send it along to the provider and they do with it what they will and they send us an invoice, right?

A. Well, about every bill, no.

Q. Well, but if you've actually gone to the trouble to retain an IME or a peer review -

A. Uh-huh (affirmative).

Q. -- and the provider is looking for some guidance on how a particular procedure that they're recommended will be treated, you don't actually tell them whether or not you'll pay, you just send them the IME and then they have to make the decision on doing the surgery and then sending you the bill?

A. Correct.

Q. So when that happens what is the auditor looking at to determine if the right decision was made to pay something or not. How is she or -- yeah, she, how is she looking at that and tying it all together in making a -- does she make a judgment call that it was -- that you made the right choice or not to pay it? What are her criteria to do that with?

A. I assume so. I don't know exactly what her criteria is. I'm not the auditor.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

*[handwritten margin notes: GB authority = $150,000 ; Ex 2 ; $103,000 paid on Germain's claim. ; german referred ACE b/c of "legal notice"]*

Page 65

Q. Because you're not an auditor, okay. Well, let me move on here.
    Let's talk about the reviews, I think they're called authority reviews at Ace when you reach a certain dollar amount -
A. Correct.
Q. -- right? What is that dollar amount?
A. A hundred and fifty thousand.
Q. And when we talked to Ace last week I think there was a breakdown of it's not just a hundred and fifty thousand that's paid period, that it was a hundred -- where is that sheet? Do you have the last -- can I look at Exhibit 2 again?
    (Whereupon, Defendants' Exhibit No. 2 was marked for identification.)
    BY MR. BOOHAKER:
Q. All right. Take a look at Exhibit 2. You see how it's broken down by wage loss, medical and expense? See that?
A. Yes.
Q. And at the top, net paid a hundred and three thousand and some change?
A. Yes.
Q. And that's Exhibit 2, Defendants' 14, correct?

Page 66

A. Correct.
Q. Do you look at that total number paid or do you look at some subset of between wages, medical and expenses?
A. No, we look at the total paid but we don't always -- well, I guess those fees would be included as part of the -- sometimes expenses are not inclusive, depending on what they are. But this would be inclusive, yes, so it would be a hundred and three thousand so we'd have forty-seven thousand to go before we had to refer it. *[handwritten: direct claims expense]*
Q. What source of expenses are not included on this? *[handwritten: does not erode indemnity]*
A. Usually the police report, I guess, is not included.
Q. Anything else?
A. Not that I can think of right offhand. There might be other things.
Q. And it's your belief that Mr. Brown wasn't referred to Ace because he didn't reach the dollar threshold?
A. It was referred to Ace but it wasn't for the dollar threshold.
Q. There you go. Thank you. It was because of the legal notices?

Page 67

A. Correct.
Q. Do you know if any occupational accident policies in Georgia have been reported to the Department of Insurance?
A. I don't know.
Q. Now, this, Mr. Brown's case, was referred up because of the lawsuit, correct?
A. I don't know if it was referred up after the demand letter or after the lawsuit.
Q. Let me - *[handwritten: referral in claim log.]*
A. I believe it's in the notes.
Q. Let me drill down on that a little bit. Mr. Brown was actually involved with another firm on his personal injury action before this current action was involved. Would a referral to Ace happen no matter what kind of lawsuit was involved, even if Ace may not be a defendant?
A. No.
Q. Bad question on my part. Mr. Brown had a personal injury attorney who was handling his personal injury side of things. When that notice of representation came in would that -- would his claim have been referred to Ace? *[handwritten: BI liability]*
A. No. *[handwritten: claim would not be referred]*
Q. No, okay. Only when our demand letter *[handwritten: to Ace.]*

Page 68

against Ace specifically came in, that's when it would be referred up?
A. As far as being referred to this policy, yes.
Q. Do you know if there are any other suits similar to Mr. Brown's pending against Ace or that have been -- that have involved Ace in the payment of occupational accident benefits?
A. Do I know of any other suits under this policy?
Q. Yes, ma'am, under the Swift policy.
A. That have been referred to Ace?
Q. Yes. *[handwritten: [should this be "A."?]]*
Q. Yes.
Q. Can you tell me the names or the locations of any of those other suits?
A. Not off the top of my head.
Q. Do you know how many there are?
A. No, because we've been paying these for several years, I can't -
Q. Does Gallagher Bassett and Swift have any sort of relationship?
A. Yes. *[handwritten: GB also pays claims for Swift]*
Q. What is that?
A. We pay claims for Swift Transportation *[handwritten: Transportation]*

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

*(Margin handwriting: "Swift captive where different motor carrier pool risk")*

Page 69

under other lines of business, I believe.

Q. Under the occupational accident policy, though, what is the relationship between Gallagher Bassett and Swift?

A. I know that Swift is in a captive but I'm not sure how that works so there might be an underlying contract that I'm not aware of that it would be in the home office, yes.

Q. What is a captive?

A. That's beyond my -

Q. Well, you said you know they might be in a captive. So what can you tell me about what that means? I don't know what that means.

A. I think a captive is where like different motor carriers pool together and are insured under like the same contract with different policy numbers.

Q. Let me ask another maybe more specific question. How does Swift find out about a particular claim filed by one of their drivers?

A. I believe they report it to Swift first and then Swift calls in -- or not Swift but I believe the owner-operator is required to notify Swift if they're in an accident or if they're hurt and then they're given a number to a Claims Line and then they report the claim to Claims Line and they email us the report.

Page 70

Q. Swift emails Gallagher Bassett or no?

A. The Claims Line does.

Q. The Claims Line does.

A. But I believe Swift wants the owner-operators to notify them of an accident so that's how they're told.

Q. What kind of involvement does Swift have in the adjustment of any particular claim?

A. None.

Q. Do they provide any sort of oversight or anything like that to Gallagher Bassett on any claim?

A. No.

Q. Do they communicate with Gallagher Bassett through the course of a claim?

A. They will if we ask them to or they may have a liability claim that affects our occupational accident claim on like for a lien or something like that. But as far as giving us instructions on how to handle a particular occupational accident claim, no.

Q. Would there be any communication between you and Swift other than what's found in the claim log?

A. No. And probably regarding a liability claim since it was a vehicular accident.

Q. What do you mean by that?

A. Well, usually if there's a vehicular

Page 71

accident Swift becomes involved on the liability side and there may be some communication between Gallagher Bassett and Swift regarding the liability side and like that but no specific advice on -

Q. On adjusting?

A. Right.

Q. And all that communication would be encompassed in the claims note?

A. Yes. *(handwriting: Swift's involvement with accident claim b/c of BI claim)*

Q. Do you make any reporting to Swift about any of the claims paid or anything like that?

A. We notify them when there's been lawsuits. *(handwriting: claim notes)*

Q. But other than that you don't tell them about what you've paid or how much you paid or anything like that?

A. No.

Q. And you notify them when there's been a liability lawsuit or -

A. Well, they usually notify us but sometimes the liability suit comes to us in error and we will send it to them.

Q. So as far as you know, they don't keep track of claims or anything else, at least from your reporting?

A. I don't believe they keep track of them.

Page 72

Now, they may ask what we paid from a liability standpoint so they know exactly what's been paid out of the occupational accident.

Q. So they may ask you how much you've paid on an occupational accident?

A. Right, from a liability standpoint.

Q. For their purposes in a liability -- okay.

MR. BOOHAKER: Let's take a break. I think that's all I've got for you right now. Thank you.

(Whereupon, a brief recess was taken.)

CROSS-EXAMINATION
BY MR. BENGTSON:

Q. Mr. Cullinan -- am I saying that right?

A. Yes.

Q. My name is Ben Bengtson and I just say it fast, Bengtson. There's a bunch of letters in there you don't say.

A. I noticed that.

Q. I also represent Mr. Brown. I'm going to ask you some more specific questions about the claim file, okay?

A. Okay.

Q. Before I start on that, though, I wanted to just get clear in my mind about a term that you and Mr.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 73

Boohaker were using earlier talking about referring out files to -- or referring a file to Ace. When I heard you use that term I was imagining what you're doing is having Ace weigh in on decisions that Gallagher Bassett is making on that particular file. Is that the right impression or did you actually -- when you refer it out you actually send them the file and let them take over from there?

A. We get their opinion, we continue to handle the file.

Q. So when I'm thinking refer out in this context I should be thinking, hey, you're calling up Ace and you're saying look, we're going to do this on this file. Do you have any input on this? And they say yeah, you should do blah, blah, blah or whatever and then you keep trucking along with the file, right?

A. Correct, but we send them the whole file to review to make their determination.

Q. Good. I just wanted to make sure I had that right.

I'm going to ask you questions mostly centered around Defendants' 434 through 442 and we're going to -- we're going to call that Exhibit 4. We're skipping over Exhibit 3 for right now.

(Whereupon, a discussion ensued off the

Page 74

record.)

BY MR. BENGTSON:

Q. We're going to call this, for identification purposes, Exhibit 4. Did we mark it?

(Whereupon, Defendants' Exhibit No 4 was marked for identification.)

BY MR. BENGTSON:

Q. What I'd like to do is just start by paging back -- well, first let's talk about what this document is. Can you describe what Gallagher Bassett calls this document and specifically what we're talking about is Exhibit 4. This is Defendants' Bates stamp from 434 through 442.

A. It's payment history.

Q. Also called a pay screen?

A. I don't call it a pay screen but it's payment history.

Q. Payment history, okay. And this is a payment history for Germain Brown's entire case, correct?

A. Correct.

Q. There's nothing that has been paid on Germain Brown's case that is not included in this payment history?

A. I believe so. This was ran in February. I

Page 75

don't believe we've paid anything after that.

Q. Let me ask it this way. It's Gallagher Bassett's position that this constitutes all of the payments that were made on Germain Brown's file through February of 2019?

A. Yes.

Q. So let's page to -- this is the eighth page of this exhibit but for simplicity purposes we'll call this Defendants' 441. What I'd like for you to do is help orient me to what we're looking at on Page 441 of Exhibit 4. At the top it says client 02778. What does that mean?

A. That's an internal client number in our claim system.

Q. And that refers to Mr. Brown?

A. Yes.

Q. And it says Mojave Transportation. What does that mean?

A. I believe that's the name of the captive that they rent.

Q. Captive?

A. Yes.

MR. BOOHAKER: I remember from earlier.

BY MR. BENGTSON:

Q. Okay. And then at the top it says list

Page 76

claim payments, right, and that's synonymous with claim payment history, right?

A. Correct.

Q. And then underneath there it has Mr. Brown's name and it has net paid to date $103,389.62. Is that everything that was paid through February 21st, 2019?

A. Yes.

Q. Now, below that there's a list of stuff. Could you describe what the first entry -- and understand I'm not going to make you go through -- take me through all of this, but I want just to understand what we're looking at in terms of these codes and the numbers and the letters starting right underneath that, that kind of dotted line where it starts as CR-CP. What does that mean?

A. Okay. That's cleared and then it's got a check number. I'm sorry, that's the control number, that's an internal Gallagher Bassett and then you have your check number and then you have the date it was issued, the amount, who it was paid to, Germain Brown. Underneath that it's WGL which is like a wage loss. 903 is the code for wage loss and then the typed in OCCACC TTD benefits for 4/22 to 4/28, that would be what the adjuster typed in.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

**Page 77**

Q. And is that like generally what we think of in a description on a check or memo on a check?

A. Correct.

Q. Would that -- so when you say the typed in part is that the stuff in between the second to the last and the last asterisk on that second line?

