# EXHIBIT I

# The Claims Environment

James J. Markham, J.D., CPCU, AIC, AIAF
*Director of Curriculum, General Counsel, and Ethics Counsel*
*Insurance Institute of America*

Kevin M. Quinley, CPCU, AIC, AIM, ARM
*Vice President*
*Hamilton Resources Corporation*

Layne S. Thompson, CPCU
*Fire Claim Superintendent*
*State Farm Companies*



First Edition • 1993

INSURANCE INSTITUTE OF AMERICA
*720 Providence Road, Malvern, Pennsylvania 19355-0716*

© 1993
INSURANCE INSTITUTE OF AMERICA
*All rights reserved. This book or any part thereof
may not be reproduced without the written
permission of the publisher.*

*First Edition, Fourth Printing • June 1999*

Library of Congress Catalog Number 93-071086
International Standard Book Number 0-89462-078-9

*Printed in the United States of America*

testimony they hear and the evidence and witnesses they see. Both sides are allowed to present their cases and to examine and to cross-examine the witnesses.

Following the verdict, the losing party can either accept the judgment or file an appeal to a higher court. If there is no appeal, or if the appeal has been exhausted, the judgment becomes final.

There has been much discussion in the insurance industry on how to reduce litigation costs. These costs tie up valuable resources and add substantially to the costs of insurance generally and to the premiums insureds must pay. Litigation costs must be managed, but, at the same time, the insured must be afforded the best possible defense and legal representation.

The promise to defend the insured is one of the key promises of the insurance policy. In addition, insureds are concerned about the negative publicity litigation can bring. Proper management of litigation is one of the essential functions of claim personnel. Although litigated cases are a very small proportion of all claims, they consume a very disproportionate share of the dollars spent by claim departments.

## The Claim Professional

A professional is a person who demonstrates a high degree of competence in his or her field and adheres to ethical standards. A professional is considered an expert and is relied upon to use this expertise for the good of the public.

Claim professionals should have expert knowledge of insurance policy coverages, the law, and determination of damages. Claim professionals are increasingly relying on computers to perform the routine aspect of their jobs and thus must be computer literate.

**Knowledge of Coverage.** Other than the most sophisticated insurance buyers, insureds generally do not read their policies, and even if they do, the nature and extent of their coverages are not often fully understood.

In interpreting the policy as it applies to a given claim, the claim representative may encounter ambiguities that raise questions as to whether there is coverage for the loss. The claim representative must keep in mind that the language of the insurance policy is normally drafted by the insurance company or the industry and the insured simply adheres to the terms as written. The insured generally does not have the opportunity to select the wordings. Insurance contracts are thus considered *contracts of adhesion*. In the event of a dispute as to the meaning of the words, the courts will liberally construe the meaning in favor of the insured. Thus, the insurance company should

ascertain that the policy terms and language are clear and unambiguous as they relate to a given loss before relying on these terms to deny any claim.

Determination of coverage requires knowledge of matters outside the policy. For example, handling property claims requires a knowledge of the insured properties and the perils or causes of loss against which the properties are insured. Liability policies refer to the insured's legal liability. Thus, handling liability claims requires a knowledge of the different sources of legal obligations, including statutory law, common law (for example, the law of contracts), and criminal law. However, not all legal obligations are the proper subject of insurance.

When a claim is made and a coverage dispute arises, the nature and extent of the dispute must be fully disclosed and communicated to the insured, citing the relevant provisions in the policy. The process of analyzing coverage and resolving coverage disputes is explained in detail in Chapter 2.

Coverage disputes are delicate and serious matters. The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims. Because of the personal relationship formed in an insurance transaction, the insurance company should not place its interests above the insured's. The claim professional handling claims should honor the company's obligations under the implied covenant of good faith and fair dealings. Judges and juries frown upon insurance companies taking advantage of insureds, who are viewed as the weaker party in the insurance transaction. The consequences of unfairly benefiting from the insured are often quite severe. Large bad faith and punitive damage awards against insurance companies are not uncommon.

**Knowledge of Law.** In order to be effective in handling claims, a claim representative should have a working knowledge of tort law, contract law, statutory law, common law, and civil procedures. It is not uncommon to see a claim department staffed with persons with law degrees.

Laws can generally be divided between criminal law and civil law. Criminal law deals with laws that protect society from harm. It is designed to promote peace and order. Punishments against the violator usually come in the form of fines or imprisonment. Civil law deals with individual or private relationships. It describes the rights of individuals to protect their person and property, including the right to be free from harm.

Laws emanate from four sources:

1. *The Constitution.* The United States Constitution is the high-

Case 1:19-cv-01233-JPB   Document 26-9   Filed 01/17/20   Page 3 of 14

est law of the land and all other laws must conform to it. Each state also has a constitution to guide the state government and the state courts, but they too must conform with the national Constitution.

2. *Statutory Laws.* Statutory laws are laws passed by legislators at the national, state, and local levels.

3. *Common Law.* Common law derives from court decisions. Court decisions serve as precedents for subsequent similar cases. Common law, or case law as it is also known, is the predominant source of law in certain subject areas of the law, such as torts and contracts.

4. *Administrative Laws.* Administrative laws are detailed rules and regulations enacted by government agencies to carry out the mandate of existing statutory laws. Government agencies derive their regulatory powers from the legislature through the statutory laws.

A knowledge of law allows claim professionals to communicate effectively with lawyers who have been retained to defend the insured in a lawsuit or to resolve a coverage dispute. While having some knowledge of the law and civil procedure is not a substitute for retaining professional legal counsel, this knowledge will assist the claim representative in coordinating legal services so that claims can be fairly and efficiently handled.

