# EXHIBIT J

# SHINING A LIGHT ON INSURER MISCONDUCT

By Frederick C. "Rick" Berry, Jr., J.D., C.P.C.U., C.L.U.[1]
1951 W. Camelback Rd. #200, Phoenix, AZ 85015; 602-274-5700;
Frederick.C.Berry@gmail.com; https://www.frederickcberry.com/

**Summary**

A uniform law proposed by the National Association of Insurance Commissioners (NAIC) is currently working its way through state legislatures. The Corporate Governance Annual Disclosure Model Act[2] would require American insurers to disclose a wide range of information relating to their governance, performance evaluation systems, compensation and incentive plans, Enterprise Risk Management ("ERM") plans and codes of ethics and conduct. This article will highlight some of the important features of the NAIC's model act and illuminate how they are designed to cloak insurer disclosures in secrecy, but at the same time provide compelling evidence of information whose existence insurers have long denied. Discarding the secrecy mandated by the model act and allowing access to the disclosed information will help discourage insurer misconduct long hidden from the insuring public.

**Important Features of Corporate Governance Annual Disclosure ("CGAD")**

As announced by the NAIC in its press release regarding the model act and regulation,[3] the proposed act requires each insurer to provide a disclosure to their state's insurance regulator annually, describing practices including the following:

1

- The policies and practices directing senior management, including a description of standards whether officers and key persons have appropriate background, experience and integrity to fulfill their roles, the insurer's code of conduct and ethics, performance evaluation, compensation practices, and succession planning.

- The processes by which the Board of Directors and senior management ensure an appropriate level of oversight to the critical risk areas impacting the insurer's business activities, including risk management processes,[4] the actuarial function, investment, reinsurance, and business strategy decision-making processes.

- The insurer's corporate governance framework and structure, including duties and structure of the Board of Directors and its committees.

- The policies and practices of its Board of Directors and significant committees, including appointment practices, the frequency of meetings held, and review procedures.

**Usefulness of CGAD Information**

Much of the information that is required to be disclosed in the CGAD would be useful to insurance consumers in civil litigation. This would not only include direct actions against insurers

2

for sub-standard claim practices or unfair marketing, but also evaluating third-party claim practices, insurance producer malpractice and litigation arising out of the unauthorized transaction of insurance by insurers and enterprising marketers, exposing unfair methods of competition among insurers and marketers including state antitrust violations, and assist insurance consumer advocates as they work toward an insurance marketplace that is more fair.

## Enterprise Risk Management

Since the early 1990's, Enterprise Risk Management ("ERM") has grabbed the attention of the business world including the insurance industry. Insurers enthusiastically embraced ERM concepts as they developed methods to evaluate their own risks and seize opportunities to generate more earned surplus. By implementing ERM practices, insurers found they could also increase shareholder value and provide greater senior management compensation.

The role of American International Group ("AIG") in the 2008 world financial crises is a cautionary tale of the risks of ERM. Meeting the demand of the securitized mortgage industry, AIG developed financial guarantee contracts that promised to make money available if the securitized mortgages lost value. The single risk point for all issued contracts was the systemic devaluation of American residential real estate. AIG weighed the reward of being the only market for an in-demand contract against the risk of real estate values actually teetering off this solitary

3

risk point and decided to ignore the fundamental principles of risk spreading[5] in favor of enormous and immediate earnings for both AIG and its marketers.

To hide this reckless ERM plan, AIG attempted to "fly under the radar" by deliberately not obtaining required[6] Certificates of Authority from state insurance regulators for AIG Financial Products Corporation and AIG Securities Lending Corporation to transact insurance business and by locating its day to day operations for these enterprises in the United Kingdom.[7] The resulting collapse of world financial markets demonstrated the failure of unguided state by state regulation of the business of insurance.[8]

ERM is supposed to be sensitive to the needs of stakeholders, other than owners and senior management.[9] But too often first-party insureds and third-party claimants end up on the losing side as insurance companies embrace EMR principles and view the claim department as a spigot of red ink, where risk takers can find resources to exceed corporate profit goals. By improving combined ratios and shareholder value, stunning compensation for senior management is achieved.[10]

There is no doubt that ERM based on unfair marketing and claim practices contradicts the insurance industry theme that when low-information consumers buy insurance from high-information professionals and insurers, they can rest assured that they will receive the indemnity and fair service they were promised.