A. The typed in would be the OCCACC TTD benefits for 4/22 to 4/28.

Q. Got you. Okay. And just circle back around to the top again. CR and CP stands for like control number and check number?

A. CR means the check has cleared.

Q. Oh, I see. And what does CP mean?    CP = clack payment

A. I think that's check payment.

Q. So check paid, check cleared?

A. Yep.

Q. So if there were a bunch of payments that were made but that hadn't been cleared yet, that line might not say CR-CP, it might just say CP?

A. It might say PE for pending.    PE = pending

Q. Pending. Got you. But since all of the stuff that's on this list have long since been paid, everything in here has been cleared, it seems to be?

A. Correct.

Q. And what does TTD benefits mean?

TTD = Temporary total disability

**Page 78**

A. Temporary total disability.

Q. Where does that get defined in the policy? Excuse me, I'm sorry. I should have asked a better question. Is it defined in the policy?

A. Yes.

Q. So if I'm looking at the policy I can find it somewhere?

A. Yes.

Q. Very good. And the OCCACC part, you mentioned this a couple of times before. That means occupational accident policy, correct?

A. That's correct. It's just abbreviated because you have limited space to type.

Q. And we don't want to have to use four-syllable words in every other word, right?

A. Correct.

Q. So the next line says CR-CP and it has a control number and it has a check number and it says 27, April '16. That means that the payment was issued on April 27th, 2016, correct?

A. Correct.

Q. And it was made in the amount of $743.28, correct?

A. Correct.

Q. And it was made to Southern Alabama Phys

**Page 79**

LLP?

A. Correct.

Q. And that was -- who is Southern Alabama Phys LLP?

A. I don't know.

Q. Is there some place in the claims file that -- or in any of the documents that Gallagher Bassett can tell me who Southern Alabama Phys LLP is and why they were paid?

A. I would have to go through the file. If there's not then probably the money was returned and this would not be reflected on here. There should be a bill in the file is what I'm saying.

Q. Do you have the claims file with you?

A. No.

Q. I'm going to hand you what we're going to mark as Exhibit 3 and this will be Defendants' 0001 through Defendants' 0433, which would be the documents attached to the claim file and the claims -

MR. LOOMIS: I'm sorry, it's one to what?

MR. BENGTSON: 01 to 433.

MR. LOOMIS: 433?

MR. BENGTSON: 433. Let me have him mark it first.

(Whereupon, Defendants' Exhibit No. 3    CX 3

Claim File 0001 - 0433

**Page 80**

was marked for identification.)

MR. LOOMIS: So that's the claim file and the payment log? MR. BENGTSON: No.

MR. LOOMIS: Because the claim file, is that -- well -

THE DEPONENT: Do you have them date ordered so I can look faster?

MR. BENGTSON: We should be so lucky. That was the order that it was produced to us in. It's in -- what do you call it?

MR. LOOMIS: Bates label order, yes.

MR. BENGTSON: Bates lable order. I did not take the liberty of re-ordering what was sent to us, no. But I happen to have some handy references that might point you in the right direction.

THE DEPONENT: Okay.

MR. BENGTSON: Because I'm all about being efficient. (Whereupon, a discussion ensued off the record.)

BY MR. BENGTSON:

Q. So -- oh, God, what was my question again?

A. Southern Alabama -

Q. Southern, right, okay. So I want you to turn in our hymnal to Page -- stand by -- 208. This

*[handwritten margin note: "...the word that ACE would have used in its insuring clause to require that the medical expense must be incurred and procedure performed"]*

**Page 81**

would be Bates label stamp 208 of Exhibit 3.

A. Okay.

Q. Hold on, hold on.

MR. LOOMIS: He's thinking.

MR. BENGTSON: Did I say 203?

MR. LOOMIS: You said 208.

THE DEPONENT: 208.

MR. LOOMIS: So are we going to 208?

MR. BENGTSON: 208.

MR. BOOHAKER: 208.

MR. LOOMIS: All right, I'm there.

BY MR. BENGTSON:

Q. Can you tell us what 208 is?

A. It's the bill from Southern Alabama Physicians, LLP for, evidently, the doctor that treated him at Flowers Hospital.

Q. All right. I like to call these the emergency room physicians.

A. Okay.

Q. Is that fair?

A. Yes.

Q. So a person goes to the hospital emergency room, they get a bill from the hospital. They also get a separate bill from the emergency room doctors.

A. Correct.

**Page 82**

Q. Pretty typical?

A. Correct.

Q. You see this all the time?

A. Correct.

Q. So this is a separate bill from the emergency room physicians that see him on March 14, 2016?

A. Correct.

Q. Is there a proof of loss associated with this bill?

A. No.

Q. Does Gallagher Bassett require a proof of loss to be associated with the bill when a bill is sent for payment?

A. We usually have the proof of loss initially when it's sent in by the insured with the information from the doctor -- the treating physician fills out. We do not send this bill back to them and say please complete this claim form slash proof of loss with every bill that comes in. The policy states we can but we -- I don't know if the policy states we can but we don't require it with every bill, no.

Q. So your practice, as I understand -- I don't want to put words in your mouth.

A. Okay.

**Page 83**

Q. But as I understand it, Gallagher Bassett's practice is require proof of loss from the beginning of the claim but we don't necessary require a proof of loss for each and every date of service that is charged or that is submitted during the life of the claim?

A. No.

Q. Is that right?

A. No, that is correct.

Q. That is your position?

A. Yes.

Q. And so you didn't require in this particular circumstance a separate proof of loss with this bill, correct?

A. Correct.

Q. Now, Mr. Boohaker had asked you about this term charged and ordered, these terms charged and ordered. So when Gallagher Bassett received this bill from Southern Alabama Phys LLP would Gallagher Bassett have considered this bill to have been charged?

A. Yes.

Q. And how does Gallagher Bassett define that from a claims handling standpoint what charged means?

A. Charged would mean the service has been completed and either the insured received the bill or we received the bill. Normally the bill comes to us

*[handwritten margin notes: "Proof of loss not required for each bill. Waiver of policy form contrary"; "incurred med expense is charged"]*

**Page 84**

*[handwritten note: "extra contractual condition not in policy = illegal"]*

but once in a while it will go to like Mr. Brown and he would submit it. But the service was performed, there was a charge rendered and then we reviewed it.

Q. But you'd never pay for a service that hadn't already been done, right?

A. No.

MR. LOOMIS: Is what he said correct?

THE DEPONENT: Oh, correct.

BY MR. BENGTSON:

Q. So the procedure, as I understand it is, the service gets provided, then the service gets charged, then the charge gets submitted to Gallagher Bassett, then Gallagher Bassett decides whether it's related and pays it or doesn't pay it?

A. Correct.

Q. That is the procedure?

A. Correct.

Q. And that's done in every single charge, correct?

A. Correct.

Q. And you already went over with David how Gallagher Bassett decides whether something is related or not related in general but I want to talk about in particular how did Gallagher Bassett decide whether this particular bill from Southern Alabama Phys LLP was

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 85

related or not related?

MR. BOOHAKER: And I object to the form, the term related. If you said covered I probably wouldn't have an objection.

MR. BENGTSON: Well, I really feel like I have to cure that before going on because it seems to me like she used related -- maybe I'm misremembering -- in answers to your questions earlier.

All right. Well, let me double back around and tie it up then.

MR. BOOHAKER: Ask whatever question you like.

MR. BENGTSON: As long as you don't object to it -

MR. BOOHAKER: No, I'm going to object to the form related. The issue is the claim -- the bill comes in, they determine whether it's covered under the policy.

MR. BENGTSON: Okay, fair enough

MR. BOOHAKER: Yeah.

MR. LOOMIS: Is related to --

MR. BENGTSON: Hold on, hold on.

BY MR. BENGTSON:

Q. How about this? The over-arching thing we

Page 86

can all agree is, is it covered under the policy, right?

A. Correct.

Q. Right. And to determine whether it's covered under the policy, one of the things that Gallagher Bassett decides is whether the service is related to the accident, correct?

A. For the accident but the injury -- the injury related to the accident, yes.

Q. Right. I mean like if, for example, and I'm not trying to make this obtuse or anything like but if a provider sent you -- sent Gallagher Bassett a charge for acupuncture for a service that was provided a month before the accident, you clearly would be able to say well, this is not related because it was before the accident, right?

A. Correct.

Q. Yeah, okay. I'm not trying to make it into, you know, a big deal. One of the things that you have to decide whether it's covered or not is whether it's related to the accident?

A. Correct.

Q. How did Gallagher Bassett decide whether the bill from Southern Alabama Phys LLP was related to the accident?

Page 87

A. I believe that we probably had the emergency room records and they were looked at and he went in to treat for his injuries that he sustained in the accident or what he reported he sustained in the accident.

Q. Does Gallagher Bassett know -

A. I would have to find the hospital bill in the records.

Q. Yeah, can you do that?

MR. LOOMIS: What are you asking her to do, find the -

MR. BENGTSON: No, I'm asking -- you know, I'm asking -- look, the question is how did Gallagher Bassett decide whether this was related or not, and the response was I'd have to look at the file and I'm asking her to look at the claim.

MR. LOOMIS: The response was -- she located it, I guess. Those are the records from the emergency provider.

MR. BENGTSON: Okay, fair enough.

MR. LOOMIS: The next thing, you want her to find that record somewhere?

MR. BENGTSON: I mean, I just want her to answer the overlying question. How did you decide?

Page 88

MR. LOOMIS: Can you answer that question? Don't look at documents, just answer his question on your own.

THE DEPONENT: I'm looking at the hospital bill and the records and the physician's notes.

BY MR. BENGTSON:

Q. Did Gallagher Bassett look at the hospital bill to determine whether this physician's bill was related?

A. I would have to verify -- look at the records to verify that they're in here but I believe that, yes.

Q. If you need to look at it to verify it, do. Look at it to verify it.

(Whereupon, a discussion ensued off the record.)

BY MR. BENGTSON:

Q. Do you know if they're in here or not?

MR. LOOMIS: Are we on the record, off the record.

MR. BENGTSON: This is going to take forty-five minutes for her to go through this. If you know for sure that the Southern Alabama records aren't in there, tell me and I'll take your word for it.

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

**BRENDA CULLINAN**
**September 12, 2019**

Page 89

MR. LOOMIS: 347 has references to talking to Flowers Hospital about the billing and I know that there -- you know, the medical records from Flowers are in there a couple of times. They are specifically on Pages 246 in the file if you want to start there.

MR. BENGTSON: Yeah, just kind of make it faster.

MR. LOOMIS: Yeah, I mean I know where all this stuff -- where I think all this stuff is but I don't, you know, I'm not trying to be obtuse, I just want to know what the answers are, right?

(Whereupon, a discussion ensued off the record.)

MR. LOOMIS: 242 has got a Flowers Hospital bill -- 202 has got a Flowers Hospital bill.

MR. BENGTSON: 246 has got the face sheet.

THE DEPONENT: Yes.

BY MR. BENGTSON:

Q. I'm sorry. Now I've forgotten what my question was. You -- okay. Let me make sure I got my question right. The question was how did Gallagher Bassett determine that this bill was related to the accident? And my understanding of your answer was well, I'd have to look at the file but usually it's

Page 90

that we look to see if the emergency room records are there, look at the emergency room records, right?

A. Correct.

MR. LOOMIS: So she found them beginning on 248.

MR. BENGTSON: Right. And so did -- thank you.