**Knowledge of Damages.** The issue of damages probably generates the largest number of disputes with insureds or claimants. Most insurance policies are contracts of indemnity, which means that the insured should be compensated or indemnified for actual loss, the dollar amount of which is not specified. That there are only general standards of indemnification set forth in the policy invites disagreements and often results in intense negotiations and litigation.

It is therefore important for a claim representative to have extensive knowledge of property values and the cost of their repair or replacement. A familiarity with building codes and ordinances is likewise helpful. For commercial property losses, it is important to know the economic loss caused by the business interruption. The disciplines of accounting and finance can be very helpful in such cases.

In claims under liability insurance, claim representatives must be able to evaluate the reasonableness, necessity, and appropriate cost of medical care and must be able to assess periods of disability. It is also important for the claim representative to place a monetary value on permanent residuals of bodily injuries and to understand how they affect future earning capacity. General damages, such as pain and

suffering, are a compensable part of liability claims, yet placing a monetary value on this aspect of the claim is difficult. The discipline of economics can help a claim representative project future loss of earning capacity caused by bodily injuries.

Workers compensation claims also deal with bodily injuries. While the monetary value of permanent disabilities is generally prescribed by the statutes, the claim representative still needs to evaluate the nature and extent of injuries and diseases using medical and rehabilitation records. The claim representative must often consult with medical practitioners and rehabilitation consultants. A working medical vocabulary and an appreciation of rehabilitation services are therefore essential to a claim representative who handles workers compensation claims.

**Computer Literacy.** The insurance industry never ceases to need more and better information. The claim adjustment process, in particular, involves processing voluminous records and transactions that lend themselves well to automation.

It is now common for claim professionals to access coverage information through a computer terminal and to record losses in a claim-handling and management information database. Claim payments are now routinely processed through a computer.

Some of the claim representative's job is now being automated. For example, most property and auto estimating is now being done with specially programmed software. The claim professional simply identifies the damaged part and the computer automatically provides an estimate of repair, including labor charge. The computer has the distinct advantage of having immediate access to large information banks and the ability to make instant calculations. Computerizing repetitive, routine, and tedious tasks helps the claim professional to focus on the primary jobs of investigating, evaluating, negotiating, and sometimes litigating claims.

While the computer is not yet ready to take over the claim function completely, expert systems designed to mimic the decision making of an experienced claim professional are already under development. The claim professional of the future may no longer need to deliberate on coverage, liability, damages, or set reserves. He or she may simply investigate and collect the needed information, set the computer parameters, and decide whether to pay, dispute, settle, or litigate claims based on the computer output.

It is thus becoming imperative for the claim professional to be computer literate. The personal computer is becoming a piece of standard field and office equipment, much like the briefcase of the past. Those who can master this technology and take advantage of its limitless potential will have a competitive edge over those who do not.

## 16—The Claims Environment

# THE CLAIM REPRESENTATIVE'S CUSTOMERS

In fulfilling the terms of an insurance contract fairly and efficiently, claim representatives encounter and must seek to satisfy a variety of customers, even if some of them have conflicting interests. These customers include the insurance company, the insured, third-party claimants, service providers, regulators, and the general public.

## The Insurance Company

The insurance company employs the claim representative, either directly as an employee or, in the case of independent adjusters, on a contract basis. Ultimately, the claim representative must serve the needs and objectives of the insurance company. As a business, the insurance company wishes to make a profit. Even though the main function of the claim department is to pay claims, it plays an essential role in insurer profitability. Honest and reputable insurance companies do not regard the prompt, fair payment of claims as being in conflict with their profit objectives.

In performing a core function of the insurance company, claim personnel interact with the other functional areas of the company and with each other.

**Insurer Profit Objectives.** The claim function is crucial to achieving an insurance company's profit objectives. Controlling losses directly affects underwriting results. In addition, the measure of overall insurance company performance includes expense control. These expenses are expressed as a ratio to premium and as a percentage:

$$\frac{\text{Expenses (\$)}}{\text{Earned Premium (\$)}} \times 100 = \text{Expense ratio (\%)}$$

Adding the loss ratio, discussed previously, to the expense ratio results in the combined loss and expense ratio:

$$\text{Loss ratio} + \text{Expense ratio} = \text{Combined ratio}$$

The combined ratio represents an insurance company's underwriting profitability. A combined ratio of greater than 100 percent means that the company incurred losses and expenses greater than the amount of premium and has therefore suffered an underwriting loss. Conversely, if the combined ratio is less than 100 percent, the company has made an underwriting profit. The claim department plays a key role in an insurance company's success by managing losses and by controlling loss adjustment expenses.

It might appear on the surface that the claim department could contribute to insurer profitability by deliberately delaying and underpaying claims. However, all honest and reputable insurers recognize that claims are an expected part of business and are to be paid fully and fairly. No honest and reputable insurer has either explicit or implicit "standing orders" to its claim department to delay or underpay claims. Indeed, even out of selfish interest, insurers would likely avoid such a reckless policy. Consumers are aware of and assertive of their rights, and courts are extremely sympathetic to victims of perceived insurance company abuse.

**Interaction With Other Departments.** The claim department also interacts closely with other functional departments to market the insurance product and to deliver service successfully and efficiently.

The underwriting, loss control, marketing, and actuarial departments rely on the claims function for the loss information needed to accomplish their objectives. The marketing department sells insurance through its producers but the claim department delivers the service. The insurance product is merely a conditional promise to perform. The insurance buyer does not know the true value of the product until there is a loss and the claim is made and adjusted. The claim representative is often the first and only personal contact the insured has with his or her insurance company. How the claim is handled is often the deciding factor in whether an insured continues as a customer.

The claim department's interaction with the underwriting department is not limited to providing loss information. Although the claim department is typically the final authority on coverage interpretation, underwriters can provide insight into individual risks and coverage interpretation because of their involvement with the risk at the time it was written. They may therefore be able to provide first-hand knowledge of the intentions of the parties. Underwriters are acutely interested in how policies are being interpreted so that risks can be continually reassessed.