4

**Fraudulent Insurer Enterprise Risk Management Practices**

Practices that unfairly exploit ERM principles have been called many things by different insurance companies. Today, it seems insurers have learned that not assigning a name to their ERM program makes it easier to hide their sub-standard practices and avoid resulting civil liability. This has caused some insurers to erase all labels for their ERM programs. Nevertheless, ERM continues to be commonly practiced.[11]

### A. Assiduous Adherence to "SX"

One ubiquitous ERM method used involves the simple process of evaluating of how much money the insurer *would like to pay* to settle a claim and thereafter refusing to settle for more than this settlement amount ("SX"). The insurer uses its great powers of money, time, knowledge, and litigation tolerance[12] as it forces insureds and claimants through the litigation gauntlet if they are unwilling to settle for the SX or less.

The SX value of a claim is not the claim reserve. Establishing and maintaining a proper claim reserve is an important part of insurance company solvency regulation and must adhere to statutory requirements.[13] There is no direct regulation of the SX.

A necessary element to the success of such a claim department ERM program is to grant a form of broad transactional immunity to adjusters, vendors and claim lawyers that eliminates carrier risk for those who purposefully fail to conduct ongoing prompt, thorough, and fair claim investigations and evaluations or otherwise engage in sub-standard claim-handling practices.

Rewards of bonus money for not paying or delaying the payment of covered claims is easily discovered in claim litigation, is widely recognized as a sub-standard claim practice, and even justifies a punitive damage award.[14] So instead of a small bag of money or a flat screen television, insurers have learned to reward their claim people with something far more valuable – the elimination of carrier risk if the insurer is caught cheating. All the adjuster or vendor need do is assiduously adhere to the established SX.

ERM is easy for insurers to understand because the business of insurance employs the Law of Large Numbers[15] at its core. This means that insurers know that the vast majority of insureds and claimants will accept the SX – usually sooner than later. At the end of the day, this ERM method produces overall lower combined ratios and higher contributions to earned surplus.

## B.  False Replacement Cost Value

Another ERM method appears in property insurance and starts with issuing a Replacement Cost Value ("RCV") policy, but implementing a valuation process that provides less indemnity than will be required to repair or replace the property. Marketing of this product (usually accompanied by an "inflation guard" feature that automatically increases the amount of indemnity each year) is directed to clients who want the very best protection for their family but when their covered property is burned to the ground, many find themselves without the means to rebuild fully and are forced to accept an Actual Cash Value ("ACV") loss adjustment. The difference between the RCV loss reserve and the ACV loss settlement (the "Depreciated Amount") goes directly to earned surplus. Of course, the policy is peppered with language stating that the insured has the

6

"choice" to select the amount of indemnity limit to buy. This unfair trade practice,[16] consumer fraud, and insurance producer malpractice is perpetrated as the policy is marketed and underwritten, cashed in during the life of the policy (as greater premium is collected for "Cadillac" coverage), and is a windfall realized on the occurrence of many total loss claims.

### C.  Tricks and Traps

A third unfair ERM method is used in life and disability insurance when the policy is marketed and underwritten. The trick is set with a vague question on the application about the applicant's earnings or some other matter that invites the applicant to interpret the question and answer with an estimate. The insurer springs the trap in a subsequent claim if the amount reported on an IRS Form 1040 does not match the insured's earlier estimate, providing an excuse to deny the claim for fraud. Although the law in all states places the burden on the insurer to show that a misrepresentation on an application is material, insurers know that claimants will likely withdraw from the claim process when presented with a claim denial suggesting the insured was guilty of fraud.