BY MR. BENGTSON:

Q. Did Gallagher Bassett rely on these medical records found on 248 and the few pages that follow to determine whether the emergency room physician's bill was related to the accident to decide whether to pay for it or not?

A. Yes.

Q. Are there any other documents that Gallagher Bassett used to decide whether the Southern Alabama Phys LLP claim should be paid or not?

A. No.

Q. I mean besides that and the bill itself, right?

A. Yes.

Q. So that bill that was on 208, in the middle of that bill there's some handwriting and that's Gallagher Bassett's adjuster's handwriting, correct?

A. Yes.

Page 91

Q. You didn't get the bill with a bunch of handwriting on it?

A. Correct.

Q. And the handwriting says F956.00, correct?

A. No. That's a T.

Q. Oh, it's a T, okay. T. What does the T stand for? Oh, got it.    *A = allowed*

And then it says A equals 743.28, what does that mean?   *$956 (repriced) to $743.28*

A. Allowed.

Q. So if I'm divining this correctly the total bill was $956 and the amount allowed was $743.28?

A. Correct.

Q. And the adjuster made that decision to pay $743.28 out of this nine hundred and fifty-six because of this usual and customary jargon that you all talked about earlier, using the rule of customary system, Fair Health?   *Fair Health repriced*

A. Fair Health, yes.

Q. Did the adjuster use any other -- did the adjuster in this case use any other criteria to decide whether to pay this claim?

A. No.

Q. So just to sum up, look at the emergency room record, determine that it was, in fact, an

Page 92

emergency room visit, right?

A. Correct.

Q. Looked at the things that were said by the emergency room doctors in the emergency room records to determine it was for this accident, correct?

A. Correct.

Q. Looked at the bill and consulted with the UCR system to decide how much of it should be paid?   *UCR was Fair Health*

A. Correct.

Q. The Fair Health system?   *who repriced.*

A. Correct.

Q. And that's based on CPT codes that you can find in the bill that we're looking at?

A. Correct.

Q. All right, that's not rocket science, this is pretty simple. You just put the CPT code in and it tells you what's reasonable and customary?

A. Along with the zip code, yes.

Q. With the region, okay, great.

All right. Let's go back to our Exhibit 4 and -

MR. LOOMIS: Got to keep that in order. Still at Bates 441?

MR. BENGTSON: Yeah, 441.

MR. LOOMIS: Hold on a second. I want to

Page 93

make sure we keep these exhibits -- is this right, that's 3 and that's 4?

MR. BENGTSON: Yeah.

MR. LOOMIS: And then that's 441, okay.

BY MR. BENGTSON:

Q. All right. Now, I promise you that I'm not going to make you go through every single one of these but I do want to get kind of a sample of these, okay? The Thomasville Orthopedic with the check date April 18th, 2016 in the amount of $404.11. How did Gallagher Bassett decide to pay that claim?

A. The bill was received along with the records and they were reviewed.

Q. That was also the one that had the proof of loss with it, correct?

A. I don't know if it was turned in with the proof of loss. We already had the proof of loss in the file.

Q. And so the adjuster read through the treatment notes from the doctor?

A. Correct.

Q. Determined that the doctor is talking about the same symptoms related to the accident that Mr. Brown described?

A. Correct.

Page 94

Q. All right. And that the doctor saw the claimant, saw Mr. Brown, and charged for the services?

A. Correct.

Q. Let's turn to Page 440 of Exhibit 3. All right. I want to ask you about the second to last entry, One Call Medical, Inc. How did Gallagher Bassett decide to pay that claim?

A. I believe One Call Medical, Inc. set up -- it was either an MRI or -- I'm assuming -- I think it was an MRI.

Q. I don't understand. One Call Medical performed the MRI? That's the service provider?

A. No. There's numerous diagnostic companies that belong to or are a member of One Call Medical and so they bill it through One Call Medical. They didn't actually perform the service.

Q. So you paid One Call Medical and not whoever it was that did the service?

A. Correct.

Q. So when was this charged, this bill for $461?

A. It looks like the service date was April 19th, 2016.

Q. And it was paid May 3rd, 2016?

A. Correct.

Page 95

Q. And how did Gallagher Bassett decide to pay this -- pay for this service? What criteria was used?

A. We would have received the charge and the MRI results and paid it based on -- first of all, it's a diagnostic procedure so we would have paid that as long as it was for the same part of the body it was reported.

Q. So do you have like a policy to lean more towards approving a charge for a service if it's a diagnostic charge rather than a charge for treatment?

A. I'm not going to say that at a hundred percent but on most claims, in order to determine the cause of -- or the diagnosis you need diagnostic so normally those would be considered under the policy.

Q. And in this particular -- in this particular circumstance with One Call Gallagher Bassett decided that this was reasonably necessary before the service was provided, correct?

A. We did not pre-authorize or verify we were going to pay it, no.

Q. That's not really what my question is.

A. All right.

Q. Gallagher Bassett decided that they were going to approve that service before the service was provided; is that correct?

*[handwritten: GB decided to pay procedure before it was performed and the expense incurred.]*

Page 96

A. As a diagnostic procedure we probably would have been -- our mindset, yes, we will pay for a diagnostic procedure.

Q. So if the treatment or if the claim notes, for example, on Page 345 of Exhibit 4 -- sorry, Exhibit 3 --

MR. LOOMIS: Page number again? 345?

MR. BENGTSON: 345.

THE DEPONENT: Yes.

BY MR. BENGTSON:

Q. So this is to Patricia Kendall. Who's that?

A. She's the adjuster.

Q. And this is an email, correct, that we're looking at -

A. Yes.

Q. -- on Page 345?

A. Yes.

Q. And it says referral notification -

A. Okay.

Q. -- is the subject line, correct?

A. Yes.

Q. And it says Claim No. 002778, correct?

A. Plus some other numbers, yes.

Q. But I mean that's Gallagher Bassett's claim

Page 97

number, 02778?

A. No. The claim number is 002778-00, two zeros, the whole number.

Q. The whole thing?

A. Yes.

Q. But the 002778, that's the same number that we talked about earlier being on the pay screen is the client number?

A. Correct.

Q. So One Call Medical sends this email to the adjuster saying referral notification for Mr. Brown, right?

A. Correct.

Q. And that's -- so could you describe what's being conveyed here in this email?

A. Okay. It looks like One Call MRI request received. Referral notification -- do I read the whole thing?

Q. I just want you to summarize what your understanding of that message is.

A. Okay. This is saying they received the notification schedule of diagnostic study.

Q. Who did they receive it from? The Gallagher Bassett adjuster, correct?

A. They received it from -- I think it starts

Page 98

with -- on the previous page, 344, there is an entry date from One Call Medical to Tricia that says thanks for using One Call Management Case Referral. So that is to Tricia and then it's from One Call on Page 345 to Tricia saying it's a referral notification schedule diagnostic study and they have received requests to schedule one.

Q. My understanding is that the adjuster requested the MRI from One Call, correct?

A. I think the MRI was requested by the doctor and we probably conveyed to Mr. Brown that we could set it up through One Call Medical.

Q. Okay.

A. Yes.

Q. But I mean the adjuster set it up?

A. Right.

Q. The doctor didn't set it up with One Call Medical?

A. I'm not sure. We received -- yeah, we received the prescription from Thomas Billings for that, yes.

Q. We meaning Gallagher Bassett?

A. Gallagher Bassett.

Q. And that's consistent with -- if we look just a little bit above that where it says -- we're

Page 99

still on Page 344. It says called the insured, left voice mail advising that sending MRI through One Call Medical for scheduling. That would be consistent with what you just said, the doctor ordered it, Gallagher Bassett is setting it up?

A. Yes.

Q. Got you. So would I be correct in assuming that if Gallagher Bassett is setting this MRI up that Gallagher Bassett, as I had asked earlier, had already decided they were going to pay for the MRI before the service was provided?

A. Right. It's a diagnostic procedure, yes.

Q. Right. So on Page 345 there is in the body of this email it says please note we will make every effort to comply with any special instructions provided for this referral. And below that it says authorized if you were the referral source and/or this has previously been authorized, no action is required. Is that normal for you to receive an email that has that language in it from One Call Care Diagnostics regarding stuff that was set up by Gallagher Bassett on behalf of claimant?

A. I believe so because that is a form that is sent in that they use for every type of coverage because I believe Gallagher Bassett uses One Call for

Page 100

all lines of service.

Q. And Gallagher Bassett uses One Call all the time, right?

A. I think most offices do, yes.

Q. Or Align?

A. Yes.

Q. Right, A-l-i-g-n?

A. Yes.

Q. Are they the same?

A. I think they didn't use to be but I think One Call purchased Align a few years ago.

Q. And just so we're on the same page about that, you and I are steeped in claims handling but maybe other people who might be reading this later might not be. But Align, like One Call, kind of develops relationships with the TPA's and other people who handle the claim and say, hey, look, if you need physical therapy, you need MRI's, you need stuff that's just routine, stuff that needs to be done, we've got a bunch of people who can do all this stuff, you don't have to recreate the wheel, just call us and we'll set it up for you?

A. Correct.

Q. That's their general -- I mean, I'm not asking you to know exactly what their business model --

Page 101

but that's how they market themselves to Gallagher Bassett and Sedgwick and other people?

A. Correct, and to the insurance carriers.

Q. Sure, because it might be tough for an individual adjuster to know every physical therapist in that general area and it's fine to rely on Align or One Call to do that?

A. Correct.

Q. So let's go back to our Exhibit 4.

MR. LOOMIS: We're on 440?

MR. BENGTSON: We're on 440 still.

BY MR. BENGTSON:

Q. So we left off talking about One Call Medical and I think I've connected all the dots here so I'm just going to tell you what I think it is and you tell me whether I'm right, okay?

The doctor orders the MRI, the adjuster at Gallagher Bassett sets it up through One Call Medical and says set up the MRI and get it done. And then the adjuster pays for that directly to One Call Medical?

A. Now, I want to qualify that does not happen in every case because the insured may want to go somewhere else to have the MRI and they may not be a member of One Call. So they go have the MRI, then we receive the charge in the note but it may not be a One

Page 102

Call.

Q. How would the insured let you know that they were not interested in having it done that way or that they wanted it done some place else?

A. Well, it's usually a case where the physician actually writes a prescription and -- and he will refer them out to another place, to an MRI place that -- without even checking with us or requesting that -- or they may -- he may have the MRI before we even receive the prescription for it.

Q. So it sounds like that kind of works the same way as we see in like Workers' Compensation claims where like if a doctor says hey, we just need an MRI, then Gallagher Bassett can decide well, we're going to do the MRI with whoever can do the MRI. But if the doctor says I want an MRI done without contrast with XYZ MRI Standup of Tallahassee, then you have to abide by whatever the doctor says unless everybody agrees otherwise?

A. Well, and he may go have the MRI and we don't even know it until we receive the bill. But, you know, a lot of doctors prefer certain facilities or they may have -- claim ownership with a group of -

Q. They might be cozy with the MRI people, right?

Page 103

A. I mean, a lot of times they already have their MRI before we -- and then we receive a prescription for the MRI, the charge and the report all at the same time.

Q. So either -- so in those circumstances that sequence that we talked about earlier would be different depending on whether Gallagher Bassett set it up or the doctor set it up, right? By specifically it's going to be a long question. What I mean is we talked about the sequence. The service happens first, the charge happens, then Gallagher Bassett decides whether to pay it or not and pays it or doesn't, right? That's the sequence we talked about earlier, correct?