Most insurance companies have an in-house legal department that works closely with the claim department. The legal department provides guidance on specific losses and legal issues. Effective interaction between the two departments provides better service to customers and should help control litigation expenses.

In order to serve the insured and all its other "customers" better, the claim professional must possess the requisite knowledge discussed earlier, and keep abreast of any new developments. This requires continuing education. Many large insurance companies and independent adjusting companies maintain in-house educational and training

facilities that train new adjusters and keep experienced claim personnel current on insurance issues and claim-handling techniques. These facilities provide both college-level training in claims and insurance-related fields and hands-on training in the latest adjusting methods. Textbooks and other educational materials are published and provided to staff, customers, and insureds.

**Interaction Within the Claim Department.** The claim adjustment process is a team effort. Claim representatives, managers, supervisors, and other workers within the claim department must build a good working relationship to deliver the promise to pay promptly, fairly, and efficiently. This team spirit should be extended to all other functions in the organization. The claim representative should view every employee in the insurance company as a "customer." Chapter 11 describes more fully the structure, organization, and objectives of claim departments.

## Insured—The First Party

Provided there are no coverage problems, the claim representative should focus his or her energies on serving the insured. Being a party to the insurance transaction and the one to whom the promise to pay was made, the insured is the primary customer of the claim representative. It is to the insured that the insurance company owes the contractual obligation of utmost good faith and fair dealing.

The insured should be able to trust the insurance company's claim representative. The claim representative must follow through with promises and be completely honest with the insured. This service includes common courtesies, such as returning telephone calls and being available for questions and explanations. Explanations, letters, documents, and other materials given to the insured should be clear and easy to understand. The insured also expects to receive fast claim service, and insurance companies that can meet the insured's expectations will have a competitive edge in the insurance marketplace.

**First-Party Losses.** Severe first-party losses can be catastrophic to an insured. For example, an insured whose home is destroyed by fire will suffer far more than the great financial impact of the loss. He or she may be shocked, disoriented, and emotionally unable to function.

As in all first-party losses, the insured will have suffered a disruption in his or her life and will need guidance with the claim process, a process most insureds would prefer to avoid. Good claim representatives are willing and able to provide guidance in ways that do not compromise any of the insurer's rights.

Claim representatives handling first-party losses should promptly pay all amounts they know the insurer owes and should negotiate in a forthright, honest, and flexible manner over any amounts that are in dispute.

**Third-Party Claims.** Insurance provides an invaluable service to insureds facing claims for which they are legally liable to another. Most insureds would be completely unable on their own to assess objectively their legal liability to another, to deal with lawyers and the legal system, or to evaluate the worth of another's injury. In order to perform these services, insureds must rely on insurance companies and the claim personnel.

In exchange for their services, claim representatives require cooperation from the insured. Most insureds cooperate very willingly, even though the claim and legal processes can be slow, frustrating, and demeaning. A few insureds may be inclined to abandon third-party claims to the insurer but will usually cooperate when reminded of their policy duty to do so.

Insureds who have been sued have many questions about the procedures and schedules of the courts. Claim representatives should be able to answer these questions and should make sure that the defense counsel selected by the insurer is responsive to the insured.

## Claimant—The Third Party

The third party in a liability insurance claim is the person who is seeking a legal remedy from the insured. This is the party to be indemnified in the event the loss is covered and the insured is found liable. While not a party to the insurance contract, the third-party claimant should be afforded "customer" status. In fact, the relationship is such that in a few states, the third-party claimant is allowed to assert a direct action against the insurance company, despite the lack of direct contractual relationship between the third-party claimant and the insurance company.

Liability policies provide that the insurance company may deal directly with the claimant on behalf of the insured. This can be an adversarial relationship, but if the insured's liability is clear and the insured's coverage is in order, the third-party claimant should be dealt with as any other party who must be indemnified.

**Unrepresented Claimants.** In asserting their claims many third-party claimants deal directly with insurance companies rather than with attorneys. These claimants may regard the claim as too small to justify legal representation, or they may dislike and distrust attorneys more than insurance companies.

A claim representative dealing with an unrepresented claimant should be careful not to mislead the claimant. Many insurance companies prefer their claim representatives specifically to advise the claimant of their right to legal representation. Such forthrightness not only protects the insurer from any charges of misleading or taking advantage of the claimant, but it also helps win the trust of the claimant and facilitates the negotiating process.

Other insurance companies may prefer not to mention attorneys but will be scrupulous to advise a claimant of a pending statute of limitations (a time period after which a claimant would be legally barred from filing suit). Any advice concerning statutes of limitations must be correct.

Claim representatives cannot mislead claimants about the insured's legal liability. If the insured's liability is unknown or doubtful, or if the insured is not liable, the claimant should be told and the effect of the insured's liability on the claim should be explained.

If the insured is clearly liable, the claim representative should assist the claimant in gathering whatever documentation is required to determine damages. The claim representative should explain the need for and time frames of this process.

**Attorney Representation.** Claimants with serious bodily injury cases typically seek legal representation. Plaintiff attorneys who handle injury claims are usually compensated through some portion, usually such as one third or one half, of the eventual settlement or judgment.

Plaintiff attorneys serve a legitimate role in the claim process. Claim representatives should deal with them in a courteous manner and should communicate to the attorney what the insurer requires to document and to settle the claim. Once a claimant has hired an attorney, it is unethical for a claim representative to communicate directly with the claimant, except to verify the fact of the representation. Claim representatives will generally find plaintiff attorneys to be skilled negotiators and advocates for their clients' interests.