### Cost of Doing Business

Insurers are willing to take hits for systematically engaging in illegal and unethical sub-standard claim handling because (1) state regulatory disincentives are weak and usually not imposed; (2) most states prohibit insureds and claimants from seeking a remedy for violation of the state insurance code; (3) there is presently no federal regulation of insurer marketing and claim

7

handling; (4) almost all insureds and claimants are unwilling to pursue civil remedies; (5) when an insured or claimant does pursue civil remedies, the insurer usually only pays part of what it should have paid in the first place plus some litigation cost; and (6) new constitutional restrictions imposed by the U.S. Supreme Court place a low ceiling on assessing punitive damages.[17] These factors together with the power of the Law of Large Numbers provide strong financial incentives to insurers to ignore their express promises to pay indemnity and provide good claim service and their implied promise to engage in good faith and fair dealing.

ERM in an insurer's claim department by any name (or no name) is unethical and results in sub-standard service. Most state insurance regulators cannot or do not choose to protect insurance consumers from such practices. Although insureds in almost all states and claimants in some states can pursue civil remedies, their pursuit of justice can only be successful if they can discover evidence to prove insurer misconduct.

### The Power of "No"

It is always difficult to get insurers to disclose evidence of unethical and sub-standard practices. All the insurer need do is say "No," and it's hard to discover something with no official name. Discovery in civil litigation is made more challenging by The Corporate Governance Annual Disclosure Model Act. Having an informed judge and asking deposition questions[18] about the things that are known to be reported in the CGAD, as well as other elements of the insurer's ERM program, may result in discovery of admissible evidence. Thereafter, the discovered

8

evidence should be widely shared with the Federal Insurance Office, state regulators, and other litigants so that bad practices can be effectively discouraged. This means that significant effort must be made to resist protective orders hiding bad practices.

Parties seeking disclosure and discovery should keep in mind that insurers likely have taken measures to hide their ERM procedures. For example, defense lawyers and lower level adjusters[19] most certainly have no direct knowledge of the reprehensible practices. Methods and rules, such as those for setting and adhering to the SX, are most probably communicated to claim managers by non-written instruction outside any claim manual[20]. These claim managers are given the job of making sure lower level adjusters do not settle claims for more than the SX. All insurers must, however, disclose their ERM plan under the CGAD.

**Tradition of Secrecy in NAIC Reporting**

The NAIC and state insurance regulators have long been criticized as being unduly influenced by the industry they regulate.[21] Leading up to the adoption of the NAIC Unfair Claim Settlement Practices Act and Regulation, John D. Dingell (D-Mich.), Chairman, Committee on Energy and Commerce, House of Representatives, conducted hearings into whether the Federal Trade Commission should take over regulation of insurer claim handling because of the failure of states to adopt state laws and regulations establishing uniform claim-handling standards.[22] Realizing that further inaction might well trigger the McCarran-Ferguson Act of 1945, 15 USC §1011 *et seq.*, and open the door to more federal regulation of the business of insurance, the NAIC

9

took steps to codify preexisting and widely recognized ethical claim handling standards. Clearly, the insurance industry would rather be regulated by fifty monkeys than one big gorilla.

## Secrecy in the CGAD

The NAIC has a history of advocating secrecy over the information produced by insurance companies. Its Holding Company Model Act[23] established mandates for prophylactic confidentiality by hiding key portions of holding company statements from public scrutiny. It later tightened up secrecy and confidentiality with the Risk Management and Own Risk and Solvency Assessment Model Act (ORSA).[24]

It should come as no surprise then that mandated secrecy also found its way into the Corporate Governance Annual Disclosure Model Act. Section 6 declares contents of the CGAD to be "proprietary and to contain trade secrets,"[25] and the CGAD is specifically exempted from state Freedom of Information Laws and Sunshine Laws. It also provides a statutory basis to deny litigants the power of subpoena to discover the contents of the CGAD "in the possession of or control of the department of insurance." Section 6 of the Act even provides that the CGAD "shall not be subject to discovery or admissible in evidence in any private civil action."[26]