A. Correct.

Q. But if we use One Call Medical the sequence is different. Gallagher Bassett has already decided they're going to pay for it, then the service gets done, then the charge gets done and then Gallagher Bassett pays?

A. Correct.

Q. So it's either of those two, depending on whether Gallagher Bassett has already made up its mind in advance whether it's related or not?

A. Correct. Now, let me qualify that, too. We've had them go through One Call before without being

Page 104

in touch with us because a facility will look at Gallagher Bassett Worldwide that does Work Comp and we will once in a while get an MRI that we're not going to pay for that is not covered under the policy. So we don't automatically know before they go to One Call. So I don't want to go on the record as saying everything going through One Call we've already decided because that's not true. We may get a bill that's not covered.

Q. Let me pose it this way so we all have a face page about that, okay?

A. Okay.

Q. So what I hear you saying is that if Gallagher Bassett is referring it out to One Call Medical, you wouldn't do that, you wouldn't like change your mind later?

A. No.

Q. But sometimes One Call Medical or Align might get presumptuous because they have this longstanding relationship with Gallagher Bassett and just set it up anyway and you have to look at it later and say gosh, you know, we didn't -- we didn't set this up ourselves and we don't think this is related?

A. We'll look at it and see. If it's not covered under the policy we're not going to pay for it,

not part of a claim; of a condition; it is pre-authorization & waiver of the extra contractual condition procedure must be performed; expense incurred before ACE will process expense both indemnity

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

BRENDA CULLINAN
September 12, 2019

*[Handwritten margin notes: "medical expense scheduled through One Call pre auth — another ex. of the 'pre auth' condition in claim found (not) in policy is used by ACE to cheat on to Germain of promised of indemnity"]*

Page 105

no. It doesn't matter if it's from One Call. Just because it went through One Call doesn't mean it's covered.

Q. Right. But if you set it up through One Call, it does mean it's covered, right?

A. Well, I assume it's going to be for the part of body that's been reported so diagnostics are necessary. Like if they were going to do it of the right arm and he had a left leg injury, no.

Q. Right.

A. Yes.

Q. But I mean, the adjuster wouldn't order, you know -

A. Correct.

Q. -- an MRI of the left leg if we're talking about -

A. Correct.

Q. Right. So just so I'm clear, if Gallagher Bassett is setting it up through One Call Medical, right?

A. Probably going to be covered. *[handwritten: of course — it's covered]*

Q. Well, that sounds like -- different than what -- okay. Let me ask it a different way.

If Gallagher Bassett sets it up through One Call medical and says set up an MRI of the neck,

Page 106

they've already decided, we're going to cover this?

A. We're going to need that report to determine if the claim is covered for diagnostic reasons, yes.

Q. So now are there any other circumstances where you would refer out to One Call Medical besides an MRI, besides a diagnostic thing where you make your determination in advance that you're going to cover something because you referred it out?

MR. LOOMIS: Objection to form.

THE DEPONENT: The only other one -

MR. BENGTSON: Before you answer, I need to cure that. What's the objection to form?

MR. LOOMIS: Because you said that -- the question assumes that they've already decided that the procedure was approved.

MR. BENGTSON: I didn't say approved but okay. So let me see if I can ask it in a way that you're okay with.

BY MR. BENGTSON:

Q. Are there any other circumstances where Gallagher Bassett would refer out to One Call Medical besides diagnostics where you've already made the decision to pay for it before the service gets provided?

Page 107

MR. LOOMIS: Objection to form.

MR. BENGTSON: Well, what's wrong with that one?

MR. LOOMIS: You said she's already decided to pay for it. All she's decided is to send it out.

MR. BENGTSON: Well, I don't know if you're listening to the same answers I'm listening to but, I mean, it sounds like she's said over and over, look, if -- well, all right. I'll ask it -

MR. LOOMIS: (Inaudible) we need the diagnostics so they send it out and then they get billed when they decide whether it's covered or not. What you're trying to do is make her say that she's pre- -- that Gallagher Bassett has got a habit of pre-approving procedures.

MR. BENGTSON: I'm not trying to make her say anything. I've asked her whether the sequence is different in situations where it's referred out, right? I haven't used the word approval or pre-approval. I'll be transparent with you. I don't think the label matters, right, but, you know, I'm not trying to be tricky about how I'm asking the question.

I just want to know if there are any other

Page 108

circumstances because you've qualified this by saying look, yeah, because it's a diagnostic thing there are times where we send -- we refer it out and say, hey, have this done and you have already made the decision that you're going to pay for it before the service gets rendered.

MR. LOOMIS: That's my objection. I don't think the decision has been they're going to pay for it. The decision is that there's -- a decision has been made that the procedure needs to be done, the diagnostic needs to be done, then they get billed and they may or may not pay for it, is what I've heard her say. But you're asking now other than diagnostics is there any other circumstance under which you say go have this done.

MR. BENGTSON: Now, let me go back around because clearly I didn't ask the first set of questions clearly enough. Let's go back about ten minutes, all right?

BY MR. BENGTSON:

Q. What I want to make sure I understand correctly is there's a sequence? *[handwritten: Sequence]*

A. Yes.

Q. The sequence goes like this. The service

*[handwritten: Claim manual]*

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 109

gets provided first, then the charge is given, the charge for the service is sent to Gallagher Bassett. Then Gallagher Bassett decides whether it's covered and whether it's -- and part of that is whether it's related or not, right?

A. Correct.

Q. And then Gallagher Bassett pays it or doesn't pay it. That's the sequence?

A. Correct.

Q. And you had earlier said that that's always the sequence, correct?

A. Correct.

Q. What I'm saying is there are some times, and I want to make sure that I'm not trying to put words in your mouth. We talked about this MRI, right, and it seems to me from the fact that the Gallagher Bassett adjuster sent it out to One Call Medical for the MRI to be done, that Gallagher Bassett had already decided that that MRI would be covered because it was related before the service was provided and before the charge was given. Is that correct?

A. We need it to make a determination -- we needed the MRI to make a determination to verify that the current condition is related to the accident and going forward to better evaluate the problem. I don't

Page 110

think we made a promise to pay but probably we were referring it out and it's a diagnostic test so we were going to need to pay for it. You can't just have free treatment and get reports.

Q. Sure.

A. But we would not have said yes, we will pre-approve this verbally to One Call Medical.

Q. Are there any circumstances under which Gallagher Bassett has referred out to One Call Medical where they decide later not to pay?

A. I can't answer that because we have so many files. It could be.

Q. I think I asked that question five minutes ago and already got the answer.

MR. LOOMIS: She answered yes. She said it could be.

BY MR. BENGTSON:

Q. Well, no, I'm pretty sure that what I heard -- let me make sure I heard right, okay? I asked you earlier are there any circumstances where One Call Medical would send you a bill that you decided not to pay and you said -

A. Yes.

Q. -- yeah, sure, there were some times where One Call Medical gets presumptuous and does something

Page 111

Q. without sending it out?

A. Right.

Q. And then I said -- I asked you to qualify that and said well, but that would never happen if Gallagher Bassett adjusters proactively sends it out to One Call Medical, they wouldn't renege on it later. And you said no, they wouldn't do that.

A. I don't think they would do that. I should qualify that. I can't say a hundred percent either way because I have not looked at every file.

Q. But that would not be your policy?

A. ==It would not be our operating procedure,== no. *[handwritten: Claim manual called (1)]*

Q. Where would I find those operating procedures? *[handwritten: operating procedure or (2) Best]*

A. In the ==Best Practices.== *[handwritten: Practices]*

Q. That twenty-page document we were talking about earlier?

A. Yes. *[handwritten: undisclosed]*

Q. So that would cover sending out to One Call Medical?

A. Not specifically. It would be covered as far as referring files out to -- for treatment -- or not for treatment but for -- how do I want to say that? Using vendors or anything like that.

Page 112

*[handwritten: One call = approved vendor]*

Q. So there's a section about using ==vendors== for treatment?

A. Right.

Q. Because there's no circumstances where Gallagher Bassett -- we talked about this in terms of diagnostic -- there's no circumstances where Gallagher Bassett would ever send out to One Call Medical or Align for treatment, right?

A. They're ==not treatment places.==

Q. I just want to make sure I'm understanding you, right?

A. Yeah.

Q. And just so that we're all clear if this comes up later, there are no circumstances under which Gallagher Bassett would make a referral out to some place like One Call or Align for treatment rather than diagnostic, correct?

A. Well, Align is a ==physical therapy== ==association.==

Q. So there are some circumstances where Gallagher Bassett would refer out to ==Align== to have physical therapy done? *[handwritten: no foundation]*

A. But ==we have also denied bills from them,== too.

Q. I really wish -- you can explain but I

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 113

really wish you would answer it first.

A. Oh. We can -- what we do is if the doctor doesn't refer them elsewhere or if the patient -- or if the insured wants to go somewhere, they can go anywhere they want for physical therapy. If the patient doesn't have anywhere that he knows of and wants to go or anything, we can refer him to Align. We can notify Align that we've got a prescription and they can set it up for him, but it is not a requirement where that they go through Align.

Q. Right. No, I didn't mean to suggest that.

A. Okay.

Q. No, that's not at all where I'm going.

A. Okay.

Q. What I just want to make sure because you had said a couple of times, well -- when I was asking you about the MRI you do One Call for the MRI and you had said, well, you know, because it's diagnostic and I just wanted to see are there other circumstances besides diagnostic, like for treatment, where you would refer it out to a provider and the provider would bill you later. And you're saying yes, Align -

A. Align, right, but we do decline Align bills quite a bit.

Q. And under what circumstances?

Page 114

A. For medical necessity.

Q. But not related?

A. No, for medical necessity like over-treatment as -

Q. Sure.

A. -- or necessity.

Q. Yeah. I mean, if you get a benchmark -

A. You get fifty-eight treatments and some of it ends up with policy limits of thirty and we're not paying for fifty-eight.

Q. That's right because like referring something out to Align doesn't give them a blank check to just keep treating.

A. Correct.

Q. Right. I get that. But -- okay. But if the adjuster is sending it out to Align she's already made the decision that the treatment is related to the accident?

A. She is looking at the medical records, she's been prescribed physical therapy. We're doing it as a courtesy to the insured to help him find a place to go. We are not saying we're going to pay this.

Q. Okay.

A. Okay?

Q. Got it. Are there any other circumstances

Page 115

where Gallagher Bassett has referred -- sorry. Is there any other circumstances where Gallagher Bassett has used a different sequence besides service first, charge second, decision third, payment fourth?

A. Probably on investigations or IME's. I mean, we know we're going to pay for an IME before it's done, yeah.

Q. Okay, got it. Let's go back to -- I want you to turn in Exhibit 4 to Page 350.

MR. LOOMIS: 350, you say?

MR. BENGTSON: Uh-huh (affirmative).

THE DEPONENT: 350?

BY MR. BENGTSON:

Q. Yeah, it's the big one, the big exhibit.

A. That's 3.

Q. Oh, did I mess that up again? I keep doing that. I'm sorry, Exhibit 3.

A. To what page?

Q. 350. I should have known better than to introduce them in the opposite order. Some of it is messed up in my brain.

A. Okay.

Q. Okay. So I want to direct your attention to Entry Date 4/22/16 at 14:38. This is a note to the file by Ilda Miranda.

Page 116

MR. LOOMIS: What was the time stamp again?

MR. BENGTSON: 14:38. The bottom of the page.

MR. LOOMIS: Yeah, I've got it. I see it.