## Service Providers

In order to deliver its promise to pay claims promptly and fairly, the claim department cannot rely solely on its own knowledge and experience. It must use the services of specialists in other fields. When a lawsuit is filed, for example, the insured must be defended by professional legal counsel. A medical specialist is required to determine properly the nature and extent of injuries, medical causation, and whether there are permanent residuals. An expert in building construction must be called upon to evaluate a complicated property loss.

With all service providers, the claim representative must provide clear and specific instructions as to the scope and limitation of the provider's assignment. Claim representatives must take an active role in reviewing and approving bills from such providers and should not neglect paying these bills. Finally, although these providers are hired for their expertise, the claim representative must know enough to evaluate the quality of their work.

**Medical.** Medical professionals are needed to interpret and provide opinions on medical findings and records, including autopsies, diagnoses, surgical procedures, prognoses, permanent residuals, and other medical issues. An independent medical examiner (IME) is often called on to conduct an independent evaluation to help resolve a medical dispute. The resolution of damages in a liability claim and the issue of permanent disability in a workers compensation claim will largely depend on the credibility of the medical opinion.

On catastrophic injury claims, the injured must be promptly admitted to the correct treatment facility. Although the list is growing, there are still only a handful of fully staffed and equipped medical facilities specializing in spinal cord and head injuries, serious burns, and other catastrophic traumatic injuries. Claim departments should identify these specialized medical facilities and make arrangements for prompt referral and admission in the event these facilities' services become necessary. Catastrophic injuries are losses that involve millions of dollars in medical costs, so the prompt intervention of the proper medical services is critical.

As an important element of medical cost control, certain companies offer medical bill auditing services. These companies review the reasonableness and necessity of the different medical treatments and tests. They look for overcharges, duplication of services, and unnecessary tests, treatments, or hospital stays. The task is not an easy one, however, since issues of medical necessity and reasonableness are not clear cut. For example, how much medical testing should be necessary in a given case to rule out other conditions or to confirm a diagnosis?

Medical bill auditing services have raised questions in the medical field as to whether these services properly balance the need for medical cost control on the one hand and superior medical care on the other.

**Legal.** The services of professional legal counsel are required to defend the insured in the event of a lawsuit, or for the insurance company, any time there is a claim issue that must be litigated. Before major claim decisions are made, claim representatives will want legal opinions on coverage, liability, damages, and other legal issues.

Other services may be required to prepare a litigated case properly. Private investigators may be hired to do a background check on the

claim and the claimant, carry out surveillance, conduct neighborhood canvasses, locate witnesses, and perform other activities necessary to obtain evidence and testimony helpful in the defense. Claim representatives might also use companies that produce videos, graphics, computer simulations, and other communication media that help present the case to the jury in court. Juries are often confused by the highly technical testimonies of expert witnesses. Certain organizations arrange mock trials to gauge the potential reaction of a real jury to the particular facts of a case, thereby helping determine the chances of success or the likely amount of the verdict.

**Other Service Providers.** The adjustment process involves many other service providers, including vocational rehabilitation consultants, forensic experts, public services, insurance-supported organizations, professionals and academicians, and others.

*Vocational Rehabilitation Consultants.* Vocational rehabilitation professionals assist in getting disabled workers back to work. Their services include making work capability assessments, analyzing job markets, counseling employees, evaluating retraining potential, coordinating the return to modified employment, evaluating and coordinating formal training and performing other early return-to-employment services. These services minimize the severity of a loss by reducing the impact of an injury on the injured person's ability to be gainfully employed.

*Forensic Experts.* In a liability claim, such as a lawsuit arising from an automobile accident, claim representatives may need an accident reconstructionist, an expert who evaluates the accident scene and establishes the cause of the accident. This is done by using witnesses' accounts and scientific study of the evidence, such as skid marks and debris, to recreate the events leading up to the collision. In a property loss where arson and fraud are suspected, the claim representative consults with a cause and origin expert who attempts to determine the cause of the fire by studying remnants of the fire loss.

*Public Services.* Serious accidents are usually investigated by the police department, which compiles a comprehensive report. These reports and the testimony of the officers at the scene are very valuable in establishing who was at fault and, therefore, who was legally liable for the accident. Similarly, fire departments file a report on fires they respond to. The departments are usually staffed with cause and origin experts who can investigate suspicious fires. If the weather at the time of the loss is a factor, the National Weather Service can be consulted about the weather condition at the time of the accident.

*Insurance-Supported Organizations.* There are various organizations created to assist the insurance industry's fight against fraudulent insurance claims. The National Insurance Crime Bureau (NICB) investigates suspicious claims referred by member companies and assists in the prosecution of the perpetrators and logs auto theft and total loss claims. An attempt to insure a vehicle that was reported stolen or totally destroyed is an indication of potential fraud. A similar service organization for fire and theft claims is the Property Insurance Loss Register (PILR), which logs records of fire and theft claims over a certain dollar amount. Members share the pooled information to identify suspicious property claims. The Index Bureau serves the same objectives for liability and workers compensation claims.

*Professionals and Academicians.* An architect can assist in the valuation of a home or a building and in its design or renovation. Engineers, depending on their field of expertise, are usually recognized and admitted by courts to be expert witnesses on liability and damages issues involving the physical makeup of a product, scene, or design. Economists can project future income loss based on an evaluation of economic trends in the job market, demographics, incomes, and business opportunities.

*Miscellaneous.* In order to assist in negotiating a settlement in a third-party liability claim, a structured settlement consultant can offer the parties alternatives to cash settlement. An annuity can be provided to the injured claimant to provide him or her with a stream of income, instead of a lump-sum amount that may be squandered. An annuity that satisfies a specific need of the claimant should facilitate the settlement discussion.

Computer software vendors can develop special computer programs, such as property and auto physical damage estimating systems, to help in the claim adjustment process.