One of the justifications for secrecy found in Section 6 is a legislative finding that information disclosed in the CGAD is "proprietary" and includes "trade secrets." In truth, all insurers adopting ERM in their claim department use the same means and methods that have been

10

widely reported in both the trade and popular press.[27]    Legitimate confidentiality concerns regarding insureds, applicants, and claimants are addressed in existing law.[28] Senior management compensation is already required to be publically disclosed by the U. S. Securities and Exchange Commission.[29] To the extent an insurer spent money to develop its own version of an industry-wide ERM program, what public policy supports the notion that methods and means employed to cheat clients and claimants should be hidden from public scrutiny? There is nothing to stop insurers from moving evidence of illegal ERM practices that now may be found is a claim manual or known to employees and vendors to the CGAD. Armed with the power of legislatively imposed secrecy, insurers can challenge insureds and claimants to years of secret litigation before justice might be found for those few who can match the insurer's power of money, time, knowledge, and litigation tolerance.

## Challenging Secrecy as Legislatures Consider Adoption of Corporate Governance Annual Disclosure Model Act

In order for an Enterprise Risk Management Plan to be successful, it is supposed be transparent to all of its stakeholders.  The insurance industry, however, has its own view of transparency. In insurance company operations, "transparency means openly communicating the right information to those who need to know it."[30] By claiming the ERM Plan is proprietary and a trade secret, insurers attempt to hide relevant admissible evidence concerning systematic insurer misconduct in the claim-handling process from their own insureds and third-party claimants.

11

Insureds and claimants apparently are not included within the class of stakeholders who have a "need to know" how insurers implement their claim department ERM programs. Although Congress mandated the Federal Insurance Office to gather information, the NAIC inserted secrecy mandates not established by federal or state law and not found in preexisting written contracts "between the original source of any nonpublicly available data or information and the source of such information to the [Federal Insurance] Office." 31 U.S.C. §312(e)(5)(B). It is noted that the original source of the secret information is always the errant insurer. There is no federal secrecy law and there should be no state secrecy law.

If an insurer truthfully provides the information required by the proposed CGAD, insureds and claimants could easily have access to useful information that would allow them to seek justice. At the same time, easy access to this information would expose any illegal or unethical business activities and encourage insurers toward lawful and ethical business practices. Insurance industry ethics should include more than giving each other ethics awards each spring.[31]

**Where the Corporate Governance Annual Disclosure Model Act Goes From Here**

It has been reported that the NAIC Corporate Governance Law was adopted in California, Indiana, Iowa, Louisiana, and Vermont in 2015.[32]  In the 2016 legislative season, the CGAD was adopted in Connecticut, Florida, Nebraska, New Hampshire, Ohio and Rhode Island.[33]  It is on a path to be adopted in all states as part of the NAIC accreditation requirement, which means that

each state is mandated to adopt a law and regulation that are "similar in force and no less effective" than the NAIC Model by the end of 2019.[34] Omitting the secrecy components of the CGAD certainly does not make the model act less effective. If anything, sunshine would make the model much more effective as real parties in interest would be able to use public information to discourage illegal and unethical claim handling practices.