BY MR. BENGTSON:

Q. Who is Ilda Miranda?

A. She's another adjuster.

Q. Did Patricia and Ilda, do they work alternatively on the case or how does that work?

A. Tricia may have been out that day so Ilda got the call. She might be listed as one of Tricia's backups.

Q. Or Tricia might have been still on the phone with somebody else?

A. At 14:35 she was on the phone and sometimes people are impatient and -

Q. I mean three minutes later, good lord.

A. Yeah.

Q. So this says received call from Hanger Prosthetics and Orthotics and spoke to Margaret. She states that they need authorization for a back brace. Advised her that the policy does not require pre-authorization and is based on medical necessity. What does that mean?

A. That means we don't pre-authorize any

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 117

service.

Q. Except for MRI's, right?

A. I'm not going to respond to that.

Q. I'm sorry, I'll withdraw it.

A. Anyway, they were requesting a back brace and we said it was based on medical necessity and we wouldn't pre-authorize it.

Q. So in this circumstance we are following the sequence, service first, charge, then Gallagher Bassett decides and then it's paid or it's not paid?

A. Correct.

Q. Got it. Now I want you to page over to No. 352, the same exhibit. I use the term same exhibit because I still cannot remember which exhibit we're on. This is 3, right? Yeah. At the bottom of the page, time stamp 14:14 it states, spoke with the insured as he stated per his medical provider his treatment injection was getting rejected. Advised the insured that G slash Bates had emailed correspondence with Thomasville Ortho regarding his Occ/Acc policy, however nothing to date has been rejected. G slash B has only advised that no pre-auth is required and treatment is based off of medical necessity to the DOL. What does that mean?

A. The DOL?

Page 118

Q. The whole thing.

A. Oh. Saying that we had not denied anything. That pre-authorization was not required and that Tricia has already been in touch with some of the orthopedic explaining that there was no pre-authorization and that it was based off medical necessity to the date of log or date of entry is what that means.

Q. So Gallagher Bassett, when adjusting OCCACC policy claims, has to reiterate this same thing over and over, right? This is not a Workers' Comp policy, pre-authorization is not required, correct?

A. Correct.

Q. And that's because the providers just aren't use to hearing it?

A. Correct, they're used to Work Comp.

Q. All right. And how is it different with Work Comp?

A. My guess is Work Comp pre-authorizes everything. I don't know. I'm not a Work Comp person.

Q. But in the context of an occupational accident policy Gallagher Bassett can understand why a provider might want some assurance that their bill is going to be paid before they provide the service?

MR. LOOMIS: I'm sorry. Are you able to

Page 119

read the question back?

MR. BENGTSON: I can state it back?

MR. LOOMIS: Yeah, can you state it again? I'm sorry.

MR. BENGTSON: I think. I'm going to try.

BY MR. BENGTSON:

Q. When adjusting OCCACC policy claims, Gallagher Bassett can understand why a provider would want some assurance that the service that they're fixing to provide is going to be covered?

A. Well, I can understand the provider doesn't want to do something and not get paid for it.

Q. Yeah. And I'm not asking in an obtuse way. Yeah, I mean, especially if it's an injection, right? I mean the injection is going to be a couple of thousand dollars.

A. Right, but the policy is based on medical necessity.

Q. That's right. I'm with you still. I'm not trying to get you to change your mind about what the policy covers.

A. Okay.

Q. I just want to make sure that we're all on the same page about, hey, look, the providers are calling because they don't want to do something and not

Page 120

get paid for it.

A. Correct.

Q. Right. And the adjusters are trained to say, look, this is not a Workers' Comp policy, it doesn't work the same way as Workers' Comp, this works this way. Sequence is service, then charge, then we decide whether it's related or not.

A. Correct.

Q. And the providers just either have to live with it or don't treat the patient.

A. Correct.

Q. And in this circumstance with Thomasville Ortho, they got frustrated and decided well, we just can't deal it this way, we're not going to treat him any more?

A. That is correct.

Q. And so Mr. Brown had to find a different doctor and the Gallagher Bassett adjuster helped him find two different providers that he could choose from and he chose Musculoskeletal Associates, correct?

A. We did not make him choose from them, he asked if we could help find it

Q. Yes, I agree with that. I agree. I'm looking at the same thing. Again, I'm not trying to trap you. That was not intended that way.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

*[Handwritten margin notes: "Standard = training manual = claim manual"]*

**Page 121**

He said I don't know and Gallagher Bassett, the Patricia, looked some stuff up, maybe she looked it up on Google, whatever, and said, hey, try these, right. We all agree it happened kind of that way, right?

A.   Correct.

Q.   And he chose from those two and he chose Musculoskeletal Associates and MSA and they started treating him?

A.   Correct.

Q.   Now, when -- and just so we're on the same literal page about that, this that we just talked about is documented on Page 359. I'm just going to read it to you. It says that the insured stated his orthopedic at Thomasville Ortho has dropped him as a patient since Gallagher Bassett's occupational accident policy will not pre-authorize the treatment. That's consistent with what we just talked about, correct?

A.   Correct.

Q.   And it was shortly after that that the adjuster decided to send the file out for an IME to review further treatment, correct?

A.   What date was it?

Q.   I'm referring specifically to Page 365 in the exhibit, this is July 20th, 2016, time stamped

*[Handwritten margin notes: "Thomasville ortho dropped German b/c no preauth", "IME"]*

**Page 122**

10:00 a.m.

A.   365?

Q.   365.

A.   Yes, it was like a month after that, correct.

Q.   Correct.

(Whereupon, a discussion ensued off the record.)

BY MR. BENGTSON:

Q.   So let's turn to Page 368 and I want to direct your attention to the section called current plan of action, colon. What is that?

MR. LOOMIS: I'm sorry, current what?

MR. BENGTSON: Current plan of action.

MR. BOOHAKER: Three-quarters of the way down.

MR. LOOMIS: Yeah, I got it. I got it.

THE DEPONENT: That's what she's doing, what she's planning to do.

BY MR. BENGTSON:

Q.   How does an adjuster get trained to write up a current plan of action?

A.   It's a Gallagher Bassett standard for a nationwide Gallagher that we have to follow.

Q.   And where are those standards written?

*[Handwritten margin notes: "Where is claim manual should this be produced"]*

**Page 123**

A.   I don't think they are. I mean, I'll take that back. We've had training and all lines of business have to use similar information, not exact, and we get audited internally on that on our plans of action. It is probably originally in those, probably different earlier notes than these because it's a new, relatively new procedure that we have to use.

Q.   That would explain why maybe we didn't see it earlier in the claim notes and we did start seeing it in like the later parts of 2016, correct?

A.   Correct.

Q.   Very good. And so it says in the current plan of action here, file has been sent to DiversiMed for IME and date is pending for evaluation, correct?

A.   Correct.

Q.   And that was to determine if the injections that were recommended by the doctor would be treated as reasonably necessary or not, correct.

MR. LOOMIS: Objection to form. Reasonably or medically?

MR. BENGTSON: Sure, medically necessary.

THE DEPONENT: It looks like to determine what further treatment, if any, is medically necessary, yes.

BY MR. BENGTSON:

*[Handwritten margin notes: "audit for compliance with NAIC unfair claim handling practice & statute & regulation", "purpose of IME is to determine if spinal fusion surgery is medically necessary."]*

**Page 124**

Q.   So not per treatment that has already been -- not for services and charges that have already been provided but what further treatment, that's why it says further treatment, right?

A.   Correct.

Q.   Meaning treatment in the future would be considered reasonably -- medically necessary?

A.   Correct.

Q.   If -- strike that. So directing your attention to Page 369, entry date 8/15/2016 at 08:48 there's a note from Patricia Eaddy -- how do you say her name?

A.   Oh, she got married so it's Boucek now.

Q.   Boucek, okay. We'll just call her Patricia still; is that all right?

A.   Tricia would be better.

Q.   Tricia, okay. Tricia said ortho provider called regarding authorization for an injection for insured after his appointment on Friday. Advised that the occupational accident and not Workers' Comp is based off of medical necessity for his March 7th, 2016 date of loss. No pre-authorization is required under the policy.

A.   Correct.

*[Handwritten margin notes: "Treatment is pre approved"]*

*[Handwritten notes across bottom: "standard to not produce", "claim manual = always is sub standard"]*

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

*(handwritten margin notes: "standard [mumbo jumbo] language" ; "claim delay, pending 'IME report'" ; "IME was to determine treatment if was & is medically necessary")*

Page 125

Q.  There were some short versions and I said it in the long version but that accurate, correct?
A.  Correct.
Q.  The substance of what I said is accurate?
A.  Correct.
Q.  So this is standard language that Tricia has been using since the beginning of this claim. It says hey, this is not a Workers' Comp case, we don't pre-authorize treatment, correct?
A.  Correct.
Q.  And so this is a new provider saying hey, we think that he needs an injection. Will you authorize this and she says we don't authorize it?
A.  Correct.
Q.  So turning to Page 371, this is from several weeks, I think, later. September 21st, 2016. This is time stamped 07:30 and it says the insured called in and wanted to know the status of his claim and Tricia explained to the insured that they were currently pending the receipt of an IME report, correct?
A.  Correct.
Q.  And the IME report was to determine whether the injections that the doctor was recommending would be considered reasonably -- well, medically necessary,

Page 126

correct?
A.  This was the same referral as for any medical treatment. I don't know if it was limited to the injections. I can't remember the referral, what it says. But for medical necessity, yes.
Q.  Right. But again, we all agree that the whole point of having the IME was that the doctor had recommended the injection and Tricia sent him out for an IME to determine whether the injection would be considered necessary or not?
A.  Right, or any further treatment at all.
Q.  And so then once the IME came back how did Tricia communicate to the insured about what Gallagher Bassett would consider medically necessary?
A.  Well, evidently he got a copy before we did.
Q.  I wasn't going to point that out. I thought it interesting but it's unusual for a claimant to get a copy of an IME report before the adjuster did. That's correct, right, it's unusual?
A.  Well, I think at that point she just communicated. We did not have the report and he said he did, so on that particular entry she said that we needed to have the IME report.
Q.  So turning to Page 372, time stamped 14:06.

Page 127

Am I correct in looking at the middle of that part where it says DX-colon-lumbar strain-semi colon requesting RX for six weeks physical therapy to provider. That part there is Tricia's like summary of what the IME report sent?
A.  Yes.
Q.  And essentially what I'm reading here, correct me if I'm misreading, is that they got the IME report and that the treatment that's then done to date has been medically necessary and the IME report doctor thinks that there should be six weeks of physical therapy.
A.  Correct.
Q.  And so after that Tricia asked the treating doctor to prescribe the physical therapy that was recommended by the IME doctor, correct?
A.  It appears she faxed the report to him requesting our expert's six weeks physical therapy.
Q.  So is that right?
A.  That's what -- yeah, she's done what
Q.  We're on the same page.
A.  But she's telling him what the report says with the IME doctor.
Q.  Oh, I see. When I read requesting I read it like Tricia is requesting a prescription for six

Page 128

weeks of physical therapy. And when you read it you read it as the doctor, the IME doctor, is requesting a prescription for the physical therapy.
A.  That's how I read it, yes.
Q.  Oh, okay. I read it differently.
MR. LOOMIS: That's what depositions are for.
MR. BENGTSON: Right. I can see where reasonable people could read that differently.
BY MR. BENGTSON:
Q.  So in this context, though, the treating doctor did eventually prescribe the physical therapy that the IME doctor had recommended, correct?
A.  I believe he did, yes.
Q.  Sure. And Tricia went ahead and set up the physical therapy through Align Network?
A.  Correct.
Q.  And that physical therapy was done and the bill was paid?
A.  Yes.
Q.  And Tricia had already decided to pay the bill from Align Network before the service was provided, correct?
A.  That would be a question for Tricia but -
Q.  It's a question for Gallagher Bassett and

*(handwritten margin notes near page 128: "IME said PT was necessary, it + then done. = PT was pre-authorized")*

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 129

you're speaking on behalf of -

A. Okay. I believe she was going to review the charges for internal -- or under the policy, yes.

Q. My question had she's already decided when she set it up with Align Network that she was going to -- that it was medically necessary?