Salvage contract and salvage pools assist in selling total loss autos or stocks of damaged merchandise. Salvage dealers may enter into a contract with a ready and available salvage buyer, or they may send the goods to an independent contractor operating a salvage pool, who will store them and make arrangements for salvage buyers to make bids. Either method will bring in salvage recovery money, which is then credited to the loss. Salvage recovery amounts help significantly reduce an insurance company's total loss payments.

## Regulators

It should be a source of satisfaction for claim personnel to know that the regulation of claim practices is *not* the primary reason insur-

Case 1:19-cv-01233-JPB   Document 26-9   Filed 01/17/20   Page 8 of 14

Simultaneously, each party weighs the seriousness and resolve of the other party. Power that the other party is not really serious about using is not power at all. Empty threats and promises are common in negotiations, but so are real threats and promises. Each party to a negotiation faces the challenge of evaluating the other party's intentions as well as the other party's objective power. Misperceiving real power as an empty threat is a terrible negotiation blunder. Likewise, believing empty threats is a mistake.

Thus, the perception of power can be as effective as the reality. During negotiations, many nonverbal messages are communicated between the parties. These nonverbal messages are intended to say, "I am very confident and powerful. If you do not adjust your position towards mine, I am perfectly willing to pursue the alternative to this negotiation." The party receiving this message evaluates both the sincerity of the sender and the sender's objective power and adjusts, or does not adjust, his or her position accordingly.

Both claim representatives and parties with claims have significant power over one another. Likewise, both are interested in achieving settlement and avoiding the alternatives to settlement. Thus, claim negotiations tend to be successful. Most claim representatives find negotiating to be a very satisfying part of their work.

**The Power of Money.** Everyone who submits a claim to an insurance company wants money. Because the claim representative controls the money, he or she is in a great position of power. Yet, this power must be used wisely and appropriately to prevent problems for the claim representative and the insurance company. Claim representatives are required to disperse money according to the insurance policy terms. A claim representative who refuses to perform his or her role properly can suffer discipline or sanctions.

Claim representatives can use the power of money in very positive ways. A claim representative who makes a realistic settlement offer usually causes the other party to become very cooperative and seriously interested in settlement. When presented with new evidence of a claim's value, a claim representative who adjusts his or her settlement offer accordingly will command respect from the other party.

**Waiting Power.** Insureds and claimants are usually much more eager than claim representatives to get claims resolved. Claim representatives can better afford to wait. This circumstance gives great power to claim representatives, but, as with money power, waiting power can be abused. Claim representatives who make insureds or claimants wait unnecessarily are likely to encounter hardened attitudes that make claim settlements more difficult and, as explained further in Chapter 10, are probably guilty of bad faith.

The eagerness of insureds and claimants to settle cases quickly creates power for the claim representative, but only if the claim representative uses the power. If the claim representative allows the opportunity for an early settlement to slip by, the claim representative loses power. A claim representative's waiting power is extremely effective for obtaining an insured's or claimant's compliance with the claim process. The claim representative can make clear that nothing will be done on the claim until the other party has complied with the required procedures.

The waiting power of claim representatives generally appears much greater to insureds and claimants than it is in fact. Many people fear that the claim representative has no incentive to attempt settlement. They assume that they are at the mercy of the claim representative's goodwill. However, claim representatives know they must turn over their cases or they will quickly be overrun with work. All conscientious and professional claim representatives wish to resolve their cases promptly. While the claim may be more important to the insured or claimant, the claim representative cannot afford to neglect it. A mounting caseload of open claims is enormously stressful to claim representatives.

**Knowledge Power.** Knowledge and information relate to power in two ways: (1) knowledge and information are valuable commodities that are directly traded in a negotiation and (2) knowledge and information create the appearance of power.

Claim representatives want and need information about the loss to settle the claim. Claimants and insureds who cooperate in providing information during the claim representative's investigation not only expedite the claim process but also create an implicit obligation on the part of the claim representative to be cooperative in settling the claim.

All parties to negotiations want to know the track record of the other party in pursuing claims through litigation. Someone who knows this information about the other party is at an advantage. For example, bluffing would be discouraged if it was known that the opposing party had a strong record of litigation.

Knowledge about how comparable claims have settled is invaluable to both sides. Claim representatives often have more of such information than they realize. They see far more cases than do most attorneys. A claim representative who shares such information with an opposing attorney will seem credible and will exert power over that attorney. Obviously, claim representatives see many more cases than do unrepresented claimants and insureds. These parties will have great respect for the claim representative's knowledge. A claim representative who makes reasonable settlement offers will likely see these

offers readily accepted by parties who respect the claim representative's knowledge.

The appearance of knowledge carries with it the appearance of power. A confident and knowledgeable opposite party is a formidable opponent in negotiations. Relatively inexperienced claim representatives frequently concede too much during negotiations with attorneys because they assume the attorney is far more expert than they. In fact, the attorney may not know any more about the law or facts of the case than the claim representative does. Yet the perception of knowledge and expertise creates the reality of power.

**Litigating Power.** Litigating power has two different dimensions: (1) the financial and emotional resources necessary to conduct litigation and (2) the willingness to risk whatever verdict results from the litigation process. Both parties to claim negotiations typically have some amount of litigating power. The relative power of the parties depends on the circumstances of the case.

Litigating power is extremely important to the outcome of negotiations. Litigation is the alternative to negotiation (in this context, litigation should be understood to refer to uninsured motorist arbitration, property appraisal, and any other formal means of claim resolution). Anyone who does not have litigation power cannot present a very strong position in negotiation. If the other side knows that a party cannot or will not litigate, that other side is unlikely to be very flexible.

Litigation places enormous strain on all parties involved. The direct financial costs are considerable. Insurance companies expect to spend thousands of dollars in the defense of an ordinary car accident lawsuit. The plaintiff in such a suit spends at least as much, even though the attorney's fees come out of the eventual settlement or judgment. The emotional toll of litigation is just as significant. Most people are afraid to testify in court or even to appear for a sworn deposition.