## Conclusion

Ever since *United States v. Southeastern Underwriters Association*, 322 U.S. 533 (1944), held that the business of insurance was engaged in interstate commerce and subject to federal regulation, insurance companies have fought to keep Uncle Sam out of their business. Through a process spanning decades, state regulation of insurance has been strengthened by cooperative effort funneled through the National Association of Insurance Commissioners. The recent recession created fear of further financial insecurity and introduced much more federal rather than state regulation of insurance. Notably, the Affordable Care Act of 2010[35] supplanted much of the pre-existing and ad hoc state regulation of health insurance in favor of a federally regulated system. But the 111th Congress did more. It established within the Department of the Treasury the Federal Insurance Office, charging it with the authority "to monitor all aspects of the insurance industry, including identifying issues or gaps in the regulation of insurers that could contribute to a systemic crisis in the insurance industry or the United States financial system." 31 U.S.C. §312(c)(1)(A). The Federal Insurance Office was directed "to consult with the States (including State insurance

13

regulators) regarding insurance matters of national importance …" *Id.* at §312(c)(1)(G). One end result of the collaboration between the Federal Insurance Office and NAIC was the Corporate Governance Annual Disclosure Model Act, but there is significant NAIC deviation from the mandate of the Federal Insurance Office Act of 2010. If state insurance regulators are unable to pull away from the corrupting influence of the insurance industry, the Federal Insurance Office Act of 2010 promises future federal regulation of the business of insurance.[36]

The NAIC's CGAD is a consequence of the mandates of the 111th Congress, greatly influenced by the fear of the insolvency of an insurer too big to fail. As the insurance industry grudgingly moves to comply with new federal mandates, the NAIC has erected unnecessary barriers to prevent access to information that insurers are required to report annually. Not only have state sunshine laws been halted, but clerks of the courts are prohibited from issuing subpoenas requiring production of information in mandated disclosures. As The NAIC Corporate Governance Model Act is considered further by state legislatures, its secrecy provisions should be omitted. Public access to CGAD information will only strengthen state regulation of insurance, as insurers are encouraged to conduct their affairs lawfully, ethically, and in good faith.

---

[i]    Frederick Berry has a Bachelor of Science degree in Insurance (1969) and a Juris Doctor degree (1973) from Arizona State University. Mr. Berry served as the Deputy Director of Insurance of the State of Arizona from July 1, 1976 through September 30, 1978 and attained his professional insurance designations of Chartered and Property and Casualty Underwriter (CPCU) in 1981 and

Chartered Life Underwriter (CLU) in 1983.  He served as a member of the State Bar of Arizona Insurance Committee for many years, including six years as Chairman, and was a member of the Arizona Supreme Court Committee on Character and Fitness from June 14, 2011 to October 31, 2014.  Mr. Berry has testified as an expert witness in State and Federal Court concerning insurance matters on numerous occasions and is a licensed insurance producer in Arizona for life, health, disability, property, and liability insurance.

[2]    http://www.naic.org/store/free/MDL-305.pdf.

[3]    www.naic.org/Releases/2014_docs/naic_adopts_corporate_governance_models.htm
www.naic.org/store/free/MDL-306.pdf.

[4]    Emphasis added. The author believes that the Models refer to Enterprise Risk Management ["ERM"] discussed, *infra*. That disclosure of an insurer's ERM is also apparent from the required disclosure of ERM functions from insurers with more than $500 Million in annual premium or insurance company groups with more than $1 Billion in premium require by the 2010, 2011 and 2012 revisions to the NAIC Model Insurance Holding Company System Regulatory Act and NAIC Own Risk and Solvency Act. Tetrault and Rogers, *Perspective -- How International Policy Matters to Every Insurer: What Happens in Basel Does Not Stay in Basel*, 2 Insights 27 (CPCU Society, Summer, 2015).

[5]    https://www.irmi.com/online/insurance-glossary/terms/s/spread-of-risk.aspx ("The pooling of risks from more than one source. Can be achieved by insuring in the same underwriting period either a large number of homogeneous risks or multiple insured locations or activities with **noncorrelated risks**." [emphasis added]).

[6]    Unauthorized Transaction of Insurance Criminal Model Act.
http://www.insurancefraud.org/downloads/NAIC_unauthorized.pdf [December 10, 2006 draft]. Earlier versions of this model act were part of state insurance codes long before the Great Recession of 2008. *See, i.e., Ariz. Rev. Stat.* §20-401 to 401.06 (Ariz. Laws 1954, Ch. 64, Art 7, §1).