A. It was medically necessary based on the IME report, yes.

Q. Right. That's why she got the IME report -

A. Right.

Q. -- was to figure out what she thinks would be medically necessary.

A. Right.

Q. And then she conveyed that to the treating doctor -

A. Correct.

Q. -- and we think RX for six weeks of physical therapy is medically necessary, right?

A. Correct, because she sends the report, yes.

Q. And that's how the providers get some notion about what Gallagher Bassett thinks is going to be necessary?

A. Right. We sent the IME report requesting six weeks of therapy, yes.

Q. I'm sorry that I'm dialing into this so

Page 130

deeply because I think the sequence is important and I want to go back over it, okay?

MR. BENGTSON: I think it's time for us to take a quick break. My brain just stopped functioning.

MR. BOOHAKER: We've been going a little more than an hour, too.

MR. BENGTSON: I don't think we'll be more than another half an hour at most. I told you it would be 1:00 but I might have lied by fifteen minutes.

(Whereupon, a brief recess was taken.)

MR. BENGTSON: All right, ready?

MR. BOOHAKER: I'm ready.

MR. BENGTSON: Kenan?

MR. LOOMIS: Yeah, yeah.

BY MR. BENGTSON:

Q. So we left off talking about the IME and the physical therapy and what I wanted to ask that I completely blanked out on was like how did Gallagher Bassett communicate to the provider what their -- what they think is medically necessary or not? Do they call them? Is there a form? Is there some kind of correspondence?

A. Well, once -- if the charges are received

Page 131

*[handwritten margin note: If "charges" are not medically necessary]*

and the records are received and we determine it's not medically necessary, they are sent a denial letter for those charges, saying it's not medically necessary under the terms and conditions of the policy.

*[handwritten margin notes: claim denial letter goes out. If procedure... authorization letter should also go out.]*

Q. Now, does Gallagher Bassett have like an EOB form or an explanation of review or anything like that that says hey, we got this charge and here's how much we paid and here's the code that tells you why we only paid a certain amount? You know what I'm talking about, right?

A. Right.

Q. You don't have one of those?

A. No.

Q. So the only thing that gets communicated to the provider is when we're talking about the sequence service first -

A. Correct.

Q. -- charge next -

A. Correct.

Q. GBS decision next and payment or non-payment last?

A. Correct.

Q. And in that set of circumstances service happens, the charge is sent to Gallagher Bassett, Gallagher Bassett decides and then if they decide not

Page 132

to, they send a letter to the provider or the insured?

A. The provider.

Q. The provider. And that letter says we're denying this as not medically necessary because blah?

A. Yes.

Q. Are there any circumstances in the Germain Brown case where Gallagher Bassett decided after a charge was brought or after a charge was submitted not to pay something?

A. I honestly don't know if we denied any charges or not.

Q. Would there be a code put in the claims notes indicating that a denial letter was sent out?

*[handwritten margin note: claim denial letter would be kept by ACE]*

A. A code? No. There would be probably a note stating they had denied it but the actual denial letter would not probably be attached.

Q. So does Gallagher Bassett keep copies of denial letters?

A. Yes.

Q. So if Gallagher Bassett produced 340 pages of documents from the claim file and I look through all 340 of those pages and I don't see any denial letters, can I be reasonably safe in assuming that there were no denial letters sent out?

A. Yes.

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

BRENDA CULLINAN
September 12, 2019

*[Handwritten annotations in top margin: "incurred is claim condition that is often used in medical expense ins policies, But NOT in the ACE policy. Here ACE is imposing an extra-contractual condition or limitation that the expense must be 'incurred' before it will be paid = sub standard."]*

Page 133

Q. Fair enough. So now we're on Page 373 and this is time stamped 15:04.

A. Okay.

Q. And this is a conversation between Tricia and Mr. Brown where Tricia tells him that based on the IME results an additional six weeks of therapy was needed, correct?

A. Yes.

Q. And this is one of those circumstances where Tricia had already decided that the physical therapy was medically related before the service was provided and charge was submitted to Gallagher Bassett, correct?

A. We'd still have to have the charges and review the notes to make sure it was medically necessary. The charges would have to be incurred first.

Q. Then can you explain why Tricia wrote six weeks therapy was needed?

A. That was per the IME results, yes.

Q. Okay, got you. So this doesn't indicate that Tricia had already decided herself that the therapy was needed?

A. Right. The IME report said that or recommended that.

Page 134

Q. Got you. So if Mr. Brown wanted to know in advance whether Tricia thought that the physical therapy was needed, right, he wouldn't be able to know that, correct?

A. Well, he knew it because he had the IME report.

Q. And so you're saying that whatever is in he IME report, that's what Gallagher Bassett's position is? *[handwritten: whatever is in IME is probably going to be position of ACE]*

A. That is probably going to be yes but still not -- we still have to review it for medical necessity after the treatment was performed.

Q. So if I'm reading the IME report I can't tell what Gallagher Bassett thinks is necessary or not necessary or needed or not needed, correct?

A. It's going to -- you're going to know the IME recommendation. I mean, if it says six weeks, okay, six weeks of therapy, that's what the IME recommended. We can set it up through Align or you can go wherever but it's still going to be reviewed after the charges are incurred.

Q. Now, but that's not really what I'm asking. And I realize I probably didn't ask the question very well. I understand you can't -- like if we all agree that Germain Brown got a copy of the IME report before

Page 135

Q. Tricia did, right? *[handwritten margin notes]*

A. Correct.

Q. And if he's reading the IME report, I'm just trying to make sure that I understand Gallagher Bassett's position is you can't just read the IME report and know that Gallagher Bassett is going to abide by it, right?

A. You're not going to know that it's -- we're going to consider it as medical necessity until the charges are incurred and we get the report.

Q. Right. So I'm correct?

A. Yes.

Q. You can't just read the IME report and know what Gallagher Bassett's position is going to be?

A. Right. We're not going to guarantee payment or pre-approve anything. *[handwritten: But it does]*

Q. I want you to go forward to Page 381 and the current plan of action for January 30th, 2017.

    MR. LOOMIS: You're on 381 now?

    MR. BENGTSON: 381.

    MR. LOOMIS: Got you. I'm sorry, the date again?

    MR. BENGTSON: January 30th, 2017.

    BY MR. BENGTSON:

Q. In the middle of this current plan of

Page 136

action it says sending claim file to follow up peer review post IME and completed physical therapy to determine if requested surgery is medically necessary and related to original date of loss. That's what this note says, correct?

A. Correct.

Q. And that means that the physical therapy had already been done and that the doctor at MSA had requested or had ordered surgery, correct?

A. Correct.

Q. And that Tricia was sending it out for peer review to determine if the surgery that the doctor had ordered was reasonably necessary -- sorry, was medically necessary and related, correct? *[handwritten: sent surgery order out to determine if it was reasonably necessary]*

A. Correct.

Q. On the following page, 382, February 17th, 2017 -

A. Okay.

Q. Okay. It says DFI. What does that mean?

A. That says document. That would be the report itself attached.

Q. So and then it says peer review results and then there's a bunch of words after that, right?

A. Yes.

Q. And this -- am I correct in assuming that



GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 137

this is Tricia's summary of the peer -- the actual peer review results document that was in the file?

A. Correct.

Q. And it says lumbar spinal fusion and LESI, that's lumbar epidural steroid injections, correct -

A. Correct.

Q. -- are not medically necessary, correct?

A. Correct.

Q. Now, am I correct in assuming that the lumbar spinal fusion had not been performed?

A. Correct.

Q. And that the L-E-S-I injection, lumbar epidural steroid injection injections had also not been performed?

A. There had been some performed earlier so I assume these are additional ones they wanted.

Q. So Tricia sent it out for peer review to determine if these things that had not been done yet were medically necessary, correct?

MR. LOOMIS: Can you just say it one more time?

BY MR. BENGTSON:

Q. Tricia sent this out for a peer review to determine if the surgery and the injections that had not been performed yet were medically necessary,

Page 138

correct?

A. Would be medically necessary, yes.

Q. And she communicated that to the provider, saying these are -- how? How did she communicate this to the provider?

A. I believe she sent the report.

Q. But a cautionary note. We can't tell Gallagher Bassett's position just by reading the report, can we?

A. Correct.

Q. So what did Tricia tell -- how did she communicate to the doctor that the surgery was not necessary, medically necessary?

A. I believe she just sent the report but I -- I wasn't -

Q. I think I know the answer but I don't want to put words in your mouth. Forgive me if I'm presumptuous. But there's a note, looks like there's a letter or an email on 384 dated March 7th, 2017 and this is to the insured. And it says a review of your claim was completed and the surgery that was requested was deemed not medically necessary or/and directly related to your March 7, 2016 date of loss. That was sent out to the insured, correct?

A. To the insured, yes, not the provider, I

Page 139

don't think.

Q. No, I think I agree with you. I don't think it was sent out to the provider either.

A. Okay. Yes.

Q. But either way, Gallagher Bassett's official position about surgery was communicated to the insured through this email to Gabriel Henry Brown.

A. Right.

Q. Right. That's -

A. But the procedure was not performed so there would have been additional records if the procedure was performed that we would had reviewed after the charges were received.

Q. Where does it say that?

A. No, that's how it works, though, once the procedure is performed we would still review it.

Q. But it doesn't say that here, does it?

A. No.

Q. How would Mr. Brown know that, then?

A. He probably wouldn't.

Q. Fair enough. So now I want to Page forward to 38- -- well, before we leave that I want to clarify. This peer review that was done, that peer review did not say that surgery was not medically necessary, did it?

Page 140

A. I would have to look at the report itself.

Q. I submit to you that it said it might be necessary. Do you want to review it?

A. At the L4/L5, right?

Q. I mean -- well, let's dig it out.

A. Okay.

MR. LOOMIS: 83.

THE DEPONENT: 83?

MR. BENGTSON: Thank you. That's the one thing I didn't have a note for.

BY MR. BENGTSON:

Q. So this is HHC Group, you mentioned them before. This is one of the vendors that you use, correct?

A. Correct.

Q. I'm sorry. I don't want to get ahead of you.

MR. BENGTSON: I don't know if there's a question on the table or not. Hang on and let me think for a second.

BY MR. BENGTSON:

Q. Okay, let's tender 89. No. 4. This is a question that Tricia asked your internal doctor, or it says HHC doctor, correct?

A. Correct.

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 141

Q. And this says please address whether the current treatment plan is reasonably necessary, lumbar spinal fusion of spondylolisthesis, correct?

A. Correct.

Q. And we can all agree that lumbar spinal fusion of spondylolisthesis had not been done at the time that that question was asked, correct?

A. Correct.

Q. And so the doctor goes into an answer that talks about a bunch of physicians that wrote about whether surgery is good for patients or not and then the doctor continues -

MR. LOOMIS: On Page 90?

MR. BENGTSON: On Page 90, thank you.