A significant aspect of litigation power is the ability to withstand the emotional and financial strain involved. On the surface, it might appear that a claim representative or insurance company would be much more powerful than an insured or claimant. The insurance company is typically worth millions or hundreds of millions of dollars. Furthermore, the claim representative has no personal stake in the suit and usually does not have to testify as a witness.

Nevertheless, insurance companies and claim personnel in particular are extremely sensitive about litigation. Litigated cases are often regarded as "failures." In addition, the expense of litigation is one of the most closely scrutinized of all insurer expenses. For the claim representative involved, litigated cases are enormously time-consuming. Most claim representatives have caseloads that are based on the

assumption that all cases will be quick and routine matters. Naturally, not every case is quick and routine, but an inordinate number of problem cases adversely affect the claim representative's ability to handle his or her entire caseload.

Most insureds and claimants care far more about the outcome of litigation than claim representatives do. This concern for the outcome is both an advantage and a disadvantage for the insured or claimant. The advantage it provides is that insureds or claimants have more emotional desire to see the case through to completion. The disadvantage is that they suffer more emotional strain along the way.

In addition to the ability to withstand the litigation process, litigation power is based on the willingness to risk whatever outcome the litigation process produces. The outcome of many litigation processes is highly uncertain. Obviously, neither party wants an outcome that is worse than what it could have received through negotiation. Insurance companies that frequently litigate cases risk a result far above what they were willing to offer in negotiation and sometimes experience bad results. Claimants in litigation often risk a defense verdict. The reality of these risks is undoubtedly a cause of many settlements that occur on the courthouse steps.

Again, it might appear that an insurance company is much better situated to withstand a bad outcome in court than a claimant is. However, since there is conceivably no limit to what a jury could award in many cases, insurance company personnel tend to be shy about trying cases to verdict. Claim department personnel do not want to explain to a superior why a case was litigated at a cost of thousands of dollars and resulted in an astronomical verdict. In addition, many claim departments have periodic campaigns to settle litigated cases and reduce legal expense. A claim representative in the middle of such a campaign is not in a strong position to litigate.

Claim personnel can develop litigation power. They must gain experience with litigated cases at all stages, including pre-trial discovery, trials, and appeals. They must have a clear sense of how much upper management support they will get for running risks. Claim personnel are likely to have successful experiences in litigation if they litigate only their best cases, that is, those cases in which a defense verdict is most likely or in which the claimant is being most unreasonable. Claim representatives who make solid, realistic settlement offers on every appropriate case will settle most cases. Cases that do not settle are probably ones in which the claimant was being unreasonable.

**The Power of Being Less Personally Involved.** As mentioned above with respect to litigated cases, there is a difference between how much the claim representative cares about the outcome of a claim and how much the insured or claimant cares. In almost all claims, the claim

representative cares less because he or she has less personal involvement. Even among conscientious, professional claim personnel, there is a lower level of concern than there is in the person who has experienced the loss and needs indemnification.

In general, a person who is less personally involved and cares less about a particular matter has power over the person who is more personally involved and cares more. The person who cares more is willing to be more flexible and give more on other matters to get his or her way. Children have a great deal of power over their parents because of this phenomenon. Parents often care a great deal about matters that do not concern their children much.

Claim representatives can make the best use of this power by holding firm on settlement offers that are reasonable and in amounts best supported by the evidence. Claim representatives should not abuse this power by delaying the claim, failing to make settlement when appropriate, or offering inadequate amounts in settlement. The eagerness of claimants and insureds to settle claims will enable them to see that reasonable offers are, in fact, legitimate and should be accepted. A claim representative who tries to exploit the power of caring less by offering a less than adequate amount is likely to provoke hostility that causes the claimant to persevere through the claim process and litigation to obtain justice.

**The Power of Complaints.** Insureds and claimants who are dissatisfied with the claim process or settlement offer have the power to complain. This is a very significant power. It can be exercised directly with the claim representative, with the claim representative's superiors, or with the department of insurance.

Claim representatives have limited time in which to conclude many claims. They must allocate their time according to the priorities they think are best. A claimant or insured who occupies a great deal of the claim representative's time is likely to get the claim representative's attention for that person's claim. If nothing else, the claim representative will want to be rid of that person. A person who frequently contacts the claim representative does not need to complain specifically. Persistent and time-consuming telephone calls "just to check" will motivate most claim representatives to move the claim.

If a claimant or insured is genuinely dissatisfied, complaints to the claim representative's superiors are very effective. If nothing else, the claim representative will be required to account for his or her work to date on the claim in question. All supervisors and managers have been in the claim representative's position, so they do not automatically side with a complaining party. However, they are obligated to investigate the problem and may pressure the claim representative to get the routine work on that particular claim disposed of as soon as possible.

In addition, superiors know when they are hearing an inordinate number of complaints about a particular claim representative. Claim representatives who generate an unusual number of complaints or several meritorious complaints will be reprimanded.

Complaints to the state department of insurance have the same effect on insurance companies as complaints to superiors have on claim representatives. An inordinate number of complaints about a particular company will likely result in corrective measures. In addition, departments of insurance almost always require an investigation and a written response from an insurance company that is the subject of a complaint. Claim departments do not welcome insurance department inquiries. An insured or claimant who has initiated such an inquiry is certain to get the attention of management.

## Communication Skills

Since negotiation is a special type of communication, communication skills are essential to successful negotiations. Good negotiators have strong verbal and nonverbal communication skills. The nonverbal aspect of communication in negotiations is very significant. It is noteworthy that negotiations rarely are conducted in writing, except during the most preliminary stages. In-person, or at least telephone, communication is deemed essential by most negotiators.