[7]    AIG established AIG Financial Products Corporation to issue the financial guarantee contracts.
http://www.nytimes.com/2008/09/28/business/28melt.html?_r=0.

[8]    It is widely recognized in the insurance industry that the failure of AIG led to federal insurance regulatory mandates in the 111th Congress. Tetrault, Perspective-Getting to Know You: New NAIC Corporate Governance Law to Illuminate Insurance Company's Practices, 3 CPCU Society Insights, 2 (CPCU Society, Summer 2016 at 28)("The disclosure like the Own Risk and Solvency Assessment ["ORSA"] and revisions to the Model Holding Company Act, requiring the filling of **enterprise risk reports**, is a product of the NAIC's Solvency Modernization Initiative, which itself was largely a response to the global financial crisis and resulting pressures from federal and international authorities to ensure that the state insurance solvency regime was on solid ground.") [Emphasis added].

[9]    McEwan, *ERM: An Opportunity for Organizational Development*, 2 CPCU Society Insights, Issue 4 at 10 (Professional Journal by the CPCU Society, Winter 2015).

[10]    http://fcpacompliancereport.com/tag/wsj/.

[11]    McEwan, *ERM: An Opportunity for Organizational Development*, 2 CPCU Society Insights, Issue 4 (Professional Journal by the CPCU Society, Winter 2015);
https://www.actuary.org/files/ERM_practice_note_030713_exposure.pdf.

[12]    Markham, *The Claim Environment*, Insurance Institute of America (1st ed. 1991) at 227-228.

[13]    http://www.naic.org/cipr_newsletter_archive/vol2_oversight.htm.

[14]    Hoopes, *The Claims Environment*, Insurance Institute of America (2d ed. 2000) at 9.15-16.

15 Hoopes, *The Claim Environment*, Insurance Institute of America (2nd ed. 2000) at 1.1-1.2 ("The law of large numbers is a mathematical principal that states that when the number of similar, independent exposure units increases, the relative accuracy of predictions about future outcomes based on those exposure units increases."); Markham, *The Claim Environment*, Insurance Institute of America (1st ed. 1991) at 2; https://www.irmi.com/online/insurance-glossary/terms/l/law-of-large-numbers.aspx. The Law of Large Numbers as used in the business of insurance has been discussed in reported cases over many years. *See, i.e., German Alliance Ins. Co. v. Lewis*, 233 U.S. 389 (1914); *Sears, Roebuck and Co. v. C.I.R.*. 972 F.2d 858 (7th Cir. 1992); *Cont. Ins. Co. v. Illinois Dept. of Transp.*, 709 F.2d 471 (7th Cir. 1983); *Conn. Gen. Life Ins. Co. v. Shelton*, 611 S.W.2d 928 (Tex. Ct. App. 1981).

16 Unfair Trade Practices Act, Sec. 4(A)(1). http://www.naic.org/store/free/MDL-880.pdf.

17 https://www.lexisnexis.com/legalnewsroom/constitution/b/constitutional-civil-rights/archive/2013/09/05/punitive-damages-over-10-1-violates-due-process.aspx?Redirected=true; In a number of cases, the Courts have indicated that a 4:1 ratio between punitive and compensatory damages is high enough to lead to a finding of constitutional impropriety, and that any ratio of 10:1 or higher is almost certainly unconstitutional. In *Arellano v. Primerica Life Ins. Co.*, 235 Ariz. 371, 332 P.3d 597 (App. 2014), The court lowered punitive damages to a 4:1 ratio where the insurer had no good reason to deny a $150,000 death claim and key claim documents were forged while in the control of the insurer. There, the Arizona Court of Appeals found that the insurer's acts had been merely "moderately reprehensible".