MR. LOOMIS: Okay.

BY MR. BENGTSON:

Q. It says -- the last paragraph of that question says within a reasonable degree of medical certainty the claimant's clinical and radiographic findings does not support the medical necessity of lumbar spinal fusion using these criteria at this time. What criteria was the doctor referring to?

A. I believe all of the previous No. 4.

Q. So in this letter that a bunch of doctors wrote to Blue Cross-Blue Shield about whether surgery

Page 142

is advisable or not, correct?

A. Correct.

Q. And I want to direct your attention to Defendants' -- on Page 91, No. 8. The question is does the claimant require a surgical procedure? If so, what surgical procedure would be medically necessary? And the doctor's answer says, the claimant may require a surgical procedure, correct?

A. That's what it says, yes.

Q. But that's not what was communicated to the insured, was it?

A. What was communicated to the insured was that the spinal fusion using this criteria was not necessary at this time, I think.

Q. Let's review. 384 is the letter.

A. Right, that's what I was looking at. He states it's deemed not medically necessary.

Q. Or/and directly related to your date of loss, right?

A. Right. And asks that his doctors submit more medical documentation if they want it re-reviewed.

Q. Right. But we can all agree that it doesn't say at this time?

A. No, it does not.

Page 143

Q. And it does not say it may be necessary in the future?

A. No.

Q. Right. And it doesn't say that the IME doctor said that it may be necessary in the future, this letter to the client doesn't say that?

A. No.

Q. Right. And this is the only communication that Gallagher Bassett made to the client or the provider about medical necessity of surgery recommended by Dr. Barnard at MSA, correct?

A. I think there was other communication with the doctor because the report was sent to them.

Q. Was there anything besides just the report sent to this -- to Dr. Barnard's office?

A. Had to be sent to them because there was other communication with Dr. Barnard's office on No. 391.

Q. Uh-huh (affirmative). So am I correct in assuming that Gallagher Bassett never communicated to the doctor that they -- that Gallagher Bassett deemed the surgery recommended by the doctor was medically necessary?

MR. LOOMIS: Objection to form and it misstates the content of the report.

Page 144

MR. BENGTSON: I didn't mention report. I'm asking -- let me ask it a different way, then.

BY MR. BENGTSON:

Q. Gallagher Bassett never told the medical provider we are -- we believe that the surgery you recommended is medically necessary.

A. That it's medically necessary, no.

Q. Gallagher Bassett never communicated to the provider, to the doctor, that we believe that the surgery you recommended is related to your accident?

A. No.

Q. I didn't think so but I just wanted to make sure. So now, let's talk about Page 397. It's time stamped 07:35 and it says provider contact Northwest Plaza. I submit to you that this is the facility where the injection -- where there would be a facility charge for an injection. Says returned call regarding injection authorization. Advised that this is an occupational accident policy and not Workers' Comp, no pre-authorization required for treatment but based on the medical necessity to the date of loss. In substance that's correct, correct, 3/7/2016? That's what Tricia wrote?

A. At which time, 7:35 or 9:01?

Page 145

Q.  7:35. We're going to get to 9:01 in a second.

A.  Oh, okay. All right, yeah.

Q.  And then she goes on to say that the claim is in the process of being reviewed and will be reviewed once the medical records are received, per the policy, correct?

A.  Correct.

Q.  And then just less than two hours later she says to Regional Health, Dr. Hadnett's office, that the bills are pending attendance of IME. What does that mean?

A.  That means he needed to go to his independent medical exam.

Q.  So it's another independent medical examination?

A.  Right.

Q.  And the results determine what treatment was medically necessary and related to the date of loss, correct?

A.  Correct.

Q.  And that IME was to determine whether the surgery recommended by the doctor that had not been done yet was medically necessary and related to the loss, correct?

*[margin handwriting:]* Bill pending Govrnan going to I ME

*[margin handwriting:]* not independent, it is insurance medical examination

Page 146

A.  Well, and there's some bills pending, too, from 2017.

Q.  This is 2017.

A.  Pardon?

Q.  This is 2017 the note -

A.  She said all bills for 2017 are pending IME and the results to determine what treatment and surgery is medically necessary, yes.

Q.  And also what was on the table with the injections that these two providers were asking about, correct?

A.  Correct.

Q.  And eventually Tricia informed the medical providers, those Regional Health and Northwest Plaza and Dr. Barnard's office that injections were, in fact, reasonably necessary, correct?

A.  That they were?

Q.  That they were.

A.  On what date did she say yes, they were? I don't see that. She said they were being reviewed for medical necessity.

Q.  Okay, hang on. So on Page 406 -

A.  Oh, at 13:43?

Q.  At 14:10 I was looking at.

A.  Oh.

Page 147

Q.  But I mean either one works, right?

A.  Right.

Q.  This is Tricia saying okay, the injections you're talking about are medically necessary.

A.  Okay.

    MR. LOOMIS: Objection to form. It's a mischaracterization of the --

    BY MR. BENGTSON:

Q.  Okay, I'll read it verbatim. Explained that per the IME report, the left sided injections are medically necessary and related to DOL. That's what it says, correct.

    MR. LOOMIS: Which one are you on, 14:10?

    THE DEPONENT: Thirteen -

    MR. BENGTSON: 1345 -- 1343.

    MR. LOOMIS: Okay.

    THE DEPONENT: That's what it says, yes.

    BY MR. BENGTSON:

Q.  Yes. And those injections had not been done yet?

A.  Correct.

Q.  Right, okay. And it says at the next one that Gallagher Bassett had determined, right, that the left sided injections were medically necessary, correct?

Page 148

A.  That's what it says, yes.

    MR. LOOMIS: Okay, 14:10?

    MR. BENGTSON: At 14:10.

    MR. LOOMIS: Objection to form. That's a mischaracterization of --

    BY MR. BENGTSON:

Q.  Did Gallagher Bassett already determine by 14:10 on August 25th, 2017 that left sided injections were medically necessary?

A.  Based off the IME report, yes, but we had still had proof, the notes after the charges were submitted.

Q.  Right. But, I mean, that's what was communicated to the provider, correct?

A.  Right, that it was not a guarantee of payment or pre-authorization.

Q.  I didn't ask you that, no.

A.  Okay.

Q.  But, I mean, you had determined before the thing was done that it was medically necessary?

A.  Right. But they were still subject to review after the procedures were done.

Q.  Where does it say that?

A.  Because that's what the procedure is after the charges are received and the records received, then

*[margin handwriting:]* Pre-authorize is NOT a guarantee of payment

*[Handwritten top margin: "[have a hearing of an extra contractual loss condition.]"]*

*[Handwritten left margin: "provider not told of ACE's claim handling practice. By keeping claim practice ACE secret, interjecting uncertainty in claim process, a hurdle for client to get benefits promised — sub standard" and "can't divine"]*

Page 149

it's reviewed.

Q. Yeah, but where does it say that you told the provider that?

A. We didn't but that is our procedure.

Q. How does the provider know that?

A. From previous conversations, probably. We're not guaranteeing that they're paid.

Q. Right.

A. Right. So we would still review them after the charges and the records were received.

Q. So let me see if I understand this right. Tricia is communicating to the provider, okay, you've been asking about these injections and we're saying they're medically necessary, correct?

A. That's what she says the IME report says.

Q. The question is whether that's what Gallagher Bassett's position is?

A. It is, but there's still going to be a review. That doesn't mean we're automatically accepting the charges without reviewing the records and what was done.

Q. Right. I'm with you on that. What I want to know is how is that communicated to the insured or the provider, that position that you just said?

A. It is communicated that's what the IME

Page 150

*[Handwritten: "mumbo jumbo"]*

report says. It's also communicated that it is not a pre-authorization policy and it's reviewed for medical necessity and the record.

Q. Got you. So we already established a couple of times and I want to make sure that I'm not misunderstanding, that you can't just read the IME as a provider and divine what Gallagher Bassett's position is going to be about medical necessity, correct?

A. That's correct. If the charges have not been incurred and the service is not performed.

Q. So going to Page 409, okay, it says current treatment plan.

MR. LOOMIS: What was the time stamp on that one?

MR. BENGTSON: 10/25/17 at 12:37.

MR. LOOMIS: Got it.

BY MR. BENGTSON:

Q. Per IME injections only to the left side are medically necessary. Is that Gallagher Bassett's position on injections?

A. That's the IME's recommendation, yes. It doesn't mean that we're going to pre-authorize them. It will be reviewed for coverage under the policy, yes.

Q. And then it says no further PT is necessary. That's also per the IME?

Page 151

A. Correct.

Q. Is that also Gallagher Bassett's position that no further physical therapy is necessary?

A. Not necessarily. If it was performed and we had notes and records and charges, we would send them in for further review to see if they were medically necessary.

Q. And then it says if surgery needs to be just the L4-5 level -- was that Gallagher Bassett's position, that it would approve a surgery at the L4-5 level?

A. We're not approving, pre-approving anything.

Q. Fair enough.

A. That's what the IME doctor felt may be related to his back problems or his accident.

Q. Right. Just because the IME doctor says it doesn't mean that's Gallagher Bassett's position?

A. No. We may get more records that require further review.

Q. How does Gallagher Bassett decide whether to adopt the IME doctor's position as its own?

A. Well, if the I--- in this situation if the IME doctor says the surgery at L4-L5 was related and if the surgery was performed at L4-L5 the charge -- not

*[Handwritten right margin: "[But ACE didn't reserve for surgery] surgery"]*

Page 152

the charges but the records would be reviewed for relationship to the accident. But for an IME on its own we have to take into consideration other medical records, too.

Q. Yeah, but that's not really what I'm asking. I'm like asking how would they decide. I mean what criteria would they use, what guidance would they use to decide whether to adopt the IME doctor's position on relatedness or not?

A. Well, we would review the report and we usually send it to the treating physician and if they want to disagree or if they want to provide more medical information to have it re-reviewed -

Q. Right.

A. And if we don't hear from the treating physician in thirty to sixty days they obviously are going to not contest it if they don't communicate to it. Because we send it to them and say could you please provide further documentation or if you disagree with this decision. — *[Handwritten: "[silly response]"]*

Q. What decision?

A. Whatever the IME doctor is saying.

Q. I thought we decided the IME doctor's opinion was not a decision.

A. Well, it's a recommendation or their

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

**BRENDA CULLINAN**
**September 12, 2019**

Page 153

thoughts, so we send that report to the treating physician. He can either disagree or agree.

Q.  But I'm just asking like how did Gallagher Bassett, what criteria, what guidance does Gallagher Bassett use to decide whether to adopt the IME doctor's opinions as their own or not?

A.  Well, we would unless the treating doctor is going to dispute it because he is an independent.

Q.  So I mean what weight would you put on like the treating doctor's opinion about whether it's related or not?

A.  I don't put a weight on it. Take both of them into consideration. And again, as I told him earlier, if there is a dispute sometimes we'll send it to Ace and have them review it and oftentimes we'll send it to a third opinion. *[handwritten: Send review to 3rd IME]*

Q.  But you didn't do that in this case.

A.  No. *[handwritten: until ACE get support for]*

Q.  We all agree to that, right? *[handwritten: claim denial?]*

A.  Right.

Q.  You never -- Gallagher Bassett never communicated to the provider that they might consider an L4-5 surgery as being related, did they?