Negotiators must communicate on several levels. They must communicate their negotiating positions, their understanding of the other party's needs, the flexibility or inflexibility of their positions, and their confidence levels. Simultaneously, they must accurately understand and assess all such communication from the other party.

**Negotiating Positions.** Negotiations are ultimately successful when the parties agree. In order to reach agreement, each party must be able to communicate its negotiating positions to the other party and must clearly understand the other party's negotiating positions.

Claim representatives must indicate when they are not negotiating. For example, upon the claim representative's initial contact with the insured or claimant, the insured or claimant may ask how, or even for how much, the claim will be settled. The claim representative should explain the claim process, but he or she must be very careful not to say anything that will be understood as a specific settlement commitment.

The first negotiating position the claim representative should communicate is the desire to settle. Unless the claim representative intends completely to deny the claim, there is no reason not to communicate a desire to settle. In cases of doubtful liability and doubtful

Case 1:19-cv-01233-JPB   Document 26-9   Filed 01/17/20   Page 11 of 14

damages, expressing a desire to settle does not imply a willingness to pay the claim at the face value of the claimant's demand. Expressing a willingness to negotiate settlement does not communicate weakness or a lack of confidence. Attorneys who represent parties with insurance claims know that virtually all insurance claims are settled through negotiation. Unrepresented parties are reassured by a claim representative's forthright willingness to discuss settlement.

Specific negotiating positions should be stated clearly so that the other party does not misunderstand. Misunderstandings can occur even with the clearest communications, but are more likely to result from garbled, indefinite negotiating positions.

A clearly stated negotiating position need not deal with every issue that exists between the parties. It is usually easier to deal with only one or two issues at once, especially if they are the core issues separating the parties. Some negotiators prefer to deal with the most difficult or the most important issue first so that its resolution produces a sense of success and goodwill that can be carried over to other issues. Other negotiators prefer to deal with less important or simpler issues first so that the parties experience mounting success as each issue is dealt with.

A negotiator's listening skills are of utmost importance when negotiating positions are exchanged. Any misunderstanding can cause the negotiators to become suspicious and can thus cause the negotiations to break down. A negotiator is wise to repeat verbatim any stated negotiating position advanced by the other party. Anything unclear in one party's negotiating position should be identified by the other party.

Claim representatives should be especially cautious of negotiating positions that are couched in contingent, qualifying language. For example, if an attorney for a bodily injury claimant states, "If you offer $10,000, I will recommend it to my client," he or she has not made a settlement offer of $10,000. Likewise, a party who says "$3,500 could be just right" has not stated a definite offer or amount.

A claim representative who discusses settlement should be clear about whether the matter includes both bodily injury and property damage, general damages and special damages, or both damages already incurred plus future damages. A proposed settlement figure is usually understood to include all possible damages, but the claim representative should make sure that the other party is not operating under some other assumption.

**Awareness of the Other Party's Needs.** Nothing smooths negotiations more than the belief by each party that his or her needs are understood. Stated negotiating positions can be different, but mutual understanding of each other's needs motivates the parties to continue the negotiations.

It costs nothing to recognize the other party's needs. These needs include not only the demands stated in the other party's negotiating position, but also the other party's emotional needs. Claim representatives should always be sensitive to the impact the loss has had on the insured or claimant. They should make every effort to express to the other parties an awareness of their situations. Indeed, since claim representatives see so many losses, they are frequently in a position to express what the other party is experiencing even before that party says anything. Claim representatives who understand the insured's or claimant's needs are seen as extraordinarily sensitive individuals and will probably enjoy smooth negotiating.

All parties to a negotiation need to feel respected by the other party. Claim representatives must critically examine their own attitudes towards every party with whom they deal. Disdain and dislike are difficult to hide, yet claim representative with these emotions must not reveal them. The claim representative must remind himself or herself that every party with a legitimate claim deserves courtesy and good service.

Likewise, when a party is represented by an attorney, the claim representative must respect the attorney. Hired professionals deserve the same poise and courtesy shown to the claimant or insured. Claim representatives should also respect the decision of the other party to seek attorney representation.

**Flexibility or Inflexibility.** As each party states a negotiating position, it sends some message to the other party about how flexible that position is. It is virtually impossible not to send some message of this sort. Even a bald statement, "This is our position," carries with it an implicit message of flexibility. Anyone holding a truly inflexible position would probably not engage in negotiations or any other communication. If the party were to engage in negotiations, his or her position of true inflexibility would often be questioned.

Properly communicating and understanding messages about flexibility is possibly the most difficult and fascinating aspect of negotiating. Parties to a negotiation need to remain flexible as long as negotiating positions differ. At the same time, each party to a negotiation must convince the other of the importance and legitimacy of his or her position. Each party must show some inflexibility in order to convince the other of his or her position.

Mixed messages are often common in negotiations. Consider the message, "We aren't flexible on this, but we'll listen to any proposals you want to make." The first part of this message expresses inflexibility, but the rest of the message indicates cooperative negotiating. Cues about flexibility are often expressed nonverbally, especially with tone of voice. The verbal message "We can't see going beyond this point" can

Some claims simply cannot be settled through negotiation and must be litigated or must proceed to appraisal.

Other "final offers" are best interpreted as strong statements that the other party's negotiating flexibility is diminishing. This is important information for a negotiator to receive. However, neither real nor feigned final offers change the merits of a claim. Claim representatives should not evaluate the merits of a claim any differently just because another party has issued a "final offer."

Claim representatives should issue only genuine final offers. A person who issues "final offers" that are regularly changed looks foolish and weak. Claim representatives should not undermine their negotiating credibility with ridiculous statements.