18 Insurers have learned to not respond to "paper discovery" using respected local lawyers to perpetrate acts of unfair claim handling. Although American Bar Association Model Ethical Rule 4.4 prohibits a lawyer from using "means that have no substantial purpose other than to embarrass, delay, or burden any other person…" insurers simply do not turn over admissible evidence to their lawyers who can thereafter disavow direct knowledge of applicable documents. *See,* http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_p rofessional_conduct/rule_4_4_respect_for_rights_of_third_persons.html).

19 The hierarchy of insurance claim adjusters (from bottom to top) is generally: adjuster, supervisor, manager, vice-president, executive vice-president, chief executive officer, board of directors.

20 All insurers in all states are always required to have and maintain a claim manual. Unfair Claim Settlement Practices Act, Sec. 4(C). http://www.insurance.naic.org/store/free/MDL-900.pdf ("Any of the following acts by an insurer, if committed in violation of Section 3, constitutes an unfair claims practice.…C. Failing to adopt and implement reasonable standards for the prompt     investigation and settlement of claims arising under its policies.").

21 http://www.consumerwatchdog.org/story/regulators-enjoy-cozy-relationship-insurance-industry; https://www.washingtonpost.com/investigations/drinks-junkets-and-jobs-how-the-insurance-industry-courts-state-commissioners/2016/10/02/1069e7a0-6add-11e6-99bf-f0cf3a6449a6_story.html.

22 http://www.nytimes.com/1994/10/20/business/new-report-is-critical-of-states-on-regulation-of-insurers.html.

23 http://www.naic.org/store/free/MDL-440.pdf.

24 http://www.duanemorris.com/alerts/naic_summer_2015_meeting_orsa_and_confidentiality_0815.html.

25 Corporate Governance Annual Disclosure Model Act 7-28-2014 draft.

26 *Id.*

27 http://www.bloomberg.com/news/articles/2006-04-30/in-tough-hands-at-allstate.

28 The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); NAIC Insurance Information and Privacy Protection Model Act, http://www.naic.org/store/free/MDL-670.pdf.

29    https://www.sec.gov/answers/execomp.htm.

30    McEwan, *ERM: An Opportunity for Organizational Development*, 2 CPCU Society Insights, Issue 4 at 10 (CPCU Society, Winter 2015).

31    https://www.cpcusociety.org/membership/ethics/ethics-awareness-month; http://www.independentagent.com/Updates/Lists/Posts/Post.aspx?ID=85; http://www.prweb.com/releases/2007/03/prweb508828.htm.

32    CAL. INS. CODE §§ 936.1 to 963.9 (2015); IND. CODE ANN. § 27-1-4.1 (2015); IOWA CODE ANN. § 521h (2015); LA. REV. STAT. §§ 22:691.31 to 22:691.38 (2015); VT. STAT. ANN. tit. 8 § 3316 (2015).

33    2016 CONN. ACTS 206 (2016); FLA. STAT. ANN. § 628.8015 (2016); NEB. REV. STAT. § 44-4404 (2016); N.H. REV. STAT. ANN. §§ 401-D: 1 to 401-D:9 (2016); OHIO REV. CODE ANN. §§ 3901.072 to 3901.077 (2016); R.I. GEN. LAWS §§ 27-1.2-1 to 27-1.2-9 (2016).

34    http://www.naic.org/cipr_topics/topic_accreditation.htm.

35    Public Law 111-148 (2010).

36    31 U.S.C. Sec. 312(p)(1) and (2)(C) and (E) ("[The] Director shall conduct a study ... on how to modernize and improve the system of insurance regulation in the United States .... [considering] [c]onsumer protection for insurance products and practices, including gaps in State regulation [and].... [t]he ability of any potential Federal regulation or Federal regulator to provide robust consumer protection for policyholders.") *But see*, "The Annual Report on the Insurance Industry" (Federal Insurance Office, U.S. Department of the Treasury (September 30, 2016) (does not include results of any study to modernize and improve the system of insurance regulation in the United States considering consumer protection for insurance products and practices.).

17