A.  They sent the reports from the independents.

Page 154

Q.  So did Gallagher Bassett communicate to the provider that they might consider an L4-5 surgery as related or not?

A.  I don't think that's what they were asking for. I don't think they ever asked for an L4-L5.

Q.  Didn't the doctor request fusion surgery way back like the previous year, that was before the peer review that was done? *[handwritten: IME said fusion at L4-L5 was covered]*

A.  That's not the L4-L5 though.

Q.  Let me come back to it.

(Whereupon, a discussion ensued off the record.)

BY MR. BENGTSON:

Q.  So did the doctor recommend fusion surgery before the peer review in two thousand and -- before the peer review conducted in February, 2017?

A.  I'm sorry, what was the date?

Q.  Did Dr. Barnard request a -- or order a surgery to the L4-5 disk level for Mr. Brown before the peer review performed in February, 2017?

MR. LOOMIS: You asked about L4-L5, right?

MR. BENGTSON: L4-L5.

MR. LOOMIS: Just answer if you know.

THE DEPONENT: I believe the fusion was for his entire back and not just the L4-L5 they were

Page 155

asking for.

BY MR. BENGTSON:

Q.  But the answer that Gallagher Bassett gave as a result of the peer review was surgery is not related and/or medically necessary, correct?

A.  I believe that's what the IME report said, yes.

Q.  We're talking about -

A.  The report that we faxed the provider shows.

Q.  We're talking about what was communicated to the client, to Mr. Brown, was surgery not medically necessary, not related?

A.  I believe that was communicated, yes.

Q.  That's what was communicated. We read it.

A.  Right.

Q.  Right. And what I'm saying is that Gallagher Bassett never said after that communication, never said, hey, now we think that L4-5 surgery may be related. They never changed their mind after that communication to Mr. Brown after the peer review?

A.  We sent the report to his treating physician. So he could have reviewed it, yes.

Q.  But we all agree that you can't divine from the IME report what Gallagher Bassett's position is,

Page 156

can you? *[handwritten: insurance]*

A.  Right. But they could review the IME report to determine what they thought as an independent, yes.

Q.  They meaning -- they who?

A.  The provider. We're still not going to pre-authorize it but the service has to be performed.

Q.  But you'll pre-deny something. You did in that -

A.  That's not a -- that's not a denial, it was just what the IME doctor said.

Q.  Let's review it again because maybe I'm misreading it. 3/7/2017 on Page 384 at the bottom of the page.

A.  Okay.

Q.  It says a review of your claim was completed and the surgery that was requested was deemed not medically necessary or/and directly related to your March 7, 2016 date of loss. That's what it says.

A.  Correct.

Q.  My question is did Gallagher Bassett ever communicate to Mr. Brown any change in that position?

A.  No. We communicated with the doctor but this we do not consider a denial letter.

Q.  Okay, so when it says -

*[handwritten: No. Ms. Cullinan mistaken.]*

*German told he can submit medical documentation*

*Direct by ACE*

Page 157

A. Because it says we'll review further documentation.

Q. Does it tell the claimant what appeal rights they have?

A. It says they've been advised they can submit medical documentation to support.

MR. BENGTSON: I don't have anything further. Do you have anything?

MR. LOOMIS: I think I've got just a few.

(Whereupon, a discussion ensued off the record.)

MR. BENGTSON: We're done.

MR. LOOMIS: I've got a few.

DIRECT EXAMINATION

BY MR. LOOMIS:

Q. I want to go back to this L4-L5 surgery. Was that what the insured was asking for, surgery, fusion surgery just at the L4-L5 level?

A. No.

Q. Asking for something much more expansive?

A. Yes.

Q. Was he asking for something that could cure his congenital defects?

A. Yes.

Q. Now, the Defendants' 384, did I understand

Page 158

you to say -- well, it says right there, these results were faxed to Musculoskeletal Associates, right?

A. Correct.

Q. And that's Dr. Barnard?

A. Yes.

Q. And Mr. Brown was told that if Dr. Barnard didn't agree with their determination they could submit further medical documentation, right?

A. Correct.

Q. Did he do it? Did Dr. Barnard do it?

A. I don't believe so.

Q. Look at Page 409. Down at the bottom, current diagnosis where it says current treatment plan per IME, injections only to the left side are medically necessary, no further PT is necessary. If surgery it needs to be just at the L4-L5 level and not addressing the other congenital issues. Did I read that right?

A. Yes.

Q. Now the first two words there are per IME, right?

A. Correct.

Q. So is that note the adjuster just regurgitating what the IME says?

A. Yes.

Q. It's not a decision that Gallagher Bassett

Page 159

was making; is that right?

A. Correct.

Q. Counsel asked you several times well, how is these decisions or IME reports, how is this communicated to the insured. Do you remember that?

A. Yes.

Q. Was the insured given a copy of the policy?

A. Yes.

Q. The policy governs whether something is covered, doesn't it?

MR. BOOHAKER: Object to form.

THE DEPONENT: Correct.

BY MR. LOOMIS:

Q. Let's go to 406. Let's see. And then at the top, the 8/25/2017 13:43 time stamp. See that one?

A. Yes.

Q. The sentence that says explained that per the IME report the left-sided injections are medically necessary and related to DOL. Did I read that correctly?

A. Yes.

Q. So is the adjuster just regurgitating what the IME report says?

MR. BOOHAKER: Object to form.

THE DEPONENT: Yes.

Page 160

BY MR. LOOMIS:

Q. Is the adjuster, is that the adjuster making determinations on behalf of Gallagher Bassett that the injections were medically necessary?

A. No.

Q. Let's look at 91. Now, there was questions there about his decision - let me see -- on Page 91, Paragraph 8 the question was does the claimant require a surgical procedure and if so what surgical procedure would be medically necessary. Do you see that?

A. Yes.

Q. And the answer was the claimant may require a surgical procedure, all right?

A. Correct.

Q. Does that mean maybe in the future, or how do you interpret that?

A. May require -- I would interpret that as in the future.

Q. But did this doctor think also in response to the Question No. 4 about a current treatment plan, lumbar spinal fusion spondylolisthesis, what did he say about the need during the current treatment plan?

A. He said

Q. On Page 90.

A. 90?

*ACE interprete in way to support claim delay past 104 week claim window: Sub-standard*

**GERMAIN BROWN v.**
**ACE AMERICAN INSURANCE COMPANY, et al.**

**BRENDA CULLINAN**
**September 12, 2019**

Page 161

Q. Right.

MR. BOOHAKER: Object to form.

BY MR. LOOMIS:

Q. The question is what did he say about the current treatment plan?

A. It says did not support the medical necessity of lumbar spinal fusion using these criteria at this time. Psychological testing is strongly recommended to determine if there are non-organic barriers to claimant's recovery.

Q. To your knowledge does the policy, the Ace policy pay for surgical procedures that may be required in the future?

A. No.

Q. Let's look at 384 if we could. The email is from Mr. Brown down at the bottom.

A. Okay.

Q. Is that a decision -- the statements in there, is that Gallagher Bassett's independent decision or just regurgitation of what the IME report says?

MR. BOOHAKER: Object to form.

THE WITNESS: It's what the IME says.

BY MR. LOOMIS:

Q. Look at 373. Down at the very bottom it says insured contact, spoke with insured re status of

Page 162

claim. See that?

A. Yes.

Q. Explained that per IME results and there's more verbiage there, right?

A. Correct.

Q. Says then about additional six weeks therapy was needed. Was that a decision that Gallagher Bassett made or just what the IME report said?

A. What the IME report says.

Q. Look at Page 372. It says IME report PDF and DX lumbar, the time stamp of 9/28/16, 14:06, you see that?

A. Yes.

Q. Is that entry any indication that Gallagher Bassett had decided six weeks of future physical therapy was needed?

MR. BOOHAKER: Object to form.

THE DEPONENT: No, it was in the IME report.

BY MR. LOOMIS:

Q. Just reiterating what the IME report said? Is that what that entry is?

A. Yes.

Q. I want to go back to the questions earlier on about the use of One Call and Align. Do you

Page 163

remember those questions?

A. Yes.

Q. What did Gallagher Bassett use those providers for?

A. One Call is diagnostic, Align is physical therapy and we use it to help the insured find a place to go if his doctor hasn't sent him to a specific place.

Q. By providing that assistance is Gallagher Bassett pre-approving any procedures?

A. No.

Q. Is it agreeing to pay for any procedures before they're done?

MR. BOOHAKER: Object to form.

THE DEPONENT: No.

BY MR. LOOMIS:

Q. There were also some questions early on about standards being provided to providers so they can make decisions of what kind of treatment is needed, specifically IME's. You sent it out to an IME and you were questioned about were there any standards that they are given so they can decide whether or not this treatment is going to fall within the policy. Remember those?

A. Right.

Page 164

Q. Do you buys provide policy language to the IME or medical records of yours?

A. Yes.

MR. BOOHAKER: Object to form.

BY MR. LOOMIS:

Q. Look at 127. Look 124 just so we know what this document is. This is an IME performed by a Dr. Lowe, right?

A. Correct.

Q. And then if we go to 127 -- bear with me -- look at Paragraph 5. It says in your opinion did the insured suffer from the occupational accident on 3/7/2016 and then in parentheses, attached policy order right?

A. Right.

Q. Is that an example of Gallagher Bassett providing standards to the reviewer?

MR. BOOHAKER: Object to form.

THE DEPONENT: Yes.

BY MR. LOOMIS:

Q. And was that common?

A. Yes.

MR. LOOMIS: All right. I don't have any more questions for you.

(Concluded at 2:45 p.m.)

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 165

DISCLOSURE
STATE OF GEORGIA  : DEPONENT:
COUNTY OF DEKALB  : GERMAIN BROWN

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am a representative of Wheeler Reporting Company, a Georgia corporation registered as a court reporting firm. I am not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28.

The firm was contacted by The Law Firm of Benjamin O. Bengtson to provide court reporting services for this deposition. The firm will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

The firm has no contractual agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to

Page 166

cover this deposition. The firm will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

This, 6th day of October, 2019

NILE L. JONES, No. B-1527
Certified Court Reporter

Page 167

C E R T I F I C A T E
STATE OF GEORGIA   :
COUNTY OF DEKALB    :

I hereby certify that the foregoing deposition was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given upon said proceedings.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of Wheeler Reporting Company, Inc., Certified Court Reporters, and the signature and original seal is attached thereto.

I further certify that I am not a relative or employer or attorney of any party, nor am I financially interested in the outcome of this action.

This 6th day of October, 2019

NILE L. JONES, No. B-1527
Certified Court Reporter

Page 168

ERRATA SHEET
Pursuant to Rule 30(b) of the Federal Rules of Civil Procedure and/or Georgia Code Annotated 9-11-30(a), any changes in form or substance shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

I the undersigned, NILE L. JONES, do hereby certify that I have read the foregoing deposition and that to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below.)

PAGE____LINE____SHOULD READ_____
REASON FOR CHANGE_____
PAGE____LINE____SHOULD READ_____
REASON FOR CHANGE_____
PAGE____LINE____SHOULD READ_____
REASON FOR CHANGE_____
PAGE____LINE____SHOULD READ_____
REASON FOR CHANGE_____
PAGE____LINE____SHOULD READ_____
REASON FOR CHANGE_____

GERMAIN BROWN v.
ACE AMERICAN INSURANCE COMPANY, et al.

BRENDA CULLINAN
September 12, 2019

Page 169

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

PAGE____LINE____SHOULD READ_____

REASON FOR CHANGE_____

_____

                                          GERMAIN BROWN

Sworn to and Subscribed

before me this _____ day

of_____, 2019.


_____

NOTARY PUBLIC

My Commission Expires_____