**Time Demands.** In third-party liability claims, claimant attorneys sometimes issue "time demands." These are settlement offers that, if not accepted within the stated time, will supposedly be withdrawn and no longer available. It is perfectly legal for any party in negotiations to make conditional offers, that is, offers that can only be accepted under certain conditions. Imposing a time limit in which to accept a settlement offer is a perfectly legal condition to attach to the offer. In many cases of time demands, the attorney simply wants to receive a prompt response.

As with "final offers," time demands do not change the merits of the case. However, the consequences of failing to accept a time demand can be serious. If the claim is legitimately worth the amount demanded and a jury subsequently returns a verdict in excess of the policy limits, the insurance company may be guilty of bad faith. Thus, time demands at or near policy limits must be taken seriously.

If the insurer can respond to the offer within the time limit, it should do so. If the insurer needs more time, it should so advise the attorney and should specify when it will respond. In either case, a deadline for accepting the demand does not make the demand an appropriate settlement amount, but the insurer should respond promptly.

## Negotiating Ethics

Claim representatives may sometimes view negotiating as a game or a contest. Nevertheless, there are important ethical considerations to negotiating. This section discusses the claim representative's ethical obligation to settle claims and the unethical practices of lying and lowballing. The bad faith possibilities of unethical practices are discussed in Chapters 9 and 10.

**Settlement Paramount.** The overriding ethical consideration in insurance claims involves achieving settlement. Negotiating claim settlements may be good business strategy and may be required by the law, but it is also an ethical obligation of claim representatives and insurance companies.

The claim representative's purpose is to perform the insurance company's promises under the insurance policy. Thus, claim representatives have an ethical obligation to pay covered claims. The claim representative's ethical obligation to settle claims is also founded on the disproportionate bargaining power between the insured and the insurance company. When insureds buy their policies they have some power to shop among insurance companies. Once a loss occurs, they are beholden to the insurance company to do what it promised. Insurance companies have the wealth and power to resist claims until ordered by a court to pay. It is ethically unacceptable for the strong to take advantage of weaker parties. Claim representatives should settle claims on their merits, not according to the power of the parties.

**Lying.** With respect to statements about their flexibility or inflexibility and about their views on the strengths and weaknesses of each side, negotiators are often not fully truthful with their counterparts. Although that might result in favorable settlements, untruthfulness is not ethically defensible. Settlement is the paramount ethical objective of a claim representative in negotiations.

Other types of lying are not defensible. For example, a claim representative should never lie about evidence or policy provisions. Before formal discovery proceedings in litigation, parties must rely on one another to provide complete and unaltered evidence. Before discovery, there is an opportunity to withhold or fabricate evidence, but claim representatives should never do so. Such deceit takes advantage of the other party and has no ethical justification. Likewise, because claim representatives have an ethical obligation to perform the policy, they must never knowingly misrepresent policy provisions or coverages.

**Lowballing.** Lowballing is a negotiating tactic by which a claim representative knowingly offers far less than the merits of the claim warrant. Lowballing is undeniably effective in forcing claimants and insureds to accept settlements that may be lower than their claims deserve.

Lowballing is ethically indefensible, even in response to an outrageously high settlement demand. As a tactic, lowballing may be effective in altering outrageous demands, yet it remains ethically

Case 1:19-cv-01233-JPB   Document 26-9   Filed 01/17/20   Page 13 of 14

unsupportable. Claim representatives should not respond to outrageous demands with equally unreasonable behavior. A claim representative can avoid making outrageous demands by addressing the merits of the claim and making realistic settlement offers. A confident negotiator will not be intimidated by outrageous demands and will not believe that equally outrageous counteroffers are a necessary response. A claim representative who engages in lowballing is ultimately refusing to settle covered claims.

## SUMMARY

The two most identifiable styles of negotiating are cooperative negotiating and confrontational negotiating. Cooperative negotiators believe that there is mutual advantage to settlement and that concessions in negotiating positions are desirable steps towards settlement. They establish mutual respect and goodwill and try to focus on issues instead of personalities. Cooperative negotiating is valuable in any situation where the relationship between the parties is important, and it is the recommended negotiating style for claim representatives. Cooperative negotiating has the least risk of failure, is most likely to result in settlements, is easy on the negotiators, and complies with the good faith duties of claim representatives. It has the disadvantages of causing concessions that are too great, sacrificing principle, and exposing the cooperative negotiator to abuse from those with other styles.

Confrontational negotiating is characterized by unreasonableness, reluctance to make concessions, and personal attacks. It has the advantages of shattering the confidence of an opposing negotiator, bringing good results when it works, and satisfying the competitive urges of the negotiator. Confrontational negotiating has obvious disadvantages: it often causes negotiations to break down, is stressful for the parties, and is likely to constitute bad faith if practiced by claim representatives.

Negotiations with insureds should follow from the communication and investigation that has already occurred during the handling of the claim. Such negotiating is substantially a process of education for both the claim representative and the insured. Claim representatives should establish as much agreement with insureds on factual matters as possible before discussing more debatable issues. Claim representatives must understand the extent of flexibility that exists with respect to issues of repair versus replacement, depreciation, labor rates, and time to repair. Cases of suspected fraud require that claim representatives negotiate carefully and refrain from making accusations until fraud can be proved.

Negotiations with unrepresented claimants require that the claim representative establish trust, explain the liability claim process and legal liability, and be able to respond to attorney threats. Negotiations with attorneys require the claim representative to understand the powers of the parties. Although inexperienced claim representatives are intimidated by the prospect of negotiating with attorneys, they will discover that they can succeed and will find such negotiating rewarding.

All negotiations require that claim representatives be familiar with various negotiating tactics that may be used by other parties or by the claim representative. Claim representatives must also be familiar with certain ethical obligations by which they must abide. The claim representative's most important ethical obligation is to settle covered claims.

Case 1:19-cv-01233-JPB   Document 26-9   Filed 01/17/20   Page 14 of 14